RECEIVED

MAY 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CAROL A. FORTI,**
Plaintiff,

v.

**Civil Action No. 1:06CV00613 JR**

**W.C. & A.N. MILLER DEVELOPMENT CO. et al.**
Defendants

**JUNE HUMBERT, AGENT, W.C. & A.N. MILLER**
Defendant,

**GEORGE MASSON, JR. AND HAMILTON AND HAMILTON LLP (COUNSEL TO W.C. & A.N. MILLER)**
Defendants

### MOTION FOR SUMMARY JUDGMENT AGAINST THE ABOVE-NAMED DEFENDANTS

**I.      Material facts that are not in dispute.**

1.      The advertisement that Forti ran in the <u>Washington Post</u> for the sale of her home was merely an invitation or solicitation to make offers. It was not an offer itself.

2.      June Humbert, an experienced agent of W.C. & A.N. Miller, recognized that the Washington Post ad was not an offer. After showing Forti's home to buyers Chong and Zanforlin, Humbert prepared a Purchase Offer for buyers Chong and Zanforlin and presented it to Forti. The Purchase Offer included an Escalator Clause Addendum. According to the terms of the Escalator Clause Addendum, Chong and Zanforlin offered to pay Forti $5,000 in Net Proceeds above the Net Proceeds of the next highest offer for title to her home at 2936 Garfield Terrace, N.W.  <u>Webster's New Collegiate Dictionary</u> defines "net" as "free from all charges and deductions." Since the

next highest offer was for 945,000 in Net Proceeds, Chong and Zanforlin contracted to pay Forti $950,000 in Net Proceeds. That this amount was the contract price is admitted by Chong, Zanforlin, Agulia, and Hardie in their Answer, p.3, line 15.

      3.     Forti reasonably interpreted the Chong/Zanforlin Purchase Offer as offering $950,000 in Net Proceeds.

      4     According to first sentence of the text of the Escalator Clause Addendum, "the parties agree that the following provisions are incorporated into the referenced Contract and shall supercede any provisions to the contrary in said Contract." Thus, the provisions of the Escalator Clause Addendum take precedence of any conflicting provisions in the Contract.

      5.     The phrase, "commission 3 % to be paid to W.C. & A.N. Miller at settlement" was written into the contract and does not say who is to pay a commission. Humbert identified herself to Forti at their first meeting as the buyer's exclusive broker and stated that she represented their interests exclusively, an identification that she memorialized on page 1 of 1 of the Disclosure of Brokerage Relationship of the Purchase Offer. Since the Escalator Clause Addendum promised Forti $950,000 in Net Proceeds, the Escalator Clause Addendum precludes any deduction from $950,000 of a commission for Miller. For all of these reasons, Seller Forti reasonably assumed, when she selected the Chong/Zanforlin Purchase Offer over the next highest Purchase Offer for $945,000 that the phrase written into the contract by Humbert referred to some prior agreement between buyers and buyers' broker Humbert for buyers to pay Humbert a 3 percent commission.

6.    Humbert reviewed the next highest Purchase Offer for $945,000 in Forti's kitchen and went through the Purchase Offer page by page in Forti's presence. She also reviewed the earnest money check for $45,000 that accompanied the other Purchase Offer. Forti offered to have the Purchase Offer and earnest money check xeroxed for Humbert, but Humbert said that was not necessary, because she was satisfied that the other Purchase Offer was bona fide. Miller, Masson, Agulia, and Hardie did not challenge the bona fide nature of the other Purchase Offer until after Forti had refused to pay Miller a 3 percent commission at settlement.

7.    Since the seller of the townhouse that Forti was buying had insisted that Forti go to settlement on the townhouse on April 29, 2002, that settlement date was made a specific provision in the Purchase Offer that Humbert prepared for Chong and Zanforlin. What Forti envisaged was "back to back" settlements—first on her property, then on the townhouse.

8.    Based on the clear language of the Escalator Clause Addendum in the Purchase Offer and Humbert's assurances that Chong and Zanforlin would pay her $950,000 in Net Proceeds and would go to settlement on April 29, 2002, Forti told Humbert that she would select the Chong/Zanforlin Purchase Offer over the next highest purchase offer for $945,000.

9.    About one week prior to settlement, Forti told Finkelstein's wife (who prepares settlement papers for him) that she did not owe Miller a commission and told her make sure that the HUD Settlement Sheet reflected that fact. She also left a second message for Finkelstein, directing him to fax to her the HUD Settlement Sheet five days

3

in advance of settlement. Finkelstein, however, ignored both of these instructions.

10.    Finkelstein informed Humbert that there was an Assignment of Proceeds on the transaction in which part of the proceeds to be received by Forti at settlement on her house would go directly to the settlement company to pay the balance that Forti owed on the townhouse that she was buying. Finkelstein and Humbert apparently concluded that the Assignment of Proceeds on the sale of Forti's property could provide leverage in forcing Forti to pay a commission to Miller that Forti did not owe. Apparently, this is why Forti did not receive the HUD Settlement Sheet in advance of settlement as she had requested.

