# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**CAROL A. FORTI,**
14 West Chapman Street
Alexandria, VA 22301
703.535.5449
         Plaintiff         **Civil Action No. 1:06CV00613**
    v.                           **JR**

**GEORGE MASSON, JR. (COUNSEL TO**
   **W.C. & A.N. MILLER)**
Hamilton and Hamilton LLP
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
         Defendant

**HAMILTON AND HAMILTON LLP (COUNSEL TO**
   **W.C. & A.N. MILLER)**
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
         Defendant,

**RICHARD AGULIA**
**(COUNSEL TO CHONG AND ZANFORLIN)**
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006
         Defendant,

**JEFFREY HARDIE**
**(COUNSEL TO CHONG AND ZANFORLIN)**
Hunton & Williams, LLP
1900 K Street, N.W.
Washington, D.C. 20006
         Defendant,

**NATHAN FINKELSTEIN**
**(SETTLEMENT ATTORNEY)**
Finkelstein & Horvitz
7315 Wisconsin Avenue
Suite 400 East
Bethesda, MD 20814
         Defendant,

# RECEIVED

### JUL 1 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**FINKELSTEIN & HORVITZ, P.C.**
**(SETTLEMENT ATTORNEYS)**
7315 Wisconsin Ave., N.W.
Suite 400 East
Bethesda, MD 20814
          Defendant.

# AMENDED COMPLAINT

## JURISDICTION

This case is properly before this court based on complete diversity among the litigants. The amount in controversy also exceeds the statutory minimum.

## AMENDED COMPLAINT

1.    Forti is suing George Masson, Jr. and the law firm of Hamilton and Hamilton LLP, who represented W.C. & A.N. Miller. She is suing Richard Agulia and Jeffrey Hardie, who represented Chong and Zanforlin. She is suing Nathan Finkelstein and the law firm of Finkelstein & Horvath P.C., who were supposed to act as her settlement attorneys but instead acted illegally to benefit Miller.

2.    The causes of action against these defendant attorneys are for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. These acts were accompanied by fraud, ill will, recklessness, and willful disregard of Forti's rights. Forti is also suing the defendant attorneys for furthering and participating in civil fraud and for conspiracy to commit civil fraud.

3.    Forti advised Finkelstein, who was hired to be Forti's settlement attorney, approximately two weeks before settlement on April 29, 2002 that she did not owe Miller a commission and to make sure that the HUD Settlement Sheet reflected that fact. Forti also left a message for Finkelstein directing him to fax the HUD Settlement Sheet to her at least five days in advance

2

of the settlement date. Finkelstein had a fiduciary obligation to Forti. Finkelstein, however, ignored both of these instructions. He made no effort to return either of Forti's calls.

4.      Finkelstein did not fax the HUD Settlement Sheet to Forti in advance of settlement as Forti had requested, because Finkelstein and Humbert did not want Forti to see that the HUD Settlement Sheet deducted a commission for Miller.  Consequently, Forti did not see the HUD Settlement Sheet until the day of settlement on April 29, 2006.

5.      Finkelstein played a key role in injuring Forti by drawing up a HUD Settlement Sheet giving a commission to Miller although Miller was barred from receiving a commission by D.C. Code and District of Columbia case law.

6.      It is evident that Finkelstein had informed Humbert that there was an Assignment of Proceeds on the sale of Forti's property in which part of Forti's proceeds from the sale of her property would go directly to the settlement company to pay the balance that Forti owed on the townhouse. Finkelstein and Humbert obviously believed that the Assignment of Proceeds would provide excellent leverage to force Forti to pay a commission to Miller that she did not owe. They used the Assignment of Proceeds to force Forti to pay a commission to Miller or risk losing the townhouse.

         (Gant Redmon, attorney for the seller of the townhouse that Forti was buying insisted that there be an Assignment of Proceeds on the settlement transaction on Forti's property. Since Forti did not tell Humbert that there was an Assignment of Proceeds on Forti's property, Humbert could have only learned this from Finkelstein.)

7.      When Forti saw the HUD Settlement Sheet and she saw that Finkelstein had deducted a 3 percent commission for Miller from what was supposed to be 950,000 in Net Proceeds to Forti,

she was furious. She told Finkelstein , Humbert, Chong, and Zanforlin that she would not sign a
HUD Settlement Sheet that did not accurately reflect the Contract that she had signed with
Chong and Zanforlin to pay her $950,000 in Net Proceeds for title to her property.

8.    As a fallback position, Finkelstein proposed putting the disputed commission in escrow.
Forti reluctantly agreed to that proposal, because she had not anticipated fraud and,
consequently, had not arranged alternative funding for the townhouse on which she was going to
settlement that same day. Humbert, however, adamantly refused to escrow the disputed
commission and go to settlement, and she persuaded Chong and Zanforlin not to escrow the
disputed commission. Legally, Humbert engaged in tortious interference with contract, and
Chong and Zanforlin breached their contract with Forti by refusing to pay her $950,000 in Net
Proceeds on April 29, 2002 as the Contract required.

9.    Finkelstein and Humbert obviously underestimated Forti's resolve not to be defrauded of
$28,500. Forti refused to sign the HUD Settlement Sheet as it read with a commission for Miller
and told Finkelstein, Humbert, Chong, and Zanforlin that she would not sign any HUD
Settlement Sheet that did not accurately reflect the terms of her Contract with Chong and
Zanforlin. She announced that she was leaving Finkelstein's offices for a walk-through of the
townhouse in Alexandria followed by settlement on her townhouse at noon on April 29,2002.

10.    Finkelstein kept the pressure on Forti on behalf of Miller and Humbert. In the days that
followed this abortive settlement on Forti's property, Finkelstein phoned Forti
and warned her that she "had better sign the HUD Settlement Sheet," because "she did
not want to lose the townhouse."

11.    On or about May 8, 2002, Miller, Humbert, Chong, and Zanforlin changed their minds.

4

They decided that they would agree to escrow the disputed commission, and on May 8, 2002, Chong, Zanforlin, and Forti signed the settlement papers on Forti's property.

12.    Richard Agulia prepared the escrow account with some input from Dan Hodin, who represented Forti at settlement and with respect to the escrow agreement. Agulia put into escrow the disputed commission for $28,500 (3 percent of $950,000) plus alleged costs of Chong and Zanforlin (property taxes and interest on their loan), so that the escrow account totaled $29,850.70, but he refused to give Forti equal benefits. Since Forti needed to move out of her home on May 10, 2002 and into the townhouse, Hodin was prevented by Agulia from making the escrow account equally beneficial to Forti.

