# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CAROL A. FORTI,**
14 West Chapman Street
Alexandria, VA 22301
703.535.5449
          Plaintiff

    **v.**

**Civil Action No. 1:06CV00613
JR**

**GEORGE MASSON, JR. (COUNSEL TO
   W.C. & A.N. MILLER)**
Hamilton and Hamilton LLP
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
        Defendant


**HAMILTON AND HAMILTON LLP (COUNSEL TO
   W.C. & A.N. MILLER)**
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
        Defendant,

**RICHARD AGULIA
(COUNSEL TO CHONG AND ZANFORLIN)**
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006
        Defendant,

**JEFFREY HARDIE
(COUNSEL TO CHONG AND ZANFORLIN)**
Hunton & Williams, LLP
1900 K Street, N.W.
Washington, D.C. 20006
        Defendant,

**NATHAN FINKELSTEIN
(SETTLEMENT ATTORNEY)**
Finkelstein & Horvitz P.C.
7315 Wisconsin Avenue
Suite 400 East
Bethesda, MD 20814
        Defendant,

**RECEIVED**

JUL 1 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**FINKELSTEIN & HORVITZ, P.C.**
**(SETTLEMENT ATTORNEYS)**
7315 Wisconsin Ave., N.W.
Suite 400 East
Bethesda, MD 20814
            Defendant.

### IT WOULD BE WRONG FOR THE DISTRICT COURT TO DISMISS FORTI'S AMENDED COMPLAINT AND IMPOSE SANCTIONS FOR ALL OF THE FOLLOWING REASONS

#### Forti's Opposition to the Motion for Rule 11 Sanctions By George Masson, Jr. and Hamilton and Hamilton, LLP

George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein have all deliberately and intentionally misrepresented the facts in their motions for Rule 11 sanctions in order to mislead the District Court. George Masson, Jr. and the law firm of Hamilton and Hamilton LLP, sued Forti on behalf of W.C. & A.N. Miller ("Miller") for a commission from which Miller was barred by D.C. Code and District of Columbia case law. Forti impleaded June Humbert (Miller's agent) as well as the buyers of her property, Alberto Chong and Luisa Zanforlin as third party defendants. Forti's causes of action against Alberto Chong and Luisa Zanforlin were for breach of contract and compensatory and consequential damages.

Forti honestly believed that it was proper under Rule 11 to sue W.C. & A.N. Miller, June Humbert, and Chong and Zanforlin in United States District Court for civil fraud and conspiracy to commit civil fraud, because Miller's cause of action in Superior Court was for a commission. In the trial judge's Order, he granted summary judgment to Miller for a commission and dismissed Forti's claims for breach of contract and compensatory and consequential damages against Chong and Zanforlin. Forti viewed her

2

original complaint for civil fraud and conspiracy to commit civil fraud as different causes

of action against Miller, Humbert, and Chong and Zanforlin than what was litigated and

decided in Superior Court. Judge Robertson, however, apparently saw the causes of

action as in too close accord with the issues decided in Superior Court against the same

parties. Accordingly, Forti has amended her Complaint. Forti is not suing any of the

parties to the action in Superior Court. She is suing the attorneys who represented the

parties to the action in Superior Court. She is suing George Masson, Jr. and the law firm

of Hamilton and Hamilton LLP, who represented W.C. & A.N. Miller. She is suing

Richard Agulia and Jeffrey Hardie, who represented Chong and Zanforlin. Finally, she is

suing Nathan Finkelstein and the law firm of Finkelstein & Horvitz P.C., who were

supposed to act as her settlement attorneys but instead acted illegally to benefit Miller.

The causes of action against these defendant attorneys are for the intentional torts of

malicious prosecution, abuse of process, and furthering and participating in a fraudulent

conveyance. These acts were accompanied by fraud, ill will, recklessness, and willful

disregard of Forti's rights. Forti is also suing these attorneys for furthering and

participating in civil fraud and for conspiracy to commit civil fraud. "To prove civil

fraud, a plaintiff must show "false representation of a material fact which is made with

knowledge of its falsity, with intent to deceive, on which the victim took action in

justified reliance upon the misrepresentation." Furash & Co., Inc. v. McClave, 130 F.

Supp. 2d 48, 55, citing Pyne v. Jamaica Nutrition Holdings, Ltd., 497 A.2d 118, 131

(D.C. App. 1985), citing Bennett v. Kiggins, 377 A. 2d 57, 59 (D.C. App 1977), cert

denied, 434 U.S. 1034, 98 S.Ct 768, 54 L.Ed.2d 782 (1978). Civil conspiracy requires an

3

agreement between two or more parties to take part in an unlawful action, and an overt

tortious act in furtherance of the agreement that causes injury. Halberstam v. Welch, 705

F.2d 472, 479 (D.C. Cir. 1983); International Underwriters, Inc. v Boyle, 365 A.2d

779,784 (D.C. App. 1976).

With respect to Rule 11(b)(1), Forti did not file the original complaint for any

improper purpose such as to harass or to cause unnecessary delay or needless increase in

the cost of litigation. By filing the complaint, she honestly sought only to vindicate what

she believed are her rights.

With respect to Rule 11(b)(2), she honestly believed that her original complaint

was warranted by existing law and that res judicata and collateral estoppel did not bar the

action.

With respect to Rule 11(b)(3), she honestly believed that the allegations and other

factual contentions have evidentiary support.

Forti accepts, however, Judge Robertson's opinion that the causes of action are in

too close accord with the issues in Superior Court to sue Miller, Humbert, Chong, and

Zanforlin for civil fraud and conspiracy to commit civil fraud in United States District

Court. Given the Court's opinion, she has amended her Complaint to sue only the

defendant attorneys. Forti's Amended Complaint against the defendant attorneys and

their law firms does not raise issues of res judicata or collateral estoppel. Plaintiff Forti

did not plead or argue these causes of action in Superior Court. George Masson Jr.,

Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein and

Finkelstein & Horvitz P.C. were not parties to the action in Superior Court. Thus, res

4

judicata is not a bar to Forti's Amended Complaint against the attorney defendants in
United States District Court. Neither is collateral estoppel a bar to Forti's Amended
Complaint in United States District Court against the attorney defendants. The issues are
not the same as those decided in Superior Court or in the Court of Appeals, and the
attorney defendants are not in privity with parties to that action.

