UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAROL A. FORTI,
14 West Chapman Street
Alexandria, VA 22301
703.535.5449
            Plaintiff                    Civil Action No. 1:06CV00613
    v.                                   JR

GEORGE MASSON, JR. (COUNSEL TO
    W.C. & A.N. MILLER)
Hamilton and Hamilton LLP
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
            Defendant

HAMILTON AND HAMILTON LLP (COUNSEL TO
    W.C. & A.N. MILLER)
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
            Defendant,

RICHARD AGULIA
(COUNSEL TO CHONG AND ZANFORLIN)
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006
            Defendant,

JEFFREY HARDIE
(COUNSEL TO CHONG AND ZANFORLIN)
Hunton & Williams, LLP
1900 K Street, N.W.
Washington, D.C. 20006
            Defendant,

NATHAN FINKELSTEIN
(SETTLEMENT ATTORNEY)
Finkelstein & Horvitz P.C.
7315 Wisconsin Avenue
Suite 400 East
Bethesda, MD 20814
            Defendant,

**RECEIVED**

JUL 1 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**FINKELSTEIN & HORVITZ, P.C.**
**(SETTLEMENT ATTORNEYS)**
7315 Wisconsin Ave., N.W.
Suite 400 East
Bethesda, MD 20814
            Defendant.

### IT WOULD BE WRONG FOR THE DISTRICT COURT TO DISMISS FORTI'S AMENDED COMPLAINT AND IMPOSE SANCTIONS FOR ALL OF THE FOLLOWING REASONS

#### Forti's Opposition to the Motion for Rule 11 Sanctions By Nathan Finkelstein and Finkelstein & Horvitz P.C.

George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein have all deliberately and intentionally misrepresented the facts in their motions for Rule 11 sanctions in order to mislead the District Court. George Masson, Jr. and the law firm of Hamilton and Hamilton LLP, sued Forti on behalf of W.C. & A.N. Miller ("Miller") for a commission from which Miller was barred by D.C. Code and District of Columbia case law. Forti impleaded June Humbert (Miller's agent) as well as the buyers of her property, Alberto Chong and Luisa Zanforlin as third party defendants. Forti's causes of action against Alberto Chong and Luisa Zanforlin were for breach of contract and compensatory and consequential damages.

Forti honestly believed that it was proper under Rule 11 to sue W.C. & A.N. Miller, June Humbert, and Chong and Zanforlin in United States District Court for civil fraud and conspiracy to commit civil fraud, because Miller's cause of action in Superior Court was for a commission. In the trial judge's Order, he granted summary judgment to Miller for a commission and dismissed Forti's claims for breach of contract and compensatory and consequential damages against Chong and Zanforlin. Forti viewed her

2

original complaint for civil fraud and conspiracy to commit civil fraud as different causes

of action against Miller, Humbert, and Chong and Zanforlin than what was litigated and

decided in Superior Court. Judge Robertson, however, apparently saw the causes of

action as in too close accord with the issues decided in Superior Court against the same

parties. Accordingly, Forti has amended her Complaint. Forti is not suing any of the

parties to the action in Superior Court. She is suing the attorneys who represented the

parties to the action in Superior Court. She is suing George Masson, Jr. and the law firm

of Hamilton and Hamilton LLP, who represented W.C. & A.N. Miller. She is suing

Richard Agulia and Jeffrey Hardie, who represented Chong and Zanforlin. Finally, she is

suing Nathan Finkelstein and the law firm of Finkelstein & Horvitz P.C., who were

supposed to act as her settlement attorneys but instead acted illegally to benefit Miller.

The causes of action against these defendant attorneys are for the intentional torts of

malicious prosecution, abuse of process, and furthering and participating in a fraudulent

conveyance. These acts were accompanied by fraud, ill will, recklessness, and willful

disregard of Forti's rights. Forti is also suing these attorneys for furthering and

participating in civil fraud and for conspiracy to commit civil fraud."To prove civil fraud,

a plaintiff must show "false representation of a material fact which is made with

knowledge of its falsity, with intent to deceive, on which the victim took action in

justified reliance upon the misrepresentation." Furash & Co., Inc. v. McClave, 130 F.

Supp. 2d 48, 55, citing Pyne v. Jamaica Nutrition Holdings, Ltd., 497 A.2d 118, 131

(D.C. App. 1985), citing Bennett v. Kiggins, 377 A. 2d 57, 59 (D.C. App 1977), cert

denied, 434 U.S. 1034, 98 S.Ct 768, 54 L.Ed.2d 782 (1978). Civil conspiracy requires an

3

agreement between two or more parties to take part in an unlawful action, and an overt

tortious act in furtherance of the agreement that causes injury. Halberstam v. Welch, 705

F.2d 472, 479 (D.C. Cir. 1983); International Underwriters, Inc. v Boyle, 365 A.2d

779,784 (D.C. App. 1976).

With respect to Rule 11(b)(1), Forti did not file the original complaint for any

improper purpose such as to harass or to cause unnecessary delay or needless increase in

the cost of litigation. By filing the complaint, she honestly sought only to vindicate what

she believed are her rights.

With respect to Rule 11(b)(2), she honestly believed that her original complaint

was warranted by existing law and that res judicata and collateral estoppel did not bar the

action.

With respect to Rule 11(b)(3), she honestly believed that the allegations and other

factual contentions have evidentiary support.

Forti accepts, however, Judge Robertson's opinion that the causes of action are in

too close accord with the issues in Superior Court to sue Miller, Humbert, Chong, and

Zanforlin for civil fraud and conspiracy to commit civil fraud in United States District

Court. Given the Court's opinion, she has amended her Complaint to sue only the

defendant attorneys. Forti's Amended Complaint against the defendant attorneys and

their law firms does not raise issues of res judicata or collateral estoppel. Plaintiff Forti

did not plead or argue these causes of action in Superior Court. George Masson Jr.,

Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardic, and Nathan Finkelstein and

Finkelstein & Horvitz P.C. were not parties to the action in Superior Court. Thus, res

4

judicata is not a bar to Forti's Amended Complaint against the attorney defendants in United States District Court. Neither is collateral estoppel a bar to Forti's Amended Complaint in United States District Court against the attorney defendants. The issues are not the same as those decided in Superior Court or in the Court of Appeals, and the attorney defendants are not in privity with parties to that action.

