# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CAROL A. FORTI,**
14 West Chapman Street
Alexandria, VA 22301
703.535.5449
        Plaintiff

    v.

**Civil Action No. 1:06CV00613
JR**

**GEORGE MASSON, JR. (COUNSEL TO
   W.C. & A.N. MILLER)**
Hamilton and Hamilton LLP
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
        Defendant


**HAMILTON AND HAMILTON LLP (COUNSEL TO
   W.C. & A.N. MILLER)**
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
        Defendant,


**RICHARD AGULIA
(COUNSEL TO CHONG AND ZANFORLIN)**
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006
        Defendant,


**JEFFREY HARDIE
(COUNSEL TO CHONG AND ZANFORLIN)**
Hunton & Williams, LLP
1900 K Street, N.W.
Washington, D.C. 20006
        Defendant,


**NATHAN FINKELSTEIN
(SETTLEMENT ATTORNEY)**
Finkelstein & Horvitz P.C.
7315 Wisconsin Avenue
Suite 400 East
Bethesda, MD 20814
        Defendant,

**RECEIVED**

JUL 1 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**FINKELSTEIN & HORVITZ, P.C.**
**(SETTLEMENT ATTORNEYS)**
7315 Wisconsin Ave., N.W.
Suite 400 East
Bethesda, MD 20814
            Defendant.

## IT WOULD BE WRONG FOR THE DISTRICT COURT TO DISMISS FORTI'S AMENDED COMPLAINT AND IMPOSE SANCTIONS FOR ALL OF THE FOLLOWING REASONS

### Forti's Opposition to the Motion for Rule 11 Sanctions By Richard Agulia, Jeffrey Hardie, Alberto Chong, and Luisa Zanforlin

George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein have all deliberately and intentionally misrepresented the facts in their motions for Rule 11 sanctions in order to mislead the District Court. George Masson, Jr. and the law firm of Hamilton and Hamilton LLP, sued Forti on behalf of W.C. & A.N. Miller ("Miller") for a commission from which Miller was barred by D.C. Code and District of Columbia case law. Forti impleaded June Humbert (Miller's agent) as well as the buyers of her property, Alberto Chong and Luisa Zanforlin as third party defendants. Forti's causes of action against Alberto Chong and Luisa Zanforlin were for breach of contract and compensatory and consequential damages.

Forti honestly believed that it was proper under Rule 11 to sue W.C. & A.N. Miller, June Humbert, and Chong and Zanforlin in United States District Court for civil fraud and conspiracy to commit civil fraud, because Miller's cause of action in Superior Court was for a commission. In the trial judge's Order, he granted summary judgment to Miller for a commission and dismissed Forti's claims for breach of contract and compensatory and consequential damages against Chong and Zanforlin. Forti viewed her original complaint for civil fraud and conspiracy to commit civil fraud as different causes of action against Miller, Humbert, and Chong and

2

Zanforlin than what was litigated and decided in Superior Court. Judge Robertson, however, apparently saw the causes of action as in too close accord with the issues decided in Superior Court against the same parties. Accordingly, Forti has amended her Complaint. Forti is not suing any of the parties to the action in Superior Court. She is suing the attorneys who represented the parties to the action in Superior Court. She is suing George Masson, Jr. and the law firm of Hamilton and Hamilton LLP, who represented W.C. & A.N. Miller. She is suing Richard Agulia and Jeffrey Hardie, who represented Chong and Zanforlin. Finally, she is suing Nathan Finkelstein and the law firm of Finkelstein & Horvath P.C., who were supposed to act as her settlement attorneys but instead acted illegally to benefit Miller. The causes of action against these defendant attorneys are for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. These acts were accompanied by fraud, ill will, recklessness, and willful disregard of Forti's rights. Forti is also suing these attorneys for furthering and participating in civil fraud and conspiracy to commit civil fraud.

"To prove civil fraud, a plaintiff must show "false representation of a material fact which is made with knowledge of its falsity, with intent to deceive, on which the victim took action in justified reliance upon the misrepresentation." Furash & Co., Inc. v. McClave, 130 F. Supp. 2d 48, 55, citing Pyne v. Jamaica Nutrition Holdings, Ltd., 497 A.2d 118, 131 (D.C. App. 1985), citing Bennett v. Kiggins, 377 A. 2d 57, 59 (D.C. App 1977), cert denied, 434 U.S. 1034, 98 S.Ct 768, 54 L.Ed.2d 782 (1978). Civil conspiracy requires an agreement between two or more parties to take part in an unlawful action, and an overt tortious act in furtherance of the agreement that causes injury. Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983); International Underwriters, Inc. v Boyle, 365 A.2d 779,784 (D.C. App. 1976).

3

With respect to Rule 11(b)(1), Forti did not file the original complaint for any improper purpose such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. By filing the complaint, she honestly sought only to vindicate what she believed are her rights.

With respect to Rule 11(b)(2), she honestly believed that her original complaint was warranted by existing law and that res judicata and collateral estoppel did not bar the action.

With respect to Rule 11(b)(3), she honestly believed that the allegations and other factual contentions have evidentiary support.

Forti accepts, however, Judge Robertson's opinion that the causes of action are in too close accord with the issues in Superior Court to sue Miller, Humbert, Chong, and Zanforlin for civil fraud and conspiracy to commit civil fraud in United States District Court. Given the Court's opinion, she has amended her Complaint to sue only the defendant attorneys. Forti's Amended Complaint against the defendant attorneys and their law firms does not raise issues of res judicata or collateral estoppel. Plaintiff Forti did not plead or argue these causes of action in Superior Court. George Masson Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein and Finkelstein & Horvitz P.C. were not parties to the action in Superior Court. Thus, res judicata is not a bar to Forti's Amended Complaint against the attorney defendants in United States District Court. Neither is collateral estoppel a bar to Forti's Amended Complaint in United States District Court against the attorney defendants. The issues before Judge Robertson are not the same as those decided in Superior Court or in the Court of Appeals, and the attorney defendants are not in privity with parties to that action.

