## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

W.C. & A.N. Miller Development Company
    Plaintiff

      v.

Carol A. Forti
    Defendant/Third Party Plaintiff

      v.

June Humbert
4901 Scarsdale Road
Bethesda, Maryland 20816
    Third Party Defendant

      v.

Luisa Zanforlin
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
    Third Party Defendant

      v.

Alberto Chong
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
    Third Party Defendant

Case No. 02ca0004745
Calendar 13, Judge Abrecht



RECEIVED
Civil Clerk's Office

AUG 06 2002

Superior Court of the
District of Columbia
Washington, D.C.

## THIRD PARTY COMPLAINT

### PREFACE TO THE THIRD PARTY COMPLAINT

The issues in the instant case are breach of contract and damages.

Defendant/Third Party Plaintiff asks the court to note that Plaintiff failed to submit

the entire Contract when Plaintiff filed the Complaint. In fact, Plaintiff failed to

include the most important provisions of the Contract, which are contained in the



DEFENDANT'S
EXHIBIT
4

Escalator Clause Addendum. According to the first sentence of text in the Escalator Clause Addendum: "The parties agree that the following provisions [of the Escalator Clause Addendum] shall supercede any provisions to the contrary contained in said Contract. Defendant/Third Party Plaintiff furnished a true and complete copy of the Contract as Exhibit 1 to her Answer.

## BEGINNING OF THIRD PARTY COMPLAINT

1. This Court has jurisdiction over this civil action under D.C. Code Section 11-921 (2001).

2. On or about April 15, 2002, June Humbert, a Buyer-Broker for Luisa Zanforlin and Alberto Chong (hereafter "Chong/Zanforlin") drafted a Contract Offer by Chong/Zanforlin to purchase Defendant Forti's residence at 2936 Garfield Terrace, N.W., Washington, D.C. 20008. The Contract Offer included an Escalator Clause Addendum. The first line of text of the Escalator Clause Addendum specifically states:

> The parties (namely Chong, Zanforlin, and Forti) agree that the following provisions are incorporated into the referenced Contract and shall supercede any provisions to the contrary in said Contract:
>
> 1. In the event that Seller receives one or more additional bonafide offers to purchase the Property with terms acceptable to Seller (the 'Other Offers'), but which result in net proceeds of sale payable to the Seller equal to or greater than the net proceeds of sale payable to the Seller under this Contract, then the sales price stated in this Contract shall automatically increase, without further action on the part of Buyer, to an amount which generates net proceeds of sale to Seller equal to $5,000 dollars in excess of the highest net proceeds of sale generated in such Other Offers. Notwithstanding the foregoing, the sales price under this Contract shall in no event exceed $975,000.

3. The Offer to buy began at $915,000 and escalated automatically up to but not to exceed $975,000.

- 2 -

4. June Humbert told the Seller that this Escalator Clause Addendum was drafted by an attorney for W.C. & A.N. Miller.

5. After reviewing Contract Offers on the evening of April 15, 2002, Seller called Humbert to inform her that she was accepting the Chong/ Zanforlin Contract Offer to pay $950,000 for the property. Forti informed Humbert of the following facts. The next highest contract offer was for $945,000. It was between principals and no broker was involved. This "Other Offer" would have provided net proceeds to Seller of $945,000. This "Other Offer" automatically invoked the Escalator Clause Addendum of the Chong/Zanforlin Contract, whereby Chong/Zanforlin agreed to pay net proceeds of $5,000 above the net proceeds of the next highest offer, i.e., $950,000 in net proceeds.

6. The next day, June Humbert reviewed the next highest Contract Offer at her leisure, page by page, in the presence of Seller Forti (in Forti's kitchen). Satisfied that it was a bona fide offer, she handed the "Other Offer" back to Forti together with the other Buyer's earnest money check.

7. Humbert then arranged for Chong and Zanforlin to initial their Contract Offer to pay net proceeds of $5,000 above the net proceeds of the next highest offer, i.e., $950,000.

8. The settlement attorney failed to provide Seller Forti with the HUD settlement statement with the allocation of costs to Buyers and Seller in advance of the date of settlement. Not until the day of settlement, April 29, 2002, did Seller Forti discover that Buyers' Broker Humbert and possibly, the Buyers, either persuaded or colluded with the settlement attorney to deduct a 3 percent broker's commission, $28,500, from the $950,000 owed to Seller as net proceeds.

