**RECEIVED**

JUL 3 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**CAROL A. FORTI,**
14 West Chapman Street
Alexandria, VA 22301
703.535.5449
       Plaintiff
    v.

**GEORGE MASSON, JR. (COUNSEL TO**
   **W.C. & A.N. MILLER)**
Hamilton and Hamilton LLP
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
       Defendant

**HAMILTON AND HAMILTON LLP (COUNSEL TO**
   **W.C. & A.N. MILLER)**
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
       Defendant,

**RICHARD AGULIA**
**(COUNSEL TO CHONG AND ZANFORLIN)**
Hunton & Williams, LLP
1900 K Street, N.W.
Washington, D.C. 20006
       Defendant,

**JEFFREY HARDIE**
**(COUNSEL TO CHONG AND ZANFORLIN)**
Hunton & Williams, LLP
1900 K Street, N.W.
Washington, D.C. 20006
       Defendant,

**NATHAN FINKELSTEIN**
**(SETTLEMENT ATTORNEY)**
Finkelstein & Horvitz
7315 Wisconsin Avenue
Suite 400 East
Bethesda, MD 20814
       Defendant,

Civil Action No. 1:06CV00613
JR

**FINKELSTEIN & HORVITZ, P.C.**
**(SETTLEMENT ATTORNEYS)**
7315 Wisconsin Ave., N.W.
Suite 400 East
Bethesda, MD 20814
          Defendant.

## AMENDED MOTION FOR SUMMARY JUDGMENT

The following material facts are undisputed.

1.    The defendant attorneys committed against Forti the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance.

2.    The defendant attorneys also furthered and participated in civil fraud and conspired to commit civil fraud against Forti.

3.    Forti advised Finkelstein, whom she had hired to act as her settlement attorney, approximately two weeks before settlement on April 29, 2002 that she did not owe W.C. & A.N Miller Development Co ("Miller") a commission and to make sure that the HUD Settlement Sheet reflected that fact. Forti also left a message for Finkelstein directing him to fax the HUD Settlement Sheet to her at least five days in advance. Although Finkelstein had a fiduciary obligation to Forti, he ignored both of these instructions. He made no effort to return either of Forti's calls.

4.    Finkelstein did not fax the HUD Settlement Sheet to Forti in advance of settlement as Forti had requested, because Finkelstein and Humbert did not want Forti to see that the HUD Settlement Sheet deducted a commission for Miller. Consequently, Forti did not see the HUD Settlement Sheet until the day of settlement on April 29, 2002.

5.    Finkelstein played a key role in injuring Forti by drawing up a HUD Settlement

2

Sheet giving a commission to Miller even though Forti did not owe Miller a commission and Miller was barred from receiving a commission by D.C. Code and District of Columbia case law.

6.    Finkelstein informed Humbert that there was an Assignment of Proceeds on the sale of Forti's property in which part of Forti's proceeds from the sale of her property would go directly to the settlement company to pay the balance that Forti owed on the townhouse that she was buying. Finkelstein and Humbert obviously believed that the Assignment of Proceeds would provide excellent leverage to force Forti to pay a commission to Miller that she did not owe. They used the Assignment of Proceeds in an attempt to force Forti to pay a commission to Miller or risk losing the townhouse. Gant Redmon, attorney for the seller of the townhouse that Forti was buying, insisted that there be an Assignment of Proceeds on the settlement transaction on Forti's property. Since Forti did not tell Humbert that there was an Assignment of Proceeds on Forti's property, Humbert could have only learned this from Finkelstein.

7.    When Forti first reviewed the HUD Settlement Sheet and saw that Finkelstein had deducted a 3 percent commission for Miller from what was supposed to be 950,000 in Net Proceeds to Forti, she was furious. She told Finkelstein, Humbert, Chong, and Zanforlin that she would not sign a HUD Settlement Sheet that did not accurately reflect the Contract that she had signed with Chong and Zanforlin to pay her $950,000 in Net Proceeds for title to her property.

8.    As a fallback position, Finkelstein proposed putting the disputed commission in escrow. Forti reluctantly agreed to that proposal, because she had not anticipated fraud

3

and, consequently, had not arranged alternative funding for the townhouse on which she was going to settlement that same day. Humbert, however, adamantly refused to escrow the disputed commission and go to settlement, and she persuaded Chong and Zanforlin not to escrow the disputed commission.

9.      In the days that followed this abortive settlement on Forti's property, Finkelstein kept the pressure on Forti on behalf of Miller and Humbert. Finkelstein phoned Forti and warned her that she "had better sign the HUD Settlement Sheet," because "she did not want to lose the townhouse."

10.     On or about May 8, 2002, Miller, Humbert, Chong, and Zanforlin changed their minds and decided that they would agree to escrow the disputed commission. On May 8, 2002, Chong, Zanforlin, and Forti signed the settlement papers on Forti's property.

11.     Richard Agulia prepared the escrow account with some input from Dan Hodin, who represented Forti at settlement and with respect to the escrow agreement. Agulia put into escrow the disputed commission: $28,500 (3 percent of $950,000) plus alleged costs of Chong and Zanforlin (property taxes and interest on their loan), so that the escrow account totaled $29,850.70. Agulia refused, however, to give Forti equal benefits. Since Forti needed to move out of her home on May 10, 2002 and into the townhouse, Hodin was prevented by Agulia from making the escrow account equally beneficial to Forti.

