EXHIBIT A

## AFFIDAVIT OF CAROL A. FORTI IN SUPPORT OF HER AMENDED MOTION FOR SUMMARY JUDGMENT

1. I, Carol A. Forti, am an adult citizen of the United States. I am of sound mind and body.

2. All of the facts stated in this Affidavit are based on personal knowledge.

3. I graduated from the Georgetown Law Center. I am an attorney licensed in the Commonwealth of Pennsylvania. I have been a member in good standing of the Bar of the Commonwealth of Pennsylvania since 1989.

4. I advised Finkelstein, whom I had hired to be my settlement attorney, approximately two weeks before settlement on April 29, 2002 that I did not owe W.C. & A.N Miller Development Co ("Miller") a commission and to make sure that the HUD Settlement Sheet reflected that fact. I also left a message for Finkelstein directing him to fax the HUD Settlement Sheet to me at least five days in advance. Although Finkelstein had a fiduciary obligation to me, he ignored both of these instructions. He made no effort to return either of my calls.

5. Finkelstein did not fax the HUD Settlement Sheet to me in advance of settlement as I had requested, because Finkelstein and Humbert did not want me to see that the HUD Settlement Sheet deducted a commission for Miller. Consequently, I did not see the HUD Settlement Sheet until the day of settlement on April 29, 2002.

6. Finkelstein played a key role in injuring me by drawing up a HUD Settlement Sheet giving a commission to Miller even though I did not owe Miller a commission and Miller was barred from receiving a commission by D.C. Code and District of Columbia case law.

7. Finkelstein informed Humbert that there was an Assignment of Proceeds on the sale of my property in which part of my proceeds from the sale of my property would go directly to the settlement company to pay the balance that I owed on the townhouse that I was buying. Finkelstein and Humbert obviously believed that the Assignment of Proceeds would provide excellent leverage to force me to pay a commission to Miller that I did not owe. They used the Assignment of Proceeds in an attempt to force me to pay a commission to Miller or risk losing the townhouse. Gant Redmon, attorney for the seller of the townhouse that I was buying insisted that there be an Assignment of Proceeds on the settlement transaction on my property. Since I did not tell Humbert that there was an Assignment of Proceeds on my property, Humbert could have only learned this from Finkelstein.

8. When I reviewed the HUD Settlement Sheet and saw that Finkelstein had deducted a 3 percent commission for Miller from what was supposed to be 950,000 in Net Proceeds to me, I was furious. I told Finkelstein, Humbert, Chong, and Zanforlin that I would not sign a HUD Settlement Sheet that did not accurately reflect the Contract that I had signed with Chong and Zanforlin to pay me $950,000 in Net Proceeds for title to my property.

9. As a fallback position, Finkelstein proposed putting the disputed commission in escrow. I reluctantly agreed to that proposal, because I had not anticipated fraud and, consequently, had not arranged alternative funding for the townhouse on which I was going to settlement that same day. Humbert, however, adamantly refused to escrow the disputed commission and go to settlement, and she persuaded Chong and Zanforlin not to

escrow the disputed commission.

10. In the days that followed this abortive settlement on my property, Finkelstein kept the pressure on me on behalf of Miller and Humbert. Finkelstein phoned me and warned me that I "had better sign the HUD Settlement Sheet," because "I did not want to lose the townhouse."

11. On or about May 8, 2002, Miller, Humbert, Chong, and Zanforlin changed their minds and decided that they would agree to escrow the disputed commission. On May 8, 2002, Chong, Zanforlin, and I signed the settlement papers on my property.

12. Richard Agulia prepared the escrow account with some input from Dan Hodin, who represented me at settlement and with respect to the escrow agreement. Agulia put into escrow the disputed commission: $28,500 (3 percent of $950,000) plus alleged costs of Chong and Zanforlin (property taxes and interest on their loan), so that the escrow account totaled $29,850.70, but he refused to give me equal benefits. Since I needed to move out of my home on May 10, 2002 and into the townhouse, Hodin was prevented by Agulia from making the escrow account equally beneficial to me.

13. By drawing up settlement papers that put the disputed commission in escrow, Finkelstein was instrumental in setting the defendant attorneys' litigation in motion.

14. I did not owe a real estate commission to Miller. I ran an advertisement in the Washington Post listing my house for sale. The ad included the phrase "co-op 3 %." The Supreme Court and the Court of Appeals for the D.C. Circuit have stated unequivocally that advertisements are solicitations or invitations to bid and that they are not offers.

