*Compare this admission by Chong and Zanforlin with the false statements in the sworn affidavits.*

18.  Humbert disagreed with placing the disputed commission into an escrow account. Chong and Zanforlin also disagreed with placing the disputed commission into an escrow account. (Forti Dep. 93, 96)

19.  The meeting ended without the proposed house sale being completed. Chong and Zanforlin paid no money, and Forti did not relinquish title to the house. (Forti Dep. 95-96)

**D.  Transaction Completed, Obligations Fulfilled**

20.  On May 8, the parties participated in another attempt to complete the house sale. Chong and Zanforlin met again at the Finkelstein offices. (Chong Aff. ¶ 7; Finkelstein Aff. ¶ 4)

**EXHIBIT C**

21.  In conjunction with the settlement on May 8, Forti, Miller, Finkelstein, and Chong and Zanforlin entered into an Escrow Agreement. (Forti Dep. 98-100 and Exh. 6) The Escrow Agreement provided that, "The parties hereto acknowledge that a dispute has arisen between the Seller [Forti] and the Broker [Miller] as to the payment, if any, of a Commission by Seller to the Broker in the amount of 3% of the Purchase Price of $950,000 ($28,500)." (Forti Dep. Exh. 6, first page, Recital B)

22.  The Agreement provided that $29,850.70 of Chong's and Zanforlin's $950,000 payment for the house purchase would be placed into an escrow account. Of the $29,850.70, $28,500 represented the disputed commission; $1,081.85 represented First Trust financing costs that had accrued to Chong and Zanforlin due to the nine-day delay in closing; $140.24 represented Second Trust financing costs that had accrued to Chong and Zanforlin due to the nine-day delay in closing; and $128.61 represented property taxes that had accrued to Chong and Zanforlin due to the nine-day delay in closing. (Forti Dep. 148-55 and Exh. 6, second page)

6

# AFFIDAVIT
# OF
# LUISA ZANFORLIN

Luisa Zanforlin, being first duly sworn under oath, deposes and says:

1. My name is Luisa Zanforlin. I am over 21 years of age and of sound mind and body. I have dual citizenship, being a citizen of Italy and Britain.

2. I am employed at the International Monetary Fund and have worked there for the past 7 years as an economist.

3. My current address is 2936 Garfield Terrace, N.W. in the District of Columbia which is the home that Alberto Chong and I purchased from Carol Forti in 2002.

4. On or about April 29, 2002, I arrived at the law office of Nathan Finkelstein for the purpose of settling on the sale of Ms. Forti's house to me and Alberto Chong. Ms. Forti actually recommended Mr. Finkelstein as the closing attorney. Mr. Finkelstein and his wife Esther Finkelstein, who is his settlement coordinator, had prepared the closing statement and documents for the sale of Ms. Forti's house to us.

5. When Ms. Forti arrived at the closing, she reviewed the settlement statement, disagreed with the amount of the commission to be paid by her ($28,500), and then met with the broker's agent for this property, June Humbert in another office. After concluding her discussions with the broker, Ms. Forti abruptly left the closing without signing the closing statement. She mentioned that she was going to a final walk through in Virginia.

6. Ms. Humbert indicated to me that Ms. Forti wanted to pay a reduced commission. Ms. Humbert tendered to us a letter that Ms. Forti had just given her. Ms. Humbert indicated to us that in that letter Ms. Forti had stated that she was part of a Department of Justice anti-trust



investigation into broker's commissions. The letter also stated, according to Ms. Humbert, that if Ms. Humbert agreed to reduce her commission, that Ms. Forti would not turn her in to the government authorities for anti-trust violations.

7. At no time did I conspire or collude with Ms. Humbert or attorney Finkelstein to extort a commission from Ms. Forti on behalf of Ms. Humbert.

8. At no time did Ms. Forti suggest that the disputed commission be placed into escrow to facilitate the closing; in fact, my impression was that she was opposed to doing so. I recall that after Ms. Forti left, a call was placed to Don Hadley, counsel to the broker, who suggested an escrow account for the disputed commission.