11.    "To prove civil fraud, a plaintiff must show "false representation of a material fact which is made with knowledge of its falsity, with intent to deceive, on which the victim took action in justified reliance upon the misrepresentation." Furash & Co., Inc. v. McClave, 130 F. Supp. 2d 48, 55, citing Pyne v. Jamaica Nutrition Holdings, Ltd., 497 A.2d 118, 131 (D.C. App. 1985), citing Bennett v. Kiggins, 377 A. 2d 57, 59 (D.C. App 1977), cert denied, 434 U.S. 1034, 98 S.Ct 768, 54 L.Ed.2d 782 (1978). Civil conspiracy requires an agreement between two or more parties to take part in an unlawful action, and an overt tortious act in furtherance of the agreement that causes injury. Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983); International Underwriters, Inc. v Boyle, 365 A.2d 779,784 (D.C. App. 1976). After inducing Forti to select the Chong/Zanforlin offer over the next highest offer, Humbert, Miller (through its agent Humbert), Chong, and Zanforlin ignored the existence and terms of the Escalator Clause Addendum. All the these defendants made false representation of a material fact that

4

Chong and Zanforlin would pay $950,000 in Net Proceeds for title to Forti's property with knowledge of its falsity and with intent to deceive. Forti took justifiable reliance upon the misrepresentation, which resulted in substantial financial injury to Forti. These facts contain all the elements of civil fraud. These facts also contain all the elements of conspiracy to commit civil fraud. From the facts, it can be inferred that there was an agreement among Humbert, Miller, Chong, and Zanforlin to act unlawfully and their overt tortious acts caused substantial financial injury to Forti.

12.    Settlement attorney Nathan Finkelstein became part of the conspiracy by drawing up a HUD Settlement Sheet that treated the $950,000 in Net Proceeds as Sales Price and assigned a $28,500 commission to Miller out of Forti's Net Proceeds of $950,000. Finkelstein drew up the HUD Settlement Sheet in this manner despite the fact that Paragraph 21 of the Regional Sales Contract directed him "to pay the broker compensation as set forth in the listing agreement ... as of the Contract Date." He deducted a commission for Miller on the Settlement Sheet despite the fact there was no listing agreement between Forti and Miller, no employment contract between Forti and Miller, and no agreement reflecting a seller /agent relationship between Forti and Miller. Apparently, Finkelstein did not fax the HUD Settlement Sheet to Forti in advance of settlement as she had requested, because Humbert and Finkelstein did not want her to see that the HUD Settlement Sheet deducted a commission for Miller.

13.    In violation of the contract principle of mutual mistake, defendants took advantage of a mistake (known to both parties) when Seller Forti wrote in $950,000 next to NEW SALES PRICE on the printed form but did not cross out NEW SALES PRICE

5

and write in NET PROCEEDS. "Where a mistake of one party was made as to a basic

assumption on which she made the contract has a material effect on the agreed exchange

of performance that is adverse to her, the contract is voidable by her if (a) the effect of

the mistake is such that enforcement of the contract would be unconscionable, or (b) the

other party had reason to know of the mistake." Restatement (Second) of Contracts,

Section 153.

14    At settlement on April 29, 2002, Humbert, Chong, and Zanforlin refused

to pay $950,000 in Net Proceeds as promised in the Chong/Zanforlin Purchase Offer,

thereby preventing settlement on April 29, 2002.

15.    Humbert, Finkelstein, Chong, and Zanforlin used the Assignment of

Proceeds on the sale of Forti's home in an attempt to force Forti to pay a commission or

risk losing the townhouse that she was planning to buy using proceeds from the sale of

her home.

16.    Humbert is liable to Forti for tortious interference with contract by

persuading buyers to breach the contract by writing in a commission for Miller. Humbert

is also liable to Forti for tortious interference by refusing the escrow the disputed

commission and by persuading buyers Chong/Zanforlin to refuse to escrow the disputed

commission. Both of these actions by Humbert prevented settlement on April 29, 2002.

17.    Although Forti has asked that the HUD Settlement Sheet be faxed to her in

advance of settlement, Finkelstein did not fax it to her, and she did not see the HUD

Settlement Sheet until the day of settlement. When she saw the HUD Settlement Sheet,

Forti was furious. She told Humbert, the buyers, and Finkelstein that she did not owe

6

Miller any commission and would not sign any HUD settlement sheet that did not reflect Chong/Zanforlin's contractual agreement to pay her $950,000 in Net Proceeds. After inducing Forti to select the Chong/Zanforlin offer over the next highest offer, Humbert, Miller , Chong and Zanforlin all ignored the existence and terms of the Escalator Clause Addendum.

18.    Finkelstein's fall-back position was to suggest that the disputed commission be escrowed, so that settlement could proceed. Forti agreed to this suggestion reluctantly, because she had not anticipated fraud and had not obtained a loan to pay the balance on the townhouse. Humbert, however, refused to escrow the disputed funds, and persuaded Chong and Zanforlin not to escrow the disputed funds. Thus, Chong and Zanforlin breached their contractual agreement to pay Forti $950,000 in Net Proceeds on April 29, 2001—the settlement date specified in the contract.

19.    On or about May 8, 2002, Humbert and buyers Chong and Zanforlin decided that they were willing to escrow the disputed commission. An escrow agreement was signed and settlement took place on May 10, 2002.

20.    By and through George Masson, Jr., W.C. & A.N. Miller sued Forti for a commission despite the fact that Miller was barred from receipt of a commission by D.C. Code and D.C. case law. "A licensee (Miller in this case) shall not receive payment of a commission in the absence of a written listing agreement." D.C. Code sec. 42-1705. The District of Columbia Court of Appeals has interpreted this provision to require proof of an employment contract between seller and broker in which the seller agrees to pay the broker a commission for procuring buyers before a broker may receive a commission.