13.    By drawing up settlement papers that put the disputed commission in escrow, Finkelstein was instrumental in setting the defendant attorneys' litigation in motion. Finkelstein was actively engaged in the civil fraud against Forti and in the conspiracy to commit civil fraud against Forti. He gave Agulia a perjured affidavit to file with the court as did his wife, Esther Finkelstein. The perjured affidavits signed by Nathan Finkelstein and his wife, Esther Finkelstein, were written with the intention of supporting defendant attorneys' conspiracy to defraud Forti of the money in the escrow account, including the $28,500 disputed commission.

14.    Forti did not owe a real estate commission to Miller. Forti ran an advertisement in the Washington Post listing her house for sale. The ad included the phrase "co-op 3 %." The Supreme Court and the Court of Appeals for the D.C. Circuit have stated unequivocally that advertisements are solicitations or invitations to bid and that they are not offers. Although Judge Wright accepted Masson's legally non-meritorius argument that Forti's advertisement created an offer for a unilateral contract that was satisfied by June Humbert's procurement of buyers, Judge

5

Wright's conclusion is rebutted by well-settled Supreme Court case law and case law by the Court of Appeals for the D.C. Circuit. Furthermore, Judge Wright's conclusion only applied to parties Miller, Humbert, Chong, and Zanforlin—not the defendant attorneys. According to the Supreme Court, "advertisements are uniformly regarded as mere preliminary invitations to bid which create no power of acceptance in the recipient." Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 539 (9th Cir. 1983), cert denied, 104 S.Ct 1315, 465 U.S. 1038, 79 L.Ed 2d 712 (1984). According to the Court of Appeals for the District of Columbia Circuit, the "great weight of authority" is that "advertisements" are "mere solicitations for offers which create no power of acceptance in the offeree." Mesaros v. United States, 845 F.2d 1576, 1580 (D.C. Cir. 1988). The general rule is that advertisements are not offers. A Treatise on the Law of Contracts by Samuel Williston, 4th Edition by Richard A. Lord, West Group, section 4:7. In virtually all of these cases, a "promissory undertaking is absent and in all of these cases, a reasonable person receiving the communication has reason to know, from the circumstances under which the manifestation is made, that no offer exists." Id. Thus, the Supreme Court and the Court of Appeals for the D.C. Circuit support the conclusion that Forti's advertisement in the Washington Post for sale of her home, including the phrase "co-op 3 %," was a solicitation to make an offer—not an offer creating the power of acceptance in the recipient.

15.    Even if it is business practice in the real estate industry to use co-op 3 percent to refer to a commission, Supreme Court law always takes precedence over trade practices.

16.    June Humbert, an experienced agent for Miller, recognized that the ad was an invitation to bid or solicitation to make a Purchase Offer and she prepared a Purchase Offer for Chong and Zanforlin and presented it to Forti.

6

17.     Since the ad was a solicitation to make an offer and not an offer itself, it could not be an

offer for a unilateral contract, as Masson contended. Judge Wright's conclusion that Forti's ad

was an offer for a unilateral contract that was satisfied by Humbert's procurement of buyers is

not only wrong on the law but also applied only to Miller, Humbert, Chong, and Zanforlin. Judge

Wright's conclusion has no bearing on Forti's causes of action against the defendant attorneys.

The Court of Appeals did not address the question as whether Forti's ad was an invitation to

make offers or an offer for a unilateral contract. The Court of Appeals merely affirmed Judge

Wright's order granting summary judgment to Miller for a commission and affirmed Judge

Wright's dismissal of Forti's claims against Chong and Zanforlin for breach of contract and

compensatory and consequential damages.

18.     Humbert reviewed the next highest Purchase Offer from Mr. J.W. Silas for $945,000 in

Net Proceeds in Forti's kitchen and went through the Purchase Offer page by page in Forti's

presence. She also reviewed the earnest money check for $45,000 that accompanied the Purchase

Offer. Forti offered to have the Purchase Offer and earnest money check xeroxed for Humbert,

but Humbert said that was not necessary, because she was satisfied that the other Purchase Offer

was bona fide. Only after Forti had refused to pay Miller a 3 percent commission at settlement on

April 29, 2002 did Masson, Agulia, and Hardie challenge the bona fide nature of the other

Purchase Offer.

19.     In violation of the contract principle of mutual mistake, the defendant attorneys took

advantage of a mistake (known to both parties) when seller Forti wrote in $950,000 next to NEW

SALES PRICE on the printed form of the Purchase Offer/Contract but did not cross out NEW

SALES PRICE and write in NET PROCEEDS in its place. Since Forti had received another

7

Purchase Offer from Mr. J.W. Silas for $945,000 in NET PROCEEDS, the Escalator Clause

Addendum automatically raised the Chong/Zanforlin Purchase Offer from $915,000 to $950,000

in NET PROCEEDS." Humbert also made a verbal commitment to Forti that Chong and

Zanforlin would pay $950,000 in Net Proceeds since they had pre-approval for a loan of

$975,000. Based on the Escalator Clause Addendum and Humbert's assurances, Forti told

Humbert that she would select the Chong/Zanforlin Purchase Offer over the next highest

Purchase Offer for $945,000 in Net Proceeds. Adding $5,000 in Net Proceeds to $945,000 in Net

Proceeds was the basis for Forti writing in $950,000 on the page of the Purchase Offer

containing the Escalator Clause Addendum. Judge Wright did not deal with the issue of mistake

and neither did the Court of Appeals.