For the Court's information, it is the height of hypocrisy for the attorney
defendants in the instant case to move for sanctions against Forti for several reasons.
First, George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein all
submitted perjured affidavits in the action in Superior Court. Agulia and Hardie filed
perjured affidavits signed by Chong and Zanforlin with Superior Court in support of their
motion for summary judgment. Masson filed a perjured affidavit by Humbert, who made
the utterly false statement that Forti prevented settlement on April 29, 2002 when, in fact,
it was Chong and Zanforlin who prevented settlement by refusing to pay Forti the
$950,000 in Net Proceeds that they promised her in their Purchase Offer/Contract.
Humbert also lied in saying that she did not persuade Chong and Zanforlin to breach their
contract a second time on April 29, 2002 by refusing to put the disputed commission into
an escrow account so that settlement could proceed, although that is precisely what she
did. Agulia filed perjured affidavits by Chong and Zanforlin, who claimed that Forti had
refused to put the disputed commission into an escrow account, which was utterly false,
and that June Humbert had not persuaded them not to agree to the escrow agreement,
which was also false. Agulia also filed with Superior Court perjured affidavits by Nathan
Finkelstein and Esther Finkelstein that were written to support defendant attorneys' claim

5

to the escrow account, including the disputed commission. There is no question that the affidavits by Chong, Zanforlin, Humbert, and the Finkelsteins were perjured, because Chong and Zanforlin, who had filed perjured affidavits with the trial court, subsequently admitted in another pleading that their prior affidavits were perjured. The admission by Chong and Zanforlin confirmed that the affidavits prepared by Humbert and the Finkelsteins, which contained virtually identical statements, were also perjured.

Second, at the time that this case was being heard in Superior Court, there was no security for pleadings filed with Superior Court. These unethical attorneys were able to remove and did, in fact, illegally remove from the File Room in the Civil Action Branch of Superior Court Forti's most significant pleadings. They included Forti's Opposition to Miller's Motion for Summary Judgment; Forti's Opposition to Chong and Zanforlin's Motion for Summary Judgment; Forti's Rebuttal of Miller's Points and Authorities; Forti's Rebuttal of Chong and Zanforlin's Points and Authorities; Forti's Renewed Motion for Summary Judgment, and subpoenas duces tecum addressed to Miller and Humbert, which called for information or records on any settlement business that Miller provided to Finkelstein following the settlement transaction between Forti and Chong/Zanforlin. (Although Forti made some technical errors in serving earlier subpoenas, the subpoenas that were stolen from the File Room met all legal requirements and were personally served on Miller's agent for service of process in D.C. and on Humbert.) All of these pleadings were missing from the Record on Appeal. Only opposing counsel had a motive to purloin Forti's pleadings; therefore, theft of these pleadings by opposing counsel is the only reasonable explanation for their disappearance.

6

The pleadings filed in Superior Court are the pleadings used to prepare the record on appeal. As a result of the egregious and highly illegal conduct by these defendant attorneys, the record before Superior Court and the record before the Court of Appeals was full of gaping holes where Forti's pleadings should have been. As a direct result, the trial judge mistakenly believed that Forti had not filed a Renewed Motion for Summary Judgment, when, in fact, she had. Theft by the defendant attorneys of Forti's most important pleadings caused the trial judge and the Court of Appeals to reach erroneous decisions. Although Forti attempted to bring to the attention of the Court of Appeals the fact that her most important pleadings had been removed surreptitiously and illegally from the File Room of the Civil Action Branch before the record on appeal was sent to the Court of Appeals, the Court of Appeals never dealt with the theft issue and affirmed the lower court decision based on a seriously incomplete record.

Forti realizes that the District Court must, despite these gross illegalities, accept these decisions as fact, but she wants Judge Robertson to know that those decisions were procured by fraud upon the court.

All three motions for Rule 11 sanctions against Forti contain gross misrepresentation of the facts and falsely claim that important issues were decided by Superior Court and the Court of Appeals when neither Superior Court nor the Court of Appeals decided these issues.

George Masson claims that Forti "offered to pay a real estate broker a commission of 3 percent if the broker introduced her to a buyer with whom Forti subsequently entered into a contract of sale." Page 2, lines 4 and 5. In fact, Forti ran an

7

advertisement in the <u>Washington Post</u> listing her house for sale. The ad included the phrase "co-op 3 %." The Supreme Court and the Court of Appeals for the D.C. Circuit have stated unequivocally that advertisements are solicitations or invitations to bid and that they are <u>not</u> offers. Although Judge Wright accepted Masson's legally non-meritorius argument that Forti's advertisement created an offer for a unilateral contract that was satisfied by June Humbert's procurement of buyers, Judge Wright's conclusion is rebutted by well-settled Supreme Court case law and case law by the Court of Appeals for the D.C. Circuit. Furthermore, Judge Wright's conclusion only applied to parties Miller, Humbert, Chong, and Zanforlin—not the defendant attorneys. According to the Supreme Court, "advertisements are uniformly regarded as mere preliminary invitations to bid which create no power of acceptance in the recipient." <u>Foremost Pro Color, Inc. v. Eastman Kodak Co.</u>, 703 F.2d 534, 539 (9th Cir. 1983), <u>cert</u> <u>denied,</u> 104 S.Ct 1315, 465 U.S. 1038, 79 L.Ed 2d 712 (1984). According to the Court of Appeals for the District of Columbia Circuit, the "great weight of authority" is that "advertisements" are "mere solicitations for offers which create no power of acceptance in the offeree." <u>Mesaros v. United States,</u> 845 F.2d 1576, 1580 (D.C. Cir. 1988). The general rule is that advertisements are not offers. <u>A Treatise on the Law of Contracts</u> by Samuel Williston, 4tth Edition by Richard A. Lord, West Group, section 4:7. In virtually all of these cases, a "promissory undertaking is absent and in all of these cases, a reasonable person receiving the communication has reason to know, from the circumstances under which the manifestation is made, that no offer exists." <u>Id</u>. Thus, the Supreme Court and the Court of Appeals for the D.C. Circuit support the conclusion that Forti's advertisement in the

8

Washington Post for the sale of her home, including the phrase "co-op 3 %," was a solicitation to make an offer—not an offer creating the power of acceptance in the recipient. Even if it is business practice in the real estate industry to use co-op 3 percent to refer to a commission, Supreme Court law always takes precedence over trade practices.