For the Court's information, it is the height of hypocrisy for the attorney defendants in the instant case to move for sanctions against Forti for several reasons. First, George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein all submitted perjured affidavits in the action in Superior Court. Agulia and Hardie filed perjured affidavits signed by Chong and Zanforlin with Superior Court in support of their motion for summary judgment. Masson filed a perjured affidavit by Humbert, who made the utterly false statement that Forti prevented settlement on April 29, 2002 when, in fact, it was Chong and Zanforlin who prevented settlement by refusing to pay Forti the $950,000 in Net Proceeds that they promised her in their Purchase Offer/Contract. Humbert also lied in saying that she did not persuade Chong and Zanforlin to breach their contract a second time on April 29, 2002 by refusing to put the disputed commission into an escrow account so that settlement could proceed, although that is precisely what she did. Agulia filed perjured affidavits by Chong and Zanforlin, who claimed that Forti had refused to put the disputed commission into an escrow account, which was utterly false, and that June Humbert had not persuaded them not to agree to the escrow agreement, which was also false. Agulia also filed with Superior Court perjured affidavits by Nathan Finkelstein and Esther Finkelstein that were written to support defendant attorneys' claim

5

to the escrow account, including the disputed commission. There is no question that the affidavits by Chong, Zanforlin, Humbert, and the Finkelsteins were perjured, because Chong and Zanforlin, who had filed perjured affidavits with the trial court, subsequently admitted in another pleading that their prior affidavits were perjured. The admission by Chong and Zanforlin confirmed that the affidavits prepared by Humbert and the Finkelsteins, which contained virtually identical statements, were also perjured.

Second, at the time that this case was being heard in Superior Court, there was no security for pleadings filed with Superior Court. These unethical attorneys were able to remove and did, in fact, illegally remove from the File Room in the Civil Action Branch of Superior Court Forti's most significant pleadings. They included Forti's Opposition to Miller's Motion for Summary Judgment; Forti's Opposition to Chong and Zanforlin's Motion for Summary Judgment; Forti's Rebuttal of Miller's Points and Authorities; Forti's Rebuttal of Chong and Zanforlin's Points and Authorities; Forti's Renewed Motion for Summary Judgment, and subpoenas duces tecum addressed to Miller and Humbert, which called for information or records on any settlement business that Miller provided to Finkelstein following the settlement transaction between Forti and Chong/Zanforlin. (Although Forti made some technical errors in serving earlier subpoenas, the subpoenas that were stolen from the File Room met all legal requirements and were personally served on Miller's agent for service of process in D.C. and on Humbert.) All of these pleadings were missing from the Record on Appeal. Only opposing counsel had a motive to purloin Forti's pleadings; therefore, theft of these pleadings by opposing counsel is the only reasonable explanation for their disappearance.

6

The pleadings filed in Superior Court are the pleadings used to prepare the record on appeal. As a result of the egregious and highly illegal conduct by these defendant attorneys, the record before Superior Court and the record before the Court of Appeals was full of gaping holes where Forti's pleadings should have been. As a direct result, the trial judge mistakenly believed that Forti had not filed a Renewed Motion for Summary Judgment, when, in fact, she had. Theft by the defendant attorneys of Forti's most important pleadings caused the trial judge and the Court of Appeals to reach erroneous decisions. Although Forti attempted to bring to the attention of the Court of Appeals the fact that her most important pleadings had been removed surreptiously and illegally from the File Room of the Civil Action Branch before the record on appeal was sent to the Court of Appeals, the Court of Appeals never dealt with the theft issue and affirmed the lower court decision based on a seriously incomplete record.

Forti realizes that the District Court must, despite these gross illegalities, accept these decisions as fact, but she wants Judge Robertson to know that those decisions were procured by fraud upon the court.

All three motions for Rule 11 sanctions against Forti contain gross misrepresentation of the facts and falsely claim that important issues were decided by Superior Court and the Court of Appeals when neither Superior Court nor the Court of Appeals decided these issues.

Finkelstein tries to claim that "all claims alleged by Plaintiff in this matter arose in the spring of 2002, almost four years prior to the filing of Plaintiff's most recent Complaint in this Court." That statement by Finkelstein is clearly erroneous. On

7

07/25/05, both George Masson, Jr. and Richard Agulia demanded attorney's fees for their legal services in Superior Court and in the Court of Appeals. Masson demanded $84,340.71 in attorney's fees on that date, and Agulia and Hardie demanded $73,773.93 in attorney's fees on that date. Forti paid those fees on that date to remove a lien placed on her retirement property in Maryland by Masson and Agulia and to prevent the property from being sold at auction. Forti filed her Complaint on 04/03/06, which puts her Complaint well within the three-year Statute of Limitations.

Finkelstein played a key role in injuring Forti by drawing up a HUD Settlement Sheet giving a commission to Miller although Miller was barred from receiving a commission by D.C. Code and District of Columbia case law. This act by Finkelstein was instrumental in setting the defendant attorneys' litigation in motion. Finkelstein was actively engaged in the civil fraud against Forti and in the conspiracy to commit civil fraud against Forti. He gave Agulia a perjured affidavit to file with the court as part of the conspiracy to defraud Forti of the $29, 850.70 in the escrow account.commission. The perjured affidavits signed by Nathan Finkelstein and his wife, Esther Finkelstein, were written with the intention of supporting defendant attorneys' conspiracy to defraud Forti of the money in the escrow account, of which $28,500 was the disputed commission.

Forti advised Finkelstein, who was hired to be Forti's settlement attorney, approximately two weeks before settlement on April 29, 2002 that she did not owe Miller a commission and to make sure that the HUD Settlement Sheet reflected that fact. Forti also left a message for Finkelstein directing him to fax the HUD Settlement Sheet to her

at least five days in advance of the settlement date. Finkelstein had been hired by Forti to serve as her settlement attorney and had a fiduciary obligation to Forti. Finkelstein, however, ignored both of these instructions. He made no effort to return either of Forti's calls. Consequently, Forti did not see the HUD Settlement Sheet until the day of settlement on April 29, 2006. When she saw the HUD Settlement Sheet and she saw that Finkelstein had deducted a 3 percent commission for Miller from what was supposed to be 950,000 in Net Proceeds to Forti, she was furious. She told Finkelstein , Humbert, Chong, and Zanforlin that she would not sign a HUD Settlement Sheet that did not accurately reflect the Contract that she had signed with Chong and Zanforlin to pay her $950,000 in Net Proceeds for title to her property.

As a fallback position, Finkelstein proposed putting the disputed commission in escrow. Forti reluctantly agreed to that proposal, because she had not anticipated fraud and, consequently, had not arranged alternative funding for the townhouse on which she was going to settlement that same day. Humbert, however, adamantly refused to escrow the disputed commission and go to settlement, and she persuaded Chong and Zanforlin not to escrow the disputed commission. Legally, Humbert engaged in tortious interference with contract, and Chong and Zanforlin breached their contract with Forti by refusing to pay her $950,000 in Net Proceeds on April 29, 2002 as the Contract required. Since Chong and Zanforlin also followed Humbert's lead and refused to escrow the disputed commission, they breached their Contract with Forti a second time on April 29, 2002.