For the Court's information, it is the height of hypocrisy for the attorney defendants in

4

the instant case to move for sanctions against Forti for several reasons. First, George Masson, Jr.,

Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein all submitted perjured affidavits in the

action in Superior Court. Agulia and Hardie filed perjured affidavits signed by Chong and

Zanforlin with Superior Court in support of their motion for summary judgment. Masson filed a

perjured affidavit by Humbert, who made the utterly false statement that Forti prevented

settlement on April 29, 2002 when, in fact, it was Chong and Zanforlin who prevented settlement

by refusing to pay Forti the $950,000 in Net Proceeds that they promised her in their Purchase

Offer/Contract. Humbert also lied in saying that she did not persuade Chong and Zanforlin to

breach their contract a second time on April 29, 2002 by refusing to put the disputed commission

into an escrow account so that settlement could proceed, although that is precisely what she did.

Agulia filed perjured affidavits by Chong and Zanforlin, who claimed that Forti had refused to

put the disputed commission into an escrow account, which was utterly false, and that June

Humbert had not persuaded them not to agree to the escrow agreement, which was also false.

Agulia also filed with Superior Court perjured affidavits by Nathan Finkelstein and Esther

Finkelstein that were written to support defendant attorneys' claim to the escrow account,

including the disputed commission. There is no question that the affidavits by Chong, Zanforlin,

Humbert, and the Finkelsteins were perjured, because Chong and Zanforlin, who had filed

perjured affidavits with the trial court, subsequently admitted in another pleading that their prior

affidavits were perjured. The admission by Chong and Zanforlin confirmed that the affidavits

prepared by Humbert and the Finkelsteins, which contained virtually identical statements, were

also perjured.

  Second, at the time that this case was being heard in Superior Court, there was no

security for pleadings filed with Superior Court. These unethical attorneys were able to remove

and did, in fact, illegally remove from the File Room in the Civil Action Branch of Superior

Court Forti's most significant pleadings. They included Forti's Opposition to Miller's Motion for

Summary Judgment; Forti's Opposition to Chong and Zanforlin's Motion for Summary

Judgment; Forti's Rebuttal of Miller's Points and Authorities; Forti's Rebuttal of Chong and

Zanforlin's Points and Authorities; Forti's Renewed Motion for Summary Judgment, and

*addressed*

subpoenas duces tecum to Miller and Humbert, which called for information or records on any

settlement business that Miller provided to Finkelstein following the settlement transaction

between Forti and Chong/Zanforlin. (Although Forti made some technical errors in serving

earlier subpoenas, the subpoenas that were stolen from the File Room met all legal requirements

and were personally served on Miller's agent for service of process in D.C. and on Humbert.) All

of these pleadings were missing from the Record on Appeal. Only opposing counsel had a

motive to purloin Forti's pleadings; therefore, theft of these pleadings by opposing counsel is the

only reasonable explanation for their disappearance. The pleadings filed in Superior

Court are the pleadings used to prepare the record on appeal. As a result of the egregious

and highly illegal conduct by these defendant attorneys, the record before Superior Court and the

record before the Court of Appeals was full of gaping holes where Forti's pleadings should have

been. As a direct result, the trial judge mistakenly believed that Forti had not filed a Renewed

Motion for Summary Judgment, when, in fact, she had. Theft by the defendant attorneys of

Forti's most important pleadings caused the trial judge and the Court of Appeals to reach

erroneous decisions. Although Forti attempted to bring to the attention of the Court of Appeals

the fact that her most important pleadings had been removed surreptitiously and illegally from

6

the File Room of the Civil Action Branch before the record on appeal was sent to the Court of

Appeals, the Court of Appeals never dealt with the theft issue and affirmed the lower court

decision based on a seriously incomplete record.

Forti realizes that the District Court must, despite these gross illegalities, accept these

decisions as fact, but she wants Judge Robertson to know that those decisions were procured by

fraud upon the court.

All three motions for Rule 11 sanctions against Forti contain gross misrepresentation of

the facts and falsely claim that important issues were decided by Superior Court and the Court of

Appeals when neither Superior Court nor the Court of Appeals decided these issues.

Contrary to the claims by Agulia, Hardie, Chong, and Zanforlin (henceforth referred to as

"Agulia") Forti did not owe a real estate commission to Miller. Forti ran an advertisement in the

Washington Post listing her house for sale. The ad included the phrase "co-op 3 %." The

Supreme Court and the Court of Appeals for the D.C. Circuit have stated unequivocally that

advertisements are solicitations or invitations to bid and that they are not offers. Although Judge

Wright accepted Masson's legally non-meritorius argument that Forti's advertisement created an

offer for a unilateral contract that was satisfied by June Humbert's procurement of buyers, Judge

Wright's conclusion is rebutted by well-settled Supreme Court case law and case law by the

Court of Appeals for the D.C. Circuit. Furthermore, Judge Wright's conclusion only applied to

parties Miller, Humbert, Chong, and Zanforlin—not the defendant attorneys. According to the

Supreme Court, "advertisements are uniformly regarded as mere preliminary invitations to bid

which create no power of acceptance in the recipient." Foremost Pro Color, Inc. v. Eastman

Kodak Co., 703 F.2d 534, 539 (9th Cir. 1983), cert denied, 104 S.Ct 1315, 465 U.S. 1038, 79

7

L.Ed 2d 712 (1984). According to the Court of Appeals for the District of Columbia Circuit, the "great weight of authority" is that "advertisements" are "mere solicitations for offers which create no power of acceptance in the offeree." Mesaros v. United States, 845 F.2d 1576, 1580 (D.C. Cir. 1988). The general rule is that advertisements are not offers. A Treatise on the Law of Contracts by Samuel Williston, 4tth Edition by Richard A. Lord, West Group, section 4:7. In virtually all of these cases, a "promissory undertaking is absent and in all of these cases, a reasonable person receiving the communication has reason to know, from the circumstances under which the manifestation is made, that no offer exists." Id. Thus, the Supreme Court and the Court of Appeals for the D.C. Circuit support the conclusion that Forti's advertisement in the Washington Post for the sale of her home, including the phrase "co-op 3 %," was a solicitation to make an offer—not an offer creating the power of acceptance in the recipient. Even if it is business practice in the real estate industry to use co-op 3 percent to refer to a commission, Supreme Court law always takes precedence over trade practices.