9. Deduction of $28,000 from the proceeds due Seller conflicted directly with the

provisions of the Escalator Clause Addendum, which promised to pay Seller $5,000 in net proceeds above the net proceeds of the next highest offer.

10. Seller Forti never signed any agreement with Broker Humbert to pay her a three percent commission.

11. Paragraph 21 of the Contract addresses the issue of the broker's fee. It states: "Seller irrevocably instructs the Settlement Agent to pay the Broker compensation ("Broker's Fee") as set forth in the listing agreement...." There was no listing agreement, and there was no agreement between Seller Forti and Buyers' Broker Humbert regarding payment of a commission.

12. In Paragraph 33, "OTHER TERMS," handwritten by Humbert, was the phrase: "Commission 3% to be paid to W.C. & A.N. Miller at settlement." The phrase written in by Humbert does not specify who will pay a 3 % commission.

13. Given the terms of the Escalator Clause Addendum, which both parties agreed takes precedence over any conflicting contract terms, Seller Forti reasonably assumed that Buyers had agreed to pay a 3 % commission.

14. Webster's New Collegiate Dictionary defines "net" as "free from all charges or deductions." By definition, net proceeds excludes a commission of $28,500.

15. Seller verbally and specifically agreed at the settlement table on April 29, 2002 to accept the settlement attorney's recommendation to escrow the disputed commission and proceed with settlement, but Buyers' Broker Humbert, loudly and emphatically, but without any legal basis, refused to escrow the disputed amount of the commission and proceed with settlement. In addition, she encouraged Buyers Chong/Zanforlin to refuse to escrow the disputed commission and proceed to settlement.

- 4 -

16. Humbert announced imperiously that Seller Forti would have to negotiate with W.C. & A.N. Miller's outside counsel, Don Hadley.

17. From the offices of the settlement attorney, Seller Forti tried to reach Hadley by phone, but he was not available, and no one in his office knew when he would be available. Since Humbert and Buyers refused to escrow the disputed commission, Seller told the Buyers, Buyers' Broker, and the settlement attorney that she would not sign the HUD settlement statement in its current form. She also informed them that she was leaving to keep previously scheduled appointments known to all three other parties: an 11:00 a.m. "walkthrough" of 14 West Chapman Street, Alexandria, Virginia, on which she had a contract to buy, and a 12:00 noon settlement on 14 West Chapman Street.

18. Since there was an Assignment of Proceeds from the sale of 2936 Garfield Terrace, N.W. towards the purchase of 14 West Chapman Street, Buyers and the Buyers' Broker apparently thought that they had Seller "over a barrel" and that Seller would, by necessity, have to sign any HUD settlement statement put in front of her—no matter how much she disagreed with the allocation of costs.

19. Although Seller tried to reason with Buyer Chong that the Buyers and Buyer Broker's interpretation of the Contract was illogical, the Buyers refused to listen to reason and engaged Richard Aguglia, an attorney with Hunton & Williams. On behalf of Buyers, Aguglia threatened to sue Seller for specific performance.

20. Seller engaged the firm of Paley Rothman to represent her. Counsel for Seller told Agulia that Seller was ready and willing to proceed to settlement immediately--provided the Buyers agreed to escrow the disputed commission.

21. Finally, on May 8, 2002, Buyers and Buyers' Broker agreed to do what they had

previously refused to do, i.e., escrow the disputed commission. Thus, it was the Buyers and Buyers' Broker--not the Seller--who delayed settlement from June 29, 2002 until May 8, 2002.

22. Under terms of the Escrow Agreement, the prevailing party in this litigation will receive the amount of the escrowed commission, all costs associated with the delay in going to settlement from June 29, 2002 until May 8, 20002, interest, attorney's fees, and court costs.

23. W.C. & A.N. Miller and its agent, June Humbert, are bound by the terms of the Escrow Agreement by the signature of Don Hadley, W.C. & A.N. Miller's outside counsel.


WHEREFORE, Defendant/Third Party Plaintiff asks this Court to recognize that the conduct of the Plaintiff and Third Party Defendants constitute an egregious breach of contract, that they caused the delay in going to settlement, and to award Defendant/Third Party Plaintiff all damages caused directly and indirectly by this breach of contract.


Respectfully submitted,

Carol A. Forti
Defendant/Third Party Plaintiff pro se
14 West Chapman Street
Alexandria, Virginia 22301
703/535-5449

- 6 -