12.     By drawing up settlement papers that put the disputed commission in escrow, Finkelstein was instrumental in setting the defendant attorneys' litigation in motion.

13.     Forti did not owe a real estate commission to Miller. Forti ran an advertisement in the Washington Post listing her house for sale. The ad included the phrase "co-op 3 %."

4

The Supreme Court and the Court of Appeals for the D.C. Circuit have stated

unequivocally that advertisements are solicitations or invitations to bid and that they are

not offers.

14.    June Humbert, an experienced agent for Miller, recognized that the ad was an

invitation to bid or solicitation to make an offer, and she prepared a Purchase Offer for

Chong and Zanforlin and presented it to Forti.

15.    Since the ad was a solicitation to make an offer and not an offer itself, it was not

an offer for a unilateral contract. Judge Wright concluded that Forti's ad was an offer for

a unilateral contract that was satisfied by Humbert's procurement of buyers. The Court of

Appeals did not address the question as whether Forti's ad was an invitation to make

offers or an offer for a unilateral contract. The Court of Appeals merely affirmed Judge

Wright's order granting summary judgment to Miller for a commission and affirmed

Judge Wright's dismissal of Forti's claims against Chong and Zanforlin for breach of

contract and compensatory and consequential damages.

16.    Humbert reviewed the next highest Purchase Offer from Mr. J.W. Silas for

$945,000 in Net Proceeds in Forti's kitchen on Garfield Terrace and went through the

Purchase Offer page by page in Forti's presence. She also reviewed the earnest money

check for $45,000 that accompanied the Purchase Offer. Forti offered to have the

Purchase Offer and earnest money check xeroxed for Humbert, but Humbert said that was

not necessary, because she was satisfied that the other Purchase Offer was bona fide.

Only after Forti had refused to pay Miller a 3 percent commission at settlement on April

29, 2002 did Masson, Agulia, and Hardie challenge the bona fide nature of the other

5

Purchase Offer.

17.    Seller Forti wrote in $950,000 next to NEW SALES PRICE on the printed form

of the Purchase Offer/Contract but did not cross out NEW SALES PRICE and write in

NET PROCEEDS in its place. Since Forti had received another Purchase Offer from Mr.

J.W. Silas for $945,000 in NET PROCEEDS, the Escalator Clause Addendum

automatically raised the Chong/Zanforlin Purchase Offer from $915,000 to $950,000 in

NET PROCEEDS." Humbert also made a verbal commitment to Forti that Chong and

Zanforlin would pay $950,000 in Net Proceeds since they had pre-approval for a loan of

$975,000. Based on the Escalator Clause Addendum and Humbert's assurances, Forti told

Humbert that she would select the Chong/Zanforlin Purchase Offer over the next highest

Purchase Offer for $945,000 in Net Proceeds.

18.    Adding $5,000 in Net Proceeds to $945,000 in Net Proceeds was the basis for

Forti writing in $950,000 on the page of the Purchase Offer containing the Escalator

Clause Addendum.

19.    Judge Wright did not deal with the issue of mistake and neither did the Court of

Appeals.

20.    Miller was barred by D.C. Code and District of Columbia case law from receiving

a commission.

21.    Judge Wright's decision to grant summary judgment to Miller for a commission

and to dismiss Forti's claims against Chong and Zanforlin for breach of contract and

compensatory and consequential damages did not address the relevant case law nor was

the case law addressed by the Court of Appeals.

6

22.    Even if one assumes that Judge Wright considered the relevant case law but did

not address it in his Order, his Order only applies to Miller, Humbert, Chong, and

Zanforlin—not the defendant attorneys. Judge Wright's Order has no relevance to Forti's

causes of action against the defendant attorneys.

23.    Nathan Finkelstein was the settlement attorney who handled Forti's purchase of

the house at 2936 Garfield Terrrace, N.W. in Washington, D.C. He held himself out as

qualified to handle settlements in the District of Columbia. He knew or had a duty to

know D.C. Code and District of Columbia case law applicable to settlements in the

District of Columbia. He knew or had a duty to know that District of Columbia case law

barred receipt of a commission without proof of a written employment contract or a

principal /agent relationship and written agreement promising to pay a commission for

procuring buyers. He knew that Forti had not signed an employment contract with Miller

and had not entered into a principal/agent relationship with Miller or signed an agreement

promising to pay a commission for procuring buyers. Although he had a fiduciary

responsibility to Forti as her settlement attorney, he conspired with Humbert against Forti

by drawing up a HUD Settlement Sheet that deducted a 3 percent commission for Miller.

24.    Forti did not raise the issue of conspiracy in Superior Court, and Judge Wright's

order did not deal with conspiracy. All Judge Wright's Order did was grant summary

judgment to Miller on the commission and dismiss Forti's claims against Chong and

Zanforlin for breach of contract and compensatory and consequential damages.

25.    Forti is entitled to the money in the escrow account, which includes the disputed

commission. The Chong/Zanforlin Purchase Offer that Humbert presented to Forti

7

included an Escalator Clause Addendum. The Escalator Clause Addendum promised to pay Forti $5,000 in net proceeds above the net proceeds of the next highest Purchase Offer. Since the next highest Purchase Offer was for $945,000 in NET PROCEEDS, the Chong/Zanforlin offer automatically escalated from $915,000 to $950,000 in NET PROCEEDS. Since the Escalator Clause Addendum promised Forti $950,000 in Net Proceeds, the Escalator Clause Addendum precluded any deduction from $950,000 in Net Proceeds of a commission for Miller.