15. June Humbert, an experienced agent for Miller, recognized that the ad was an

3

invitation to bid or solicitation to make an offer, and she prepared a Purchase Offer for Chong and Zanforlin and presented it to me.

16. Judge Wright concluded that my ad was an offer for a unilateral contract that was satisfied by Humbert's procurement of buyers. The Court of Appeals did not address the question as whether my ad was an invitation to make offers or an offer for a unilateral contract. The Court of Appeals merely affirmed Judge Wright's order granting summary judgment to Miller for a commission and affirmed Judge Wright's dismissal of my claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages.

17. Humbert reviewed the next highest Purchase Offer from Mr. J.W. Silas for $945,000 in Net Proceeds in my kitchen on Garfield Terrace and went through the Purchase Offer page by page in my presence. She also reviewed the earnest money check for $45,000 that accompanied the Purchase Offer. I offered to have the Purchase Offer and earnest money check xeroxed for Humbert, but Humbert said that was not necessary, because she was satisfied that the other Purchase Offer was bona fide. Only after I had refused to pay Miller a 3 percent commission at settlement on April 29, 2002 did Masson, Agulia, and Hardie challenge the bona fide nature of the other Purchase Offer.

18. I wrote in $950,000 next to NEW SALES PRICE on the printed form of the Purchase Offer/Contract but did not cross out NEW SALES PRICE and write in NET PROCEEDS in its place. Since I had received another Purchase Offer from Mr. J.W. Silas for $945,000 in NET PROCEEDS, the Escalator Clause Addendum automatically raised the Chong/Zanforlin Purchase Offer from $915,000 to $950,000 in NET

4

PROCEEDS." Humbert also made a verbal commitment to me that Chong and Zanforlin would pay $950,000 in Net Proceeds since they had pre-approval for a loan of $975,000. Based on the Escalator Clause Addendum and Humbert's assurances, I told Humbert that I would select the Chong/Zanforlin Purchase Offer over the next highest Purchase Offer for $945,000 in Net Proceeds.

19.   Adding $5,000 in Net Proceeds to $945,000 in Net Proceeds was the basis for my writing in $950,000 on the page of the Purchase Offer containing the Escalator Clause Addendum. Judge Wright did not deal with the issue of mistake and neither did the Court of Appeals.

20.   Miller was barred by D.C. Code and District of Columbia case law from receiving a commission.

21.   Judge Wright's decision to grant summary judgment to Miller for a commission and to dismiss my claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages did not address the relevant case law nor was the case law addressed by the Court of Appeals.

22.   Even if one assumes that Judge Wright considered the relevant case law but did not address it in his Order, Judge Wright's Order has no relevance to my causes of action against the defendant attorneys.

23.   Nathan Finkelstein was the settlement attorney who handled my purchase of the house at 2936 Garfield Terrrace, N.W. in Washington, D.C. He held himself out as qualified to handle settlements in the District of Columbia. He knew or had a duty to know D.C. Code and District of Columbia case law applicable to settlements in the

District of Columbia. He knew or had a duty to know that D.C. Code barred a licensee from receiving a commission in the absence of a written listing agreement. He knew or had a duty to know that District of Columbia case law barred receipt of a commission without proof of a written employment contract or a principal /agent relationship and a written agreement promising to pay a commission for procuring buyers. He knew that I had not signed an employment contract with Miller and had not entered into a principal/agent relationship with Miller or signed an agreement promising to pay a commission for procuring buyers. Although he had a fiduciary responsibility to me as my settlement attorney, he conspired with Humbert against me by drawing up a HUD Settlement Sheet that deducted a 3 percent commission for Miller.

24. I did not raise the issue of conspiracy in Superior Court, and Judge Wright's order did not deal with conspiracy. All Judge Wright's Order did was grant summary judgment to Miller on the commission and dismiss my claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages.

25. I am entitled to the money in the escrow account, which includes the disputed commission. The Chong/Zanforlin Purchase Offer that Humbert presented to me included an Escalator Clause Addendum. The Escalator Clause Addendum promised to pay me $5,000 in net proceeds above the net proceeds of the next highest Purchase Offer. Since the next highest Purchase Offer was for $945,000 in NET PROCEEDS, the Chong/Zanforlin offer automatically escalated from $915,000 to $950,000 in NET PROCEEDS. Since the Escalator Clause Addendum promised me $950,000 in Net Proceeds, the Escalator Clause Addendum precluded any deduction from $950,000 in

6

Net Proceeds of a commission for Miller.