9. On or about April 29, 2002, Alberto Chong and I had tendered the full contract purchase price of $950,000 and had signed all documents to facilitate the closing on the sale of Forti's house to us.

10. After Ms. Forti refused to sign the closing statement and documents on or about April 29, 2002, Alberto Chong and I met shortly thereafter with attorneys from Hunton and Williams, specifically Jay Range, Esq. and Richard Aguglia, Esq. They also suggested placing the disputed commission in an escrow account so that the broker and Ms. Forti could settle or litigate the matter between themselves and allow the house closing to occur. Our attorneys prepared the escrow agreement which all parties signed, the disputed commission was placed into escrow, and the house closing occurred on or about May 8, 2002.

2



Further affiant sayeth not.

_____
Luisa Zanforlin

Subscribed to and sworn before me this 06 day of March, 2003.

_____
Notary Public D.C.

My Commission expires: BIRAMA DIENG, NOTARY PUBLIC
WASHINGTON, DISTRICT OF COLUMBIA
My Commission Expires April 14, 2007

3

# AFFIDAVIT OF ALBERTO E. CHONG

Alberto E. Chong, being first duly sworn under oath, deposes and says:

1. My name is Alberto E. Chong. I am over 21 years of age and of sound mind and body. I have dual citizenship, being a citizen of Peru and Canada.

2. I am employed as an economist at the Inter-American Development Bank.

3. My current address is 2936 Garfield Terrace, N.W. in the District of Columbia which is the home that Luisa Zanforlin and I purchased from Carol Forti in 2002.

4. In March 2002, Ms. Zanforlin and I agreed with June Humbert of W.C. and A.N. Miller Development Company that Miller would serve as the broker to assist Ms. Zanforlin and me in locating and possibly purchasing a home. On March 10, 2002, Ms. Zanforlin and I entered into a written Retainer Agreement with Miller. A copy of that Agreement, signed by me, Ms. Zanforlin, and Ms. Humbert, is attached to this Affidavit as Exhibit A. Ms. Zanforlin and I agreed to pay a $1 advance fee for Miller's services, and in exchange Miller agreed to locate and present available property to us for purchase, and to assist us through the process of property acquisition. We all specifically agreed in writing that Ms. Zanforlin and I would not pay any commission based on any property purchase that may occur. Finally, Ms. Zanforlin and I authorized Miller to receive a commission payment from the seller of any property.

5. On or about April 29, 2002, Ms. Zanforlin and I arrived at the law office of Nathan Finkelstein for the purpose of settling on the sale of Ms. Forti's house to me and Ms. Zanforlin. We were prepared to pay $950,000 that day in exchange for title to the house. We signed a settlement statement, which provided that $28,500 of that amount would go to Miller on behalf of Forti to cover a three percent commission from Forti to Miller. A copy of that settlement statement, signed by me and Ms. Zanforlin, is attached to this Affidavit as Exhibit B.

6. However, settlement did not occur on April 29 because of a dispute over how the $28,500 commission ($950,000 sales price times three percent commission) should be allocated. Ms. Forti refused to pay more than $4,000 in commission, claiming that she did not owe a three percent commission, and that the reference in her advertisement to a three percent commission was done at the recommendation of the U.S. Department of Justice, Antitrust Division, as part of an investigaiton. Ms. Humbert refused to accept a commission of less than $28,500.

7. On or about May 8, 2002, Ms. Zanforlin and I reconvened at the Finkelstein law office with Mr. Finkelstein and Ms. Forti, again for the purpose of completing the purchase of Ms. Forti's home.

8. This time, we successfully completed the purchase. Ms. Zanforlin and I tendered a $950,000 payment, including $40,000 we previously had deposited when we first signed the sales contract in mid-April 2002. Of the $950,000, $29,850.70 went into an escrow account in accordance with an Escrow Agreement entered into by me and Ms. Zanforlin, Ms. Forti, Mr. Finkelstein, and a representative of Miller. The amount in escrow covered the disputed commission of $28,500, as well as other costs.

9. In exchange for our $950,000 payment, Ms. Forti tendered title to the house to me and Ms. Zanforlin.

_____
Alberto E. Chong

Subscribed to and sworn before me this 22th day of _May 2003_.