Eggleton v. Vaughan, 45 A.2d 362, 363 (D.C. App. 1946): "One seeking to obtain compensation as an agent must prove his contract of employment before he can recover for work done for an alleged principal. The fact that one is the procuring cause of a sale does <u>not</u> entitle him to a commission unless he had authority to sell." <u>Id.</u> [Emphasis added.] There was no employment contract between Forti and Miller. In <u>Fred Ezra Co. v. Pedas</u>, 682 A.2d 173, 176 (D.C. App. 1996), this Court affirmed that "in order for a broker, as agent, to recover against a seller, as principal, the broker must first establish that they voluntarily entered into a principal-agent relationship that gives rise to the broker's contractual right to a commission." Forti did not enter into a principal-agent relationship with Miller. Since Forti did not sign an employment contract with Miller or enter into a principal-agent relationship with Miller, Forti clearly did not owe Miller a commission.

Since Miller has operated as a real estate company in D.C. for 92 years, Miller's management and brokers knew that D.C. Code 42-1705 prohibited receipt of a commission absent proof that the seller and broker have voluntarily entered into an employment contract in which the seller had agreed to pay a commission for the procurement of buyers. There was no employment contract between Forti and Miller.

21.    Miller, Humbert, Masson, Chong, Zanforlin, Agulia, and Hardie all knew what the Court of Appeals had stated in <u>Eggleston v. Vaughan</u>, 45 A. 2d 362, 363 (D.C. App 1946). They knew that there was no employment contract between Forti and Miller and that Forti owed Miller no commission. Despite that knowledge, they litigated against Forti for a commission.

8

22.     Miller, Humbert, Masson, Chong, Zanforlin, Agulia, and Hardie all knew what the Court of Appeals had stated in Fred Ezra Co. v. Pedas, 682 A. 2d 173, 176 (D.C. App. 1996). They knew that in the instant case there was no principal-agent relationship or contract between Forti and Miller and that Forti owed Miller no commission. Despite that knowledge, they litigated against Forti for a commission.

23.     In an egregious example of reversible error, the trial judge in Superior Court granted summary judgment to Miller regarding the commission and dismissed the actions for breach of contract and consequential damages against Chong and Zanforlin. As a result of the litigation, Forti was left with net proceeds of $921,500. No reasonable seller would select an offer worth $921,500 in net proceeds when she had an offer for $945,000 in net proceeds, and Forti is a reasonable seller.

24.     Miller sought and obtained attorneys fees and costs in the amount of $49,585.49 for litigating for a commission from which it was barred by D.C. Code and D.C. case law. Despite Chong/Zanforlin's clear breach of contract and Forti's undeniable right to consequential damages, Chong and Zanforlin were awarded attorney's fees and costs in the amount of $54,655.16.

25.     Miller, Humbert, Masson, Chong, Zanforlin, Agulia, and Hardie further compounded their malice against Forti further by placing a lien on property that Forti owns in Arnold, Maryland in the amount of the attorney's fees and costs and threatened to have the sheriff's office auction it off at less than market value to pay the lien. Forti had to hire a Maryland firm to represent her and work out a settlement agreement to avoid having her land sold for far less than it is worth. Miller, Humbert, Masson, Chong,

9

Zanforlin, Agulia and Hardie are all liable for civil conspiracy. Their common actions in litigating against Forti for a commission when Forti owed Miller no commission pursuant to D.C. Code and D.C. case law showed that there was an agreement between eight parties to act unlawfully and their overt tortious acts caused substantial financial injury to Forti. Miller, Humbert, Masson, Chong, Zanforlin, Agulia, and Hardie conspired to litigate a colorless, wanton, lawsuit against Forti and, by means of this litigation, forced her to pay a commission that she did not owe.

      26.    The attorneys named in the conspiracy knew of the wrongful conduct and were actively involved in the wrongful conduct. To substantiate a conspiracy claim, the plaintiff must establish that the attorneys did not act within the role of an advisor and merely advise, but instead knew of the clients' wrongful conduct and were actively involved in the wrongful conduct. See McElhanon v. Hing, 728 P.2d 256, 264-265 (Ariz.App 1985) cert denied, 481 U.S. 1030, 107 S.Ct 1956, 95 L.Ed.2d 529 (1987). Attorneys are liable for the intentional torts of malicious prosecution and abuse of process. The privilege an attorney has for his actions in representing a client is a qualified one that does not extend to the intentional torts of malicious prosecution and abuse of process. Id. Nor should the privilege apply to the intentional acts of furthering and participating in a fraudulent conveyance. Id. The attorneys named as part of the conspiracy did not merely advise. Finkelstein did the bidding of Miller and drew up a HUD Settlement Sheet that ignored the express terms of the contract that Chong and Zanforlin signed with Forti. Masson, Agulia, and Hardie litigated a completely colorless bad faith lawsuit against Forti and they did so wantonly and maliciously in willful

10

disregard of Forti's rights.

## II.    AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT.

## 1.    SINCE ADVERTISEMENTS ARE SOLICITATIONS TO MAKE AN OFFER—NOT OFFERS THEMSELVES, FORTI'S ADVERTISEMENT IN THE WASHINGTON POST, WHICH INCLUDED THE PHRASE "CO-OP 3 %, CREATED NO POWER OF ACCEPTANCE IN MILLER OR JUNE HUMBERT AND NO OBLIGATION TO PAY MILLER A 3 PERCENT COMMISSION.