20.    Miller was barred by D.C. Code and District of Columbia case law from receiving a

commission. D.C. Code and District of Columbia case law forbid receipt of a broker's

commission unless there is a written employment agreement between the seller and broker or a

written principal /agent agreement in which the seller agrees to pay the broker a commission for

procuring buyers. According to D.C. Code section 42-1705, "A licensee (i.e. Miller) shall not

receive payment of a commission in the absence of a written listing agreement." See p. 1 of 1,

Disclosure of Brokerage Relationship in the Purchase Offer/Contract in which June Humbert

identifies Miller as the "licensee." The District of Columbia Court of Appeals has interpreted this

Code provision to require proof of an employment contract between seller and broker in which

the seller agrees to pay the broker a commission for procuring buyers before a broker may

receive a commission. Eggleton v. Vaughan, 45 A.2d 362, 363 (D.C. App. 1946): "One seeking

to obtain compensation as an agent must prove his contract of employment before he can recover

8

for work done for an alleged principal. The fact that one is the procuring cause of a sale does <u>not</u> entitle him to a commission unless he had authority to sell." <u>Id</u>. [Emphasis added.] There was no employment contract between Forti and Miller. In <u>Fred Ezra Co. v. Pedas</u>, 682 A.2d 173, 176 (D.C. App. 1996), the Court of Appeals for the District of Columbia affirmed that "in order for a broker, as agent, to recover against a seller, as principal, the broker must first establish that they voluntarily entered into a principal-agent relationship that gives rise to the broker's contractual right to a commission." Forti did not enter into a principal-agent relationship with Miller or sign an agreement with Miller promising to pay a commission for procuring buyers. Since Forti did not sign an employment contract with Miller or sign a principal/agent agreement with Miller agreeing to pay a commission for procuring buyers, Forti did not owe Miller a commission.

21.     Judge Wright's decision to grant summary judgment to Miller for a commission and to dismiss Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages did not address the relevant case law nor was the case law addressed by the Court of Appeals.

22.     Even if one assumes that Judge Wright considered the relevant case law but did not address it in his Order, his Order only applies to Miller, Humbert, Chong, and Zanforlin—not the defendant attorneys. Judge Wright's Order has no relevance to Forti's causes of action against the defendant attorneys.

23.     Nathan Finkelstein was the settlement attorney who handled Forti's purchase of the house at 2936 Garfield Terrrace, N.W. in Washington, D.C.  He held himself out as qualified to handle settlements in the District of Columbia. He knew or had a duty to know D.C. Code and District of Columbia case law applicable to settlements in the District of Columbia. He knew or had a

9

duty to know that D.C. Code barred a licensee from receiving a commission in the absence of a written listing agreement. He knew or had a duty to know that District of Columbia case law barred receipt of a commission without proof of a written employment contract or a principal /agent relationship and written agreement promising to pay a commission for procuring buyers. He knew that Forti had not signed an employment contract with Miller and had not entered into a principal/agent relationship with Miller or signed an agreement promising to pay a commission for procuring buyers. Although he had a fiduciary responsibility to Forti as her settlement attorney, he conspired with Humbert against Forti by drawing up a HUD Settlement Sheet that deducted a 3 percent commission for Miller.

24.    Forti did not raise the issue of conspiracy in Superior Court, and Judge Wright's order did not deal with conspiracy. All Judge Wright's Order did was grant summary judgment to Miller on the commission and dismiss Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages.

25.    The causes of action in Forti's Amended Complaint are raised for the first time in United States District Court and are directed only against the defendant attorneys, who were not parties to the action in Superior Court and are not in privity with the parties to that action. Forti's causes of action against the defendant attorneys were not raised by Forti in Superior Court, and they were not ruled on by Judge Wright or the Court of Appeals.

26.    Forti is entitled to the money in the escrow account, which included the disputed commission. The Chong/Zanforlin Purchase Offer that Humbert presented to Forti included an Escalator Clause Addendum. The Escalator Clause Addendum promised to pay Forti $5,000 in net proceeds above the net proceeds of the next highest Purchase Offer. Since the next highest

10

Purchase Offer from Mr. J.W. Silas was for $945,000 in NET PROCEEDS, the Chong/Zanforlin

offer automatically escalated from $915,000 to $950,000 in NET PROCEEDS. Since the

Escalator Clause Addendum promised Forti $950,000 in Net Proceeds, the Escalator Clause

Addendum precluded any deduction from $950,000 in Net Proceeds of a commission for Miller.

27.    All the defendant attorneys conspired with each other against Forti by litigating wantonly

and maliciously against Forti to defraud Forti of the amount in escrow, of which the principal

amount was the disputed commission.

28.    According to the terms of the Escalator Clause Addendum, Chong and Zanforlin

offered to pay Forti $5,000 in Net Proceeds above the Net Proceeds of the next highest

offer for title to her home at 2936 Garfield Terrace, N.W.   Webster's New Collegiate Dictionary

defines "net" as "free from all charges and deductions." Since the next highest offer was for

945,000 in NET PROCEEDS, Chong and Zanforlin promised to pay Forti $950,000 in NET

PROCEEDS.  That this amount was the contract price is admitted by Chong, Zanforlin, Agulia,

and Hardie in their Answer, p.3, line 15.

29.    According to first sentence of the text of the Escalator Clause Addendum, "the parties

agree that the following provisions are incorporated into the referenced Contract and shall

supercede any provisions to the contrary in said Contract." Thus, the provisions

of the Escalator Clause Addendum take precedence over any conflicting provisions in the

Contract, including the phrase that June Humbert inserted: "3 % commission to Miller at

settlement."

30.    The phrase, "commission 3 % to be paid to W.C. & A.N. Miller at settlement" does not

say who is to pay a commission. "Any writing that does not specify who is to pay the

11

commission is void for vagueness, because that is an essential term." <u>American Jurisprudence,</u>

Second Edition, section 43.

31.     Humbert identified herself to Forti at their first meeting as the buyer's broker and stated

that she represented their interests exclusively, an identification that she memorialized on page 1

of 1 of the Disclosure of Brokerage Relationship of the Purchase Offer. For all of these reasons,

Seller Forti reasonably assumed, when she selected the Chong/Zanforlin Purchase Offer over the

next highest Purchase Offer for $945,000 that the phrase written into the contract by Humbert

referred to some prior agreement between buyers Chong and Zanforlin and broker Humbert for

the buyers to pay Miller a 3 percent commission.

32.     Finkelstein ignored his fiduciary responsibility to Forti and drew up a HUD Settlement

Sheet that treated the $950,000 in Net Proceeds as Sales Price and assigned a $28,500

commission to Miller out of Forti's Net Proceeds of $950,000. Finkelstein drew up the HUD

Settlement Sheet in this manner despite the fact that Paragraph 21 of the Regional Sales Contract

directed him "to pay the broker compensation as set forth in the listing agreement ... as of the

Contract Date." He deducted a commission for Miller on the Settlement Sheet despite the fact

there was no listing agreement between Forti and Miller, no employment contract between Forti

and Miller, and no principal/agent agreement between Forti and Miller in which Forti agreed to

pay a commission for procuring buyers. By drawing up the HUD Settlement Sheet in this

manner, Finkelstein attempted to defraud Forti of the $950,000 in Net Proceeds that she was

owed under the contract with Chong and Zanforlin.