June Humbert, an experienced agent for Miller, recognized that the ad was an invitation to bid or solicitation to make a Purchase Offer and she prepared a Purchase Offer for Chong and Zanforlin and presented it to Forti. Since the ad was a solicitation to make an offer—not an offer itself, it could not be an offer for a unilateral contract, as Masson contended. Judge Wright's conclusion that Forti's ad was an offer for a unilateral contract that was satisfied by Humbert's procurement of buyers is not only wrong on the law but also applied only to Miller, Humbert, Chong, and Zanforlin. Judge Wright's conclusion has no bearing on Forti's causes of action against the defendant attorneys. The Court of Appeals did not address the question as whether Forti's ad was an invitation to make offers or an offer for a unilateral contract. The Court of Appeals merely affirmed Judge Wright's order granting summary judgment to Miller for a commission and Judge Wright's dismissal of Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages.

Second, Masson claims that the "Buyers... executed a contract for $950,000." Page 2, Line 7. This statement is blatantly false. The Escalator Clause Addendum of the Chong/Zanforlin Purchase Offer promised to pay Forti $5,000 in Net Proceeds above the net proceeds of the next highest Purchase Offer. Since the next highest Purchase Offer

9

from Mr. J.W. Silas was for $945,000 in NET PROCEEDS, the Chong/Zanforlin offer

automatically escalated from $915,000 to 950,000 in NET PROCEEDS. Third, Masson

claims that Forti and Miller "could not agree on a day for settlement, so they executed an

escrow agreement." Page 2, Lines 9 and 10. In fact, the seller of the townhouse insisted

that Forti go to settlement on April 29, 2002, and, for that reason, April 29, 2002 was

incorporated into the Chong/Zanforlin Purchase Offer as the date they would go to

settlement on Forti's property.

1.    As violations of Rule 11, Masson contends that "only Miller claimed entitlement

to the amount of the disputed commission." Page 6, Lines 6 and 7. Only Miller may

have claimed entitlement to a commission, but Agulia and Hardie actively conspired with

Masson and Finkelstein to defraud Forti of the $29,850.70 held in the escrow account, of

which $28,500 was the disputed commission. As explained previously, Masson filed a

perjured affidavit from Humbert in support of Miller's motion for summary judgment.

Agulia and Hardie filed perjured affidavits by Chong and Zanforlin in support of Chong

and Zanforlin's motion for summary judgment. Finkelstein gave Agulia a perjured

affidavit with the objective of defrauding Forti of the amount in the escrow account.

Even Finkelstein's wife, Esther Finkelstein, who was not present at settlement on April

29, 2002 made utterly false statements about what took place at settlement and gave a

perjured affidavit to Agulia for filing purposes. Both Finkelstein affidavits made

blatantly false statements in aid of the conspiracy among the defendant attorneys to

defraud Forti of the $29,850.70 in the escrow account.

With respect to the Argument section of Miller's motion, all defendants litigated

10

against Forti either actively or through another defendant attorney. Agulia and Hardie conspired with Masson against Forti, most conspicuously in their Motions for Summary Judgment. The engaged in malicious prosecution and abuse of process against Forti and they furthered and participated in a fraudulent conveyance. They conspired among themselves to defraud Forti of $29,850.70 in the escrow account, and they succeeded in defrauding Forti of that amount.

2.    Contrary to Masson's assertion, Page 6, Lines 9, 10, 11, Miller <u>was</u>, in fact, barred by D.C. Code and District of Columbia case law from receiving a commission. D.C. Code and D.C. case law forbid receipt of a broker's commission unless there is a written employment agreement between the seller and broker or a written principal/agent agreement in which the seller agrees to pay the broker a commission for procuring buyers. According to D.C. Code section 42-1705, "A licensee (i.e. Miller ) shall not receive payment of a commission in the absence of a written listing agreement." <u>See</u> p. 1 of 1, Disclosure of Brokerage Relationship in the Purchase Offer/Contract in which June Humbert identifies Miller as the "licensee." The District of Columbia Court of Appeals has interpreted this Code provision to require proof of an employment contract between seller and broker in which the seller agrees to pay the broker a commission for procuring buyers before a broker may receive a commission. <u>Eggleton v. Vaughan</u>, 45 A.2d 362, 363 (D.C. App. 1946): "One seeking to obtain compensation as an agent must prove his contract of employment before he can recover for work done for an alleged principal. The fact that one is the procuring cause of a sale does <u>not</u> entitle him to a commission unless he had authority to sell." <u>Id</u>. [Emphasis

11

added.] There was no employment contract between Forti and Miller. In <u>Fred Ezra Co. v.</u>

<u>Pedas</u>, 682 A.2d 173, 176 (D.C. App. 1996), the Court of Appeals for the District of

Columbia affirmed that "in order for a broker, as agent, to recover against a seller, as

principal, the broker must first establish that they voluntarily entered into a principal-

agent relationship that gives rise to the broker's contractual right to a commission." Forti

did not enter into a principal-agent relationship with Miller. Since Forti did not sign an

employment contract with Miller or enter into a principal-agent relationship with Miller,

Forti did not owe Miller a commission. Judge Wright's Order to grant summary

judgment to Miller on the commission and to dismiss Forti's claims against Chong and

Zanforlin for breach of contract and compensatory and consequential damages did not

address the relevant case law nor was the case law addressed by the Court of Appeals.

Even it one assumes that Judge Wright considered case law but did not address it in his

Order, his Order only applies to Miller, Humbert, Chong, and Zanforlin. The Order has

no bearing on Forti's causes of action against the defendant attorneys.

     3.     Forti now addresses Masson's paragraph 3. In the Amended Complaint,

Forti revised her language to state as follows. "George Masson, Jr., Richard Agulia,

Jeffrey Hardie, and Nathan Finkelstein all knew that the Escalator Clause Addendum in

the Purchase Offer that Humbert prepared for buyers Chong and Zanforlin promised

Forti $950,000 in Net Proceeds if Forti would select this Purchase Offer over the next

highest Purchase Offer. Humbert, Chong, and Zanforlin made false representation of a

material fact that Chong and Zanforlin would pay $950,000 in Net Proceeds for title to

Forti's property with knowledge of its falsity and with intent to deceive. Forti took

12

justifiable reliance upon the misrepresentation, which resulted in substantial financial injury to Forti. These facts contain all the elements of civil fraud. Masson, Agulia, Hardie, and Finkelstein all knew that civil fraud had been perpetrated against Forti. They furthered that fraud by deliberately ignoring the unambiguous terms of the Escalator Clause Addendum They conspired against Forti and furthered that civil fraud by litigating a colorless, wanton suit against Forti to defraud her of $29, 850.70 in the escrow account.  George Masson, Jr., Hamilton and Hamilton, LLP; Richard Agulia, Jeffrey Hardie, Nathan Finkelstein and Finkelstein and Horvitz P.C. (by means of perjured affidavits) litigated wantonly and maliciously against Forti for a period close to three years in order to defraud her of the $29, 850.70 in the escrow account, and they succeeded in defrauding her of that amount. They badly injured Forti economically, and they did so deliberately and intentionally.  As a result of the litigation, Forti was left with NET PROCEEDS of $921,500. No reasonable seller would select an offer worth $921,500 in NET PROCEEDS when she had an offer for $945,000 in NET PROCEEDS, and Forti is a reasonable seller.