It is evident that Finkelstein had informed Humbert that there was an Assignment

9

of Proceeds on the sale of Forti's property in which part of Forti's proceeds from the sale

of her property would go directly to the settlement company to pay the balance that Forti

owed on the townhouse. Obviously, Finkelstein and Humbert believed that the

Assignment of Proceeds would provide useful leverage and force Forti to pay a

commission to Miller that she did not owe. Finkelstein claims in his Motion that Forti

"makes this claim in bad faith as there is no evidentiary support for such a claim." That

statement is clearly false. Gant Redmon, attorney for the seller of the townhouse that

Forti was buying insisted that there be an Assignment of Proceeds on the settlement

transaction on Forti's property. Since Forti did not tell Humbert that there was an

Assignment of Proceeds on Forti's property, Humbert could have only learned this from

Finkelstein. Obviously, Finkelstein and Humbert believed that the Assignment of

Proceeds would force Forti to sign the HUD settlement sheet that he had prepared giving

a commission to Miller that Forti did not owe and had not agreed to pay. Finkelstein and

Humbert obviously underestimated Forti's resolve not to be defrauded of $28,500. Forti

refused to sign the HUD Settlement Sheet as it read with a commission for Miller and

told Finkelstein, Humbert, Chong, and Zanforlin that she would not sign any HUD

Settlement Sheet that did not accurately reflect the terms of her Contract with Chong and

Zanforlin. She announced that she was leaving Finkelstein's offices for a walk-through of

the townhouse in Alexandria followed by settlement on her townhouse at noon on April

29,2002.

Finkelstein kept the pressure on Forti on behalf of Miller and Humbert. In the

days that followed this abortive settlement on Forti's property, Finkelstein phoned Forti

10

and warned her that she "had better sign the HUD Settlement Sheet," because "she did not want to lose the townhouse."

In his Motion, Finkelstein claims falsely that Miller brought sought to recover the $28,500 commission that "Forti was contractually obligated to pay." Finkelstein seriously misreads the applicable law. Forti did not owe a real estate commission to Miller. Forti ran an advertisement in the Washington Post listing her house for sale. The ad included the phrase "co-op 3 %." The Supreme Court and the Court of Appeals for the D.C. Circuit have stated unequivocally that advertisements are solicitations or invitations to bid and that they are not offers. Although Judge Wright accepted Masson's legally non-meritorius argument that Forti's advertisement created an offer for a unilateral contract that was satisfied by June Humbert's procurement of buyers, Judge Wright's conclusion is rebutted by well-settled Supreme Court case law and case law by the Court of Appeals for the D.C. Circuit. Furthermore, Judge Wright's conclusion only applied to parties Miller, Humbert, Chong, and Zanforlin—not the defendant attorneys. According to the Supreme Court, "advertisements are uniformly regarded as mere preliminary invitations to bid which create no power of acceptance in the recipient." Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 539 (9th Cir. 1983), cert denied, 104 S.Ct 1315, 465 U.S. 1038, 79 L.Ed 2d 712 (1984). According to the Court of Appeals for the District of Columbia Circuit, the "great weight of authority" is that "advertisements" are "mere solicitations for offers which create no power of acceptance in the offeree." Mesaros v. United States, 845 F.2d 1576, 1580 (D.C. Cir. 1988). The general rule is that advertisements are not offers. A Treatise on the Law of Contracts by

11

Samuel Williston, 4th Edition by Richard A. Lord, West Group, section 4:7. In virtually
all of these cases, a "promissory undertaking is absent and in all of these cases, a
reasonable person receiving the communication has reason to know, from the
circumstances under which the manifestation is made, that no offer exists." Id. Thus, the
Supreme Court and the Court of Appeals for the D.C. Circuit support the conclusion that
Forti's advertisement in the Washington Post for sale of her home, including the phrase
"co-op 3 %," was a solicitation to make an offer—not an offer creating the power of
acceptance in the recipient. Even if it is business practice in the real estate industry to use
co-op 3 percent to refer to a commission, Supreme Court law always takes precedence
over trade practices.

June Humbert, an experienced agent for Miller, recognized that the ad was an
invitation to bid or solicitation to make a Purchase Offer and she prepared a Purchase
Offer for Chong and Zanforlin and presented it to Forti. Since the ad was a solicitation to
make an offer and not an offer itself, it could not be an offer for a unilateral contract, as
Masson contended. Judge Wright's conclusion that Forti's ad was an offer for a unilateral
contract that was satisfied by Humbert's procurement of buyers is not only wrong on the
law but also applied only to Miller, Humbert, Chong, and Zanforlin. Judge Wright's
conclusion has no bearing on Forti's causes of action against the defendant attorneys.
The Court of Appeals did not address the question as whether Forti's ad was an invitation
to make offers or an offer for a unilateral contract. The Court of Appeals merely affirmed
Judge Wright's order granting summary judgment to Miller for a commission and
affirmed Judge Wright's dismissal of Forti's claims against Chong and Zanforlin for

breach of contract and compensatory and consequential damages.

Humbert reviewed the next highest Purchase Offer from Mr. J.W. Silas for $945,000 in Net Proceeds in Forti's kitchen and went through the Purchase Offer page by page in Forti's presence. She also reviewed the earnest money check for $45,000 that accompanied the Purchase Offer. Forti offered to have the Purchase Offer and earnest money check xeroxed for Humbert, but Humbert said that was not necessary, because she was satisfied that the other Purchase Offer was bona fide. Only after Forti had refused to pay Miller a 3 percent commission at settlement on April 29, 2002 did Masson, Agulia, and Hardie challenge the bona fide nature of the other Purchase Offer.

Forti's Amended Complaint states as follows: "In violation of the contract principle of mutual mistake, the defendant attorneys took advantage of a mistake (known to both parties) when seller Forti wrote in $950,000 next to NEW SALES PRICE on the printed form of the Purchase Offer/Contract but did not cross out NEW SALES PRICE and write in NET PROCEEDS in its place. Since Forti had received another Purchase Offer from Mr. J.W. Silas for $945,000 in NET PROCEEDS, the Escalator Clause Addendum automatically raised the Chong/Zanforlin Purchase Offer from $915,000 to $950,000 in NET PROCEEDS." Humbert also made a verbal commitment to Forti that Chong and Zanforlin would pay $950,000 in Net Proceeds since they had pre-approval for a loan of $975,000. Based on the Escalator Clause Addendum and Humbert's assurances, Forti told Humbert that she would select the Chong/Zanforlin Purchase Offer over the next highest Purchase Offer for $945,000 in Net Proceeds. Adding $5,000 in Net Proceeds to $945,000 in Net Proceeds was the basis for Forti writing in $950,000 on the

13

page of the Purchase Offer containing the Escalator Clause Addendum. Judge Wright did

not deal with the issue of mistake and neither did the Court of Appeals.