June Humbert, an experienced agent for Miller, recognized that the ad was an invitation to bid or solicitation to make a Purchase Offer and she prepared a Purchase Offer for Chong and Zanforlin and presented it to Forti. Since the ad was a solicitation to make an offer and not an offer itself, it could not be an offer for a unilateral contract, as Masson contended. Judge Wright's conclusion that Forti's ad was an offer for a unilateral contract that was satisfied by Humbert's procurement of buyers is not only wrong on the law but also applied only to Miller, Humbert, Chong, and Zanforlin. His conclusion has no bearing on Forti's causes of action against the defendant attorneys. The Court of Appeals did not address the question as whether Forti's ad was an invitation to make offers or an offer for a unilateral contract. The Court of

8

Appeals merely affirmed Judge Wright's Order granting summary judgment to Miller for a commission and Judge Wright's dismissal of Forti's claims against Chong and Zanforlin.

Contrary to Agulia's assertions, Miller <u>was</u> barred by D.C. Code and District of Columbia case law from receiving a commission. D.C. Code and District of Columbia  case law forbid receipt of a broker's commission unless there is a written employment agreement between the seller and broker or a written principal/agent agreement in which the seller agrees to pay the broker a commission for procuring buyers. According to D.C. Code section 42-1705, "A licensee (i.e. Miller ) shall not receive payment of a commission in the absence of a written listing agreement." <u>See</u> p. 1 of 1, Disclosure of Brokerage Relationship in the Purchase Offer/Contract in which June Humbert identifies Miller as the "licensee." The District of Columbia Court of Appeals has interpreted this Code provision to require proof of an employment contract between seller and broker in which the seller agrees to pay the broker a commission for procuring buyers before a broker may receive a commission. <u>Eggleton v. Vaughan,</u> 45 A.2d 362, 363 (D.C. App. 1946): "One seeking to obtain compensation as an agent must prove his contract of employment before he can recover for work done for an alleged principal. The fact that one is the procuring cause of a sale does <u>not</u> entitle him to a commission unless he had authority to sell." <u>Id</u>. [Emphasis added.] There was no employment contract between Forti and Miller. In <u>Fred Ezra Co. v. Pedas</u>, 682 A.2d 173, 176 (D.C. App. 1996), the Court of Appeals for the District of Columbia affirmed that "in order for a broker, as agent, to recover against a seller, as principal, the broker must first establish that they voluntarily entered into a principal/agent relationship that gives rise to the broker's contractual right to a commission." Forti did not enter into a principal-agent agreement with Miller. Since Forti did not

9

sign an employment contract with Miller or enter into a principal/agent relationship with Miller, or sign an agreement with Miller promising to pay a commission to Miller for procuring buyers, Forti did not owe Miller a commission. Judge Wright's decision to grant summary judgment to Miller and to dismiss Forti's claims against Chong and Zanforlin did not address the relevant case law nor was the case law addressed by the Court of Appeals. Even it one assumes that Judge Wright considered it but did not address it in his Order, his Order only applies to Miller, Humbert, Chong, and Zanforlin. The Order has no bearing on Forti's causes of action against the defendant attorneys.

During the week following the abortive settlement on Forti's property on April 29, 2002, Richard Agulia sent Forti a letter threatening to sue her for specific performance even though his clients, Chong and Zanforlin were the parties who had breached the contract and prevented settlement on Forti's property on April 29, 2002 by refusing to pay Forti $950,000 in Net Proceeds and by refusing to escrow the disputed commission.

After being sued by Miller, Forti impleaded Humbert, Chong, and Zanforlin as third party defendants in order to be made whole. Her causes of action against Chong and Zanforlin were for breach of contract and for compensatory and consequential damages. Contrary to the Agulia's assertions, Forti raised no conspiracy claims in Superior Court. Agulia's statement that "Forti filed a third-party complaint for...alleged breach of contract conspiracy...." is a deliberate misrepresentation of the facts by Agulia designed to mislead the District Court. Forti's third-party complaint against Chong and Zanforlin was for breach of contract and compensatory and consequential damages. Agulia's statement that Judge Wright "granted summary judgment to Chong and Zanforlin on Forti's breach of contract and conspiracy claims" is also a blatant lie

designed to mislead the District Court. Forti made no conspiracy claims in Superior Court. She raised for the first time in United States District Court causes of action for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. These claims are directed only against the defendant attorneys, who were not parties to the action in District Court and are not in privity with those parties. She has also raised against the defendant attorneys causes of action for furthering and participating in civil fraud and conspiring to commit civil fraud. All Judge Wright's Order did was to grant summary judgment to Miller for the commission and dismiss Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages.

In the Amended Complaint, Forti has revised her language to state as follows. "George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein all knew that the Escalator Clause Addendum in the Purchase Offer that Humbert prepared for buyers Chong and Zanforlin promised Forti $950,000 in Net Proceeds if Forti would select this Purchase Offer over the next highest Purchase Offer for $945,000 in Net Proceeds. Humbert, Chong and Zanforlin made false representation of a material fact that Chong and Zanforlin would pay $950,000 in Net Proceeds for title to Forti's property with knowledge of its falsity and with intent to deceive. Forti took justifiable reliance upon the misrepresentation, which resulted in substantial financial injury to Forti. These facts contain all the elements of civil fraud. Masson, Agulia, Hardie, and Finkelstein all knew that civil fraud had been perpetrated against Forti. They all deliberately and intentionally ignored the unambiguous terms of the Escalator Clause Addendum of the Purchase Offer/Contract. Since Miller was barred by D.C. Code and District of Columbia case law from receiving a commission, they furthered this civil fraud by litigating a completely colorless suit

11

against Forti wantonly and maliciously for nearly three years in order to defraud her of the $29,850.70 held in the escrow account. They badly injured Forti economically, and they did so deliberately and intentionally. As a result of the litigation, Forti was left with NET PROCEEDS of $921,500. No reasonable seller would select an offer worth $921,500 in NET PROCEEDS when she had an offer for $945,000 in NET PROCEEDS, and Forti is a reasonable seller.