26.    According to the terms of the Escalator Clause Addendum, Chong and Zanforlin offered to pay Forti $5,000 in Net Proceeds above the Net Proceeds of the next highest offer for title to her home at 2936 Garfield Terrace, N.W.   Webster's New Collegiate Dictionary defines "net" as "free from all charges and deductions." Since the next highest offer was for 945,000 in NET PROCEEDS, Chong and Zanforlin promised to pay Forti $950,000 in NET PROCEEDS.  That this amount was the contract price is admitted by Chong, Zanforlin, Agulia, and Hardie in their Answer, p.3, line 15.

27.    According to the first sentence of the text of the Escalator Clause Addendum, "the parties agree that the following provisions are incorporated into the referenced Contract and shall supercede any provisions to the contrary in said Contract." Thus, the provisions of the Escalator Clause Addendum take precedence over any conflicting provisions in the Contract, including the phrase that June Humbert inserted: "3 % commission to Miller at settlement."

28.    Humbert identified herself to Forti at their first meeting as the buyer's broker and stated that she represented their interests exclusively, an identification that she

8

memorialized on page 1 of 1 of the Disclosure of Brokerage Relationship of the Purchase

Offer. For all of these reasons, Seller Forti reasonably assumed, when she selected the

Chong/Zanforlin Purchase Offer over the next highest Purchase Offer for $945,000 that

the phrase written into the contract by Humbert referred to some prior agreement between

buyers Chong and Zanforlin and broker Humbert for the buyers to pay Miller a 3 percent

commission.

29.    Finkelstein ignored his fiduciary responsibility to Forti and drew up a HUD

Settlement Sheet that treated the $950,000 in Net Proceeds as Sales Price and assigned a

$28,500 commission to Miller out of Forti's Net Proceeds of $950,000 despite the fact

that Paragraph 21 of the Regional Sales Contract directed him "to pay the broker

compensation as set forth in the listing agreement ... as of the Contract Date." He

deducted a commission for Miller on the Settlement Sheet despite the fact there was no

listing agreement between Forti and Miller, no employment contract between Forti and

Miller, and no principal/agent agreement between Forti and Miller in which Forti agreed

to pay a commission for procuring buyers. By drawing up the HUD Settlement Sheet in

this manner, Finkelstein attempted to defraud Forti of the $950,000 in Net Proceeds that

she was owed under the Chong/Zanforlin contract.

30.    Forti was also damaged substantially by Finkelstein's provision to escrow the

disputed funds. Forti was forced to accede to an escrow arrangement, because she had not

anticipated fraud and had not arranged alternative funding for the townhouse that she was

buying in a settlement scheduled for April 29, 2002—the same day as settlement on her

property at 2936 Garfield Terrace N.W.

9

31.     Finkelstein drew up the HUD Settlement Sheet and provided for a commission for Miller with the clear intent of forcing Forti to pay a commission that she did not owe. Apparently, Finkelstein was willing to harm Forti financially for the opportunity to obtain further settlement business from Miller. During the action in Superior Court, Forti served Masson with subpoenas (that met all the rules) addressed to Miller and Humbert to turn over any information or records regarding any settlement business between Miller and Finkelstein following Finkelstein's action on behalf of Miller in the settlement proceeding between Forti and Chong/Zanforlin. Masson adamantly refused all requests for the subpoened information in gross violation of court rules.

32.     The District of Columbia recognizes civil fraud and conspiracy to commit civil fraud.

33.     Attorneys are liable for the intentional torts of malicious prosecution and abuse of process. The privilege an attorney has for his actions in representing a client is a qualified one that does not extend to the intentional torts of malicious prosecution and abuse of process. Nor does the privilege apply to the intentional tort of furthering and participating in a fraudulent conveyance.

34.     All the defendant attorneys litigated against Forti either actively or through another defendant attorney. Agulia and Hardie conspired with Masson against Forti, most conspicuously in their Motions for Summary Judgment. George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein all submitted sworn affidavits to the court that contained many false statements. Masson filed a perjured affidavit by Humbert, who

claimed that Forti had refused to escrow the disputed funds thereby preventing settlement

on April 29, 2002 when, in fact, it was Chong and Zanforlin who prevented settlement by

refusing to pay Forti the $950,000 in Net Proceeds that they promised her in their

Purchase Offer/Contract and by refusing to escrow the disputed funds. Humbert also lied

in saying that she did not persuade Chong and Zanforlin to breach their contract a second

time on April 29, 2002 by refusing to put the disputed commission into escrow so that

settlement could proceed, although that is precisely what she did. Agulia filed a perjured

affidavit by Zanforlin, who claimed that Forti had refused to put the disputed commission

into an escrow account, which was utterly false. Agulia also filed with Superior Court

perjured affidavits by Nathan Finkelstein and Esther Finkelstein that were written to

support defendant attorneys' claim to the escrow account, including the disputed

commission. Esther Finkelstein was not even present at settlement, but she swore to

actions of which she had no personal knowledge. There is no question that the sworn

affidavits by Chong, Zanforlin, Humbert, and the Finkelsteins contained false statements

because Chong and Zanforlin, subsequently admitted in another pleading that "Humbert

disagreed with placing the disputed commission into an escrow account and that Chong

and Zanforlin also disagreed with placing the disputed commission into an escrow

account." This admission by Chong and Zanforlin confirmed that the affidavits prepared

by Humbert and the Finkelsteins also contained false statements. See Exhibit C for the

affidavits containing many false statements and Chong and Zanforlin's admission.