26. According to the terms of the Escalator Clause Addendum, Chong and Zanforlin offered to pay me $5,000 in Net Proceeds above the Net Proceeds of the next highest offer for title to my home at property at 2936 Garfield Terrace, N.W. Webster's New Collegiate Dictionary defines "net" as "free from all charges and deductions." Since the next highest offer was for 945,000 in NET PROCEEDS, Chong and Zanforlin promised to pay Forti $950,000 in NET PROCEEDS. That this amount was the contract price is admitted by Chong, Zanforlin, Agulia, and Hardie in their Answer, p.3, line 15.

27. According to the first sentence of the text of the Escalator Clause Addendum, "the parties agree that the following provisions are incorporated into the referenced Contract and shall supercede any provisions to the contrary in said Contract." Thus, the provisions of the Escalator Clause Addendum take precedence over any conflicting provisions in the Contract, including the phrase that June Humbert inserted: "3 % commission to Miller at settlement."

28. Humbert identified herself to me at our first meeting as the buyer's broker and stated that she represented their interests exclusively, an identification that she memorialized on page 1 of 1 of the Disclosure of Brokerage Relationship of the Purchase Offer. For all of these reasons, I reasonably assumed, when I selected the Chong/Zanforlin Purchase Offer over the next highest Purchase Offer for $945,000 that the phrase written into the contract by Humbert referred to some prior agreement between buyers Chong and Zanforlin and broker Humbert for the buyers to pay Miller a 3 percent commission.

29.  Finkelstein ignored his fiduciary responsibility to me and drew up a HUD Settlement Sheet that treated the $950,000 in Net Proceeds as Sales Price and assigned a $28,500 commission to Miller out of my Net Proceeds of $950,000. Finkelstein drew up the HUD Settlement Sheet in this manner despite the fact that Paragraph 21 of the Regional Sales Contract directed him "to pay the broker compensation as set forth in the listing agreement ... as of the Contract Date." He deducted a commission for Miller on the Settlement Sheet despite the fact there was no listing agreement between me and Miller, no employment contract between me and Miller, and no principal/agent agreement between me and Miller in which I agreed to pay a commission for procuring buyers. By drawing up the HUD Settlement Sheet in this manner, Finkelstein attempted to defraud me of the $950,000 in Net Proceeds thatwas due me under the Chong/Zanforlin contract.

30.  I was also damaged substantially by Finkelstein's provision to escrow the disputed funds. I was forced to accede to an escrow arrangement, because I had not anticipated fraud and had not arranged alternative funding for the townhouse that I was buying in a settlement scheduled for April 29, 2002—the same day as settlement on my property at 2936 Garfield Terrace N.W.

31.  Finkelstein drew up the HUD Settlement Sheet and provided for a commission for Miller with the clear intent of forcing me to pay a commission that I did not owe. Apparently, Finkelstein was willing to harm me for the opportunity to obtain further settlement business from Miller. During the action in Superior Court, I served Masson with subpoenas (that met all the rules) addressed to Miller and Humbert to turn over any

8

information or records regarding any settlement business between Miller and Finkelstein following Finkelstein's action on behalf of Miller in the settlement proceeding Chong/Zanforlin and me. Masson adamantly refused all requests for the subpoened information in gross violation of court rules.

32. Humbert, Chong, and Zanforlin made false representation to me of a material fact that Chong and Zanforlin would pay $950,000 in Net Proceeds for title to my property with knowledge of its falsity and with intent to deceive. I took justifiable reliance upon the misrepresentation, which resulted in substantial financial injury to me. These facts contain all the elements of civil fraud. The attorney defendants did not act within the role of an advisor and merely advise, but instead knew of the clients' wrongful conduct and were actively involved in the wrongful conduct. Finkelstein injured me and acted for the benefit of Miller when he drew up a HUD Settlement Sheet that ignored the express terms of the Contract that Chong and Zanforlin signed with me. George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein all knew that civil fraud had been perpetrated against me. George Masson, Jr., Hamilton and Hamilton, LLP; Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein and Horvitz P.C. furthered that civil fraud by deliberately ignoring the unambiguous terms of the Escalator Clause Addendum They furthered that civil fraud by litigating a colorless suit against me and did so wantonly and maliciously for three years in order to deprive me of the $29,850.70 in the escrow account, and they succeeded in depriving me of that amount. They forced me to pay a commission that I did not owe.

33. The common actions of George Masson, Jr., Richard Agulia, Jeffrey Hardie, and

Nathan Finkelstein in conspiring against me and in litigating wantonly and maliciously to deprive me of the amount in escrow showed that there was an agreement among these defendants to act unlawfully and their overt tortious acts caused substantial financial injury to me. George Masson, Jr., Hamilton and Hamilton, Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein and Horvitz are all liable to me for furthering civil fraud and conspiring to commit civil fraud.