_____
Notary Public D.C.

My Commission expires: _____

Maria Perez-Molina
Notary Public District of Columbia
My Commission Expires 4-14-04

2

## AFFIDAVIT OF JUNE HUMBERT

June Humbert deposes and states as follows:

1. My name is June Humbert. I am an adult citizen of the United States and am of sound mind and body.

2. I am a licensed real estate agent in the District of Columbia and Maryland. I have held a real estate license in each of those jurisdictions since 1976.

3. On or about April 7, 2002, Carol Forti placed an advertisement in the real estate estate classified section of the Washington Post. In that ad she offered the property which she owned at 2936 Garfield Terrace, N.W., in the District of Columbia, for sale at a price of $895,000. In the same ad she included the language "Co-op 3%." A true and correct copy of that ad is attached hereto and incorporated by reference herein as Attachment A.

4. As an experienced real estate agent in the District of Columbia for over twenty-five years, I knew that the words "Co-op 3%" mean that the person placing the ad is willing to pay a commission of 3% to a real estate agent who produces a buyer (or buyers) for the property who executes a contract which is acceptable to and signed by the seller. This meaning of the words "Co-op 3%" is well-known to experienced real estate agents in the District of Columbia. It is also common practice for an owner who is advertising a property for sale but who is unwilling to pay any commission to a real estate agent who produces a buyer acceptable to seller to state that offers will be entertained from "Principals only."

5. On April 13, 2002, I took Alberto Chong and Luisa Zanforlin to the property at 2936 Garfield Terrace, N.W.. I had previously spoken to Ms. Forti to schedule the appointment.

6. On April 14, 2002, I made a telephone call to Carol Forti and advised her that Mr.

Chong and Ms. Zanforlin were interested in making an offer on the property at 2936 Garfield Terrace, N.W.. She advised me at that time that any offer on the property acceptable to her would be required to contain a provision calling for settlement on the property by April 29, 2002. Because this only provided for a very short time until closing, I confirmed with the lender for Mr. Chong and Ms. Zanforlin that it would be possible for settlement to occur by that date. I was advised by a representative for the lender that this was in fact possible.

7. On April 15, 2002, I presented a contract offer set forth on a Regional Sales Contract to Carol Forti executed by Mr. Chong and Ms. Zanforlin on that date to purchase the property at 2936 Garfield Terrace, N.W., in the District of Columbia. The offer was in the amount of $915,000. A copy of the Regional Sales Contract and related documents is attached hereto and incorporated by reference herein as Attachment B.

8. One of the documents which was submitted to Ms. Forti by me with the Regional offer was an Escalator Clause Addendum executed by Mr. Chong and Ms. Zanforlin. That document provided, <u>inter alia,</u> as follows:

> 1. In the event that Seller receives one or more additional bonafide offers to purchase the Property with terms acceptable to Seller (the "Other Offers"), but which result in net proceeds of sale payable to the Seller equal to or greater than the net proceeds of sale payable to the Seller under this Contract, then the sales price stated in this Contract shall automatically increase, without further action on the part of Buyer, to an amount which generates net proceeds of sale to Seller equal to $5,000.00 dollars in excess of the highest net proceeds of sale generated in such Other Offers. Notwithstanding the foregoing, the sales price under this Contract shall in no event exceed $975,000.

\* \* \*

> 3. Any change in the Sales Price under this Addendum shall be effective and binding upon Seller and Buyer when Seller presents the following to

        Buyer:

                A. A copy of this Contract in ratified form, with the new Sales Price written into the following blank:

                NEW SALES PRICE - _____

A copy of the Escalator Clause Addendum is attached hereto and incorporated by reference herein as Attachment C.

    9.    On April 16, 2002, I went to the property at 2936 Garfield Terrace, N.W., where I met with Carol Forti. At that time she showed me a copy of what purported to be another offer to purchase the residence. The offered price in that document was $945,000. Ms. Forti had executed the Escalator Clause Addendum submitted by Mr. Chong and Ms. Zanforlin after filling in the blank in paragraph 3.A. for "NEW SALES PRICE" in the amount of $950,000. Thereafter, I amended the sales price in the Regional Sales Contract to change the offered price of Mr. Chong and Ms. Zanforlin to $950,000, to make it conform to the terms of the Escalator Clause Addendum which had been previously signed by Mr. Chong and Ms. Zanforlin and had been accepted by Ms. Forti with a new sales price of $950,000.