Advertisements are solicitations to make an offer—not offers themselves.

"Advertisements are uniformly regarded as mere preliminary invitations which create no

power of acceptance in the recipient." Foremost Pro Color, Inc. v. Eastman Kodak Co.,

703 F.2d 534, 539 (9th Cir. 1983), cert denied, 104 S.Ct 1315, 465 U.S. 1038, 79 L.Ed 2d

712 (1984). The Court of Appeals for the District of Columbia Circuit elaborated on this

principle in Mesaros v. United States , stating that advertisements by the United States

Mint which solicited orders for commemorative coins were "no more than invitations to

deal." According to the same court, the "great weight of authority" is that

"advertisements" are "mere solicitations for offers which create no power of acceptance

in the offeree." Mesaros v. United States, 845 F.2d 1576, 1580 (D.C. Cir. 1988). The

general rule is that advertisements are not offers. A Treatise on the Law of Contracts by

Samuel Williston, 4th Edition by Richard A. Lord, West Group, section 4:7. This rule is

grounded on various bases, including the potential unlimited liability of the offeror if an

offer is held to exist. In virtually all of these cases, a promissory undertaking is absent

and in all of these cases, a reasonable person receiving the communication has reason to

know, from the circumstances under which the manifestation is made, that no offer exists.

Thus, the Supreme Court and the Court of Appeals for the D.C. Circuit support the view

that the advertisement in the <u>Washington Post</u> for sale of Forti's home, including the

phrase "co-op 3 %," was a solicitation to make an offer—not an offer creating the power

of acceptance in the offeree.

## 2.    A CONTRACT IS NOT AMBIGUOUS IF IT IS REASONABLY SUSCEPTIBLE TO ONLY ONE INTERPRETATION AND CONSTRUCTION.

"Whether a contract is ambiguous is a question of law." <u>Washington Properties v.</u>

<u>Chin</u>, 760 A.2d 546, 548 (2000). "A contract is not ambiguous merely because the parties

disagree over its meaning…A contract is ambiguous when and only when the provisions

in controversy are reasonably…susceptible …to two or more different meanings." <u>Id</u>. "It

is not ambiguous where the court can determine its meaning without any other guide than

a knowledge of the simple facts on which, from the nature of language in general, its

meaning depends." <u>Id</u>.  The contract in the instant case is reasonably susceptible to only

one interpretation and construction, and, therefore, it is not ambiguous.

## 3.    INTERPRETATION AND CONSTRUCTION OF AN UNAMBIGUOUS CONTRACT IS THE FUNCTION OF THE TRIAL JUDGE.

Interpretation of a contract is ascertaining the meaning of words used in a

contract. Construction is the process of determining the legal effect of those words. <u>A</u>

<u>Treatise on the Law of Contracts, supra</u> at section 30:1.  Although the terms

"interpretation" and "construction" are often used synonymously, there is a distinction.

"Through 'interpretation' of a contract, a court determines the meanings that the parties,

when contracting, gave to the language used.  Through 'construction' of a contract, a

court determines the legal operation of the contract—its effect upon the rights and duties

of the parties." <u>Corbin on Contracts</u>, Revised Edition, section 24.3. It is the function of

the trial judge to interpret the meaning of the words and construe the legal effect of those words in the contract between buyers Chong/Zanforlin and seller Forti.

### 4.    PARTICULAR WORDS MAY NOT BE CONSIDERED IN ISOLATION.

An "elementary canon of interpretation is that particular words may not be considered in isolation but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties and the intention which they have manifested in forming them." O'Brien v. Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469, 473 (1897). Construing the contract as a whole leads ineluctably to the conclusion that the Chong/Zanforlin offer promised Ms. Forti $950,000 in net proceeds.

### 5.    THE COURT MUST CONSTRUE THE ENTIRE CONTRACT.

Even if certain words, standing alone, are unambiguous, the court must construe the entire contract. O'Brien v. Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469, 473 (1897). In the contract in question, the two words "SALES PRICE" before the number $950,000 may not be ambiguous standing alone, but they must be interpreted in view of the Escalator Clause Addendum. If the contract is interpreted as a whole and all of the provisions read together, the only reasonable construction is that $950,000 represents net proceeds--the amount that Chong & Zanforlin offered seller Forti for her home and are legally obligated to pay her.

In interpreting any particular clause of a contract, the court is required to examine the entire contract. Chicago, R.I. & P. RY.Co. v.Denver & R.G.R. Co., 12 S.Ct 479, 143 U.S. 596, 36 L.Ed 277 (1892). The phrase that Humbert wrote under Paragraph 33 of the

13

Regional Sales Contract: "Commission 3% to be paid to W.C.& A.N. Miller at settlement" imposes no legal obligation on Seller in light of the fact that Forti did not sign any contract with Miller or Humbert agreeing to pay Miller a 3 percent commission.