33.     Forti was also damaged substantially by Finkelstein's provision to escrow the disputed

funds. Forti was forced to accede to an escrow arrangement, because she had not anticipated

fraud and had not arranged alternative funding for the townhouse that she was buying in a

settlement scheduled for April 29, 2002—the same day as settlement on her property at 2936

Garfield Terrace N.W.

34.    Finkelstein drew up the HUD Settlement Sheet and provided for a commission for Miller

with the clear intent of forcing Forti to pay a commission that she did not owe. Apparently,

Finkelstein was willing to defraud Forti for the opportunity to obtain further settlement business

from Miller. It seems likely that Humbert offered Finkelstein further settlement business if he

would draw up the HUD Settlement Sheet to provide Miller with a commission and followed

through on that quid pro quo. During the action in Superior Court, Forti served Masson with

subpoenas (that met all the rules) addressed to Miller and Humbert to turn over any information

or records regarding any settlement business between Miller and Finkelstein following

Finkelstein's action on behalf of Miller in the settlement proceeding between Forti and

Chong/Zanforlin. Masson adamantly refused all requests for the subpoened information and

records in gross violation of court rules.

35.    The causes of action in Forti's Amended Complaint are raised for the first time in United

States District Court. The defendant attorneys were not parties to the action in Superior Court.

Thus, Forti's causes of action are not barred by res judicata. Neither are her causes of action

barred by the principle of collateral estoppel. The issues to be decided by Judge Robertson are

not the same as those decided in Superior Court and the defendant attorneys are not in privity

with the parties to the action in Superior Court. Neither is the three-year Statute of Limitations a

bar to Forti's claims against the defendant attorneys. On 07/25/05, George Masson demanded

attorney's fees in the amount of $84,340.71 for his legal work in Superior Court and in the Court

13

of Appeals. On the same date Richard Agulia demanded attorney's fees in the amount of

$73,773.93 for the legal services of Agulia and Hardie in Superior Court and in the Court of

Appeals. Forti paid those attorney's fees on 07/25/05 to remove a lien placed on her retirement

property in Maryland by Masson and Agulia and to prevent the property from being sold at

auction. Forti's Complaint was filed on 04/03/06. Thus, Forti's Complaint against is well within

the three-year Statute of Limitations.

36.    George Masson, Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie,

Nathan Finkelstein, and Finkelstein & Horvitz P.C. are all liable to Forti for furthering and

participating in civil fraud and for conspiracy to commit civil fraud. Their common actions in

conspiring against Forti and in litigating wantonly and maliciously against Forti for almost three

years to defraud her of the amount in escrow showed that there was an agreement among these

defendants to act unlawfully and their overt tortious acts caused substantial financial injury to

Forti. Masson, Agulia, Hardie and Finkelstein conspired among themselves to litigate a

colorless, wanton, lawsuit against Forti and, by means of this litigation, forced her to pay a

commission that she did not owe.

37.    The District of Columbia recognizes civil fraud and conspiracy to commit civil fraud. To

substantiate a conspiracy claim, the plaintiff must establish that the attorneys did not act within

the role of an advisor and merely advise, but instead knew of the clients' wrongful conduct and

were actively involved in the wrongful conduct. See McElhanon v. Hing, 728 P.2d 256, 264-265

(Ariz.App 1985) cert denied, 481 U.S. 1030, 107 S.Ct 1956, 95 L.Ed.2d 529 (1987).

38.    Humbert, Chong, and Zanforlin made false representation of a material fact that Chong

and Zanforlin would pay $950,000 in Net Proceeds for title to Forti's property with knowledge

14

of its falsity and with intent to deceive. Forti took justifiable reliance upon the misrepresentation, which resulted in substantial financial injury to Forti. These facts contain all the elements of civil fraud. George Masson, Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein all knew that civil fraud had been perpetrated against Forti. They furthered that civil fraud by deliberately ignoring the unambiguous terms of the Escalator Clause Addendum They conspired against Forti and furthered that civil fraud by litigating a colorless, wanton suit against Forti to defraud her of $29, 850.70 in the escrow account.  George Masson, Jr., Hamilton and Hamilton, LLP; Richard Agulia, Jeffrey Hardie, Nathan Finkelstein (by means of perjured affidavits) and Finkelstein and Horvitz P.C. litigated wantonly and maliciously against Forti for nearly  three years in order to defraud her of the $29, 850.70 in the escrow account, and they succeeded in defrauding her of that amount.

38.    Attorneys are liable for the intentional torts of malicious prosecution and abuse of process. The privilege an attorney has for his actions in representing a client is a qualified one that does not extend to the intentional torts of malicious prosecution and abuse of process. McElhanon v. Hing, supra. Nor does the privilege apply to the intentional tort of furthering and participating in a fraudulent conveyance. Id. All of the defendant attorneys and their firms are liable to Forti for the intentional torts of malicious prosecution and abuse of process. All of the defendant attorneys are liable to Forti for the intentional tort of furthering and participating in a fraudulent conveyance.

39.    The defendant attorneys did not merely advise. Finkelstein injured Forti and acted for the benefit of Miller when he drew up a HUD Settlement Sheet that ignored the express terms of the Contract that Chong and Zanforlin signed with Forti. Masson, Agulia, and Hardie (with

15

Finkelstein's support) litigated a completely colorless bad faith lawsuit against Forti and they did

so wantonly and maliciously in willful disregard of Forti's rights.