Forti is entitled to the money that was in the escrow account, which included the disputed commission. The Chong/Zanforlin Purchase Offer that Humbert presented to Forti included an Escalator Clause Addendum. The Escalator Clause Addendum promised to pay Forti $5,000 in net proceeds above the net proceeds of the next highest Purchase Offer. Since the next highest Purchase Offer from Mr. J.W. Silas was for $945,000 in NET PROCEEDS, the Chong/Zanforlin offer automatically escalated from $915,000 to $950,000 in NET PROCEEDS. Since the Escalator Clause Addendum promised Forti

13

$950,000 in Net Proceeds, the Escalator Clause Addendum precluded any deduction from $950,000 of a commission for Miller. Nevertheless, all the defendant attorneys conspired against Forti and litigated wantonly and maliciously against Forti to defraud Forti of the amount in escrow, of which the principal amount was the disputed commission.

The Escalator Clause Addendum offered to pay Forti $5,000 in net proceeds above the net proceeds of the next highest Offer.  Webster's New Collegiate Dictionary defines "net" as "free from all charges and deductions." Since the next highest offer was for 945,000 in NET PROCEEDS, Chong and Zanforlin promised to pay Forti $950,000 in NET PROCEEDS.  That this amount was the contract price is admitted by Chong, Zanforlin, Agulia, and Hardie in their Answer, p.3, line 15.

According to first sentence of the text of the Escalator Clause Addendum, "the parties agree that the following provisions are incorporated into the referenced Contract and shall supercede any provisions to the contrary in said Contract." Thus, the provisions of the Escalator Clause Addendum take precedence over any conflicting provisions in the Contract, including the phrase that June Humbert inserted: "3 % commission to Miller at settlement."

The phrase, "commission 3 % to be paid to W.C. & A.N. Miller at settlement" does not say who is to pay a commission. "Any writing that does not specify who is to pay the commission is void for vagueness, because that is an essential term." American Jurisprudence, Second Edition, section 43.

Furthermore, Humbert identified herself to Forti at their first meeting as the buyer's exclusive broker and stated that she represented their interests exclusively, an

14

identification that she memorialized on page 1 of 1 of the Disclosure of Brokerage Relationship of the Purchase Offer. For all of these reasons, Seller Forti reasonably assumed, when she selected the Chong/Zanforlin Purchase Offer for $950,000 in Net Proceeds over the next highest Purchase Offer for $945,000 in Net Proceeds that the phrase written into the contract by Humbert referred to some prior agreement between the buyers Chong and Zanforlin and broker Humbert for the buyers to pay Miller a 3 percent commission.

Although the Escalator Clause Addendum promised Forti $950,000 in Net Proceeds, all the defendant attorneys conspired against Forti and litigated wantonly and maliciously through affidavits that were perjured and pleadings that grossly misrepresented the facts to defraud Forti of $29,850.70 in the escrow account. Humbert reviewed the next highest Purchase Offer for $945,000 in Net Proceeds from Mr. J.D. Silas in Forti's kitchen and went through the Purchase Offer page by page in Forti's presence. She also reviewed the earnest money check for $45,000 that accompanied the other Purchase Offer. Forti offered to have the Purchase Offer and earnest money check xeroxed for Humbert, but Humbert said that was not necessary, because she was satisfied that the other Purchase Offer was bona fide. Only after Forti had refused to pay Miller a 3 percent commission at settlement on April 29, 2002 did Masson, Agulia, and Hardie challenge the bona fide nature of the other Purchase Offer. Forti wrote in $950,000 on the page containing the Escalator Clause Addendum. The basis of the figure of $950,000 was $5,000 in Net Proceeds added to the $945,000 in Net Proceeds offered by the next highest Purchase Offer.

15

Forti knew that she did not owe Miller a commission, and she told Humbert so in a letter. She offered to pay Humbert $4,000 for introducing credit-worthy buyers to her home and for arranging the Purchase Offer.

Forti acceded to Finkelstein's suggestion to put the disputed commission into an Escrow account, but she did so very reluctantly. She did so because she had not anticipated fraud and had not arranged alternative financing on the townhouse. She was also pressured into accepting the escrow agreement because of the Assignment of Proceeds on the sale of her property in which part of the proceeds from settlement on her property would go directly to the settlement company to pay the balance that she owed on the townhouse. Settlements on both properties were scheduled for April 29, 2002, but when Chong and Zanforlin refused to pay Forti $950,000 on April 29, 2002 and Chong and Zanforlin followed Humbert's lead in refusing to escrow the disputed commission, settlement was delayed until May 8, 2002 when an escrow agreement was signed. Richard Agulia prepared the escrow account with some input from Dan Hodin, who represented Forti. Agulia put into escrow the disputed commission for $28,500 (3 percent of $950,000) plus alleged costs of Chong and Zanforlin (property taxes and interest on their loan), so that the escrow account totaled $29,850.70, but he refused to give Forti equal benefits. Since Forti needed to move out of her home on May 10, 2002 and into the townhouse, Hodin was prevented by Agulia from making the escrow account equally beneficial to Forti.

Masson's assertion that the claims against Masson and Hamilton and Hamilton LLP are barred by the principles of collateral estoppel and the three-year statute of

16

limitations is clearly erroneous. Masson and Hamilton and Hamilton LLP were not

parties to the action in Superior Court and they are not in privity with those parties. As

for the Statute of Limitations, Masson demanded on 07/25/05 that he be paid $84,340.71

in attorney's fees for his legal services in Superior Court and in the Court of Appeals, and

Forti paid those attorney's fees on that same date to remove a lien placed on her

retirement property in Maryland by Masson and Agulia and to prevent the property from

being sold at public auction. Forti filed her Complaint in District Court on 04/03/06.