Furthermore, Miller was barred by D.C. Code and District of Columbia case law

from receiving a commission. D.C. Code and District of Columbia case law forbid

receipt of a broker's commission unless there is a written employment agreement

between the seller and broker or a written principal /agent agreement in which the seller

agrees to pay the broker a commission for procuring buyers. According to D.C. Code

section 42-1705, "A licensee (i.e. Miller ) shall not receive payment of a commission in

the absence of a written listing agreement." See p. 1 of 1, Disclosure of Brokerage

Relationship in the Purchase Offer/Contract in which June Humbert identifies Miller as

the "licensee." The District of Columbia Court of Appeals has interpreted this Code

provision to require proof of an employment contract between seller and broker in which

the seller agrees to pay the broker a commission for procuring buyers before a broker

may receive a commission. Eggleton v. Vaughan, 45 A.2d 362, 363 (D.C. App. 1946):

"One seeking to obtain compensation as an agent must prove his contract of employment

before he can recover for work done for an alleged principal. The fact that one is the

procuring cause of a sale does not entitle him to a commission unless he had authority to

sell." Id. [Emphasis added.] There was no employment contract between Forti and

Miller. In Fred Ezra Co. v. Pedas, 682 A.2d 173, 176 (D.C. App. 1996), the Court of

Appeals for the District of Columbia affirmed that "in order for a broker, as agent, to

recover against a seller, as principal, the broker must first establish that they voluntarily

entered into a principal-agent relationship that gives rise to the broker's contractual right

14

to a commission." Forti did not enter into a principal-agent relationship with Miller or sign an agreement with Miller promising to pay a commission for procuring buyers. Since Forti did not sign an employment contract with Miller or sign a principal/agent agreement with Miller, Forti did not owe Miller a commission. Judge Wright's decision to grant summary judgment to Miller for a commission and to dismiss Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages did not address the relevant case law nor was the case law addressed by the Court of Appeals. Even it one assumes that Judge Wright considered the relevant case law but did not address it in his Order, his Order only applies to Miller, Humbert, Chong, and Zanforlin—not the defendant attorneys. Judge Wright's Order has no relevance to Forti's causes of action against the defendant attorneys.

Nathan Finkelstein was the settlement attorney who handled Forti's purchase of the house at 2936 Garfield Terrrace, N.W. in Washington, D.C. He held himself out as qualified to handle settlements in the District of Columbia. He knew or had a duty to know D.C. Code and District of Columbia case law applicable to settlements in the District of Columbia. He knew or had a duty to know that D.C. Code barred a licensee from receiving a commission in the absence of a written listing agreement. He knew or had a duty to know that District of Columbia case law barred receipt of a commission without proof of a written employment contract or a principal /agent relationship and written agreement promising to pay a commission for procuring buyers. He knew that Forti had not signed an employment contract with Miller and had not entered into a principal/agent relationship with Miller or signed an agreement promising to pay a

15

commission for procuring buyers. Although he had a fiduciary responsibility to Forti as

her settlement attorney, he conspired with Humbert against Forti by drawing up a HUD

Settlement Sheet that deducted a 3 percent commission for Miller.

Finkelstein deliberately and intentionally attempts to mislead the District Court

by making the following statements. "Forti then counterclaimed against Alberto Chong

and Luisa Zanforlin making baseless allegations of a purported conspiracy to breach their

contract with Forti by permitting the deduction of the owed commission from the seller's

proceeds." In fact, Forti's causes of action against Chong and Zanforlin were for breach

of contract and for compensatory and consequential damages. Forti made no allegation of

a conspiracy. Finkelstein also attempts to mislead the District Court by placing the

following sentence immediately after the quotation above. He states as follows: "The

case before the Superior Court...was resolved by an Order...[by Judge Wright] granting

summary judgment in favor of plaintiff...Miller and third-party defendants...." Finkelstein

seeks to imply that Judge Wright's Order ruled on an alleged conspiracy, but Forti did not

raise the issue of conspiracy in Superior Court, and Judge Wright's order did not deal

with conspiracy. All Judge Wright's Order did was grant summary judgment to Miller on

the commission and dismiss Forti's claims against Chong and Zanforlin for breach of

contract and compensatory and consequential damages.

According to Finkelstein, "it is clear that the Complaint filed in this Court is a

bad faith attempt to relitigate the same facts and issues which were resolved by the

District of Columbia Courts...." In fact, the causes of action in Forti's Amended

Complaint are for the intentional torts of malicious prosecution, abuse of process, and

16

furthering and participating in a fraudulent conveyance. Other causes of action against the defendant attorneys are furthering and participating in civil fraud and conspiring to commit civil fraud. These causes of action are raised for the first time in United States District Court and are directed only against the defendant attorneys, who were not parties to the action in Superior Court and are not in privity with the parties to that action. Forti's causes of action against the defendant attorneys were not raised by Forti in Superior Court, and they were not ruled on by Judge Wright or the Court of Appeals. Given the fact that Forti's Amended Complaint is directed against only the defendant attorneys, the case law cited by Finkelstein arguing for sanctions is inapplicable.

Contrary to Finkelstein's assertions, Forti is entitled to the money held in the escrow account, which included the disputed commission. The Chong/Zanforlin Purchase Offer that Humbert presented to Forti included an Escalator Clause Addendum. The Escalator Clause Addendum promised to pay Forti $5,000 in net proceeds above the net proceeds of the next highest Purchase Offer. Since the next highest Purchase Offer from Mr. J.W. Silas was for $945,000 in NET PROCEEDS, the Chong/Zanforlin offer automatically escalated from $915,000 to $950,000 in NET PROCEEDS. Since the Escalator Clause Addendum promised Forti $950,000 in Net Proceeds, the Escalator Clause Addendum precluded any deduction from $950,000 in Net Proceeds of a commission for Miller. Nevertheless, all the defendant attorneys conspired with each other against Forti by litigating wantonly and maliciously against Forti to defraud Forti of the amount in escrow, of which the principal amount was the disputed commission.

According to the terms of the Escalator Clause Addendum, Chong and Zanforlin

17

offered to pay Forti $5,000 in Net Proceeds above the Net Proceeds of the next highest

offer for title to her home at 2936 Garfield Terrace, N.W. <u>Webster's New Collegiate</u>

<u>Dictionary</u> defines "net" as "free from all charges and deductions." Since the next highest

offer was for 945,000 in NET PROCEEDS, Chong and Zanforlin promised to pay Forti

$950,000 in NET PROCEEDS. That this amount was the contract price is admitted by

Chong, Zanforlin, Agulia, and Hardie in their Answer, p.3, line 15.