All defendant attorneys litigated against Forti either actively or through another defendant attorney. Agulia, Hardie, Masson, and Finkelstein conspired among themselves against Forti, most conspicuously in their Motions for Summary Judgment. They engaged in malicious prosecution and abuse of process against Forti and they furthered and participated in a fraudulent conveyance. Furthermore, they furthered and participated in civil fraud against Forti and conspired among themselves to litigate a completely colorless lawsuit against Forti for nearly three years in order to defraud her of $29,850.70 in the escrow account, and they succeeded in defrauding Forti of that sum.

Contrary to Agulia's assertions, Forti is entitled to the money that was in the escrow account, which included the disputed commission. The Chong/Zanforlin Purchase Offer that Humbert presented to Forti included an Escalator Clause Addendum. The Escalator Clause Addendum promised to pay Forti $5,000 in net proceeds above the net proceeds of the next highest Purchase Offer. Since the next highest Purchase Offer from Mr. J.W. Silas was for $945,000 in NET PROCEEDS, the Chong/Zanforlin offer automatically escalated from $915,000 to $950,000 in NET PROCEEDS. Since the Escalator Clause Addendum promised Forti $950,000 in Net Proceeds, the Escalator Clause Addendum precluded any deduction from $950,000 of a commission for Miller. Nevertheless, all the defendant attorneys conspired against

12

Forti and litigated wantonly and maliciously against Forti to defraud Forti of the amount in escrow, of which the principal amount was the disputed commission.

The Escalator Clause Addendum offered to pay Forti $5,000 in net proceeds above the net proceeds of the next highest Offer. Webster's New Collegiate Dictionary defines "net" as "free from all charges and deductions." Since the next highest offer was for 945,000 in NET PROCEEDS, Chong and Zanforlin promised to pay Forti $950,000 in NET PROCEEDS. That this amount was the contract price is admitted by Chong, Zanforlin, Agulia, and Hardie in their Answer, p.3, line 15.

According to first sentence of the text of the Escalator Clause Addendum, "the parties agree that the following provisions are incorporated into the referenced Contract and shall supercede any provisions to the contrary in said Contract." Thus, the provisions of the Escalator Clause Addendum take precedence over any conflicting provisions in the Contract, including the phrase that June Humbert inserted: "3 % commission to Miller at settlement."

The phrase, "commission 3 % to be paid to W.C. & A.N. Miller at settlement" does not say who is to pay a commission. "Any writing that does not specify who is to pay the commission is void for vagueness, because that is an essential term." American Jurisprudence, Second Edition, section 43.

Furthermore, Humbert identified herself to Forti at their first meeting as the buyer's exclusive broker and stated that she represented their interests exclusively, an identification that she memorialized on page 1 of 1 of the Disclosure of Brokerage Relationship of the Purchase Offer. For all of these reasons, Seller Forti reasonably assumed, when she selected the

13

Chong/Zanforlin Purchase Offer for $950,000 in Net Proceeds over the next highest Purchase Offer for $945,000 in Net Proceeds that the phrase written into the contract by Humbert referred to some prior agreement between the buyers Chong and Zanforlin and broker Humbert for the buyers to pay Miller a 3 percent commission.

Although the Escalator Clause Addendum promised Forti $950,000 in Net Proceeds, all the defendant attorneys conspired against Forti and litigated wantonly and maliciously through affidavits that were perjured and pleadings that grossly misrepresented the facts to defraud Forti of the $29,850.70 in the escrow account.

Humbert reviewed the next highest Purchase Offer for $945,000 in Net Proceeds from Mr. J.D. Silas in Forti's kitchen and went through the Purchase Offer page by page in Forti's presence. She also reviewed the earnest money check for $45,000 that accompanied the other Purchase Offer. Forti offered to have the Purchase Offer and earnest money check xeroxed for Humbert, but Humbert said that was not necessary, because she was satisfied that the other Purchase Offer was bona fide. Only after Forti had refused to pay Miller a 3 percent commission at settlement on April 29, 2002 did Masson, Agulia, and Hardie challenge the bona fide nature of the other Purchase Offer. Forti wrote in $950,000 on the page containing the Escalator Clause Addendum. The basis of the figure of $950,000 was $5,000 in Net Proceeds added to the $945,000 in Net Proceeds offered by the next highest Purchase Offer.

Forti knew that she did not owe Miller a commission, and she told Humbert so in a letter. She offered to pay Humbert $4,000 for introducing credit-worthy buyers to her home and for arranging the Purchase Offer.

Forti acceded to Finkelstein's suggestion to put the disputed commission into an escrow

14

account, but she did so very reluctantly. She did so because she had not anticipated fraud and had

not arranged alternative financing on the townhouse. She was also pressured into accepting the

escrow agreement because of the Assignment of Proceeds on the sale of her property in which

part of the proceeds from settlement on her property would go directly to the settlement company

to pay the balance that she owed on the townhouse. Settlements on both properties were

scheduled for April 29, 2002, but when Chong and Zanforlin refused to pay Forti $950,000 on

April 29, 2002 and Chong and Zanforlin followed Humbert's lead in refusing to escrow the

disputed commission, settlement was delayed until May 8, 2002 when an escrow agreement was

signed. Richard Agulia prepared the escrow account with some input from Dan Hodin, who

represented Forti. Agulia put into escrow the disputed commission for $28,500 (3 percent of

$950,000) plus alleged costs of Chong and Zanforlin (property taxes and interest on their loan),

so that the escrow account totaled $29,850.70, but he refused to give Forti equal benefits. Since

Forti needed to move out of her home on May 10, 2002 and into the townhouse, Hodin was

prevented by Agulia from making the escrow account equally beneficial to Forti.

Agulia blatantly and intentionally misrepresents the facts when he says that "the parties

agreed to a purchase price of $950,000." Forti agreed to a purchase price of $950,000 in Net

Proceeds.