35.    At the time that this case was being heard in Superior Court, there was no security

for pleadings filed with Superior Court. These unethical attorneys were able to remove

11

and did, in fact, illegally remove from the File Room in the Civil Action Branch of Superior Court Forti's most significant pleadings. They included Forti's Opposition to Miller's Motion for Summary Judgment; Forti's Opposition to Chong and Zanforlin's Motion for Summary Judgment; Forti's Rebuttal of Miller's Points and Authorities; Forti's Rebuttal of Chong and Zanforlin's Points and Authorities; Forti's Renewed Motion for Summary Judgment, and subpoenas duces tecum addressed to Miller and Humbert, which called for information or records on any settlement business that Miller provided to Finkelstein following the settlement transaction between Forti and Chong/Zanforlin. (Although Forti made some technical errors in serving earlier subpoenas, the subpoenas that were stolen from the File Room met all legal requirements and were personally served on Miller's agent for service of process in D.C. and on Humbert.) All of these pleadings were missing from the Record on Appeal. Only opposing counsel had a motive to steal Forti's pleadings; therefore, theft of these pleadings by opposing counsel is the only reasonable explanation for their disappearance. The pleadings filed in Superior Court are the pleadings used to prepare the Record on Appeal. As a result of the egregious and highly illegal conduct by these defendant attorneys, the record before Superior Court and the record before the Court of Appeals was full of gaping holes where Forti's pleadings should have been. [See Exhibit D. The pleadings missing from the record are date-stamped by the Civil Action Branch in Superior Court, but they are missing from the Record on Appeal prepared for the Court Appeals.] As a direct result of the theft of these pleadings, the trial judge mistakenly believed that Forti had not filed a Renewed Motion for Summary Judgment, when, in fact,

she had. Theft by the defendant attorneys of Forti's most important pleadings caused the

trial judge and the Court of Appeals to reach erroneous decisions. Although Forti

attempted to bring to the attention of the Court of Appeals the fact that her most important

pleadings had been removed surreptitiously and illegally from the File Room of the Civil

Action Branch before the Record on Appeal was sent to the Court of Appeals, the Court

of Appeals never dealt with the theft issue and affirmed the lower court decision based on

a seriously incomplete record.

36.      The decisions in Superior Court and in the Court of Appeals were procured by

fraud upon the court by George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan

Finkelstein.

37.      The defendant attorneys engaged in malicious prosecution and abuse of process

against Forti and they furthered and participated in a fraudulent conveyance.

38.      The defendant attorneys badly injured Forti financially, and they did so deliberately

with evil motive, with malice, and with willful disregard for Forti's rights. As a result of

the litigation, she was left with $920,149.30. No reasonable seller would select an offer

worth that amount of money when she had an offer for $945,000 in NET PROCEEDS,

and Forti is a reasonable seller.

39.      Although the Escalator Clause Addendum promised Forti $950,000 in Net

Proceeds, all the defendant attorneys conspired against Forti and litigated wantonly and

maliciously through affidavits that were perjured and pleadings that grossly

misrepresented the facts to defraud Forti of $29,850.70 in the escrow account.

40.      Forti knew that she did not owe Miller a commission, and she told Humbert so in

13

a letter. She offered to pay Humbert $4,000 for introducing credit-worthy buyers to her

home and for arranging the Purchase Offer.

41.    Forti wrote in $950,000 next to NEW SALES PRICE on the printed form of the

Purchase Offer/Contract but did not cross out NEW SALES PRICE and write in NET

PROCEEDS in its place. Since Forti had received another Purchase Offer for $945,000 in

NET PROCEEDS, the Escalator Clause Addendum automatically raised the

Chong/Zanforlin Purchase Offer from $915,000 to $950,000 in NET PROCEEDS.

Humbert also made a verbal commitment to Forti that Chong and Zanforlin would pay

$950,000 in Net Proceeds since they had pre-approval for a loan of $975,000. Based on

the Escalator Clause Addendum and Humbert's assurances, Forti told Humbert that she

would select the Chong/Zanforlin Purchase Offer over the next highest Purchase Offer for

$945,000 in Net Proceeds. Judge Wright did not deal with the issue of mistake and neither

did the Court of Appeals.

42.    Adding $5,000 in Net Proceeds to $945,000 in Net Proceeds was the basis for

Forti writing in $950,000 on the page of the Purchase Offer containing the Escalator

Clause Addendum.

43.    During the week following the abortive settlement on Forti's property on April

29, 2002, Richard Agulia sent Forti a letter threatening to sue her for specific

performance even though his clients, Chong and Zanforlin were the parties who had

breached the contract and prevented settlement on Forti's property on April 29, 2002 by

refusing to pay Forti $950,000 in Net Proceeds and by refusing to escrow the disputed

commission.

14

44.    After being sued by Miller, Forti impleaded Humbert, Chong, and Zanforlin as third party defendants in order to be made whole. Her causes of action against Chong and Zanforlin were for breach of contract and for compensatory and consequential damages. Forti made no conspiracy claims in Superior Court. She raised against the defendant attorneys in United States District Court causes of action for furthering and participating in civil fraud and conspiracy to commit civil fraud.

45.    All Judge Wright's Order did was to grant summary judgment to Miller for a commission and dismiss Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages. All the Court of Appeals did was affirm Judge Wright's Order granting summary judgment to Miller for a commission and affirm dismissal of Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages.