34. Attorneys are liable for the intentional torts of malicious prosecution and abuse of process. The privilege an attorney has for his actions in representing a client is a qualified one that does not extend to the intentional torts of malicious prosecution and abuse of process. Nor does the privilege apply to the intentional tort of furthering and participating in a fraudulent conveyance. All of the defendant attorneys and their firms are liable to me for the intentional torts of malicious prosecution and abuse of process. All of the defendant attorneys are liable to me for the intentional tort of furthering and participating in a fraudulent conveyance.

35. All the defendant attorneys litigated against me either actively or through another defendant attorney. Agulia and Hardie conspired with Masson against me, most conspicuously in their Motions for Summary Judgment. George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein all submitted sworn affidavits to the court that contained many false statements. Masson filed a perjured affidavit by Humbert, who claimed that Forti had refused to escrow the disputed funds thereby preventing settlement on April 29, 2002 when, in fact, it was Chong and Zanforlin who prevented settlement by refusing to pay Forti the $950,000 in Net Proceeds that they promised her in their

Purchase Offer/Contract and by refusing to escrow the disputed funds. Humbert also lied in saying that she did not persuade Chong and Zanforlin to breach their contract a second time on April 29, 2002 by refusing to put the disputed commission into escrow so that settlement could proceed, although that is precisely what she did. Agulia filed a perjured affidavit by Zanforlin, who claimed that Forti had refused to put the disputed commission into an escrow account, which was utterly false. Agulia also filed with Superior Court perjured affidavits by Nathan Finkelstein and Esther Finkelstein that were written to support defendant attorneys' claim to the escrow account, including the disputed commission. Esther Finkelstein was not even present at settlement, but she swore to actions of which she had no personal knowledge. There is no question that the sworn affidavits by Chong, Zanforlin, Humbert, and the Finkelsteins contained false statements because Chong and Zanforlin, subsequently admitted in another pleading that "Humbert disagreed with placing the disputed commission into an escrow account and that Chong and Zanforlin also disagreed with placing the disputed commission into an escrow account." This admission by Chong and Zanforlin confirmed that the affidavits prepared by Humbert and the Finkelsteins also contained false statements. See Exhibit C for the affidavits containing many false statements and Chong and Zanforlin's admission.

36.    At the time that this case was being heard in Superior Court, there was no security for pleadings filed with Superior Court. These unethical attorneys were able to remove and did, in fact, illegally remove from the File Room in the Civil Action Branch of Superior Court my most significant pleadings. They included Forti's Opposition to Miller's Motion for Summary Judgment; Forti's Opposition to Chong and Zanforlin's

11

Motion for Summary Judgment; Forti's Rebuttal of Miller's Points and Authorities; Forti's Rebuttal of Chong and Zanforlin's Points and Authorities; Forti's Renewed Motion for Summary Judgment, and subpoenas duces tecum addressed to Miller and Humbert, which called for information or records on any settlement business that Miller provided to Finkelstein following the settlement transaction between Forti and Chong/Zanforlin. (Although I made some technical errors in serving earlier subpoenas, the subpoenas that were stolen from the File Room met all legal requirements and were personally served on Miller's agent for service of process in D.C. and on Humbert.) All of these pleadings were missing from the Record on Appeal. Only opposing counsel had a motive to steal my pleadings; therefore, theft of these pleadings by opposing counsel is the only reasonable explanation for their disappearance. The pleadings filed in Superior Court are the pleadings used to prepare the Record on Appeal. As a result of the egregious and highly illegal conduct by these defendant attorneys, the record before Superior Court and the record before the Court of Appeals was full of gaping holes where my pleadings should have been. [See Exhibit D. The pleadings missing from the record are date-stamped by the Civil Action Branch in Superior Court, but they are missing from the Record on Appeal prepared for the Court Appeals.] As a direct result of the theft of these pleadings, the trial judge mistakenly believed that I had not filed a Renewed Motion for Summary Judgment, when, in fact, I had. Theft by the defendant attorneys of my most important pleadings caused the trial judge and the Court of Appeals to reach erroneous decisions. Although I attempted to bring to the attention of the Court of Appeals the fact that my most important pleadings had been removed surreptitiously and

12

illegally from the File Room of the Civil Action Branch before the Record on Appeal was sent to the Court of Appeals, the Court of Appeals never dealt with the theft issue and affirmed the lower court decision based on a seriously incomplete record.