    10.    Because there were other changes made in the Regional Sales Contract, I then took that document to Mr. Chong and Ms. Zanforlin for their review and, if it was acceptable to them, for the initialing of the changes made and initialed by Ms. Forti. They did initial the changes on April 16, 2002. The amended sales price set forth in the Regional Sales Contract, as initialed and agreed to by Ms. Forti, Mr. Chong, and Ms. Forti, was in the amount of $950,000. In one change which Ms. Forti made in the Regional Sales Contract, Ms. Forti requested that settlement on the property be handled by Nathan I.Finkelstein, Esq..

    11.    The Regional Sales Contract provided in paragraph number 33 that "Commission

3% to be paid to W.C. & A.N. Miller at settlement."

12. On April 29, 2002, I appeared at the office of Nathan I. Finkelstein, Esq., for settlement. Ms. Forti arrived late for the settlement, and Mr. Chong and Ms. Zanforlin executed settlement documents before Ms. Forti arrived. . I am advised that on that date they signed all the documents prepared by Mr. Finkelstein and his office required for the settlement.

13. When Ms. Forti arrived at Mr. Finkelstein's office, she handed me an envelope containing a letter signed by her and dated April 29, 2002. A true and complete copy of that letter is attached hereto and incorporated by reference herein as Attachment D. I left Mr. Finkelstein's conference room to get a drink of water, and Ms. Forti asked me to take the letter with me and read it. After reading the letter, I called Donald H. Hadley, Esq., who is outside counsel for W.C. and A.N. Miller Development Company. I then went back into the conference room where Ms. Forti was located and told her that I could not negotiate on behalf of W.C. and A.N. Miller Development Company and that she would have to deal with Mr. Hadley. I also told her that I would have to get a copy of her letter of April 29, 2002, to him for his review.

14. Shortly thereafter, Ms. Forti said that she had to leave the settlement in order to go to a closing on another property which she was purchasing in northern Virginia.

15. At no time did I ever urge or request Mr. Chong and/or Ms. Zanforlin to refuse to sign any of the settlement documents presented to them on April 29, 2002.

16. At no time on April 29, 2002, did I hear Ms. Forti suggest that the disputed commission set forth in the settlement documents should be placed in escrow so that settlement could proceed on that date.

I declare and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 5th day of March, 2003.

_____
JUNE HUMBERT

## AFFIDAVIT OF NATHAN I. FINKELSTEIN

Nathan I. Finkelstein, being first duly sworn under oath, deposes and says:

1. My name is Nathan I. Finkelstein. I am an adult citizen of the United States of sound mind and body.

2. I have practiced law in the Washington, D.C. Metropolitan area for approximately 30 years and in particular real estate law for the past 25 years.

3. On or about April 29, 2002, I acted as the settlement agent on a proposed real estate transaction in which Alberto Chong and Luisa Zanforlin were to purchase from Carol A. Forti a house located at 2936 Garfield Terrace, N.W., in the District of Columbia. Mr. Chong and Ms. Zanforlin arrived at my office for the scheduled settlement, prepared to pay $950,000 for the house. However, the transaction did not occur because of a dispute between Ms. Forti and June Humbert, the agent for the real estate broker, W.C. and A.N. Miller Development Company, and for the buyers, Chong and Zanforlin. The dispute concerned whether three percent of the $950,000 was to be transferred to Miller to cover the broker's commission.

4. On or about May 8, 2002, I acted as the settlement agent for the sale of the house from Ms. Forti to Mr. Chong and Ms. Zanforlin. My wife Esther Finkelstein, who acts as my settlement coordinator, and I prepared the closing statement and closing documents that were signed and agreed to by Ms. Forti.

5. At the settlement, Mr. Chong and Ms. Zanforlin tendered a total payment of $950,000. By agreement of everyone involved, I established an escrow account and ensured that $29,850.70 of that $950,000 was placed into the account. The parties made this escrow arrangement because of the dispute between Ms. Forti and Miller over a commission payment.