## 6.    THE PRIMARY FUNCTION OF THE COURT IS TO ASCERTAIN THE INTENTION OF THE PARTIES.

"In the interpretation, and ultimately in the construction of contracts, the primary function of the court is to ascertain the intention of the parties." U.S. v. Moorman, 70 S.Ct 288, 338 U.S. 457, 94 L.Ed 256 (1950). "The intention of the parties is to be gathered, not from a single sentence but from the whole instrument read in light of the circumstances existing at the time of negotiations leading up to its execution." Miller v. Robertson, 45 S.Ct 73, 77, 266 U.S. 243, 251, 69 L.Ed 265, 272 (1924). By making an initial offer of $915,000 and having it escalate automatically to provide $5,000 in net proceeds above the net proceeds of the next highest offer up to $975,000, the clear intention of the Buyers and Broker in using the Escalator Clause Addendum was to have this offer selected over all other offers in a very "hot" market with a small inventory of homes for sale. The Escalator Clause Addendum offered net proceeds of $5,000 above the net proceeds of the next highest offer. Since the net proceeds of the next highest offer was $945,000, the Chong/Zanforlin contract promised net proceeds of $950,000. The intention of the Seller was to accept the Chong/Zanforlin offer for $950,000 in net proceeds.

## 7.    A PROMISOR'S OBLIGATION IS DETERMINED BY THE OBJECTIVE TEST OF WHAT HIS PROMISE WOULD BE UNDERSTOOD TO MEAN BY A REASONABLE PROMISEE.

The "law of contracts does not judge a promissor's obligation by what is in his

14

mind, but by the objective test of what his promise would be understood to mean by a reasonable person in the situation of the promisee." This legal principle was enunciated by the Court of Appeals for the Second Circuit and affirmed by the Supreme Court. Lee v. State Bank & Trust Co., 54 F.2d 518, 521 (2nd Cir. 1931), cert denied 52 S.Ct 395, 285 U.S. 547, 76 L.Ed 938. The Court of Appeals for the District of Columbia also supports this test. "The first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant." Washington Properties, Inc. v. Chin, Inc., 760 A.2d 546, 548 (D.C.App. 2000) citing Dodek v. CF 16 Corp., 537 A.2d 1086, 1093 (D.C. App. 1988). The court "must determine what a reasonable person in the position of the parties would have thought the disputed language meant." Capitol City Mortg. v. Habana Village Art & Folklore, Inc, 747 A.2d 564, 567 (D.C. App. 2000). A reasonable person in the situation of the promisee (Seller Forti) would interpret the Chong/Zanforlin contract as offering $950,000 in net proceeds. Otherwise, she would have no reason to select the Chong/Zanforlin contract over the next highest offer, which promised net proceeds of $945,000.

**8.    ANY AMBIGUITY IN A CONTRACT SHOULD BE CONSTRUED MOST STRONGLY AGAINST THE PARTIES WHO PREPARED THE CONTRACT.**

"If there is any doubt arising from the language used as to its proper meaning or construction, the words should be construed most strongly against the company, because their officers or agents prepared the instrument." Texas & P.R.Co. v. Reiss, 22 S.Ct 253, 255, 183 U.S. 621, 626, 46 L.Ed 358, 360 (1902). It is "reasonable and just" that the company's own words "should be construed most strongly against it." Moulor v.American Life Ins. Co., 4 S.Ct 466, 469, 111 U.S. 335, 342, 28 L.Ed 358, 447, 449

(1983). Further support for this legal principle comes from the Court of Appeals for the District of Columbia Circuit and from the District of Columbia Court of Appeals. "A canon of construction is that ambiguity in a contract is interpreted against the drafter." Gray v. American Express Co., 743 F.2d 10, 18 (D.C.Cir. 1984). "If, after applying the rules of contract interpretation, the terms are still not subject to one definite meaning, the ambiguities will be construed strongly against the drafter." Capitol City Mortg. Corp. v. Habana Village Art & Folklore, Inc., 747 A.2d 564, 567 (D.C. App. 2000). "Ambiguous language in a contract will be construed against the company." Meade v. Prudential Insurance Co. , 477 A.2d 726, 728 (D.C. App. 1984). June Humbert, the buyers' broker, told Seller Forti that the Escalator Clause Addendum was prepared by an attorney for W.C.& A.N. Miller. Humbert, an agent of W.C. & A.N. Miller, wrote the Offer that she submitted to seller Forti on behalf of Chong and Zanforlin. Thus, any ambiguity in the contract must be construed most strongly against agent Humbert and her principal, W.C. & A.N. Miller.

"The general principles of law governing the interpretation or construction or contracts generally are applicable to a real estate broker's contract of employment." R. Lord, Williston on Contracts, sec. 62.18. "As with any other contract, the primary object in interpreting a real estate broker's contract is to give effect to the intention of the parties." Id. "A real estate brokerage contract generally arises by virtue of a pre-arranged agreement between the parties." Seller Forti did not enter into a listing agreement with Miller or Humbert to sell her home, and she did not enter into any agreement with Miller or Humbert to pay a 3 percent commission. Only "under a contract" which provides that

16

the "broker is employed [by the seller]" to find a buyer ready and willing to purchase and

provides for a commission for the broker's services in procuring a purchaser," is the

broker "entitled to a commission." R. Lord, <u>Williston on Contracts</u>, sec. 6219. Seller

Forti did not retain Miller or Humbert to act as seller's broker. For Forti to be liable for a

3 percent commission to Miller, Forti would have had to enter into a written agreement

with Miller agreeing to pay Miller a 3 percent commission. Forti did not sign an

agreement with Miller agreeing to pay Miller a 3 percent commission.