40.    All the defendant attorneys litigated against Forti either actively or through another

defendant attorney. Agulia and Hardie conspired with Masson against Forti, most conspicuously

in their Motions for Summary Judgment. George Masson, Jr., Richard Agulia, Jeffrey Hardie,

and Nathan Finkelstein all submitted perjured affidavits in the action in Superior Court. Agulia

and Hardie filed perjured affidavits signed by Chong and Zanforlin with Superior Court in

support of their motion for summary judgment. Masson filed a perjured affidavit by Humbert,

who made the utterly false statement that Forti prevented settlement on April 29, 2002 when, in

fact, it was Chong and Zanforlin who prevented settlement by refusing to pay Forti the $950,000

in Net Proceeds that they promised her in their Purchase Offer/Contract. Humbert also lied in

saying that she did not persuade Chong and Zanforlin to breach their contract a second time on

April 29, 2002 by refusing to put the disputed commission into an escrow account so that

settlement could proceed, although that is precisely what she did. Agulia filed perjured affidavits

by Chong and Zanforlin, who claimed that Forti had refused to put the disputed commission into

an escrow account, which was utterly false, and that June Humbert had not persuaded them not

to agree to the escrow agreement, which was also false. Agulia also filed with Superior Court

perjured affidavits by Nathan Finkelstein and Esther Finkelstein that were written to support

defendant attorneys' claim to the escrow account, including the disputed commission. There is

no question that the affidavits by Chong, Zanforlin, Humbert, and the Finkelsteins were perjured,

because Chong and Zanforlin, who had filed perjured affidavits with the trial court, subsequently

admitted in another pleading that their prior affidavits were perjured. The admission by Chong

16

and Zanforlin confirmed that the affidavits prepared by Humbert and the Finkelsteins, which

contained virtually identical statements, were also perjured.

41.    At the time that this case was being heard in Superior Court, there was no security for

pleadings filed with Superior Court.  These unethical attorneys were able to remove and did, in

fact, illegally remove from the File Room in the Civil Action Branch of Superior Court Forti's

most significant pleadings. They included Forti's Opposition to Miller's Motion for Summary

Judgment; Forti's Opposition to Chong and Zanforlin's Motion for Summary Judgment; Forti's

Rebuttal of Miller's Points and Authorities; Forti's Rebuttal of Chong and Zanforlin's Points and

Authorities; Forti's Renewed Motion for Summary Judgment, and subpoenas duces tecum

addressed to Miller and Humbert, which called for information or records on any settlement

business that Miller provided to Finkelstein following the settlement transaction between Forti

and Chong/Zanforlin.  (Although Forti made some technical errors in serving earlier subpoenas,

the subpoenas that were stolen from the File Room met all legal requirements and were

personally served on Miller's agent for service of process in D.C. and on Humbert.) All of these

pleadings were missing from the Record on Appeal. Only opposing counsel had a motive to steal

Forti's pleadings; therefore, theft of these pleadings by opposing counsel is the only reasonable

explanation for their disappearance. The pleadings filed in Superior Court are the pleadings used

to prepare the Record on Appeal. As a result of the egregious and highly illegal conduct by these

defendant attorneys, the record before Superior Court and the record before the Court of Appeals

was full of gaping holes where Forti's pleadings should have been. As a direct result, the trial

judge mistakenly believed that Forti had not filed a Renewed Motion for Summary Judgment,

when, in fact, she had. Theft by the defendant attorneys of Forti's most important pleadings

17

caused the trial judge and the Court of Appeals to reach erroneous decisions. Although Forti attempted to bring to the attention of the Court of Appeals the fact that her most important pleadings had been removed surreptitiously and illegally from the File Room of the Civil Action Branch before the record on appeal was sent to the Court of Appeals, the Court of Appeals never dealt with the theft issue and affirmed the lower court decision based on a seriously incomplete record.

42.    The decisions in Superior Court and in the Court of Appeals were procured by fraud upon the court by George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein.

43.    The defendant attorneys engaged in malicious prosecution and abuse of process against Forti and they furthered and participated in a fraudulent conveyance. They conspired among themselves to defraud Forti of $29,850.70 in the escrow account, and they succeeded in defrauding Forti of that amount.

44.    The defendant attorneys badly injured Forti economically, and they did so deliberately with evil motive, with malice, and with willful disregard for her rights. As a result of the litigation, Forti was left with NET PROCEEDS of $921,500. No reasonable seller would select an offer worth $921,500 in NET PROCEEDS when she had an offer for $945,000 in NET PROCEEDS, and Forti is a reasonable seller.

45.    Although the Escalator Clause Addendum promised Forti $950,000 in Net Proceeds, all the defendant attorneys conspired against Forti and litigated wantonly and maliciously through affidavits that were perjured and pleadings that grossly misrepresented the facts to defraud Forti of $29,850.70 in the escrow account.

46.    Forti knew that she did not owe Miller a commission, and she told Humbert so in

a letter. She offered to pay Humbert $4,000 for introducing credit-worthy buyers to her home and for arranging the Purchase Offer.

47.    Defendant attorneys took advantage of a mistake. In violation of the contract principle of mutual mistake, the defendant attorneys took advantage of a mistake (known to both parties) when seller Forti wrote in $950,000 next to NEW SALES PRICE on the printed form of the Purchase Offer/Contract but did not cross out NEW SALES PRICE and write in NET PROCEEDS in its place. Since Forti had received another Purchase Offer from Mr. J.W. Silas for $945,000 in NET PROCEEDS, the Escalator Clause Addendum automatically raised the Chong/Zanforlin Purchase Offer from $915,000 to $950,000 in NET PROCEEDS." Humbert also made a verbal commitment to Forti that Chong and Zanforlin would pay $950,000 in Net Proceeds since they had pre-approval for a loan of $975,000. Based on the Escalator Clause Addendum and Humbert's assurances, Forti told Humbert that she would select the Chong/Zanforlin Purchase Offer over the next highest Purchase Offer for $945,000 in Net Proceeds.

48.    Adding $5,000 in Net Proceeds to $945,000 in Net Proceeds was the basis for Forti writing in $950,000 on the page of the Purchase Offer containing the Escalator Clause Addendum. Judge Wright did not deal with the issue of mistake and neither did the Court of Appeals.