Thus, Forti's Complaint in United States District Court falls well within the three-year

year Statute of Limitations.

   4.  In paragraph 4, Masson challenges Forti's claim that "defendants took

advantage of a mistake." Forti's Amended Complaint states as follows: "In violation of

the contract principle of mutual mistake, the defendant attorneys took advantage of a

mistake (known to both parties) when seller Forti wrote in $950,000 next to NEW

SALES PRICE on the printed form of the Purchase Offer/Contract but did not cross out

NEW SALES PRICE and write in NET PROCEEDS in its place. Since Forti had

received another Purchase Offer from Mr. J.W. Silas for $945,000 in NET PROCEEDS,

the Escalator Clause Addendum automatically raised the Chong/Zanforlin Purchase Offer

from $915,000 to $950,000 in NET PROCEEDS." Humbert also made a verbal

commitment to Forti that Chong and Zanforlin would pay $950,000 in Net Proceeds since

they had pre-approval for a loan of $975,000. Based on the Escalator Clause Addendum

and Humbert's assurances, Forti told Humbert that she would select the Chong/Zanforlin

Purchase Offer over the next highest Purchase Offer for $945,000 in Net Proceeds.

17

Adding $5,000 in Net Proceeds to $945,000 in Net Proceeds was the basis for Forti

writing in $950,000 on the page of the Purchase Offer containing the Escalator Clause

Addendum. Contrary to Masson's assertions, Judge Wright did not deal with the issue of

mistake and neither did the Court of Appeals.

The Statute of Frauds "does not prevent reformation [of the Contract by the

Court] as an equitable remedy." Section 156 of Restatement (Second) of Contracts states

a rule "that is substantially more liberal than former section 509 in allowing reformation

in spite of the Statute of Frauds." Id. Furthermore, "if there is a mistake of only one

party as to expression"...[and] "her mistake is believing that a writing correctly expresses

that agreement, the problem is one of the effect of the [other party's] failure to disclose

this fact. Non-disclosure [by the other party] may be tantamount to misrepresentation."

Restatement (Second) of Contracts, sections 160-61. The failure by Humbert, Chong, and

Zanforlin to acknowledge Forti's simple mistake was intentional misrepresentation. The

insistence by Masson, Agulia, and Hardie that the $950,000 [inserted by Forti on the page

containing the Escalator Clause Addendum] represented Sales Price from which a

commission could be deducted was also intentional misrepresentation to the court.

5.      Only Miller claimed entitlement to a commission, but all the defendant

attorneys conspired against Forti to defraud her of $29,850.70, the amount in the escrow

account, of which $28,500 was the disputed commission. Contrary to Masson's assertion,

Forti did not claim "wrongful collusion" in the action in Superior Court and Judge

Wright did not address it in his Order nor was it addressed by the Court of Appeals. The

intentional torts of malicious prosecution, abuse of process, and furthering and

18

participating in a fraudulent conveyance are raised for the first time by Forti in United States District Court and she makes these claims only against the defendant attorneys. The Court of Appeals merely affirmed summary judgment for Miller on the commission and affirmed dismissal of Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages. Based on a record stripped virtually clean of Forti's responsive pleadings by the defendant attorneys, it is hardly surprising that Superior Court and the Court of Appeals reached erroneous decisions.

Since Miller was barred by D.C. Code and District of Columbia case law from receiving a commission, the litigation by Masson, Agulia, Hardie, and Finkelstein against Forti for was completely colorless, wanton, and in total disregard of Forti's rights. As a result of the litigation, Forti was left with NET PROCEEDS of $921,500. No reasonable seller would select an offer worth $921,500 in NET PROCEEDS when she had an offer for $945,000 in NET PROCEEDS, and Forti is a reasonable seller. By means of a colorless, wanton, and malicious lawsuit, Forti was defrauded by the defendant attorneys of $29, 850.70, the total amount in the escrow account.

"Whether a contract is ambiguous is a question of law [for the Court]." Washington Properties v. Chin, 760 A.2d 546, 548 (2000). "A contract is not ambiguous merely because the parties disagree over its meaning...A contract is ambiguous when and only when the provisions in controversy are reasonably...susceptible ...to two or more different meanings." Id. "It is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from

19

the nature of language in general, its meaning depends." Id.  The contract in the instant

case is reasonably susceptible to only one interpretation and construction, and, therefore,

it is not ambiguous.

An "elementary canon of interpretation is that particular words may not be

considered in isolation but that the whole contract must be brought into view and

interpreted with reference to the nature of the obligations between the parties and the

intention which they have manifested in forming them." O'Brien v. Miller, 18 S.Ct 140,

144, 168 U.S. 287, 297, 42 L.Ed 469, 473 (1897). Construing the contract as a whole

leads ineluctably to the conclusion that the Chong/Zanforlin Purchase Offer/Contract

promised Forti $950,000 in net proceeds.

Even if certain words, standing alone, are unambiguous, the court must construe

the entire contract. O'Brien v. Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469,

473 (1897). In the contract in question, the two words "SALES PRICE" before the

number $950,000 may not be ambiguous standing alone, but they must be interpreted in

view of the Escalator Clause Addendum. If the contract is interpreted as a whole and all

of the provisions read together, the only reasonable construction is that $950,000

represents net proceeds—the amount that Chong & Zanforlin offered seller Forti for her

property and were legally obligated to pay her.

In interpreting any particular clause of a contract, the court is required to examine

the entire contract. Chicago, R.I. & P. RY.Co. v.Denver & R.G.R. Co., 12 S.Ct 479, 143

U.S. 596, 36 L.Ed 277 (1892). The phrase that Humbert wrote under Paragraph 33 of the

Regional Sales Contract: "Commission 3% to be paid to W.C.& A.N. Miller at

settlement" imposed no legal obligation on seller Forti in light of the fact that Forti did not sign an employment contract with Miller or enter into a principal/agent relationship with or agree to pay Miller a 3 percent commission for procuring buyers.