According to first sentence of the text of the Escalator Clause Addendum, "the

parties agree that the following provisions are incorporated into the referenced Contract

and shall supercede any provisions to the contrary in said Contract." Thus, the provisions

of the Escalator Clause Addendum take precedence of any conflicting provisions in the

Contract, including the phrase that June Humbert inserted: "3 % commission to Miller at

settlement."

The phrase, "commission 3 % to be paid to W.C. & A.N. Miller at settlement"

does not say <u>who</u> is to pay a commission. "Any writing that does not specify who is to

pay the commission is void for vagueness, because that is an essential term." <u>American</u>

<u>Jurisprudence</u>, Second Edition, section 43.

Furthermore, Humbert identified herself to Forti at their first meeting as the

buyer's broker and stated that she represented their interests exclusively, an identification

that she memorialized on page 1 of 1 of the Disclosure of Brokerage Relationship of the

Purchase Offer. For all of these reasons, Seller Forti reasonably assumed, when she

selected the Chong/Zanforlin Purchase Offer over the next highest Purchase Offer for

$945,000 that the phrase written into the contract by Humbert referred to some prior

agreement between buyers Chong and Zanforlin and broker Humbert for the buyers to pay Miller a 3 percent commission.

Settlement Attorney Finkelstein played a very active role in the civil fraud and conspiracy to commit civil fraud. Finkelstein informed Humbert of the existence of an Assignment of Proceeds. Finkelstein and Humbert used the Assignment of Proceeds in an attempt to force Forti to pay Miller a commission or risk losing the townhouse. Finkelstein and Humbert apparently believed that the Assignment of Proceeds would provide excellent leverage to force Forti to pay a commission to Miller that she did not owe.

Finkelstein ignored his fiduciary responsibility to Forti and drew up a HUD Settlement Sheet that treated the $950,000 in Net Proceeds as Sales Price and assigned a $28,500 commission to Miller out of Forti's Net Proceeds of $950,000. Finkelstein drew up the HUD Settlement Sheet in this manner despite the fact that Paragraph 21 of the Regional Sales Contract directed him "to pay the broker compensation as set forth in the listing agreement … as of the Contract Date." He deducted a commission for Miller on the Settlement Sheet despite the fact there was no listing agreement between Forti and Miller, no employment contract between Forti and Miller, and no agreement reflecting a principal/agent relationship between Forti and Miller in which Forti agreed to pay a commission for procuring buyers. By drawing up the HUD Settlement Sheet in this manner, Finkelstein attempted to defraud Forti of the $950,000 in Net Proceeds that she was owed under the contract with Chong and Zanforlin.

Finkelstein did not fax the HUD Settlement Sheet to Forti in advance of

19

settlement as Forti had requested, because Finkelstein and Humbert did not want Forti to see that the HUD Settlement Sheet deducted a commission for Miller.

Forti was also damaged substantially by Finkelstein's provision to escrow the disputed funds. Forti was forced to accede to an escrow arrangement, because she had not anticipated fraud and had not arranged alternative funding for the townhouse that she was buying in a settlement scheduled for April 29, 2002—the same day as settlement on her property at 2936 Garfield Terrace N.W.

Finkelstein drew up the HUD Settlement Sheet and provided for a commission for Miller with the clear intent of forcing Forti to pay a commission that she did not owe. Apparently, Finkelstein was willing to defraud Forti for the opportunity to obtain further settlement business from Miller. It seems likely that Humbert offered Finkelstein further settlement business if he would draw up the HUD Settlement Sheet to provide Miller with a commission and followed through on that quid pro quo. During the action in Superior Court, Forti served Masson with subpoenas (that met all the rules) addressed to Miller and Humbert to turn over any information or records regarding any settlement business between Miller and Finkelstein following Finkelstein's action on behalf of Miller in the settlement proceeding between Forti and Chong/Zanforlin. Masson adamantly refused all requests for the subpoened information and records in gross violation of court rules.

The causes of action in Forti's Amended Complaint are raised for the first time in United States District Court. The defendant attorneys were not parties to the action in Superior Court. Thus, Forti's causes of action are not barred by res judicata. Neither are

her causes of action barred by the principle of collateral estoppel. The issues to be

decided by Judge Robertson are not the same as those decided in Superior Court and the

defendant attorneys are not in privity with the parties to the action in Superior Court.

Neither is the three-year Statute of Limitations a bar to Forti's claims against Finkelstein

and Finkelstein & Hovitz P.C. On 07/25/05, George Masson demanded attorney's fees in

the amount of $84,340.71 for his legal work in Superior Court and in the Court of

Appeals. On the same date Richard Agulia demanded attorney's fees in the amount of

$73,773.93 for the legal services of Agulia and Hardie in Superior Court and in the Court

of Appeals. Forti paid those attorney's fees on 07/25/05 to remove a lien placed on her

retirement property in Maryland by Masson and Agulia and to prevent the property from

being sold at auction. Forti's Complaint was filed on 04/03/06. Thus, Forti's Complaint

against Finkelstein and Finkelstein & Horvitz is well within the three-year Statute of

Limitations.

Forti's Amended Complaint is perfectly legal, well-founded, and the actual facts

fully support her causes of action against the defendant attorneys.

George Masson, Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie,

Nathan Finkelstein, and Finkelstein & Horvitz P.C. are all liable to Forti for furthering

and participating in civil fraud and for conspiracy to commit civil fraud. Their common

actions in conspiring against Forti and in litigating wantonly and maliciously against

Forti for almost three years to defraud her of the amount in escrow showed that there was

an agreement among these defendants to act unlawfully and their overt tortious acts

caused substantial financial injury to Forti. Masson, Agulia, Hardie and Finkelstein

21

conspired among themselves to litigate a colorless, wanton, lawsuit against Forti and, by means of this litigation, forced her to pay a commission that she did not owe.