Forti's Amended Complaint states as follows: "In violation of the contract

principle of mutual mistake, the defendant attorneys took advantage of a mistake (known to both

parties) when Seller Forti wrote in $950,000 next to NEW SALES PRICE on the printed form of

the Purchase Offer/Contract but did not cross out NEW SALES PRICE and write in NET

PROCEEDS in its place. Since Forti had received another Purchase Offer for $945,000 in NET

15

PROCEEDS, the Escalator Clause Addendum automatically raised the Chong/Zanforlin Purchase Offer from $915,000 to $950,000 in NET PROCEEDS." Humbert also made a verbal commitment to Forti that Chong and Zanforlin would pay $950,000 in Net Proceeds since they had pre-approval for a loan of $975,000. Based on the Escalator Clause Addendum and Humbert's assurances, Forti told Humbert that she would select the Chong/Zanforlin Purchase Offer over the next highest Purchase Offer for $945,000 in Net Proceeds. Adding $5,000 in Net Proceeds to $945,000 in Net Proceeds was the basis for Forti writing in $950,000 on the page of the Purchase Offer containing the Escalator Clause Addendum. It is clear that when Forti wrote in $950,000, she was referring to Net Proceeds. Agulia again blatantly misrepresents the facts in order to mislead the District Court. According to Agulia, "these same assertions were made by Forti and rejected by Judge Wright in the Superior Court action and Judge Wright's entry of judgment was affirmed on appeal." In fact, Judge Wright never dealt with the issue of mistake and neither did the Court of Appeals.

Agulia is clearly in error in stating that the "assertion of claims against Agulia and Hardie is barred by the principles of res judicata, collateral estoppel, and the three-year statute of limitations..." Agulia and Hardie were not parties to the action in Superior Court. Thus, Forti's claims against Agulia and Hardie and not barred by the principle of res judicata. Forti's claims against Agulia and Hardie are not barred by the principle of collateral estoppel either. The issues decided in Superior Court are not the issues before Judge Robertson, and Agulia and Hardie are not in privity with the parties to the action in Superior Court. The three-year Statute of Limitations does not bar Forti's claims against Agulia and Hardie. Agulia and Hardie demanded attorney's fees for their legal services in Superior Court and the Court of

16

Appeals of $73,773.93 on 07/25/05, and Forti paid those fees on that date to remove a lien placed on her retirement property in Maryland by Agulia and Hardie and to prevent her property from being sold at auction. Forti filed her complaint against Agulia and Hardie on 04/03/06. Thus, her complaint against Agulia and Hardie is well within the three-year Statute of Limitations.

The Statute of Frauds "does not prevent reformation [of the Contract by the Court] as an equitable remedy." Section 156 of Restatement (Second) of Contracts states a rule "that is substantially more liberal than former section 509 in allowing reformation in spite of the Statute of Frauds." Id. Furthermore, "if there is a mistake of only one party as to expression"...[and] "her mistake is believing that a writing correctly expresses that agreement, the problem is one of the effect of the [other party's] failure to disclose this fact. Non-disclosure [by the other party] may be tantamount to misrepresentation." Restatement (Second) of Contracts, sections 160-61. The failure by Humbert, Chong, and Zanforlin to acknowledge Forti's simple mistake was intentional misrepresentation. The insistence by Masson, Agulia, and Hardie that the $950,000 [inserted by Forti on the page containing the Escalator Clause Addendum] represented Sales Price from which a commission could be deducted was also intentional misrepresentation.

"Whether a contract is ambiguous is a question of law [for the Court]." Washington Properties v. Chin, 760 A.2d 546, 548 (2000). "A contract is not ambiguous merely because the parties disagree over its meaning...A contract is ambiguous when and only when the provisions in controversy are reasonably...susceptible ...to two or more different meanings." Id. "It is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." Id. The contract in the instant case is reasonably susceptible to only one interpretation

17

and construction, and, therefore, it is not ambiguous.

An "elementary canon of interpretation is that particular words may not be considered in isolation but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties and the intention which they have manifested in forming them." O'Brien v. Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469, 473 (1897). Construing the contract as a whole leads ineluctably to the conclusion that the Chong/Zanforlin offer promised Forti $950,000 in net proceeds.

Even if certain words, standing alone, are unambiguous, the court must construe the entire contract. O'Brien v. Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469, 473 (1897). In the contract in question, the two words "SALES PRICE" before the number $950,000 may not be ambiguous standing alone, but they must be interpreted in view of the Escalator Clause Addendum. If the contract is interpreted as a whole and all of the provisions read together, the only reasonable construction is that $950,000 represents net proceeds—the amount that Chong & Zanforlin offered seller Forti for her property and were legally obligated to pay her.

In interpreting any particular clause of a contract, the court is required to examine the entire contract. Chicago, R.I. & P. RY.Co. v.Denver & R.G.R. Co., 12 S.Ct 479, 143 U.S. 596, 36 L.Ed 277 (1892). The phrase that Humbert wrote under Paragraph 33 of the Regional Sales Contract: "Commission 3% to be paid to W.C.& A.N. Miller at settlement" imposed no legal obligation on seller Forti in light of the fact that Forti did not sign an employment contract with Miller or enter into a principal/agent relationship with or sign an agreement offering to pay Miller a commission for procuring buyers.

"In the interpretation, and ultimately in the construction of contracts, the primary function

18

of the court is to ascertain the intention of the parties." <u>U.S. v. Moorman</u>, 70 S.Ct 288, 338 U.S.

457, 94 L.Ed 256 (1950). "The intention of the parties is to be gathered, not from a single

sentence but from the whole instrument read in light of the circumstances existing at the time of

negotiations leading up to its execution." <u>Miller v. Robertson</u>, 45 S.Ct 73, 77, 266 U.S. 243, 251,

69 L.Ed 265, 272 (1924). By making an initial offer of $915,000 and having it escalate

automatically to provide $5,000 in net proceeds above the net proceeds of the next highest offer

up to $975,000, the clear intention of the buyers and broker in using the Escalator Clause

Addendum was to have this offer selected over all other offers in a very "hot" market with a

small inventory of homes for sale. The Escalator Clause Addendum offered net proceeds of

$5,000 above the net proceeds of the next highest offer. Since the next highest offer offered net

proceeds of $945,000, the Chong/Zanforlin contract promised net proceeds of $950,000. The

intention of seller Forti was to accept the Chong/Zanforlin offer for $950,000 in net proceeds.