46.    The failure by Humbert, Chong, and Zanforlin to acknowledge Forti's simple mistake was intentional misrepresentation. The insistence by Masson, Agulia, and Hardie that the $950,000 [inserted by Forti on the page containing the Escalator Clause Addendum] represented Sales Price from which a commission could be deducted was intentional misrepresentation to the court.

47.    By making an initial offer of $915,000 and having it escalate automatically to provide $5,000 in net proceeds above the net proceeds of the next highest offer up to $975,000, the clear intention of the buyers and broker in using the Escalator Clause Addendum was to have this offer selected over all other offers in a very "hot" market with a small inventory of homes for sale.

15

48.     The Escalator Clause Addendum offered net proceeds of $5,000 above the net

proceeds of the next highest offer. Since the next highest offer offered net proceeds of

$945,000, the Chong/Zanforlin contract promised net proceeds of $950,000. The intention

of seller Forti was to accept the Chong/Zanforlin offer for $950,000 in net proceeds.

49.     A reasonable person in the situation of the promisee (seller Forti) would interpret

the Chong/Zanforlin contract as offering $950,000 in net proceeds. Otherwise, she would

have no reason to select the Chong/Zanforlin contract over the next highest offer, which

promised $945,000 in net proceeds.

50.     Masson had no legal basis for filing a suit against Forti on behalf of Miller for a

commission. The suit was completely without color, wanton, and in total disregard of

Forti's rights.

51.     Chong and Zanforlin's duty under the Contract was to pay Forti $950,000 in NET

PROCEEDS. Instead, they breached their contract and refused to pay Forti $950,000 in

Net Proceeds on April 29, 2002. They breached their Contract a second time that same

day by refusing to escrow the disputed commission so that settlement could take place.

Thus, Agulia and Hardie had no legal basis for litigating against Forti. The pleadings that

they filed on behalf of Chong and Zanforlin violated Rule 11 and were in total disregard

of Forti's rights.

52.     Since George Masson Jr., Richrd Agulia, and Jeffrey Hardie had no legal basis to

litigate against Forti, Masson, Agulia and Hardie had no legal basis for claiming

attorney's fees for the "work" that they did in Superior Court or in the Court of Appeals.

## ARGUMENT

Forti did not owe a real estate commission to Miller. Forti ran an advertisement in the <u>Washington Post</u> listing her house for sale. The ad included the phrase "co-op 3 %." The Supreme Court and the Court of Appeals for the D.C. Circuit have stated unequivocally that advertisements are solicitations or invitations to bid and that they are <u>not</u> offers. Although Judge Wright accepted Masson's legally non-meritorius argument that Forti's advertisement created an offer for a unilateral contract that was satisfied by June Humbert's procurement of buyers, Judge Wright's conclusion is rebutted by well-settled Supreme Court case law and case law by the Court of Appeals for the D.C. Circuit. According to the Supreme Court, "advertisements are uniformly regarded as mere preliminary invitations to bid which create no power of acceptance in the recipient." <u>Foremost Pro Color, Inc. v. Eastman Kodak Co.</u>, 703 F.2d 534, 539 (9th Cir. 1983), <u>cert</u> <u>denied</u>, 104 S.Ct 1315, 465 U.S. 1038, 79 L.Ed 2d 712 (1984). According to the Court of Appeals for the District of Columbia Circuit, the "great weight of authority" is that "advertisements" are "mere solicitations for offers which create no power of acceptance in the offeree." <u>Mesaros v. United States</u>, 845 F.2d 1576, 1580 (D.C. Cir. 1988). The general rule is that advertisements are not offers. <u>A Treatise on the Law of Contracts</u> by Samuel Williston, 4th Edition by Richard A. Lord, West Group, section 4:7. In virtually all of these cases, a "promissory undertaking is absent and in all of these cases, a reasonable person receiving the communication has reason to know, from the circumstances under which the manifestation is made, that no offer exists." <u>Id</u>. Thus, the

17

Supreme Court and the Court of Appeals for the D.C. Circuit support the conclusion that Forti's advertisement in the Washington Post for sale of her home, including the phrase "co-op 3 %," was a solicitation to make an offer—not an offer creating the power of acceptance in the recipient.

Miller was barred by D.C. Code and District of Columbia case law from receiving a commission. D.C. Code and District of Columbia case law forbid receipt of a broker's commission unless there is a written employment agreement between the seller and broker or a written principal/agent agreement in which the seller agrees to pay the broker a commission for procuring buyers. According to D.C. Code section 42-1705, "A licensee (i.e. Miller ) shall not receive payment of a commission in the absence of a written listing agreement." See p. 1 of 1, Disclosure of Brokerage Relationship in the Purchase Offer/Contract in which June Humbert identifies Miller as the "licensee." The District of Columbia Court of Appeals has interpreted this Code provision to require proof of an employment contract between seller and broker in which the seller agrees to pay the broker a commission for procuring buyers before a broker may receive a commission. Eggleton v. Vaughan, 45 A.2d 362, 363 (D.C. App. 1946): "One seeking to obtain compensation as an agent must prove his contract of employment before he can recover for work done for an alleged principal. The fact that one is the procuring cause of a sale does not entitle him to a commission unless he had authority to sell." Id. [Emphasis added.] There was no employment contract between Forti and Miller. In Fred Ezra Co. v. Pedas, 682 A.2d 173, 176 (D.C. App. 1996), the Court of Appeals for the District of Columbia affirmed that "in order for a broker, as agent, to recover against a seller, as

18

principal, the broker must first establish that they voluntarily entered into a principal/agent relationship that gives rise to the broker's contractual right to a commission." Forti did not enter into a principal-agent agreement with Miller. Since Forti did not sign an employment contract with Miller or enter into a principal/agent relationship with Miller or sign an agreement with Miller promising to pay a commission for procuring buyers, Forti did not owe Miller a commission.