37.   The decisions in Superior Court and in the Court of Appeals were procured by fraud upon the court by George Masson, Jr., Richard Agulia, Jeffrey Hardie, and Nathan Finkelstein.

38.   The defendant attorneys badly injured me economically, and they did so deliberately with evil motive, with malice, and with willful disregard for my rights. As a result of the litigation, I was left with $920,149.30. No reasonable seller would select an offer worth that when she had an offer for $945,000 in NET PROCEEDS, and I am a reasonable seller.

39.   Although the Escalator Clause Addendum promised me $950,000 in Net Proceeds, all the defendant attorneys conspired against me and litigated wantonly and maliciously through affidavits that were perjured and pleadings that grossly misrepresented the facts to deprive me of $29,850.70 in the escrow account.

40.   I knew that I did not owe Miller a commission, and I told Humbert so in a letter. I offered to pay Humbert $4,000 for introducing credit-worthy buyers to my home and for arranging the Purchase Offer.

41.   During the week following the abortive settlement on my property on April 29, 2002, Richard Agulia sent me a letter threatening to sue for specific performance even though his clients, Chong and Zanforlin were the parties who had breached the contract and prevented settlement on my property on April 29, 2002 by refusing to pay me

13

$950,000 in Net Proceeds and by refusing to escrow the disputed commission.

42. The failure by Humbert, Chong, and Zanforlin to acknowledge my simple mistake was intentional misrepresentation. The insistence by Masson, Agulia, and Hardie that the $950,000 [inserted by Forti on the page containing the Escalator Clause Addendum] represented Sales Price from which a commission could be deducted was intentional misrepresentation to the court.

43. By making an initial offer of $915,000 and having it escalate automatically to provide $5,000 in net proceeds above the net proceeds of the next highest offer up to $975,000, the clear intention of the buyers and broker in using the Escalator Clause Addendum was to have this offer selected over all other offers in a very "hot" market with a small inventory of homes for sale.

44. The Escalator Clause Addendum offered net proceeds of $5,000 above the net proceeds of the next highest offer. Since the next highest offer offered net proceeds of $945,000, the Chong/Zanforlin contract promised net proceeds of $950,000. My intention of was to accept the Chong/Zanforlin offer for $950,000 in Net Proceeds.

45. A reasonable person in the situation of the promisee (seller Forti) would interpret the Chong/Zanforlin contract as offering $950,000 in net proceeds. Otherwise, I would have no reason to select the Chong/Zanforlin contract over the next highest offer, which promised $945,000 in net proceeds.

46. Masson had no legal basis for filing a suit against Forti on behalf of Miller for a commission. His filing and subsequently pleadings egregiously violated Rule 11.

47. Chong and Zanforlin's duty under the Contract was to pay me $950,000 in NET

14

PROCEEDS. Instead, they breached their contract and refused to pay me $950,000 in Net Proceeds on April 29, 2002. They breached their Contract a second time that same day by refusing to escrow the disputed commission so that settlement could take place. Thus, Agulia and Hardie had no legal basis for litigating against me. The pleadings that they filed on behalf of Chong and Zanforlin egregiously violated Rule 11 and were in total disregard of my rights.

48. Since George Masson Jr., Richard Agulia, and Jeffrey Hardie had no legal basis to litigate against me, Masson, Agulia and Hardie had no legal basis for suing for attorney's fees for their "work" in Superior Court or in the Court of Appeals.

49. June Humbert, the buyers' broker, told me that the Escalator Clause Addendum was prepared by an attorney for W.C. & A.N. Miller. Humbert, an agent of W.C. & A.N. Miller, wrote the Purchase Offer that she submitted to seller Forti on behalf of Chong and Zanforlin.

50. I was certainly financially vulnerable as a result of the fraudulent conduct of the defendant attorneys. Not having anticipated fraud, I had not arranged alternative financing for the townhouse, and I almost lost the townhouse.

51. The conduct of the defendant attorneys was not an isolated incident. They barraged me with pleadings and attempted to bury me in paperwork. The pleadings fill three large boxes.

52. The Assignment of Proceeds was used as leverage in an attempt to force me to pay Miller a commission that I did not owe.

53. The harm that these attorneys did to me was the result of intentional malice,

15

trickery, and deceit.

54.     The malicious conduct of the defendant attorneys was repeated over and over for a period of three years, including the appeal process.

Then came Carol A. Forti, who swore under the pains and penalties of perjury that the foregoing statements are true and accurate to the very best of her personal recollection.

_July 31, 2006_
Date

_____
Carol A. Forti

_07/31/2006_
Date

_____
Notary Public

My Commission Expires December 31, 2008

16