6. I ensured that the remaining $920,149.30 was disbursed to Ms. Forti's benefit in accordance with a settlement statement she had signed.

7. In exchange for the payment, Ms. Forti transferred title to the house to Mr. Chong and Ms. Zanforlin.

Further affiant sayeth not.



Nathan I. Finkelstein

Subscribed to and sworn before me this 22 day of May 2003.

_____
Notary Public

My Commission expires: _____

ELIZABETH FRANCO
Notary Public
Montgomery Co., MD
My Comm. Exps. Oct. 28, 2006

2

# AFFIDAVIT
# OF
# ESTHER L. FINKELSTEIN

Esther L. Finkelstein, being first duly sworn under oath, deposes and says:

1. My name is Esther L. Finkelstein. I am an adult citizen of the United States of sound mind and body.

2. I am the settlement coordinator for Nathan Finkelstein, my husband, who has practiced real estate law for the past 25 years. I am not a lawyer.

3. On or about April 26, 2002, Nathan Finkelstein and I were in the process of preparing the closing statement and closing documents for the sale of a house in the District of Columbia located at 2936 Garfield Terrace, N.W. from Carol Forti to Alberto Chong and Luisa Zanforlin.

4. On or about April 26, 2002, I advised Nathan Finkelstein that Carol Forti had left a voice mail for me indicating that she (Forti) was unwilling to pay any commission over $4,000 to the broker's agent, June Humbert, and further that she (Forti) would be unavailable to discuss this until closing, scheduled for April 29, 2002.

5. Nathan Finkelstein then advised me to call the agent, Ms. Humbert, to ascertain if she knew anything about the reduced commission. Ms. Humbert advised me that she had not been contacted by Ms. Forti regarding a reduced commission.

6. After talking to his title insurer and reviewing the purchase contract for the property, Nathan Finkelstein advised me to place the cost of the full commission ($28,500) on Ms. Forti's side of the settlement sheet as an expense to her. It is standard operating procedure that the seller pays the commission on the sale of a house.

7.  At the closing, which was to occur on or about April 29, 2002, the buyers Alberto Chong and Luisa Zanforlin were present and had signed the necessary closing documents and were prepared to tender the full contract purchase price of $950,000.

8.  At the closing, which was to occur on or about April 29, 2002, Ms. Forti appeared and refused to sign the closing documents when she saw the full commission of $28,500 as a cost to her as seller on the closing statement. Ms. Forti left the closing conference room to talk to Ms. Humbert. After her discussion with Ms. Humbert, she promptly left the closing without signing the necessary documents. I would estimate that she was at the closing for no more than 10 to 15 minutes.

9.  Ms. Humbert tendered to the buyers and Nathan and me a letter signed by Ms. Forti received at closing that day from Ms. Forti wherein Forti indicated that she was working with the Department of Justice on anti-trust violations by brokers in setting their commissions. The letter indicated that if Humbert agreed to reduce her commission, Ms. Forti would not report her to the federal authorities.

10. At no time do I recall Ms. Forti suggesting that the disputed commission be placed in escrow to facilitate the closing.

11. At no time did I collude with the buyers of Forti's house to extort a commission from Ms. Forti.

12. I do recall receiving a call from buyer's counsel, Richard Aguglia, of Hunton and Williams, shortly thereafter, suggesting that the disputed commission be placed in escrow so that Ms. Forti and the broker's agent could argue or litigate over the amount of the commission and so that his clients could settle on the house.

13. The escrow agreement was prepared by Hunton and Williams and was subsequently signed by all parties and the closing actually occurred on or about May 8, 2002. Nathan Finkelstein is acting as escrow agent for the disputed commission under the escrow agreement.

Further affiant sayeth not.

_____
Esther L. Finkelstein

Subscribed to and sworn before me this 6th day of March, 2003.

_____
Notary Public D.C.

My Commission expires: _____



ELIZABETH FRANCO
Notary Public
Montgomery Co., MD
My Comm. Exps. Oct. 28, 2006

3