The Escalator Clause Addendum, which is Page 1 of the Contract, promised

Seller Forti $5,000 in Net Proceeds above the Net Proceeds of the next highest Offer,

which was for Net Proceeds of $945,000. Thus, the Chong/Zanforlin Offer to Forti was

for $950,000 in Net Proceeds. The Escalator Clause Addendum precluded deducting a

commission from Forti's Net Proceeds of $950,000. In addition, no reasonable Seller

would select the Chong/Zanforlin Offer over the next highest Offer if a 3 percent

commission was to be deducted from $950,000, leaving Seller with Net Proceeds of

$921,500 when she would have received $945,000 in Net Proceeds by selecting the next

highest Offer. "Any ambiguity [in a contract] with respect to broker's right to a

commission will generally be resolved against the broker." R. Lord, <u>Williston on

Contracts</u>, sec. 62.18.  It is well settled that "ambiguities in a contract are more strictly

construed against the drafter. This rule is especially true when the drafter has greater

professional or business knowledge, such as a real estate broker." R. Lord, <u>Williston on

Contracts</u>, sec. 62.18. If any ambiguity exists in the contract, Humbert created the

ambiguity, and since Humbert is Miller's agent, that ambiguity must be construed against

17

Miller.

## 9.    JUNE HUMBERT IS LIABLE TO FORTI FOR TORTIOUS INTERFERENCE WITH CONTRACT.

That June Humbert is liable to Forti for tortious interference with contract is supported by Casco Maine Development L.L.C. v. District of Columbia Redevelopment Land Agency et al., 834 A.2d 77, 83 (D.C.App. 2003). In that case, the Court of Appeals for the District of Columbia stated that the "elements of tortious interference with contract are (1) existence of the contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach." Humbert had knowledge of the contract. She intentionally procured a breach of the contract by buyers Chong and Zanforlin by conspiring with Finkelstein to insert a commission for Miller on the HUD Settlement Sheet. She also engaged in tortious interference with contact by refusing to escrow the disputed funds and by persuading the buyers to refuse to escrow the disputed funds. Forti was damaged substantially by the breach of contract and by the refusal to escrow the disputed amount and allow settlement to proceed.

As proven by the terms of the Escalator Clause Addendum, Buyers believed that seller's home was worth $975,000 and expressed a willingness to pay up to that price in order to have their Purchase Offer selected by Forti.

The Restatement (Second) of Contracts, published by the American Law Institute, Section 153 is entitled: "When Mistake of One Party Makes a Contract Voidable." According to the Restatement, "where a mistake of one party was made as to a basic assumption on which she made the contract has a material effect on the agreed

18

exchange of performance that is adverse to her, the contract is voidable by her if (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake." Forti could have legally voided the contract. However, Forti believed that reformation of the contract by the court rather than avoidance of the contract was more reasonable for both parties. To deny Forti the additional $28,500 that the Chong/Zanforlin contract promised her would be unconscionable. The other party had reason to know of the mistake, because Forti attempted to reason with Chong, in order to avoid the time and expense of litigation. However, Chong refused to listen to reason and referred Forti to his attorney, Richard Agulia. If the trial judge views the contract in its entirety, including the Escalator Clause Addendum, which "both parties agree takes precedence over any conflicting terms in the contract," the $950,000 figure that Ms. Forti wrote after "SALES PRICE" on the pre-printed form clearly refers to "NET PROCEEDS."

The Court of Appeals for the District of Columbia takes the same approach as Williston and the Restatement on interpretation and construction of contracts. "Whether or not a contract is ambiguous is a question of law for the court." Gryce v. Lavine, 675 A.2d 67 (D.C. App. 1996). "If the meaning of the contract is so clear that reasonable men could reach but one conclusion or no extrinsic evidence is necessary to determine the contract's meaning, the contract's interpretation is a matter for the court." Howard University v. Best, 484 A.2d 958 (D.C. App. 1984). "A contract is not rendered 'ambiguous' merely because the parties disagree over its proper interpretation." A contract is ambiguous when, and only when, it is, or provisions in controversy are

19

reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings." Gryce v. Lavine, supra at 74. "Contract language is ambiguous if it is susceptible of more than one reasonable interpretation." American Bldg Maintenance Co. v. L'Enfant Plaza, 655 A.2d 858 (D.C.App. 1995). "If the contract is ambiguous, its language should be read in light of all surrounding facts and circumstances, including the conduct of the parties." Id. "When a court is faced with an integrated agreement which contains ambiguous terms, the standard of interpretation is what a reasonable person in the position of the parties would have thought it meant." Howard University v. Best, supra at 958. Interpreting the $950,000 as "net proceeds" is consistent with the promises made by buyers Chong/Zanforlin to seller Forti in the Escalator Clause Addendum of the sales contract. Interpreting $950,000 as Sales Price with no deduction for a commission is consistent with the expectations of a reasonable person in the position of seller Forti. Interpreting $950,000 as Sales Price and deducting a $28,500 commission for Miller, which Seller did not agree to pay, is unreasonable and unconscionable. Humbert had reason to know that Forti had simply made a mistake by not crossing out the words "SALES PRICE," which appeared on the printed form and writing in the words, "NET PROCEEDS." Nevertheless, Miller, Humbert, Masson, Hamilton and Hamilton, Chong, Zanforlin, Agulia, and Hardie jointly defrauded Forti of $29,850.70 held in escrow.

Seller's offer to pay Humbert $4,000 was NOT an admission that she owed a 3 percent commission. Seller knew that she did NOT owe Humbert a 3 percent commission. She had no legal obligation to pay Humbert anything. She offered to pay

Humbert $4,000 for introducing two credit worthy buyers to her, while the quality of her home sold itself.