49.    George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein all submitted perjured affidavits in the action in Superior Court. Agulia and Hardie filed perjured affidavits signed by Chong and Zanforlin with Superior Court in support of their motion for summary judgment. Masson filed a perjured affidavit by Humbert, who made the utterly false statement

19

that Forti prevented settlement on April 29, 2002 when, in fact, it was Chong and Zanforlin who prevented settlement by refusing to pay Forti the $950,000 in Net Proceeds that they promised her in their Purchase Offer/Contract. Humbert also lied in saying that she did not persuade Chong and Zanforlin to breach their contract a second time on April 29, 2002 by refusing to put the disputed commission into an escrow account so that settlement could proceed, although that is precisely what she did. Agulia filed perjured affidavits by Chong and Zanforlin, who claimed that Forti had refused to put the disputed commission into an escrow account, which was utterly false, and that June Humbert had not persuaded them not to agree to the escrow agreement, which was also false. Agulia also filed with Superior Court perjured affidavits by Nathan Finkelstein and Esther Finkelstein that were written to support defendant attorneys' claim to the escrow account, including the disputed commission. There is no question that the affidavits by Chong, Zanforlin, Humbert, and the Finkelsteins were perjured, because Chong and Zanforlin, who had filed perjured affidavits with the trial court, subsequently admitted in another pleading that their prior affidavits were perjured. The admission by Chong and Zanforlin confirmed that the affidavits prepared by Humbert and the Finkelsteins, which contained virtually identical statements, were also perjured.

50.    During the week following the abortive settlement on Forti's property on April 29, 2002, Richard Agulia sent Forti a letter threatening to sue her for specific performance even though his clients, Chong and Zanforlin were the parties who had breached the contract and prevented settlement on Forti's property on April 29, 2002 by refusing to pay Forti $950,000 in Net Proceeds and by refusing to escrow the disputed commission.

51.    After being sued by Miller, Forti impleaded Humbert, Chong, and Zanforlin as third party

defendants in order to be made whole. Her causes of action against Chong and Zanforlin were for breach of contract and for compensatory and consequential damages. Forti raised no conspiracy claims in Superior Court. Agulia's statement that Judge Wright "granted summary judgment to Chong and Zanforlin on Forti's breach of contract and conspiracy claims" is a blatant lie designed to mislead the District Court. Forti made no conspiracy claims in Superior Court. She raised for the first time in United States District Court causes of action for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. She has also raised against the defendant attorneys causes of action for furthering and participating in civil fraud and conspiring to commit civil fraud.

52.    All Judge Wright's Order did was to grant summary judgment to Miller for the commission and dismiss Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages. All the Court of Appeals did was affirm Judge Wright's Order granting summary judgment to Miller for a commission and affirm dismissal of Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages.

53.    Judge Wright never dealt with the issue of mistake and neither did the Court of Appeals.

54.    The Statute of Frauds "does not prevent reformation [of the Contract by the Court] as an equitable remedy." Section 156 of Restatement (Second) of Contracts states a rule "that is substantially more liberal than former section 509 in allowing reformation in spite of the Statute of Frauds." Id. Furthermore, "if there is a mistake of only one party as to expression"...[and] "her mistake is believing that a writing correctly expresses that agreement, the problem is one of the effect of the [other party's] failure to disclose this fact. Non-disclosure [by the other party]

21

may be tantamount to misrepresentation." Restatement (Second) of Contracts, sections 160-61.

55.    The failure by Humbert, Chong, and Zanforlin to acknowledge Forti's simple mistake

was intentional misrepresentation. The insistence by Masson, Agulia, and Hardie that the

$950,000 [inserted by Forti on the page containing the Escalator Clause Addendum] represented

Sales Price from which a commission could be deducted was also intentional misrepresentation.

56.    "Whether a contract is ambiguous is a question of law [for the Court]." Washington

Properties v. Chin, 760 A.2d 546, 548 (2000). "A contract is not ambiguous merely because the

parties disagree over its meaning…A contract is ambiguous when and only when the provisions

in controversy are reasonably…susceptible …to two or more different meanings." Id. "It is not

ambiguous where the court can determine its meaning without any other guide than a knowledge

of the simple facts on which, from the nature of language in general, its meaning depends." Id.

The contract in the instant case is reasonably susceptible to only one interpretation and

construction, and, therefore, it is not ambiguous.

57.    An "elementary canon of interpretation is that particular words may not be considered in

isolation but that the whole contract must be brought into view and interpreted with reference to

the nature of the obligations between the parties and the intention which they have manifested in

forming them." O'Brien v. Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469, 473

(1897). Construing the contract as a whole leads ineluctably to the conclusion that the

Chong/Zanforlin offer promised Forti $950,000 in net proceeds.

58.    Even if certain words, standing alone, are unambiguous, the court must construe the

entire contract. O'Brien v. Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469, 473 (1897).

In the contract in question, the two words "SALES PRICE" before the number $950,000 may not

be ambiguous standing alone, but they must be interpreted in view of the Escalator Clause

Addendum. If the contract is interpreted as a whole and all of the provisions read together, the

only reasonable construction is that $950,000 represents net proceeds—the amount that Chong &

Zanforlin offered seller Forti for her property and were legally obligated to pay her.

59.    In interpreting any particular clause of a contract, the court is required to examine the

entire contract. Chicago, R.I. & P. RY.Co. v.Denver & R.G.R. Co., 12 S.Ct 479, 143 U.S. 596,

36 L.Ed 277 (1892). The phrase that Humbert wrote under Paragraph 33 of the Regional Sales

Contract: "Commission 3% to be paid to W.C.& A.N. Miller at settlement" imposed no legal

obligation on seller Forti in light of the fact that Forti did not sign an employment contract with

Miller or enter into a principal/agent relationship with or sign an agreement offering to pay

Miller a commission for procuring buyers. "In the interpretation, and ultimately in the

construction of contracts, the primary function of the court is to ascertain the intention of the

parties." U.S. v. Moorman, 70 S.Ct 288, 338 U.S. 457, 94 L.Ed 256 (1950).  "The intention of

the parties is to be gathered, not from a single sentence but from the whole instrument read in

light of the circumstances existing at the time of negotiations leading up to its execution." Miller

v. Robertson, 45 S.Ct 73, 77, 266 U.S. 243, 251, 69 L.Ed 265, 272 (1924).

60.    By making an initial offer of $915,000 and having it escalate automatically to provide

$5,000 in net proceeds above the net proceeds of the next highest offer up to $975,000, the clear

intention of the buyers and broker in using the Escalator Clause Addendum was to have this offer

selected over all other offers in a very "hot" market with a small inventory of homes for sale.

61.    The Escalator Clause Addendum offered net proceeds of $5,000 above the net proceeds

of the next highest offer. Since the next highest offer offered net proceeds of $945,000, the

23

Chong/Zanforlin contract promised net proceeds of $950,000. The intention of seller Forti was to

accept the Chong/Zanforlin offer for $950,000 in net proceeds.