"In the interpretation, and ultimately in the construction of contracts, the primary function of the court is to ascertain the intention of the parties." U.S. v. Moorman, 70 S.Ct 288, 338 U.S. 457, 94 L.Ed 256 (1950). "The intention of the parties is to be gathered, not from a single sentence but from the whole instrument read in light of the circumstances existing at the time of negotiations leading up to its execution." Miller v. Robertson, 45 S.Ct 73, 77, 266 U.S. 243, 251, 69 L.Ed 265, 272 (1924). By making an initial offer of $915,000 and having it escalate automatically to provide $5,000 in net proceeds above the net proceeds of the next highest offer up to $975,000, the clear intention of the buyers and broker in using the Escalator Clause Addendum was to have this offer selected over all other offers in a very "hot" market with a small inventory of homes for sale. The Escalator Clause Addendum offered net proceeds of $5,000 above the net proceeds of the next highest offer. Since the next highest offer offered net proceeds of $945,000, the Chong/Zanforlin contract promised net proceeds of $950,000. The intention of seller Forti was to accept the Chong/Zanforlin offer for $950,000 in net proceeds.

The "law of contracts does not judge a promissor's obligation by what is in his mind, but by the objective test of what his promise would be understood to mean by a reasonable person in the situation of the promisee." This legal principle was enunciated by the Court of Appeals for the Second Circuit and affirmed by the Supreme Court. Lee

v. State Bank & Trust Co., 54 F.2d 518, 521 (2nd Cir. 1931), cert denied 52 S.Ct 395, 285 U.S. 547, 76 L.Ed 938. The Court of Appeals for the District of Columbia also supports this test. "The first step in contract interpretation is to determine what a reasonable person in the position of the parties would have thought the disputed language meant." Washington Properties, Inc. v. Chin, Inc., 760 A.2d 546, 548 (D.C.App. 2000) citing Dodek v. CF 16 Corp., 537 A.2d 1086, 1093 (D.C. App. 1988). The court "must determine what a reasonable person in the position of the parties would have thought the disputed language meant." Capitol City Mortg. v. Habana Village Art & Folklore, Inc., 747 A.2d 564, 567 (D.C. App. 2000). A reasonable person in the situation of the promisee (seller Forti) would interpret the Chong/Zanforlin contract as offering $950,000 in net proceeds. Otherwise, she would have no reason to select the Chong/Zanforlin contract over the next highest offer, which promised $945,000 in net proceeds.

"If there is any doubt arising from the language used as to its proper meaning or construction, the words should be construed most strongly against the company, because their officers or agents prepared the instrument." Texas & P.R.Co. v. Reiss, 22 S.Ct 253, 255, 183 U.S. 621, 626, 46 L.Ed 358, 360 (1902). It is "reasonable and just" that the company's own words "should be construed most strongly against it." Moulor v.American Life Ins. Co., 4 S.Ct 466, 469, 111 U.S. 335, 342, 28 L.Ed 358, 447, 449 (1983). Further support for this legal principle comes from the Court of Appeals for the District of Columbia Circuit and from the District of Columbia Court of Appeals. "A canon of construction is that ambiguity in a contract is interpreted against the drafter." Gray v. American Express Co., 743 F.2d 10, 18 (D.C.Cir. 1984). "If, after applying the

22

rules of contract interpretation, the terms are still not subject to one definite meaning, the ambiguities will be construed strongly against the drafter." Capitol City Mortg. Corp. v. Habana Village Art & Folklore, Inc., 747 A.2d 564, 567 (D.C. App. 2000). "Ambiguous language in a contract will be construed against the company." Meade v. Prudential Insurance Co. , 477 A.2d 726, 728 (D.C. App. 1984). June Humbert, the buyers' broker, told seller Forti that the Escalator Clause Addendum was prepared by an attorney for W.C. & A.N. Miller. Humbert, an agent of W.C. & A.N. Miller, wrote the Purchase Offer that she submitted to seller Forti on behalf of Chong and Zanforlin.

"The general principles of law governing the interpretation or construction or contracts generally are applicable to a real estate broker's contract of employment." R. Lord, Williston on Contracts, sec. 62.18. "As with any other contract, the primary object in interpreting a real estate broker's contract is to give effect to the intention of the parties." Id. "A real estate brokerage contract generally arises by virtue of a pre-arranged agreement between the parties." Only "under a contract" which provides that the "broker is employed [by the seller] to find a buyer ready and willing to purchase and provides for a commission for the broker's services in procuring a purchaser," is the broker "entitled to a commission." R. Lord, Williston on Contracts, sec. 6219.

The only reasonable interpretation of the Escalator Clause Addendum in the Purchase Offer/Contract that Chong and Zanforlin signed with Forti was that Chong and Zanforlin offered Forti $950,000 in Net Proceeds for title to her property. All the defendant attorneys knew that the only reasonable interpretation of the Escalator Clause Addendum was that Chong and Zanforlin offered Forti $950,000 in Net Proceeds.

23

Nevertheless, they defrauded Forti by claiming that the $950,000 was Sales Price and by claiming that a commission could be deducted from that amount. They defrauded Forti of $28,500 (3 percent of $950,000) plus $1,350.70 that Agulia put into the escrow account as alleged costs of Chong and Zanforlin (property taxes and interest on their loan). Thus, Masson, Hamilton and Hamilton, Agulia, Hardie, and Finkelstein conspired and litigated against Forti to defraud Forti of $29,850.70—the total in the escrow account.

Contrary to George Masson's assertion, Judge Wright did not address the issue of mutual mistake and neither did the Court of Appeals. George Masson Jr. and Hamilton and Hamilton LLP are liable to Forti for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. They are also liable to Forti for participating in and furthering civil fraud and conspiracy to commit civil fraud. Since George Masson, Jr. and Hamilton and Hamilton LLP were not parties to the action in Superior Court or in the Court of Appeals, Forti's claims against Masson and Hamilton and Hamilton are not barred by the principal of collateral estoppel. Neither is the three-year Statute of Limitations a bar to Forti's claims against Masson and Hamilton and Hamilton. On 07/25/05, Masson demanded from Forti attorney's fees in the amount of $84,340.71 for his legal services in Superior Court and the Court of Appeals, and on 07/25/05, and Forti paid those attorney's fees to remove a lien on her retirement property in Maryland placed on it by Masson and Agulia and to prevent the property from being sold at auction. Forti's Complaint was filed on 04/03/06. Thus, Forti's Complaint is well within the three-year Statute of Limitations.