The District of Columbia recognizes civil fraud and conspiracy to commit civil fraud. To substantiate a conspiracy claim, the plaintiff must establish that the attorneys did not act within the role of an advisor and merely advise, but instead knew of the clients' wrongful conduct and were actively involved in the wrongful conduct. See McElhanon v. Hing, 728 P.2d 256, 264-265 (Ariz.App 1985) cert denied, 481 U.S. 1030, 107 S.Ct 1956, 95 L.Ed.2d 529 (1987). Humbert, Chong, and Zanforlin made false representation of a material fact that Chong and Zanforlin would pay $950,000 in Net Proceeds for title to Forti's property with knowledge of its falsity and with intent to deceive. Forti took justifiable reliance upon the misrepresentation, which resulted in substantial financial injury to Forti. These facts contain all the elements of civil fraud. Masson, Agulia, Hardie, and Finkelstein all knew that civil fraud had been perpetrated against Forti. They furthered that civil fraud by deliberately ignoring the unambiguous terms of the Escalator Clause Addendum They conspired against Forti and furthered that civil fraud by litigating a colorless, wanton suit against Forti to defraud her of $29, 850.70 in the escrow account. George Masson, Jr., Hamilton and Hamilton, LLP; Richard Agulia, Jeffrey Hardie, Nathan Finkelstein (by means of perjured affidavits) and Finkelstein and Horvitz P.C. litigated wantonly and maliciously against Forti for nearly three years in order to defraud her of the $29, 850.70 in the escrow account, and they succeeded in defrauding her of that amount.

Attorneys are liable for the intentional torts of malicious prosecution and abuse of

22

process. The privilege an attorney has for his actions in representing a client is a qualified

one that does not extend to the intentional torts of malicious prosecution and abuse of

process. McElhanon v. Hing, supra. Nor does the privilege apply to the intentional tort of

furthering and participating in a fraudulent conveyance. Id. All of the defendant attorneys

and their firms are liable to Forti for the intentional torts of malicious prosecution and

abuse of process. All of the defendant attorneys are liable to Forti for the intentional tort

of furthering and participating in a fraudulent conveyance.

The defendant attorneys did not merely advise. Finkelstein injured Forti and acted

for the benefit of Miller when he drew up a HUD Settlement Sheet that ignored the

express terms of the Contract that Chong and Zanforlin signed with Forti.   Masson,

Agulia, and Hardie (with Finkelstein's support) litigated a completely colorless bad faith

lawsuit against Forti and they did so wantonly and maliciously in willful disregard of

Forti's rights.

The Statute of Frauds "does not prevent reformation [of the Contract by the

Court] as an equitable remedy."  Section 156 of Restatement (Second) of Contracts

states a rule "that is substantially more liberal than former section 509 in allowing

reformation in spite of the Statute of Frauds." Id. Furthermore, "if there is a mistake of

only one party as to expression"...[and] "her mistake is believing that a writing correctly

expresses that agreement, the problem is one of the effect of the [other party's] failure to

disclose this fact. Non-disclosure [by the other party] may be tantamount to

misrepresentation." Restatement (Second) of Contracts, sections 160-61. The failure by

Humbert, Chong, and Zanforlin to acknowledge Forti's simple mistake was intentional

23

misrepresentation. The insistence by Masson, Agulia, and Hardie that the $950,000 [inserted by Forti on the page containing the Escalator Clause Addendum] represented Sales Price from which a commission could be deducted was also intentional misrepresentation.

Since Miller was barred by D.C. Code and District of Columbia case law from receiving a commission, the litigation by Masson, Agulia, Hardie, and Finkelstein against Forti for was completely colorless, wanton, and in total disregard of Forti's rights. As a result of the litigation, Forti was left with NET PROCEEDS of $921,500. No reasonable seller would select an offer worth $921,500 in NET PROCEEDS when she had an offer for $945,000 in NET PROCEEDS, and Forti is a reasonable seller. By means of a colorless, wanton, and malicious lawsuit, the defendant attorneys defrauded Forti of $29, 850.70, the total amount in the escrow account.

"Whether a contract is ambiguous is a question of law [for the Court]." Washington Properties v. Chin, 760 A.2d 546, 548 (2000). "A contract is not ambiguous merely because the parties disagree over its meaning...A contract is ambiguous when and only when the provisions in controversy are reasonably...susceptible ...to two or more different meanings." Id. "It is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." Id. The contract in the instant case is reasonably susceptible to only one interpretation and construction, and, therefore, it is not ambiguous.

An "elementary canon of interpretation is that particular words may not be

24

considered in isolation but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties and the intention which they have manifested in forming them." O'Brien v. Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469, 473 (1897). Construing the contract as a whole leads ineluctably to the conclusion that the Chong/Zanforlin offer promised Forti $950,000 in net proceeds.

Even if certain words, standing alone, are unambiguous, the court must construe the entire contract. O'Brien v. Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469, 473 (1897). In the contract in question, the two words "SALES PRICE" before the number $950,000 may not be ambiguous standing alone, but they must be interpreted in view of the Escalator Clause Addendum. If the contract is interpreted as a whole and all of the provisions read together, the only reasonable construction is that $950,000 represents net proceeds—the amount that Chong & Zanforlin offered seller Forti for her property and were legally obligated to pay her.

In interpreting any particular clause of a contract, the court is required to examine the entire contract. Chicago, R.I. & P. RY.Co. v.Denver & R.G.R. Co., 12 S.Ct 479, 143 U.S. 596, 36 L.Ed 277 (1892). The phrase that Humbert wrote under Paragraph 33 of the Regional Sales Contract: "Commission 3% to be paid to W.C.& A.N. Miller at settlement" imposed no legal obligation on seller Forti in light of the fact that Forti did not sign an employment contract with Miller or sign a principal/agent agreement with Miller or agree to pay Miller a 3 percent commission for procuring buyers.

"In the interpretation, and ultimately in the construction of contracts, the primary

25

function of the court is to ascertain the intention of the parties." <u>U.S. v. Moorman</u>, 70

S.Ct 288, 338 U.S. 457, 94 L.Ed 256 (1950). "The intention of the parties is to be

gathered, not from a single sentence but from the whole instrument read in light of the

circumstances existing at the time of negotiations leading up to its execution." <u>Miller v.

Robertson</u>, 45 S.Ct 73, 77, 266 U.S. 243, 251, 69 L.Ed 265, 272 (1924). By making an

initial offer of $915,000 and having it escalate automatically to provide $5,000 in net

proceeds above the net proceeds of the next highest offer up to $975,000, the clear

intention of the buyers and broker in using the Escalator Clause Addendum was to have

this offer selected over all other offers in a very "hot" market with a small inventory of

homes for sale. The Escalator Clause Addendum offered net proceeds of $5,000 above

the net proceeds of the next highest offer. Since the next highest offer offered net

proceeds of $945,000, the Chong/Zanforlin contract promised net proceeds of $950,000.

The intention of seller Forti was to accept the Chong/Zanforlin offer for $950,000 in net

proceeds.