The "law of contracts does not judge a promissor's obligation by what is in his mind, but

by the objective test of what his promise would be understood to mean by a reasonable person in

the situation of the promisee." This legal principle was enunciated by the Court of Appeals for

the Second Circuit and affirmed by the Supreme Court. <u>Lee v. State Bank & Trust Co.</u>, 54 F.2d

518, 521 (2nd Cir. 1931), <u>cert</u> <u>denied</u> 52 S.Ct 395, 285 U.S. 547, 76 L.Ed 938. The Court of

Appeals for the District of Columbia also supports this test. "The first step in contract

interpretation is determining what a reasonable person in the position of the parties would have

thought the disputed language meant." <u>Washington Properties, Inc. v. Chin, Inc.</u>, 760 A.2d 546,

548 (D.C.App. 2000) citing <u>Dodek v. CF 16 Corp.</u>, 537 A.2d 1086, 1093 (D.C. App. 1988). The

court "must determine what a reasonable person in the position of the parties would have thought

the disputed language meant." Capitol City Mortg. v. Habana Village Art & Folklore, Inc, 747

A.2d 564, 567 (D.C. App. 2000). A reasonable person in the situation of the promisee (seller

Forti) would interpret the Chong/Zanforlin contract as offering $950,000 in net proceeds.

Otherwise, she would have no reason to select the Chong/Zanforlin contract over the next

highest offer, which promised $945,000 in net proceeds.

   "If there is any doubt arising from the language used as to its proper meaning or

construction, the words should be construed most strongly against the company, because

their officers or agents prepared the instrument." Texas & P.R.Co. v. Reiss, 22 S.Ct 253, 255,

183 U.S. 621, 626, 46 L.Ed 358, 360 (1902). It is "reasonable and just" that the company's own

words "should be construed most strongly against it." Moulor v.American Life Ins. Co., 4 S.Ct

466, 469, 111 U.S. 335, 342, 28 L.Ed 358, 447, 449 (1983). Further support for this legal

principle comes from the Court of Appeals for the District of Columbia Circuit and from the

District of Columbia Court of Appeals. "A canon of construction is that ambiguity in a contract

is interpreted against the drafter." Gray v. American Express Co., 743 F.2d 10, 18 (D.C.Cir.

1984). "If, after applying the rules of contract interpretation, the terms are still not subject to one

definite meaning, the ambiguities will be construed strongly against the drafter." Capitol City

Mortg. Corp. v. Habana Village Art & Folklore, Inc., 747 A.2d 564, 567 (D.C. App. 2000).

"Ambiguous language in a contract will be construed against the company." Meade v. Prudential

Insurance Co. , 477 A.2d 726, 728 (D.C. App. 1984). June Humbert, the buyers' broker, told

seller Forti that the Escalator Clause Addendum was prepared by an attorney for W.C. & A.N.

Miller. Humbert, an agent of W.C. & A.N. Miller, wrote the Purchase Offer that she submitted to

seller Forti on behalf of Chong and Zanforlin.

"The general principles of law governing the interpretation or construction or contracts generally are applicable to a real estate broker's contract of employment." R. Lord, <u>Williston on Contracts</u>, sec. 62.18. "As with any other contract, the primary object in interpreting a real estate broker's contract is to give effect to the intention of the parties." <u>Id.</u> "A real estate brokerage contract generally arises by virtue of a pre-arranged agreement between the parties." Only "under a contract" which provides that the "broker is employed [by the seller] to find a buyer ready and willing to purchase and provides for a commission for the broker's services in procuring a purchaser," is the broker "entitled to a commission." R. Lord, <u>Williston on Contracts</u>, sec. 6219.

The only reasonable interpretation of the Escalator Clause Addendum in the Purchase Offer/Contract that Chong and Zanforlin signed with Forti was that Chong and Zanforlin offered Forti $950,000 in Net Proceeds for title to her property. All the defendant attorneys knew that the only reasonable interpretation of the Escalator Clause Addendum was that Chong and Zanforlin offered Forti $950,000 in Net Proceeds. Nevertheless, they defrauded Forti by claiming that the $950,000 was Sales Price and by claiming that a commission could be deducted from that amount. They defrauded Forti of $28,500 (3 percent of $950,000) plus $1,350.70 that Agulia put into the escrow account as alleged costs of Chong and Zanforlin (property taxes and interest on their loan). Thus, Masson, Hamilton and Hamilton, Agulia, Hardie, and Finkelstein conspired among themselves against Forti and litigated against Forti to defraud her of $29,850.70—the total in the escrow account.

Richard Agulia and Jeffrey Hardie are liable to Forti for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. Since

21

Agulia and Hardie were not parties to the action in Superior Court, Forti's claims against Agulia and hardie are not barred by the principal of res judicata. Neither are the claims against Agulia and Hardie barred by the principal of collateral estoppel. The issues to be decided by Judge Robertson are not the issues that were decided in Superior Court, and Agulia and Hardie are not in privity with the parties in Superior Court. Neither is the three-year Statute of Limitations a bar to Forti's claims against Agulia and Hardie. On 07/25/05, Agulia and Hardie demanded from Forti attorney's fees in the amount of $73,773.93 for their legal work in Superior Court and the Court of Appeals, and on 07/25/05, and Forti paid those attorney's fees to remove a lien on her retirement property in Maryland and prevent it from being sold at auction. Forti's Complaint was filed on 04/03/06. Thus, Forti's Complaint is well within the three-year Statute of Limitations.