"The general principles of law governing the interpretation or construction or contracts generally are applicable to a real estate broker's contract of employment." R. Lord, Williston on Contracts, sec. 62.18. "As with any other contract, the primary object in interpreting a real estate broker's contract is to give effect to the intention of the parties." Id. "A real estate brokerage contract generally arises by virtue of a pre-arranged agreement between the parties." Only "under a contract" which provides that the "broker is employed [by the seller] to find a buyer ready and willing to purchase and provides for a commission for the broker's services in procuring a purchaser," is the broker "entitled to a commission." R. Lord, Williston on Contracts, sec. 6219. 30. Treatises take the same view as District of Columbia case law.

Judge Wright's decision to grant summary judgment to Miller and to dismiss Forti's claims against Chong and Zanforlin did not address the relevant case law nor was the case law addressed by the Court of Appeals. Even it one assumes that Judge Wright considered it but did not address it in his Order, his Order only applies to Miller, Humbert, Chong, and Zanforlin. The Order has no bearing on Forti's causes of action against the defendant attorneys.

19

The District of Columbia recognizes civil fraud and conspiracy to commit civil fraud. To substantiate a conspiracy claim, the plaintiff must establish that the attorneys did not act within the role of an advisor and merely advise, but instead knew of the clients' wrongful conduct and were actively involved in the wrongful conduct. See McElhanon v. Hing, 728 P.2d 256, 264-265 (Ariz.App 1985) cert denied, 481 U.S. 1030, 107 S.Ct 1956, 95 L.Ed.2d 529 (1987). Humbert, Chong, and Zanforlin made false representation to Forti of a material fact that Chong and Zanforlin would pay $950,000 in Net Proceeds for title to her property with knowledge of its falsity and with intent to deceive. Forti took justifiable reliance upon the misrepresentation, which resulted in substantial financial injury to her. These facts contain all the elements of civil fraud. The attorney defendants did not act within the role of an advisor and merely advise, but instead knew of the clients' wrongful conduct and were actively involved in the wrongful conduct. Finkelstein injured Forti and acted for the benefit of Miller when he drew up a HUD Settlement Sheet that ignored the express terms of the Contract that Chong and Zanforlin signed with Forti. George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein all knew that civil fraud had been perpetrated against Forti. They furthered that civil fraud by deliberately ignoring the unambiguous terms of the Escalator Clause Addendum. George Masson, Jr., Hamilton and Hamilton, LLP; Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein and Horvitz P.C. furthered that civil fraud by litigating a completely colorless suit against Forti and did so wantonly and maliciously for three years in order to deprive her of the $29,850.70 in the escrow account. Furthermore, they succeeded in depriving her of the amount in the escrow

20

account and forced her to pay a commission that she did not owe.

The common actions of George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein in litigating wantonly and maliciously to deprive Forti of the amount in escrow showed that there was an agreement among these defendants to act unlawfully and their overt tortious acts caused substantial financial injury to Forti. Consequently, George Masson, Jr., Hamilton and Hamilton, Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein and Horvitz are all liable to Forti for furthering civil fraud and for conspiring to commit civil fraud.

Attorneys are liable for the intentional torts of malicious prosecution and abuse of process. The privilege an attorney has for his actions in representing a client is a qualified one that does not extend to the intentional torts of malicious prosecution and abuse of process. Nor does the privilege apply to the intentional tort of furthering and participating in a fraudulent conveyance. All of the defendant attorneys and their firms are liable to Forti for the intentional torts of malicious prosecution and abuse of process. All of the defendant attorneys are liable to Forti for the intentional tort of furthering and participating in a fraudulent conveyance.

The phrase, "commission 3 % to be paid to W.C. & A.N. Miller at settlement" does not say who is to pay a commission. "Any writing that does not specify who is to pay the commission is void for vagueness, because that is an essential term." American Jurisprudence, Second Edition, section 43.

The Statute of Frauds "does not prevent reformation [of the Contract by the Court] as an equitable remedy." Section 156 of Restatement (Second) of Contracts states

21

a rule "that is substantially more liberal than former section 509 in allowing reformation

in spite of the Statute of Frauds." Id. Furthermore, "if there is a mistake of only one

party as to expression"...[and] "her mistake is believing that a writing correctly expresses

that agreement, the problem is one of the effect of the [other party's] failure to disclose

this fact. Non-disclosure [by the other party] may be tantamount to misrepresentation."

Restatement (Second) of Contracts, sections 160-61.