The basic rule for mistake of both parties as to its expression is stated in Restatement (Second) of Contracts section 155. "It allows reformation [by the court] where the parties are mistaken in thinking that a writing correctly expresses an agreement that they have previously reached." Id. Under the rule stated in section 156, the Statute of Frauds "does not prevent reformation as an equitable remedy."

Id. "Section 156 states a rule that is substantially more liberal than that of former section 509 in allowing reformation in spite of the Statute of Frauds." Id. "If there is a mistake of only one party as to expression"...[and] "her mistake is in believing that a writing correctly expresses that agreement, the problem is one of the effect of the [other party's] failure to disclose this fact. Non-disclosure [by the other party] may be tantamount to misrepresentation." Restatement (Second) of Contracts, supra at 160-61

According to Restatement Second of Contracts, the "law of mistake was shaped largely by courts of equity which had broad discretionary powers." Id. "Flexibility marks the rules [of mistake] as evidenced by such necessarily imprecise language as 'materially' (section 152) and 'unconscionable'." (section 153). Id. "Section 158 makes clear that if these rules will not suffice to do substantial justice, it is within the trial court's discretion to grant relief on such terms as justice requires." Id.

Equitable reformation of this contract is permitted under either mutual mistake or unilateral mistake as the legal reasoning in Air Line Pilots Association v. Shuttle, Inc., 55 F. Supp. 2d 47 (D.D.C. 1999) proves. Mutual mistake occurred if Forti intended the

21

$950,000 to refer to NET PROCEEDS, and appellees intended the $950,000 to refer to "SALES PRICE" Price from which they could deduct a commission. Mutual mistake allows reformation of a contract when clear and convincing evidence demonstrates that "a mistake was made in the drafting of an instrument so that the written instrument fails to express the true agreement of the parties." Air Line Pilots, supra at 52. If Forti's mistake in not crossing out "SALES PRICE" on the printed form and inserting "NET PROCEEDS" is deemed a unilateral mistake, equitable reform is also permitted, because the facts in the instant case evidence fraud. June Humbert and the buyers knew very well that Forti had only selected the Chong/Zanforlin purchase offer, because the Escalator Clause Addendum automatically increased the Chong/Zanforlin offer to $5,000 in Net Proceeds over the Net Proceeds of the next highest offer ($945,000 in Net Proceeds) to make the Chong/Zanforlin offer $950,000 in Net Proceeds. It is fraud in the inducement to offer Net Proceeds of $5,000 above the Net Proceeds of the next highest offer in order to get the contract and then try to interpret the $950,000 as "Sales Price" from which a commission could be deducted. A written instrument may be reformed when there is mistake on one side and fraud or inequitable conduct on the other. American Jurisprudence, 2nd Edition, section 27. Unilateral mistake may be the basis for relief when it is accompanied by fraud or is known to the other party. Id. In the case at bar, Forti's mistake was clearly known by Humbert, Chong, Zanforlin, and Finkelstein. All four committed fraud. Miller, Humbert, Masson, and Hamilton and Hamilton are all jointly liable with Chong, Zanforlin, Agulia, and Hardie to Forti for civil fraud and conspiracy to commit civil fraud.

22

**10.    MILLER, HUMBERT, MASSON, AND HAMILTON AND HAMILTON HAVE ENGAGED IN BAD FAITH LITIGATION TACTCS AND SHOULD BE SANCTIONED BY AN AWARD OF ATTORNEYS' FEES AND COSTS TO PLAINTIFF FORTI.**

Although the courts in this jurisdiction normally follow the American Rule with each party responsible for its attorneys fees, there is one notable exception. That is the bad faith exception, which permits an award of attorneys' fees against a party who has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." Synanon Foundation , Inc. v Bernstein, 517 A. 2d 28, 36 (D.C. App. 1986). "Filing of a frivolous claim or the manner in which the claim is subsequently litigated would justify an award of bad faith attorney's fees." Synanon, supra at 39. See also Jemison v. National Baptist Convention et al., 720 A.2d 275, 285. "An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." Synanon, supra at 40. Plaintiff Miller initiated suit against Forti in bad faith since it had no basis in fact or law to claim a commission. "An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." Synanon, supra at 40.  Plaintiff Miller's suit against Forti was entirely without color and was asserted wantonly, to harass Forti, and for the improper purpose of defrauding her of the $29,850.70 that was put into escrow. Miller, Humbert, Masson, Hamilton and Hamilton, Chong, Zanforlin, Agulia, and Hardie are all jointly liable to Forti for the $29,850.70 that was put into escrow and for interest on that amount to the present.

The Supreme Court has stated that "if in the informed discretion of the court, neither the statute or the rules are up to the task, the court may safely rely on its inherent