62.     The "law of contracts does not judge a promissor's obligation by what is in his mind, but

by the objective test of what his promise would be understood to mean by a reasonable person in

the situation of the promisee." This legal principle was enunciated by the Court of Appeals for

the Second Circuit and affirmed by the Supreme Court. Lee v. State Bank & Trust Co., 54 F.2d

518, 521 (2nd Cir. 1931), cert denied 52 S.Ct 395, 285 U.S. 547, 76 L.Ed 938.

63.     The Court of Appeals for the District of Columbia also supports this test. "The first step

in contract interpretation is determining what a reasonable person in the position of the parties

would have thought the disputed language meant." Washington Properties, Inc. v. Chin, Inc., 760

A.2d 546, 548 (D.C.App. 2000) citing Dodek v. CF 16 Corp., 537 A.2d 1086, 1093 (D.C. App.

1988). The court "must determine what a reasonable person in the position of the parties would

have thought the disputed language meant." Capitol City Mortg. v. Habana Village Art &

Folklore, Inc, 747 A.2d 564, 567 (D.C. App. 2000).

64.     A reasonable person in the situation of the promisee (seller Forti) would interpret the

Chong/Zanforlin contract as offering $950,000 in net proceeds. Otherwise, she would have no

reason to select the Chong/Zanforlin contract over the next highest offer, which promised

$945,000 in net proceeds.

65.     "If there is any doubt arising from the language used as to its proper meaning or

construction, the words should be construed most strongly against the company, because

their officers or agents prepared the instrument." Texas & P.R.Co. v. Reiss, 22 S.Ct 253, 255,

183 U.S. 621, 626, 46 L.Ed 358, 360 (1902). It is "reasonable and just" that the company's own

24

words "should be construed most strongly against it." Moulor v.American Life Ins. Co., 4 S.Ct

466, 469, 111 U.S. 335, 342, 28 L.Ed 358, 447, 449  (1983). Further support for this legal

principle comes from the Court of Appeals for the District of Columbia Circuit and from the

District of Columbia Court of Appeals. "A canon of construction is that ambiguity in a contract

is interpreted against the drafter." Gray v. American Express Co., 743 F.2d 10, 18 (D.C.Cir.

1984). "If, after applying the rules of contract interpretation, the terms are still not subject to one

definite meaning, the ambiguities will be construed strongly against the drafter." Capitol City

Mortg. Corp. v. Habana Village Art & Folklore, Inc., 747 A.2d 564, 567 (D.C. App. 2000).

"Ambiguous language in a contract will be construed against the company." Meade v. Prudential

Insurance Co. , 477 A.2d 726, 728 (D.C. App. 1984).

66.    June Humbert, the buyers' broker, told seller Forti that the Escalator Clause Addendum

was prepared by an attorney for W.C. & A.N. Miller. Humbert, an agent of W.C. & A.N. Miller,

wrote the Purchase Offer that she submitted to seller Forti on behalf of Chong and Zanforlin.

67.    "The general principles of law governing the interpretation or construction or contracts

generally are applicable to a real estate broker's contract of employment." R. Lord, Williston on

Contracts, sec. 62.18. "As with any other contract, the primary object in interpreting a real estate

broker's contract is to give effect to the intention of the parties." Id.  "A real estate brokerage

contract generally arises by virtue of a pre-arranged agreement between the parties." Only

"under a contract" which provides that the "broker is employed [by the seller] to find a buyer

ready and willing to purchase and provides for a commission for the broker's services in

procuring a purchaser," is the broker "entitled to a commission." R. Lord, Williston on

Contracts, sec. 6219.

68.    Masson had no legal basis for filing a suit against Forti on behalf of Miller for a

commission. The suit was completely without color, wanton, and in total disregard of Forti's

rights.

69.    Chong and Zanforlin's duty under the Contract was to pay Forti $950,000 in NET

PROCEEDS. Instead, they breached their contract and refused to pay Forti $950,000 in Net

Proceeds on April 29, 2002. They also breached their Contract by refusing to escrow the

disputed commission so that settlement could take place on April 29, 2002 . Since Chong and

Zanforlin had no legal basis to litigate against Forti, Agulia and Hardie had no legal basis for

claiming attorney's fees for the work they did in Superior Court or in the Court of Appeals.

70.    Since Masson, Agulia and Hardie no legal basis for claiming attorney's fees, Forti

accurately described Masson, Agulia, and Hardie's action in placing a lien on Forti's retirement

property in Maryland as a further demonstration of maliciousness toward Forti.

71.    Although the courts in this jurisdiction normally follow the American Rule with each

party responsible for its attorneys fees, there is one notable exception. That is the bad faith

exception, which permits an award of attorneys' fees against a party who has acted in "bad faith,

vexatiously, wantonly, or for oppressive reasons." Synanon Foundation , Inc. v Bernstein, 517 A.

2d  28, 36 (D.C. App. 1986). "Filing of a frivolous claim or the manner in which the claim is

subsequently litigated would justify an award of bad faith attorney's fees." Synanon, supra at 39.

See also Jemison v. National Baptist Convention et al., 720 A.2d 275, 285.  "An action is

brought in bad faith when the claim is entirely without color and has been asserted wantonly, for

purposes of harassment or delay, or for other improper reasons." Synanon, supra at 40.

72.    George Masson, Jr. and Hamilton and Hamilton LLP filed suit against Forti in bad faith

26

since he had no basis in fact or law to claim a commission. George Masson Jr's complaint

against Forti was entirely without color and was asserted wantonly, to harass Forti, and for the

improper purpose of defrauding her of the $28,500 that was put into escrow.

73.    The Supreme Court has stated that "if in the informed discretion of the court, neither the

statute or the rules are up to the task, the court may safely rely on its inherent

power" to sanction those who engage in bad faith conduct in the course of the litigation.

Chambers v. NASCO, Inc., 501 U.S. 32, 50, 11 S.Ct. 2123, 115 L.Ed. 27 (1991).

74.    Masson had no basis in fact or law to file suit on behalf of Miller for a commission, but

Masson, Hamilton and Hamilton LLP, Agulia, Hardie, Finkelstein, and Finkelstein & Horvath

P.C. litigated wantonly and maliciously against Forti for a period of nearly three years to defraud

her of the amount in escrow.