24

George Masson, Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein & Horvath, P.C. are all liable to Forti for malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. They deliberately and intentionally ignored the unambiguous terms of the Escalator Clause Addendum. They furthered and participated in civil fraud and they conspired to commit civil fraud against Forti. Their common actions in litigating wantonly and maliciously against Forti for almost three years to defraud her of the amount in escrow showed that there was an agreement between these defendants to act unlawfully and their overt tortious acts caused substantial financial injury to Forti. Masson, Agulia, Hardie and Finkelstein conspired to litigate a colorless, wanton, lawsuit against Forti and, by means of this litigation, forced her to pay a commission that she did not owe.

Contrary to Masson's assertion, the District of Columbia recognizes civil fraud and conspiracy to commit civil fraud. To substantiate a conspiracy claim, the plaintiff must establish that the attorneys did not act within the role of an advisor and merely advise, but instead knew of the clients' wrongful conduct and were actively involved in the wrongful conduct. See McElhanon v. Hing, 728 P.2d 256, 264-265 (Ariz.App 1985) cert denied, 481 U.S. 1030, 107 S.Ct 1956, 95 L.Ed.2d 529 (1987). All the defendant attorneys knew that civil fraud had been perpetrated against Forti. They furthered that civil fraud by conspiring to litigate a colorless, wanton, and malicious suit against Forti. All of the defendant attorneys conspired against Forti and litigated maliciously against her to defraud her of $29,850.70 in the escrow account. It is obvious that the

25

defendant attorneys knew of the clients' wrongful conduct and were actively involved in the wrongful conduct.

Contrary to Masson's assertions, attorneys are liable for the intentional torts of malicious prosecution and abuse of process. The privilege an attorney has for his actions in representing a client is a qualified one that does not extend to the intentional torts of malicious prosecution and abuse of process. McElhanon v. Hing, supra. Nor does the privilege apply to the intentional acts of furthering and participating in a fraudulent conveyance. Id. All of the defendant attorneys and their respective law firms are liable to Forti for the intentional torts of malicious prosecution and abuse of process. All of the defendant attorneys are liable to Forti for the intentional tort of furthering and participating in a fraudulent conveyance. In addition, all the defendant attorneys are liable to Forti for furthering and participating in civil fraud and for conspiring to commit civil fraud.

The defendant attorneys did not merely advise. Finkelstein injured Forti and acted for the benefit of Miller when he drew up a HUD Settlement Sheet that ignored the express terms of the contract that Chong and Zanforlin signed with Forti. Masson, Agulia, and Hardie (with Finkelstein's support) conspired to commit civil fraud by litigating a completely colorless bad faith lawsuit against Forti and they did so wantonly and maliciously in willful disregard of Forti's rights.

6.    Forti's Amended Complaint eliminates the claim against Humbert for tortious interference with contract.

7.    Forti's reaffirms her reliance on D.C. Code and highly relevant District of

26

Columbia case law. In her Amended Complaint, this case law is directed against the defendant attorneys who were so bent on malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance that they ignored highly relevant District of Columbia case law. The attorneys were so single-minded about furthering and participating in civil fraud and in conspiring to commit civil fraud that they ignored applicable case law. Forti's reliance on District of Columbia case law does not violate res judicata or collateral estoppel since it is directed against the defendant attorneys and their law firms. The attorney defendants were not parties to the action in Superior Court. The issues to be decided in United States District Court are not the issues that were decided in Superior Court, and the defendant attorneys are not in privity with the parties in Superior Court.

8.     Masson had no legal basis for filing a suit against Forti on behalf of Miller for a commission. The suit was completely without color, wanton, and in total disregard of Forti's rights. Since Masson had no legal basis for filing a suit, he has no legal basis for claiming attorney's fees for the work he did in Superior Court or in the Court of Appeals.

9.     Since Masson and Hamilton and Hamilton LLP had no legal basis for claiming attorney's fees, Forti accurately described Masson's action in placing a lien on Forti's retirement property in Maryland as a further demonstration of maliciousness toward Forti.

10.     Forti accurately describes defendant attorneys' maliciousness in conspiring to defraud Forti of the $29,850.70 held in escrow.

27

Although the courts in this jurisdiction normally follow the American Rule with each party responsible for its attorneys fees, there is one notable exception. That is the bad faith exception, which permits an award of attorneys' fees against a party who has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." <u>Synanon Foundation , Inc. v Bernstein</u>, 517 A. 2d  28, 36 (D.C. App. 1986). "Filing of a frivolous claim or the manner in which the claim is subsequently litigated would justify an award of bad faith attorney's fees." <u>Synanon</u>, <u>supra</u> at 39. <u>See</u> also <u>Jemison v. National Baptist Convention et al.</u>, 720 A.2d 275, 285.  "An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." <u>Synanon</u>, <u>supra</u> at 40.  George Masson, Jr. and Hamilton and Hamilton LLP filed suit against Forti in bad faith since he had no basis in fact or law to claim a commission. George Masson Jr's complaint against Forti was entirely without color and was asserted wantonly, to harass Forti, and for the improper purpose of defrauding her of $28,500, the amount of the disputed commission. Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are all jointly liable to Forti for the $29,850.70 that was put into escrow and for interest on that amount to the present.

The Supreme Court has stated that "if in the informed discretion of the court, neither the statute or the rules are up to the task, the court may safely rely on its inherent power" to sanction those who engage in bad faith conduct in the course of the litigation. <u>Chambers v. NASCO. Inc.</u>, 501 U.S. 32, 50, 11 S.Ct. 2123, 115 L.Ed. 27 (1991). Masson had no basis in fact or law to file suit on behalf of Miller for a commission, but Masson,

28

Hamilton and Hamilton LLP, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz P.C. litigated wantonly and maliciously against Forti for a period of nearly three years to defraud her of the amount in escrow. Masson, Hamilton and Hamilton LLP, Agulia, Hardie, Finkelstein, and Finkelstein & Horvath should be required to pay Forti her "opportunity costs" of having to defend against this fraudulent lawsuit. Since Forti's hourly rate is $275 per hour, Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for $180,557 in opportunity costs. If Forti was not forced to spend her time responding to this fraudulent lawsuit, she could have earned this amount by performing legal services for clients in Pennsylvania, where she is licensed.

Masson is liable to Forti for the $1, 875 in legal fees she had to pay Vernon Johnson of Jackson & Campbell whom she retained as First Chair in case this baseless litigation went to trial. Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for the $1,412.50 that she had to pay Dan Hodin of Paley Rothman to draw up an escrow agreement and to represent her at settlement on her property on May 8, 2002. Finkelstein and Finkestein & Horvitz are also jointly liable to Forti for the $616.46 that she had to pay in interest to the seller of the townhouse, because there was no settlement on her property on April 29, 2002.