The "law of contracts does not judge a promissor's obligation by what is in his

mind, but by the objective test of what his promise would be understood to mean by a

reasonable person in the situation of the promisee." This legal principle was enunciated

by the Court of Appeals for the Second Circuit and affirmed by the Supreme Court. <u>Lee

v. State Bank & Trust Co.</u>, 54 F.2d 518, 521 (2nd Cir. 1931), <u>cert denied</u> 52 S.Ct 395,

285 U.S. 547, 76 L.Ed 938. The Court of Appeals for the District of Columbia also

supports this test. "The first step in contract interpretation is determining what a

reasonable person in the position of the parties would have thought the disputed language

26

meant." Washington Properties, Inc. v. Chin, Inc., 760 A.2d 546, 548 (D.C.App. 2000)

citing Dodek v. CF 16 Corp., 537 A.2d 1086, 1093 (D.C. App. 1988). The court "must

determine what a reasonable person in the position of the parties would have thought the

disputed language meant." Capitol City Mortg. v. Habana Village Art & Folklore, Inc,

747 A.2d 564, 567 (D.C. App. 2000). A reasonable person in the situation of the

promisee (seller Forti) would interpret the Chong/Zanforlin contract as offering $950,000

in net proceeds. Otherwise, she would have no reason to select the Chong/Zanforlin

contract over the next highest offer, which promised $945,000 in net proceeds.

   "If there is any doubt arising from the language used as to its proper meaning or

construction, the words should be construed most strongly against the company, because

their officers or agents prepared the instrument." Texas & P.R.Co. v. Reiss, 22 S.Ct 253,

255, 183 U.S. 621, 626, 46 L.Ed 358, 360 (1902). It is "reasonable and just" that the

company's own words "should be construed most strongly against it." Moulor

v.American Life Ins. Co., 4 S.Ct 466, 469, 111 U.S. 335, 342, 28 L.Ed 358, 447, 449

 (1983). Further support for this legal principle comes from the Court of Appeals for the

District of Columbia Circuit and from the District of Columbia Court of Appeals. "A

canon of construction is that ambiguity in a contract is interpreted against the drafter."

Gray v. American Express Co., 743 F.2d 10, 18 (D.C.Cir. 1984). "If, after applying the

rules of contract interpretation, the terms are still not subject to one definite meaning, the

ambiguities will be construed strongly against the drafter." Capitol City Mortg. Corp. v.

Habana Village Art & Folklore, Inc., 747 A.2d 564, 567 (D.C. App. 2000). "Ambiguous

language in a contract will be construed against the company." Meade v. Prudential

27

Insurance Co. , 477 A.2d 726, 728 (D.C. App. 1984). June Humbert, the buyers' broker,

told seller Forti that the Escalator Clause Addendum was prepared by an attorney for

W.C. & A.N. Miller. Humbert, an agent of W.C. & A.N. Miller, wrote the Purchase Offer

that she submitted to seller Forti on behalf of Chong and Zanforlin.

"The general principles of law governing the interpretation or construction or

contracts generally are applicable to a real estate broker's contract of employment." R.

Lord, Williston on Contracts, sec. 62.18. "As with any other contract, the primary object

in interpreting a real estate broker's contract is to give effect to the intention of the

parties." Id. "A real estate brokerage contract generally arises by virtue of a pre-arranged

agreement between the parties." Only "under a contract" which provides that

the "broker is employed [by the seller] to find a buyer ready and willing to purchase and

provides for a commission for the broker's services in procuring a purchaser," is the

broker "entitled to a commission." R. Lord, Williston on Contracts, sec. 6219.

The only reasonable interpretation of the Escalator Clause Addendum in the

Purchase Offer/Contract that Chong and Zanforlin signed with Forti was that Chong and

Zanforlin offered Forti $950,000 in Net Proceeds for title to her property. All the

defendant attorneys knew that the only reasonable interpretation of the Escalator Clause

Addendum was that Chong and Zanforlin offered Forti $950,000 in Net Proceeds.

Nevertheless, they defrauded Forti by claiming that the $950,000 was Sales Price and by

claiming that a commission could be deducted from that amount. They defrauded Forti of

$28,500 (3 percent of $950,000) plus $1,350.70 that Agulia put into the escrow account

as alleged costs of Chong and Zanforlin (property taxes and interest on their loan).

Thus, Masson, Hamilton and Hamilton, Agulia, Hardie, and Finkelstein conspired and litigated against Forti to defraud Forti of $29,850.70—the total in the escrow account. All of the defendant attorneys and their law firms are liable to Forti for the intentional tort of malicious prosecution and abuse of process. All of the defendant attorneys are liable to Forti for the intentional tort of furthering and participating in a fraudulent conveyance. All the defendant attorneys are liable to Forti for participating in and furthering civil fraud and for conspiracy to commit civil fraud.

Although the courts in this jurisdiction normally follow the American Rule with each party responsible for its attorney's fees, there is one notable exception. That is the bad faith exception, which permits an award of attorneys' fees against a party who has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." <u>Synanon Foundation , Inc. v Bernstein,</u> 517 A. 2d 28, 36 (D.C. App. 1986). "Filing of a frivolous claim or the manner in which the claim is subsequently litigated would justify an award of bad faith attorney's fees." <u>Synanon, supra</u> at 39. <u>See also Jemison v. National Baptist Convention et al.,</u> 720 A.2d 275, 285. "An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." <u>Synanon, supra</u> at 40. George Masson, Jr. and Hamilton and Hamilton LLP filed suit against Forti in bad faith since he had no basis in fact or law to claim a commission. "An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." <u>Synanon, supra</u> at 40. George Masson Jr's

complaint against Forti was entirely without color and was asserted wantonly, to harass Forti, and for the improper purpose of defrauding her of the $29,850.70 that was put into escrow. Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvath are all jointly liable to Forti for the $29,850.70 that was put into escrow and for interest on that amount from May 8 2002 to the present.

The Supreme Court has stated that "if in the informed discretion of the court, neither the statute or the rules are up to the task, the court may safely rely on its inherent power" to sanction those who engage in bad faith conduct in the course of the litigation. Chambers v. NASCO, Inc., 501 U.S. 32, 50, 11 S.Ct. 2123, 115 L.Ed. 27 (1991). Masson had no basis in fact or law to file suit on behalf of Miller for a commission, but Masson, Hamilton and Hamilton LLP, Agulia, Hardie, Finkelstein, and Finkelstein & Horvath P.C. litigated wantonly and maliciously against Forti for a period of nearly three years to defraud her of the amount in escrow. Masson, Hamilton and Hamilton LLP, Agulia, Hardie, Finkelstein, and Finkelstein & Horvath should be required to pay Forti her "opportunity costs" of having to defend against this fraudulent lawsuit. Since Forti's hourly rate is $275 per hour, Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for $180,557 in opportunity costs. If Forti was not forced to spend her time responding to this fraudulent lawsuit, she could have earned this amount by performing legal services for clients in Pennsylvania, where she is licensed.