Contrary to Agulia's assertion, the District of Columbia recognizes civil fraud and conspiracy to commit civil fraud. To substantiate a conspiracy claim, the plaintiff must establish that the attorneys did not act within the role of an advisor and merely advise, but instead knew of the clients' wrongful conduct and were actively involved in the wrongful conduct. See McElhanon v. Hing, 728 P.2d 256, 264-265 (Ariz.App 1985) cert denied, 481 U.S. 1030, 107 S.Ct 1956, 95 L.Ed.2d 529 (1987). All the defendant attorneys knew that civil fraud had been perpetrated against Forti. They furthered that civil fraud by conspiring to litigate a colorless, wanton, and malicious suit against Forti. All of the defendant attorneys conspired against Forti and litigated maliciously against her to defraud her of the $29,850.70 in the escrow account. It is obvious that the defendant attorneys knew of the clients' wrongful conduct and were actively involved in the wrongful conduct.

Contrary to Agulia's assertions, attorneys are liable for the intentional torts of

22

malicious prosecution and abuse of process. The privilege an attorney has for his actions

in representing a client is a qualified one that does not extend to the intentional torts of malicious

prosecution and abuse of process. McElhanon v. Hing, supra. Nor does the privilege apply to the

intentional acts of furthering and participating in a fraudulent conveyance. Id. All of the

defendant attorneys and their law firms are liable to Forti for the intentional torts of malicious

prosecution and abuse of process. All of the defendant attorneys are liable to Forti for the

intentional tort of furthering and participating in a fraudulent conveyance. All the defendant

attorneys and their law firms are liable to Forti for furthering civil fraud and participating in civil

fraud and for conspiring to commit civil fraud.

The defendant attorneys did not merely advise. Finkelstein injured Forti and acted for the

benefit of Miller when he drew up a HUD Settlement Sheet that ignored the express terms of the

contract that Chong and Zanforlin signed with Forti.   Masson, Agulia, and Hardie (with

Finkelstein's support) litigated a completely colorless bad faith lawsuit against Forti and they did

so wantonly and maliciously in willful disregard of Forti's rights.

Forti's reaffirms her reliance on D.C. Code and highly relevant District of Columbia

case law. In her Amended Complaint, this case law is directed against the defendant attorneys

who were so bent on malicious prosecution, abuse of process, and furthering and participating in

a fraudulent conveyance that they ignored highly relevant District of Columbia case law. The

defendant attorneys were so single-mined about furthering and participating in civil fraud and in

conspiring to commit civil fraud that they ignored applicable case law even after Forti brought

the applicable law to their attention. Forti's reliance on District of Columbia case law does not

violate res judicata or collateral estoppel since it is directed against the defendant attorneys and their law firms. The attorney defendants were not parties to the action in Superior Court. The issues to be decided in United States District Court are not the issues that were decided in Superior Court, and the defendant attorneys are not in privity with parties to the action in Superior Court.

Masson had no legal basis for filing a suit against Forti on behalf of Miller for a commission. The suit was completely without color, wanton, and in total disregard of Forti's rights. Chong and Zanforlin's duty under the Contract was to pay Forti $950,000 in NET PROCEEDS. Instead, they breached their contract and refused to pay Forti $950,000 in Net Proceeds on April 29, 2002. They also breached their Contract by refusing to escrow the disputed commission so that settlement could take place on April 29, 2002 . Since Chong and Zanforlin had no legal basis to litigate against Forti, Agulia and Hardie had no legal basis for claiming attorney's fees for the work they did in Superior Court or in the Court of Appeals.

Since Agulia and Hardie no legal basis for claiming attorney's fees, Forti accurately described Agulia and Hardie's action in placing a lien on Forti's retirement property in Maryland as a further demonstration of maliciousness toward Forti.

Although the courts in this jurisdiction normally follow the American Rule with each party responsible for its attorneys fees, there is one notable exception. That is the bad faith exception, which permits an award of attorneys' fees against a party who has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." Synanon Foundation , Inc. v Bernstein, 517 A. 2d 28, 36 (D.C. App. 1986). "Filing of a frivolous claim or the manner in which the claim is subsequently litigated would justify an award of bad faith attorney's fees." Synanon, supra at 39.

24

See also Jemison v. National Baptist Convention et al., 720 A.2d 275, 285. "An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." Synanon, supra at 40. George Masson, Jr. and Hamilton and Hamilton LLP filed suit against Forti in bad faith since he had no basis in fact or law to claim a commission. George Masson Jr's complaint against Forti was entirely without color and was asserted wantonly, to harass Forti, and for the improper purpose of defrauding her of the $29,850.70 that was put into escrow. Masson, Hamilton and Hamilton, Agulia, Hardic, Finkelstein, and Finkelstein & Horvath are all jointly liable to Forti for the $29,850.70 that was put into escrow and for interest on that amount to the present.

The Supreme Court has stated that "if in the informed discretion of the court, neither the statute or the rules are up to the task, the court may safely rely on its inherent power" to sanction those who engage in bad faith conduct in the course of the litigation. Chambers v. NASCO, Inc., 501 U.S. 32, 50, 11 S.Ct. 2123, 115 L.Ed. 27 (1991). Masson had no basis in fact or law to file suit on behalf of Miller for a commission, but Masson, Hamilton and Hamilton LLP, Agulia, Hardie, Finkelstein, and Finkelstein & Horvath P.C. litigated wantonly and maliciously against Forti for a period of nearly three years to defraud her of the amount in escrow. Masson, Hamilton and Hamilton LLP, Agulia, Hardie, Finkelstein, and Finkelstein & Horvath should be required to pay Forti her "opportunity costs" of having to defend against this fraudulent lawsuit. Since Forti's hourly rate is $275 per hour, Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for $180,557 in opportunity costs. If Forti was not forced to spend her time responding to this fraudulent lawsuit, she could have earned this amount by performing legal services for clients in Pennsylvania,

25

where she is licensed.

Forti sues Finkelstein for the $330 that he fraudulently charged her in settlement fees, because he proved so untrustworthy that Forti had to hire Dan Hodin of Paley Rothman to represent her at the actual settlement on May 8, 2002 and with respect to the escrow agreement.

Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for the $1,412.50 that she had to pay Dan Hodin of Paley Rothman to draw up an escrow agreement and to represent her at settlement on her property on May 8, 2002. Finkelstein and Finkestein & Horvitz are also jointly liable to Forti for the $616.46 that she had to pay in interest to the seller of the townhouse, because there was no settlement on her property on April 29, 2002. Settlement did not take place until May 8, 2002.

Masson and Hamilton and Hamilton are jointly liable to Forti for the $1, 875 in legal fees she had to pay Vernon Johnson of Jackson & Campbell whom she retained as First Chair in case this baseless litigation went to trial.

Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for the $29,850.70 in the escrow account from which they defrauded Forti plus interest on that amount from May 8, 2002 to the present.

Masson, Agulia, and Hardie compounded their malice against Forti by suing for attorney's fees. Masson claimed that he had to sue to obtain a commission from which Miller was actually barred by D.C. Code and District of Columbia case law. George Masson, Jr. and Hamilton and Hamilton LLP are jointly liable to Forti for the $84,340.71 that she had to pay in attorney's fees. Richard Agulia and Jeffrey Hardie are jointly liable to Forti for the $73,773.93 that she had to pay in attorney's fees. In <u>Jemison v. National Baptist Convention, Inc. et al</u>, 720

26

A.2d 275, 284 (D.C. App 1998), the District of Columbia Court of Appeals decided that repayment of attorney's fees in defending against bad faith litigation is properly treated as compensatory damages for purpose of computing punitive damages.

Masson, Agulia, and Hardie further compounded their malice against Forti by placing a lien on Forti's retirement property in Arnold, Maryland and threatened to have the sheriff's office sell it at auction for much less than the market value to pay off the lien. Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for the $10,629 that she had to pay McNamee Hosea to represent her, work out a settlement agreement, and remove the lien.

All the defendant attorneys are clearly liable to Forti for punitive damages. While compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct, punitive damages are aimed at deterrence and retribution. Punitive damages may be imposed to further a state's legitimate intent in punishing unlawful conduct and deterring its repetition." Id. In Marshall v. Marshall, 126 S. Ct. 1735, 164 L.Ed 2d 480, 2006 Lexis 3456, the Supreme Court affirmed a District Court's decision in awarding $44.3 million in compensatory damages and, based on overwhelming evidence of "willfulness, maliciousness, and fraud," awarded an equal amount in punitive damages. In determining the amount of punitive damages, the Supreme Court has instructed courts to consider, among other factors, "whether the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, or deceit." State Farm Mut. Auto Ins. Co. v. Campbell, supra at 419. In the instant case, Forti was certainly financially vulnerable. Not having

27

anticipated fraud, she did not arrange alternative financing for the townhouse. The Assignment of

Proceeds was used as leverage in an attempt to force her to pay Miller a commission that she did

not owe. She almost lost the townhouse. The fraudulent conduct of the defendant attorneys was

repeated over and over for a period of three years, including the appeal process. Finally, the harm

was the result of intentional malice, trickery, and deceit.

Punitive damages are clearly available under District of Columbia law for the intentional

torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent

conveyance. In Robinson v. Sarisky, 535 A.2d 901, 906 (D.C. App. 1988), the District of

Columbia Court of Appeals stated: "Punitive damages may be awarded for tortious acts

aggravated by evil motive, actual malice, or for outrageous conduct in willful disregard of

another's rights." Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein

& Horvath all acted with evil motive, actual malice, and with outrageous conduct in willful

disregard of Forti's rights. The court went on to say, "The requisite state of mind need not (and

usually cannot) be proven by direct evidence but may be inferred from all the facts and

circumstances of the case." Id. In Jemison v. National Baptist Convention, 720 A.2d 275 (D.C.

App 1998), the District of Columbia Court of Appeals reaffirmed that "punitive damages are

warranted" when defendants "commit a tortious act 'accompanied by fraud, ill will, recklessness

or in willful disregard of the plaintiff's rights'." Jemison, supra at 276, f.n. 10 citing to

Washington Medical Center v. Holle, 573 A.2d 1269, 1284 (D.C.App 1990) All the defendant

attorneys are liable to Forti for the intentional torts of malicious prosecution, abuse of process,

and furthering and participating in a fraudulent conveyance. Their tortious acts were

accompanied by fraud, ill will, recklessness, and willful disregard of Forti's rights.

"Whether punitive damages will lie depends on the intent with which the wrong was done and not on the extent of the actual damages" Jemison, supra at 285. The Court can "infer the requisite state of mind from the surrounding circumstances." Jemison, supra at 285-286. George Masson, Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein & Horvitz are all liable to Forti for malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. They acted with ill will, recklessly, maliciously, and in willful disregard of Forti's rights. They are also liable to Forti for furthering and participating in civil fraud and conspiring to commit civil fraud. Thus, they are liable to Forti for punitive damages. Plaintiff Forti seeks punitive damages against George Masson Jr. and Hamilton and Hamilton LLP in the amount of 6 million dollars each. She seeks punitive damages against Richard Agulia and Jeffrey Hardie in the amount of $6 million each, and she seeks punitive damages against Nathan Finkelstein and Finkelstein and Horvath P.C. in the amount of $6 million dollars each.

In order to find that an attorneys' multiplication of the proceedings was both "unreasonable and vexatious," [Agulia's choice of words], the Court must find "evidence of recklessness, bad faith, or improper motive" on his or her part. La Prade v. Kidder Peabody & Co., Inc. 330 U.S. App. D.C. 386, 146 F. 3d 899, 905 (1998)(citing FDIC v. Conner, 20 F.3d 1376, 1384 (5th Cir. 1994). There is no evidence of recklessness, bad faith, or improper motive on Forti's part. There is, however, abundant evidence of recklessness, bad faith, and improper motive by the defendant attorneys.

29

Respectfully submitted,

Carol A. Forti
Plaintiff pro se
14 West Chapman Street
Alexandria, VA 22301
703.535.5449

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I served Richard Agulia, Jeffrey Hardie, and John Jay Range with a copy of this Opposition to Dismissal and to Sanctions by first-class mail, postage prepaid on July 12, 2006.

Carol A. Forti

30