 Equitable reformation of this contract is permitted under either mutual mistake or

unilateral mistake as the legal reasoning in Air Line Pilots Association v. Shuttle, Inc., 55

F. Supp. 2d 47 (D.D.C. 1999) proves. Mutual mistake occurred if Forti intended the

$950,000 to refer to NET PROCEEDS, and defendants intended the $950,000 to refer to

"SALES PRICE" from which they could deduct a commission. Mutual mistake allows

reformation of a contract when clear and convincing evidence demonstrates that "a

mistake was made in the drafting of an instrument so that the written instrument fails to

express the true agreement of the parties." Air Line Pilots, supra at 52. If Forti's mistake

in not crossing out "SALES PRICE" on the printed form and inserting "NET

PROCEEDS" is deemed a unilateral mistake, equitable reform is also permitted, because

the facts in the instant case evidence fraud. June Humbert and the buyers knew very well

that Forti had only selected the Chong/Zanforlin purchase offer, because the Escalator

Clause Addendum automatically increased the Chong/Zanforlin offer to $5,000 in Net

Proceeds over the Net Proceeds of the next highest offer ($945,000 in Net Proceeds) to

make the Chong/Zanforlin offer $950,000 in Net Proceeds. It is fraud in the inducement

to offer Net Proceeds of $5,000 above the Net Proceeds of the next highest offer in order

to get the contract and then try to interpret the $950,000 as "Sales Price" from which a commission could be deducted. A written instrument may be reformed when there is mistake on one side and fraud or inequitable conduct on the other. <u>American Jurisprudence</u>, 2nd Edition, section 27. Unilateral mistake may be the basis for relief when it is accompanied by fraud or the mistake is known to the other party. <u>Id.</u> In the case at bar, Forti's mistake was clearly known by all the defendant attorneys. All of the defendant attorneys furthered civil fraud and conspired among themselves to commit civil fraud by litigating against Forti for the amount in the escrow account. Masson, Hamilton and Hamilton, Agulia, Hardie, Finkelstein, and Finkelstein & Horvitz are all jointly liable to Forti for civil fraud and conspiracy to commit civil fraud.

"Whether a contract is ambiguous is a question of law [for the Court]." <u>Washington Properties v. Chin</u>, 760 A.2d 546, 548 (2000). "A contract is not ambiguous merely because the parties disagree over its meaning…A contract is ambiguous when and only when the provisions in controversy are reasonably…susceptible …to two or more different meanings." <u>Id.</u> "It is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." <u>Id.</u> The contract in the instant case is reasonably susceptible to only one interpretation and construction, and, therefore, it is not ambiguous.

An "elementary canon of interpretation is that particular words may not be considered in isolation but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties and the

intention which they have manifested in forming them." O'Brien v. Miller, 18 S.Ct 140,

144, 168 U.S. 287, 297, 42 L.Ed 469, 473 (1897). Construing the contract as a whole

leads ineluctably to the conclusion that the Chong/Zanforlin offer promised Forti

$950,000 in NET PROCEEDS.

Even if certain words, standing alone, are unambiguous, the court must construe

the entire contract. O'Brien v. Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469,

473 (1897). In the contract in question, the two words "SALES PRICE" before the

number $950,000 may not be ambiguous standing alone, but they must be interpreted in

view of the Escalator Clause Addendum. If the contract is interpreted as a whole and all

of the provisions read together, the only reasonable construction is that $950,000

represents net proceeds—the amount that Chong & Zanforlin offered seller Forti for her

property and were legally obliged to pay her.

In interpreting any particular clause of a contract, the court is required to examine

the entire contract. Chicago, R.I. & P. RY.Co. v. Denver & R.G.R. Co., 12 S.Ct 479, 143

U.S. 596, 36 L.Ed 277 (1892). The phrase that Humbert wrote under Paragraph 33 of the

Regional Sales Contract: "Commission 3% to be paid to W.C.& A.N. Miller at

settlement" imposed no legal obligation on seller Forti in light of the fact that Forti did

not sign an employment contract with Miller or enter into a principal/agent relationship

with or sign an agreement offering to pay Miller a commission for procuring buyers. "In

the interpretation, and ultimately in the construction of contracts, the primary function of

the court is to ascertain the intention of the parties." U.S. v. Moorman, 70 S.Ct 288, 338

U.S. 457, 94 L.Ed 256 (1950). "The intention of the parties is to be gathered, not from a

single sentence but from the whole instrument read in light of the circumstances existing

at the time of negotiations leading up to its execution." <u>Miller v. Robertson</u>, 45 S.Ct 73,

77, 266 U.S. 243, 251, 69 L.Ed 265, 272 (1924).

The "law of contracts does not judge a promissor's obligation by what is in his

mind, but by the objective test of what his promise would be understood to mean by a

reasonable person in the situation of the promisee." This legal principle was enunciated

by the Court of Appeals for the Second Circuit and affirmed by the Supreme Court.  <u>Lee</u>

<u>v. State Bank & Trust Co.</u>, 54 F.2d 518, 521 (2nd Cir. 1931), <u>cert</u> <u>denied</u> 52 S.Ct 395, 285

U.S. 547, 76 L.Ed 938.  A person in the situation of promisee Forti would interpret the

Chong/Zanforlin Purchase Offer as offering $950,000 in net proceeds.

The Court of Appeals for the District of Columbia also supports this test. "The

first step in contract interpretation is determining what a reasonable person in the position

of the parties would have thought the disputed language meant." <u>Washington Properties,</u>

<u>Inc. v. Chin, Inc.</u>, 760 A.2d 546, 548 (D.C.App. 2000) citing <u>Dodek v. CF 16 Corp.</u>, 537

A.2d 1086, 1093 (D.C. App. 1988). The court "must determine what a reasonable person

in the position of the parties would have thought the disputed language meant." <u>Capitol</u>

<u>City Mortg. v. Habana Village Art & Folklore, Inc.</u> 747 A.2d 564, 567 (D.C. App. 2000).