23

power" to sanction those who engage in bad faith conduct in the course of the litigation.
Chambers v. NASCO, Inc., 501 U.S. 32, 50, 11 S.Ct. 2123, 115 L.Ed. 27 (1991). Since
Miller had no basis in fact or law to sue for a commission, Miller should be required to
pay Forti her "opportunity costs" of having to defend against this fraudulent lawsuit.
Since Forti's hourly rate is $275 per hour, Miller owes Forti $120,000 in opportunity
costs. If Forti was not forced to spend her time responding to Miller's suit, she could have
earned this amount by performing legal services for other clients. Miller, Humbert,
Masson, and Hamilton and Hamilton are jointly liable to Forti for the $49,585.49 that
Forti was forced to pay Miller as attorney's fees. Miller, Humbert, Masson, and
Hamilton and Hamilton are jointly liable to Forti for the $1, 875 in legal fees she had to
pay Vernon Johnson of Jackson & Campbell whom she retained as First Chair in case
this baseless litigation went to trial. Miller, Humbert, Masson, Hamilton and Hamilton,
Chong, Zanforlin, Agulia and Hardie are jointly liable to Forti for the $1, 412.50 that she
had to pay Paley Rothman to draw up an escrow agreement and to represent her at
settlement on her property. Miller, Humbert, Masson, Hamilton and Hamilton, Chong,
Zanforlin Agulia and Hardie are also jointly liable to Forti for the $616.46 that she had to
pay in interest to the seller of the townhouse, because of the breach of contract and the
delay in going to settlement. Miller, Humbert, Masson, Hamilton and Hamilton, Chong,
Zanforlin, Agulia and Hardie are also jointly liable to Forti for the $10,629 that she had to
pay McNamee Hosea to remove the lien on her property in Maryland, prevent it from
being sold at auction, and to arrange a settlement agreement. In Jemison v. National
Baptist Convention, Inc. et al, 720 A.2d 275, 284 (D.C. App 1998), the District of

Columbia Court of Appeals decided that repayment of attorney's fees in defending

against bad faith litigation is properly treated as compensatory damages for purpose of

computing punitive damages.

## 11.    MILLER, HUMBERT, MASSON, AND HAMILTON AND HAMILTON ARE LIABLE TO FORTI FOR PUNITIVE DAMAGES.

Compensatory damages "are intended to redress the concrete loss that the plaintiff

has suffered by reason of the defendant's wrongful conduct," said the Supreme Court in

State Farm Mut. Auto Ins. Co. v. Campbell, 530 U.S. 408, 416, 123 S. Ct 1513, 155 L.Ed

2d 585 (2003). By contrast, "punitive damages serve a broader function; they are aimed

at deterrence and retribution. Punitive damages may be imposed to further a state's

legitimate intent in punishing unlawful conduct and deterring its repetition." Id. In

Marshall v. Marshall, 126 S. Ct. 1735, 164 L.Ed 2d 480, 2006 Lexis 3456, the Supreme

Court affirmed a District Court's decision in awarding $44.3 million in compensatory

damages and based on overwhelming evidence of "willfulness, maliciousness, and

fraud," awarded an equal amount in punitive damages. Plaintiff Forti seeks punitive

damages against W.C. & A.N Miller and June Humbert in the amount of 4 million dollars

each. She seeks punitive damages against Masson and Hamilton and Hamilton LLP in the

amount of 4 million dollars. In determining the amount of punitive damages, the Supreme

Court has instructed courts to consider, among other factors, "whether the target of the

conduct had financial vulnerability; the conduct involved repeated actions or was an

isolated incident; and whether the harm was the result of intentional malice, trickery, or

deceit." State Farm Mut. Auto Ins. Co. v. Campbell, supra at 419. In the instant case,

Forti was certainly financially vulnerable. She almost lost the townhouse. The conduct

25

was the result of repeated actions over a period of three years. Finally, the harm was the result of intentional malice, trickery, and deceit.

Punitive damages are clearly available under District of Columbia law for intentional torts such as civil fraud and conspiracy to commit civil fraud. In Robinson v. Sarisky, 535 A.2d 901, 906 (D.C. App. 1988), the District of Columbia Court of Appeals stated: "Punitive damages may be awarded for tortious acts aggravated by evil motive, actual malice, or for outrageous conduct in willful disregard of another's rights." Miller, Humbert, Masson, Hamilton and Hamilton, Chong, Zanforlin, Agulia, and Hardie all acted with evil motive, actual malice, and with outrageous conduct in willful disregard of Forti's rights. The court went on to say, "The requisite state of mind need not (and usually cannot) be proven by direct evidence but may be inferred from all the facts and circumstances of the case." Id. In Jemison v. National Baptist Convention, 720 A.2d 275 (D.C. App 1998), the District of Columbia Court of Appeals reaffirmed that "punitive damages are warranted" when defendants "commit a tortious act 'accompanied by fraud, ill will, recklessness or in willful disregard of the plaintiff's rights'." Jemison, supra at 276, f.n. 10 citing to Washington Medical Center v. Holle, 573 A.2d 1269, 1284 (D.C.App 1990)  "Whether punitive damages will lie depends on the  intent with which the wrong was done and not on the extent of the actual damages" Jemison, supra at 285. The Court can "infer the requisite state of mind from the surrounding circumstances." Jemison, supra at 285-286. Miller, Humbert, Masson, and Hamilton and Hamilton all acted with malice and are liable to Forti for punitive damages.

26

## CONCLUSION

The complaint, pleadings, this motion, and Forti's affidavit in support of her

motion for summary judgment show that there is no genuine issue as to any truly material

fact. Plaintiff Forti is entitled to summary judgment against Miller, Humbert, George

Masson, Jr. and the law firm of Hamilton and Hamilton LLP as a matter of law.

Respectfully submitted,

Carol A. Forti
Plaintiff Pro Se
14 West Chapman Street
Alexandria, Virginia 22301
703.535.5449

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I served Patrick Kavanaugh and George Masson, Jr.
with a copy of this Motion for Summary Judgment by first-class mail, postage prepaid on
May 30, 2006.

Carol A. Forti