75.    Masson, Hamilton and Hamilton LLP, Agulia, Hardie, Finkelstein, and Finkelstein &

Horvath should be required to pay Forti her "opportunity costs" of having to defend against this

fraudulent lawsuit. Since Forti's hourly rate is $275 per hour, Masson, Hamilton and Hamilton,

Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for $180,557 in

opportunity costs. If Forti was not forced to spend her time responding to this fraudulent lawsuit,

she could have earned this amount by performing legal services for clients in Pennsylvania,

where she is licensed.

76.    Forti sues Finkelstein for the $330 that he fraudulently charged her in settlement fees,

because he proved so untrustworthy that Forti had to hire Dan Hodin of Paley Rothman to

represent her at the actual settlement on May 8, 2002 and with respect to the escrow agreement.

77.    Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for the $1,412.50 that she

27

had to pay Dan Hodin of Paley Rothman to draw up an escrow agreement and to represent her at settlement on her property on May 8, 2002. Finkelstein and Finkestein & Horvitz are also jointly liable to Forti for the $616.46 that she had to pay in interest to the seller of the townhouse, because there was no settlement on her property on April 29, 2002. Settlement did not take place until May 8, 2002.

78.    Masson and Hamilton and Hamilton are jointly liable to Forti for the $1, 875 in legal fees she had to pay Vernon Johnson of Jackson & Campbell whom she retained as First Chair in case this baseless litigation went to trial.

79.    Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for the $29,850.70 in the escrow account from which they defrauded Forti plus interest on that amount from May 8, 2002 to the present.

80.    Masson, Agulia, and Hardie compounded their malice against Forti by suing for attorney's fees. Masson claimed that he had to sue to obtain a commission from which Miller was actually barred by D.C. Code and District of Columbia case law. George Masson, Jr. and Hamilton and Hamilton LLP are jointly liable to Forti for the $84,340.71 that she had to pay in attorney's fees.

82.    Richard Agulia and Jeffrey Hardie are jointly liable to Forti for the $73,773.93 that she had to pay in attorney's fees.

83.    In Jemison v. National Baptist Convention, Inc. et al, 720 A.2d 275, 284 (D.C. App 1998), the District of Columbia Court of Appeals decided that repayment of attorney's fees in defending against bad faith litigation is properly treated as compensatory damages for purpose of computing punitive damages.

28

84.    Masson, Agulia, and Hardie further compounded their malice against Forti by placing a

lien on Forti's retirement property in Maryland and threatened to have the sheriff's office sell it

at auction for much less than the market value to pay off the lien.

85.    Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz

are jointly liable to Forti for the $10,629 that she had to pay McNamee Hosea to represent her,

work out a settlement agreement, and remove the lien.

86.    All the defendant attorneys are clearly liable to Forti for punitive damages.

While compensatory damages are intended to redress the concrete loss that the plaintiff

has suffered by reason of the defendant's wrongful conduct, punitive damages are aimed at

deterrence and retribution. Punitive damages may be imposed to further a state's legitimate intent

in punishing unlawful conduct and deterring its repetition." Id.  In Marshall v. Marshall, 126 S.

Ct. 1735, 164 L.Ed 2d 480, 2006 Lexis 3456, the Supreme Court affirmed a District Court's

decision in awarding $44.3 million in compensatory damages and, based on overwhelming

evidence of "willfulness, maliciousness, and fraud," awarded an equal amount in punitive

damages.

87.    In determining the amount of punitive damages, the Supreme Court has instructed courts

to consider, among other factors, "whether the target of the conduct had financial vulnerability;

the conduct involved repeated actions or was an isolated incident; and whether the harm was the

result of intentional malice, trickery, or deceit." State Farm Mut. Auto Ins. Co. v. Campbell,

supra at 419.

88.    In the instant case, Forti was certainly financially vulnerable. Not having anticipated

fraud, she had not arranged alternative financing for the townhouse. The Assignment of Proceeds

29

was used as leverage in an attempt to force her to pay Miller a commission that she did not owe. She almost lost the townhouse. The fraudulent conduct of the defendant attorneys was repeated over and over for a period of three years, including the appeal process.

89.     The harm was the result of intentional malice, trickery, and deceit.

90.     Punitive damages are clearly available under District of Columbia law for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. In Robinson v. Sarisky, 535 A.2d 901, 906 (D.C. App. 1988), the District of Columbia Court of Appeals stated: "Punitive damages may be awarded for tortious acts aggravated by evil motive, actual malice, or for outrageous conduct in willful disregard of another's rights."

91.     Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvath all acted with evil motive, actual malice, and with outrageous conduct in willful disregard of Forti's rights.

92.     "The requisite state of mind need not (and usually cannot) be proven by direct evidence but may be inferred from all the facts and circumstances of the case." Id.

93.     In Jemison v. National Baptist Convention, 720 A.2d 275 (D.C. App 1998), the District of Columbia Court of Appeals reaffirmed that "punitive damages are warranted" when defendants "commit a tortious act 'accompanied by fraud, ill will, recklessness or in willful disregard of the plaintiff's rights'." Jemison, supra at 276, f.n. 10 citing to Washington Medical Center v. Holle, 573 A.2d 1269, 1284 (D.C.App 1990).

94.     All the defendant attorneys are liable to Forti for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. Their

The Court can "infer the requisite state of mind from the surrounding circumstances." Jemison, supra at 285-286.

96.    George Masson, Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein & Horvitz are all liable to Forti for malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. They acted with ill will, recklessly, maliciously, and in willful disregard of Forti's rights.

97.    They are also liable to Forti for furthering and participating in civil fraud and conspiring to commit civil fraud.

98.    They are liable to Forti for punitive damages. Plaintiff Forti seeks punitive damages against George Masson Jr. and Hamilton and Hamilton LLP in the amount of 6 million dollars each. She seeks punitive damages against Richard Agulia and Jeffrey Hardie in the amount of $6 million each, and she seeks punitive damages against Nathan Finkelstein and Finkelstein and Horvath P.C. in the amount of $6 million dollars each.

99.    There is abundant evidence of recklessness, bad faith, and improper motive by the defendant attorneys.

31

Respectfully submitted,

Carol A. Forti
Plaintiff pro se
14 West Chapman Street
Alexandria, VA 22301
703.535.5449

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have served George Masson, Jr., Richard
Agulia, Jeffrey Hardie, and Nathan Finkelstein with a copy of this Amended
Complaint by first-class mail, postage prepaid on July 12, 2006.

Carol A. Forti

32