Masson, Agulia, and Hardie compounded their malice against Forti by suing for attorney's fees. Masson claimed that he had to sue to obtain a commission from which Miller was actually barred by D.C. Code and District of Columbia case law. George Masson, Jr. and Hamilton and Hamilton LLP are jointly liable to Forti for the $84,340.71

29

that she had to pay in attorney's fees. Richard Agulia and Jeffrey Hardie are jointly liable to Forti for the $73,773.93 that she had to pay in attorney's fees. In Jemison v. National Baptist Convention, Inc. et al, 720 A.2d 275, 284 (D.C. App 1998), the District of Columbia Court of Appeals decided that repayment of attorney's fees in defending against bad faith litigation is properly treated as compensatory damages for purpose of computing punitive damages.

Masson, Agulia, and Hardie further compounded their malice against Forti further by placing a lien on Forti's retirement property in Arnold, Maryland and threatened to have the sheriff's office sell it at auction for much less than the market value to pay off the lien. Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for the $10,629 that she had to pay McNamee Hosea to represent her, work out a settlement agreement, and remove the lien.

Finkelstein violated his fiduciary duty to Forti as her settlement attorney by harming her interests in order to benefit Miller.

Forti sues Finkelstein for the $330 that he fraudulently charged her in settlement fees, because he proved so untrustworthy that Forti had to hire Dan Hodin of Paley Rothman to represent her at the actual settlement on May 8, 2002 and with respect to the escrow agreement.

All the defendant attorneys are clearly liable to Forti for punitive damages. While compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct, punitive damages are aimed at deterrence and retribution. Punitive damages may be imposed to further a state's

30

legitimate intent in punishing unlawful conduct and deterring its repetition." <u>Id.</u>  In

<u>Marshall v. Marshall</u>, 126 S. Ct. 1735, 164 L.Ed 2d 480, 2006 Lexis 3456, the Supreme

Court affirmed a District Court's decision in awarding $44.3 million in compensatory

damages and, based on overwhelming evidence of "willfulness, maliciousness, and

fraud," awarded an equal amount in punitive damages. In determining the amount of

punitive damages, the Supreme Court has instructed courts to consider, among other

factors, "whether the target of the conduct had financial vulnerability; the conduct

involved repeated actions or was an isolated incident; and whether the harm was the

result of intentional malice, trickery, or deceit." <u>State Farm Mut. Auto Ins. Co. v.</u>

<u>Campbell</u>, <u>supra</u> at 419. In the instant case, Forti was certainly financially vulnerable. Not

having anticipated fraud, she did not arrange alternative financing for the townhouse. The

Assignment of Proceeds was used as leverage in an attempt to force her to pay Miller a

commission that she did not owe. She almost lost the townhouse. The fraudulent conduct

of the defendant attorneys was repeated over and over for a period of three years,

including the appeal process. Finally, the harm was the result of intentional malice,

trickery, and deceit.

Punitive damages are clearly available under District of Columbia law for the

intentional torts of malicious prosecution, abuse of process, and furthering and

participating in a fraudulent conveyance. In <u>Robinson v. Sarisky</u>, 535 A.2d 901, 906

(D.C. App. 1988), the District of Columbia Court of Appeals stated: "Punitive damages

may be awarded for tortious acts aggravated by evil motive, actual malice, or for

outrageous conduct in willful disregard of another's rights."  Masson, Hamilton and

31

Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvath all acted with evil motive, actual malice, and with outrageous conduct in willful disregard of Forti's rights. The court went on to say, "The requisite state of mind need not (and usually cannot) be proven by direct evidence but may be inferred from all the facts and circumstances of the case." Id. In Jemison v. National Baptist Convention, 720 A.2d 275 (D.C. App 1998), the District of Columbia Court of Appeals reaffirmed that "punitive damages are warranted" when defendants "commit a tortious act 'accompanied by fraud, ill will, recklessness or in willful disregard of the plaintiff's rights'." Jemison, supra at 276, f.n. 10 citing to Washington Medical Center v. Holle, 573 A.2d 1269, 1284 (D.C.App 1990) All the defendant attorneys are liable to Forti for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. Their tortious acts were accompanied by fraud, ill will, recklessness, and willful disregard Forti's rights. All the defendant attorneys are liable to Forti for furthering and participating in civil fraud and for conspiring to commit civil fraud.

"Whether punitive damages will lie depends on the intent with which the wrong was done and not on the extent of the actual damages" Jemison, supra at 285. The Court can "infer the requisite state of mind from the surrounding circumstances." Jemison, supra at 285-286. George Masson, Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein & Horvitz all acted with malice and are liable to Forti for punitive damages. Given the maliciousness with which these defendant attorneys engaged in malicious prosecution, abuse of process, furthering and participating in a fraudulently conveyance, furtherance and participation in civil fraud,

32

and conspiracy to commit civil fraud in willful disregard of Forti's rights, plaintiff Forti seeks punitive damages against George Masson Jr. and Hamilton and Hamilton LLP in the amount of 6 million dollars each. She seeks punitive damages against Richard Agulia and Jeffrey Hardie in the amount of $6 million each, and she seeks punitive damages against Nathan Finkelstein and Finkelstein and Horvitz P.C. in the amount of $6 million dollars each.

In order to find that an attorneys' multiplication of the proceedings was both unreasonable and vexatious, [George Masson, Jr's choice of words], the Court must find "evidence of recklessness, bad faith, or improper motive" on his or her part. La Prade v. Kidder Peabody & Co., Inc. 330 U.S. App. D.C. 386, 146 F. 3d 899, 905 (1998)(citing FDIC v. Conner, 20 F.3d 1376, 1384 (5th Cir. 1994). There is no evidence of recklessness, bad faith, or improper motive on Forti's part. There is, however, abundant evidence of recklessness, bad faith, and improper motive by the defendant attorneys.

Respectfully submitted,

Carol A. Forti
Plaintiff pro se
14 West Chapman Street
Alexandria, VA 22301
703.535.5449

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I served George Masson, Jr. and Patrick Kavanaugh with a copy of this Opposition to Dismissal and to Sanctions by first-class mail, postage prepaid on July 12, 2006.

Carol A. Forti

33