Masson is liable to Forti for the $1,875 in legal fees she had to pay Vernon Johnson of Jackson & Campbell whom she retained as First Chair in case this baseless

30

litigation went to trial.

Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for the $1,412.50 that she had to pay Dan Hodin of Paley Rothman to draw up an escrow agreement and to represent her at settlement on her property on May 8, 2002. Finkelstein and Finkestein & Horvitz are also jointly liable to Forti for the $616.46 that she had to pay in interest to the seller of the townhouse, because there was no settlement on her property on April 29, 2002.

Masson, Agulia, and Hardie compounded their malice against Forti by suing for attorney's fees. Masson claimed that he had to sue to obtain a commission for Miller from which Miller was actually barred by D.C. Code and District of Columbia case law. George Masson, Jr. and Hamilton and Hamilton LLP are jointly liable to Forti for the $84,340.71 that she had to pay in attorney's fees. Richard Agulia and Jeffrey Hardie are jointly liable to Forti for the $73,773.93 that she had to pay in attorney's fees. In Jemison v. National Baptist Convention, Inc. et al, 720 A.2d 275, 284 (D.C. App 1998), the District of Columbia Court of Appeals decided that repayment of attorney's fees in defending against bad faith litigation is properly treated as compensatory damages for purpose of computing punitive damages.

Masson, Agulia, and Hardie further compounded their malice against Forti further by placing a lien on Forti's retirement property in and threatened to have the sheriff's office sell it at auction for much less than the market value to pay off the lien. Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for the $10,629 that she had to pay McNamee Hosea to represent

31

her, work out a settlement agreement, and remove the lien.

Finkelstein violated his fiduciary duty to Forti as her settlement attorney by harming her interests in order to benefit Miller.

Finkelstein proved himself to be so deceiptful that Forti had to hire Dan Hodin of Paley Rothman to represent her at the actual settlement on May 8 and with respect to the escrow agreement. Forti sues Finkelstein for the $330 that he fraudulently charged her in settlement fees, because he did not represent her at settlement. In fact, he worked to deliberately harm Forti's interests at settlement. He deliberately injured Forti in order to benefit Miller, and his motive was apparently to obtain more settlement business from Miller.

All the defendant attorneys are clearly liable to Forti for punitive damages. While compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct, punitive damages are aimed at deterrence and retribution. Punitive damages may be imposed to further a state's legitimate intent in punishing unlawful conduct and deterring its repetition." Id. In Marshall v. Marshall, 126 S. Ct. 1735, 164 L.Ed 2d 480, 2006 Lexis 3456, the Supreme Court affirmed a District Court's decision in awarding $44.3 million in compensatory damages and, based on overwhelming evidence of "willfulness, maliciousness, and fraud," awarded an equal amount in punitive damages. In determining the amount of punitive damages, the Supreme Court has instructed courts to consider, among other factors, "whether the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and whether the harm was the

32

result of intentional malice, trickery, or deceit." State Farm Mut. Auto Ins. Co. v.

Campbell, supra at 419. In the instant case, Forti was certainly financially vulnerable. Not

having anticipated fraud, she did not arrange alternative financing for the townhouse. The

Assignment of Proceeds was used as leverage in an attempt to force her to pay Miller a

commission that she did not owe. She almost lost the townhouse. The fraudulent conduct

of the defendant attorneys was repeated over and over for a period of three years,

including the appeal process. Finally, the harm was the result of intentional malice,

trickery, and deceit.

　　Punitive damages are clearly available under District of Columbia law for the

intentional torts of malicious prosecution, abuse of process, and furthering and

participating in a fraudulent conveyance. In Robinson v. Sarisky, 535 A.2d 901, 906

(D.C. App. 1988), the District of Columbia Court of Appeals stated: "Punitive damages

may be awarded for tortious acts aggravated by evil motive, actual malice, or for

outrageous conduct in willful disregard of another's rights."   Masson, Hamilton and

Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvath all acted with evil

motive, actual malice, and with outrageous conduct in willful disregard of Forti's rights.

The court went on to say, "The requisite state of mind need not (and usually cannot) be

proven by direct evidence but may be inferred from all the facts and circumstances of the

case." Id. In Jemison v. National Baptist Convention, 720 A.2d 275 (D.C. App 1998), the

District of Columbia Court of Appeals reaffirmed that "punitive damages are warranted"

when defendants "commit a tortious act 'accompanied by fraud, ill will, recklessness or in

willful disregard of the plaintiff's rights'." Jemison, supra at 276, f.n. 10 citing to

Washington Medical Center v. Holle, 573 A.2d 1269, 1284 (D.C.App 1990)  All the defendant attorneys are liable to Forti for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. Their tortious acts were accompanied by fraud, ill will, recklessness, and willful disregard of Forti's rights. All the defendant attorney are liable to Forti for furthering and participating in civil fraud and for conspiracy to commit civil fraud.

"Whether punitive damages will lie depends on the intent with which the wrong was done and not on the extent of the actual damages" Jemison, supra at 285. The Court can "infer the requisite state of mind from the surrounding circumstances." Jemison, supra at 285-286. George Masson, Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein & Horvitz all acted with malice and are liable to Forti for punitive damages. Given the maliciousness with which these defendant attorneys furthered civil fraud and conspired to commit civil fraud and the wanton disregard of Forti's rights, plaintiff Forti seeks punitive damages against George Masson Jr. and Hamilton and Hamilton LLP in the amount of 6 million dollars each. She seeks punitive damages against Richard Agulia and Jeffrey Hardie in the amount of $6 million each, and she seeks punitive damages against Nathan Finkelstein and Finkelstein and Horvath P.C. in the amount of $6 million dollars each.

In order to find that an attorney's actions are "unreasonable and vexatious" [Finkelstein's choice of words], the Court must find "evidence of recklessness, bad faith, or improper motive" on his or her part. La Prade v. Kidder Peabody & Co., Inc. 330 U.S. App. D.C. 386, 146 F. 3d 899, 905 (1998)(citing FDIC v. Conner, 20 F.3d 1376, 1384

34

(5th Cir. 1994). There is no evidence of recklessness, bad faith, or improper motive on Forti's part. There is, however, abundant evidence of recklessness, bad faith, and improper motive by the defendant attorneys.

Respectfully submitted,

Carol A. Forti
Plaintiff pro se
14 West Chapman Street
Alexandria, VA 22301
703.535.5449

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I served Nathan Finkelstein with a copy of this Opposition to Dismissal and to Sanctions by first-class mail, postage prepaid on July 12, 2006.

Carol A. Forti

35