Although the courts in this jurisdiction normally follow the American Rule with

each party responsible for its attorneys fees, there is one notable exception. That is the

bad faith exception, which permits an award of attorneys' fees against a party who has

acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." <u>Synanon</u>

<u>Foundation , Inc. v Bernstein</u>, 517 A. 2d  28, 36 (D.C. App. 1986). "Filing of a frivolous

claim or the manner in which the claim is subsequently litigated would justify an award of bad faith attorney's fees." <u>Synanon, supra</u> at 39. <u>See also</u> <u>Jemison v. National Baptist Convention et al.</u>, 720 A.2d 275, 285. "An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." <u>Synanon, supra</u> at 40.

The Supreme Court has stated that "if in the informed discretion of the court, neither the statute or the rules are up to the task, the court may safely rely on its inherent power" to sanction those who engage in bad faith conduct in the course of the litigation. <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 50, 11 S.Ct. 2123, 115 L.Ed. 27 (1991).

All the defendant attorneys are clearly liable to Forti for punitive damages. While compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendants' wrongful conduct, punitive damages are aimed at deterrence and retribution. Punitive damages may be imposed to further a state's legitimate intent in punishing unlawful conduct and deterring its repetition." <u>Id.</u> In <u>Marshall v. Marshall</u>, 126 S. Ct. 1735, 164 L.Ed 2d 480, 2006 Lexis 3456, the Supreme Court affirmed a District Court's decision in awarding $44.3 million in compensatory damages and, based on overwhelming evidence of "willfulness, maliciousness, and fraud," awarded an equal amount in punitive damages.

In determining the amount of punitive damages, the Supreme Court has instructed courts to consider, among other factors, "whether the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, or deceit." <u>State Farm</u>

26

Mut. Auto Ins. Co. v. Campbell, supra at 419. In the instant case, Forti was certainly financially vulnerable. Not having anticipated fraud, she had not arranged alternative financing for the townhouse, and she almost lost the townhouse. The Assignment of Proceeds was used as leverage in an attempt to force Forti to pay Miller a commission that she did not owe or risk losing the townhouse. The fraudulent conduct of the defendant attorneys was repeated over and over for a period of three years, including the appeal process. The harm that the defendant attorneys did to Forti was the result of intentional malice, trickery, and deceit.

In Jemison v. National Baptist Convention, Inc. et al, 720 A.2d 275, 284 (D.C. App 1998), the District of Columbia Court of Appeals decided that repayment of attorney's fees in defending against bad faith litigation is properly treated as compensatory damages for purpose of computing punitive damages.

Punitive damages are available under District of Columbia law for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. In Robinson v. Sarisky, 535 A.2d 901, 906 (D.C. App. 1988), the District of Columbia Court of Appeals stated: "Punitive damages may be awarded for tortious acts aggravated by evil motive, actual malice, or for outrageous conduct in willful disregard of another's rights." George Masson, Jr., Hamilton and Hamilton, Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein & Horvath all acted with evil motive, actual malice, and with outrageous conduct in willful disregard of Forti's rights. "The requisite state of mind need not (and usually cannot) be proven by direct evidence but may be inferred from all the facts and circumstances of the case." Id.

28

In <u>Jemison v. National Baptist Convention</u>, 720 A.2d 275 (D.C. App 1998), the District of Columbia Court of Appeals reaffirmed that "punitive damages are warranted" when defendants "commit a tortious act 'accompanied by fraud, ill will, recklessness or in willful disregard of the plaintiff's rights'." <u>Jemison</u>, <u>supra</u> at 276, f.n. 10 citing to <u>Washington Medical Center v. Holle</u>, 573 A.2d 1269, 1284 (D.C.App 1990).

All the defendant attorneys are liable to Forti for the intentional torts of malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. These tortious acts were accompanied by fraud, ill will, recklessness, and willful disregard of Forti's rights.

"Whether punitive damages will lie depends on the intent with which the wrong was done and not on the extent of the actual damages" <u>Jemison</u>, <u>supra</u> at 285. The Court can "infer the requisite state of mind from the surrounding circumstances." <u>Jemison</u>, <u>supra</u> at 285-286.

George Masson, Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein & Horvitz are all liable to Forti for malicious prosecution, abuse of process, and furthering and participating in a fraudulent conveyance. They all acted with ill will, recklessly, maliciously, and in willful disregard of Forti's rights. They are also liable to Forti for furthering and participating in civil fraud and conspiring to commit civil fraud. All the defendant attorneys are liable to Forti for punitive damages.

Summary judgment is granted when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. The summary judgment

procedure "is intended to permit 'a party to pierce the allegations of fact in the pleadings and to obtain relief by summary judgment where facts set forth in detail in affidavits, depositions, and admissions on file show that there are no genuine issues of fact to be tried. 3 Moore's Federal Practice 3175 cited by the Court of Appeals for the District of Columbia Circuit in Blackhawk Heating & Plumbing Co. v. William B. Driver et al. , 433 F.2d 1137, 1145 (D.C. Cir. 1970).

Respectfully submitted,

Carol A. Forti
Plaintiff pro se
14 West Chapman Street
Alexandria, VA 22301
703.535.5449

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have served George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein with a copy of this Amended Motion for Summary Judgment by first-class mail, postage prepaid on July 31, 2006.

Carol A. Forti

29