SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

W.C. & A.N. Miller Development Company
    Plaintiff

        v.                       Case No. 02ca0004745
                                      Calendar 13, Judge Wright
Carol A. Forti
    Defendant/Counterclaimant/Third Party Plaintiff

        v.

June Humbert
4901 Scarsdale Road
Bethesda, Maryland 20816
    Third Party Defendant

        v.

Luisa Zanforlin
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
    Third Party Defendant

        v.

Alberto Chong
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
    Third Party Defendant

RECEIVED
Civil Clerk's Office

JUN 1 9 2003

Superior Court of the
District of Columbia
Washington, D.C.

OPPOSITION OF DEFENDANT, COUNTERCLAIMANT, AND THIRD PARTY
PLAINTIFF FORTI TO MOTION FOR SUMMARY JUDGMENT BY
THIRD PARTY DEFENDANTS CHONG AND ZANFORLIN

AND

RENEWED MOTION FOR SUMMARY JUDGMENT BY DEFENDANT,
COUNTERCLAIMANT, AND THIRD PARTY PLAINTIFF FORTI

Defendant, Counterclaimant, Third Party Plaintiff Forti strongly opposes the

Motion for Summary Judgment by Third Party Defendants Chong and Zanforlin.

Counsel Richard Agulia asserts that it is "undisputed fact" that Chong and Zanforlin

"entered into a contract to purchase Forti's house for $950,000." The actual facts are that

Chong and Zanforlin made an Offer to Forti to purchase her home for Net Proceeds of

$950,000 with no deduction for a commission to W.C. & A.N. Miller or Humbert, who is

Miller's agent and Buyer's exclusive Broker.

Through counsel, Third Party Defendants Chong and Zanforlin assert that this

dispute is solely between Forti and W.C. & A.N. Miller. This assertion is utterly false.

The facts are the following. Chong and Zanforlin submitted an Offer to Seller Forti to

purchase her home for $950,000 in Net Proceeds and assured Forti that they would go to

settlement on April 29, 2002, recognizing that for Forti, time was of the essence. On

April 29, 2002, they refused to pay Forti the $950,000 in Net Proceeds that they had

contracted to pay, and they refused to escrow a disputed commission. As a result,

settlement did not take place on April 29, 2002 as scheduled. The actions of Chong and

Zanforlin constitute material breach. Accordingly, they are liable to Forti for all the

damages proximately caused by their breach. The damages and their associated costs to

Forti are specified in Forti's Rebuttal of their Points and Authorities, snd they are very

substantial. Chong and Zanforlin are necessary parties to this litigation. They must

remain Third Party Defendants in order to place Forti in the same position that she would

have been in had they not breached—as required by contract law. As Forti's legal

analysis in her rebuttal of the Third Party Defendants' Points and Authorities clearly

demonstrates, the Chong/Zanforlin purported defense of accord and satisfaction has no

2

legal merit whatsoever.

Forti renews her Motion for Summary Judgment on grounds that no truly material facts are in dispute and she is entitled to summary judgment as a matter of contract law. Forti asks this Court to consider her prior Motion for Summary Judgment and her sound Opposition to this Motion as a Renewed Motion for Summary Judgment.

Respectfully submitted,

Carol A. Forti
Defendant, Counterclaimant, and
Third Party Plaintiff Pro Se
14 West Chapman Street
Alexandria, Virginia 22301
(703) 535-5449

3

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

**W.C. & A.N. Miller Development Company**
     **Plaintiff**

       **v.**
                                   **Case No. 02ca0004745**
                                    **Calendar 13, Judge Wright**

**Carol A. Forti**
     **Defendant/Counterclaimant/Third Party Plaintiff**

       **v.**

**June Humbert**
**4901 Scarsdale Road**
**Bethesda, Maryland 20816**
     **Third Party Defendant**

       **v.**

**Luisa Zanforlin**
**2936 Garfield Terrace, N.W.**
**Washington, D.C. 20008**
     **Third Party Defendant**

       **v.**

**Alberto Chong**
**2936 Garfield Terrace, N.W.**
**Washington, D.C. 20008**
     **Third Party Defendant**

### GENERAL OBJECTIONS TO THE CONTENTS OF THE MOTION FOR SUMMARY JUDGMENT FILED BY RICHARD AGULIA ON BEHALF OF THIRD PARTY DEFENDANTS CHONG AND ZANFORLIN

1.     Forti's Exhibit 1 is the actual Offer by Chong and Zanforlin and subsequent

contract between Buyers and Seller.

2.     Forti's Exhibit 2 is the Escrow Agreement signed by Buyers Chong, Zanforlin,

Don Hadley, outside counsel for W.C. & A.N. Miller, and Seller Forti

3.    Opposing counsel have made an Exhibit a HUD Settlement Sheet that was **NOT** the final iteration agreed to by Seller Forti. See Forti's Exhibit 3 for the HUD Settlement Sheet that she agreed to sign and was the final version signed by Buyers and Seller.

4.    Selective use by opposing counsel of some transcript pages and intentional omission of other transcript pages takes Forti's deposition testimony out of context and risks distorting her deposition testimony. For these reasons, the entire deposition transcript should be attached as an exhibit, or Agulia should not be allowed to use selective pages.  Forti asks this Court to <u>order</u> Richard Agulia to furnish this Court with the entire deposition transcript.

5.    Opposing counsel include as Exhibits "Affidavits" by Humbert, Chong, Zanforlin, settlement attorney Finklestein, and Esther Finklestein. All of these individuals committed perjury in swearing to these false statements. In addition, Esther Finklestein was <u>not</u> at the settlement table during the settlement proceeding on Forti's property on April 29, 2002 and has no first-hand knowledge of what was said there or by whom. <u>See</u> Gant Redmon's Affidavit in Forti's Exhibits for an accurate account—direct from Finklestein—that Chong, Zanforlin, and Humbert prevented settlement on April 29, 2002 by refusing to escrow the disputed commission.

6.    A request for admissions addressed to Seller Forti by Plaintiff W.C. & A.N. Miller is improperly included as Exhibit 4 in a pleading filed by Third Party Defendants Chong and Zanforlin.

7.    Richard Agulia did not send Forti Exhibit 3 to the Chong/Zanforlin motion, if indeed there is an Exhibit 3. Since Forti has no idea what Exhibit 3 includes, she cannot

2

comment on it, and not commenting on it can not be construed as an admission by Forti

of anything that it contains.

Respectfully submitted,

Carol A. Forti
Defendant, Counterclaimant, and
Third Party Plaintiff Pro Se
14 West Chapman Street
Alexandria, Virginia 22301

3

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION


W.C. & A.N. Miller Development Company
    Plaintiff

      v.                                    Case No. 02ca0004745
                               Calendar 13, Judge Wright
Carol A. Forti
    Defendant/Counterclaimant/Third Party Plaintiff

      v.


June Humbert
4901 Scarsdale Road
Bethesda, Maryland 20816
    Third Party Defendant

      v.


Luisa Zanforlin
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
    Third Party Defendant

      v.


Alberto Chong
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
    Third Party Defendant

### THE RESPONSE OF DEFENDANT, COUNTERCLAIMANT, AND THIRD PARTY PLAINTIFF FORTI TO CHONG AND ZANFORLIN'S STATEMENT OF UNDISPUTED MATERIAL FACTS BY LETTERED HEADINGS AND NUMBERED PARAGRAPHS

    A.  Heading "A" should read Chong/Zanforlin Offer for $950,000 in Net

Proceeds.

      1.      Undisputed.

      2.      Disputed. Forti said repeatedly during discovery and will state again, in

response to this motion, which is filed more than one year after events that gave rise to the suit, that she is relying on memory. She told opposing counsel that she thought the name of the other Offeror was Silas, but it could have been Seilas or Sailas. This gentleman submitted an Offer for $945,000 in Net Proceeds. He acted as a principal on his behalf and that of his wife. No real estate broker was involved.

3.    Disputed, because it misrepresents the facts. On or about April 15, 2002, June Humbert, a Buyer/Broker representing the exclusive interests of Chong and Zanforlin, presented an Offer to Seller on behalf of Chong/Zanforlin which began at $915,000 and through operation of an Escalation Clause Addendum (page one of the Offer and an extremely important provision in the Offer), automatically escalated the Offer to pay $5,000 in Net Proceeds above the Net Proceeds of the next highest Offer up to $975,000. The Escalator Clause Addendum was the first page of the Offer and the rest was the Regional Sales Contract.

4.    Disputed, because the Escalator Clause Addendum offered $5,000 in Net Proceeds more than the Net Proceeds of the next highest Offer and was an integral part of the contract. Paragraph 4, as stated by Third Party Defendants, infers that the Escalator Clause Addendum was a separate agreement, which it was not. It is an integral, extremely important, and controlling provision of the Offer and subsequent contract.

5.    First, see again Forti's response to paragraph 2. Second, the Escalator Clause Addendum automatically escalated the Chong/Zanforlin offer to $5,000 in Net Proceeds over the Net Proceeds of the next highest Offer. Since the Net Proceeds of the next highest Offer was for Net Proceeds of $945,000, the Escalator Clause Addendum in

2

the Chong/Zanforlin Offer automatically escalated the Chong/Zanforlin Offer to

$950,000 in Net Proceeds.

6.     Forti wrote in $950,000 intending it to represent Net Proceeds. She

neglected to cross out "Sales Price" on the printed form. However, if the court examines

the entire contract and considers all of the provisions of the Offer and subsequent

contract, the rules of contract interpretation and legal construction make it abundantly

clear that Forti's writing in $950,000 refers to Net Proceeds.

7.     Seller learned, after the failed settlement on her home on April 29, that

Chong and Zanforlin had entered into an agreement with Miller whereby Miller would

act as their Buyer/Broker for $1. June Humbert deceptively "neglected" to disclose this

agreement to Seller Forti when she presented the Chong/Zanforlin Offer or anytime

before or at settlement. However, this agreement between Buyers and Buyers' Broker

does not impose any obligation on Seller Forti to pay Humbert a commission. Forti first

learned about this prior agreement between Buyer/Broker Humbert and Buyers in a

phone call from the settlement attorney after settlement on her property broke down, and

Forti was in settlement on her townhouse.

8.     Dispute. It is legally impossible for Chong and Zanforlin to bind any

Seller to pay a commission to Miller if that Seller has not signed a contract with Miller

agreeing to pay a commission.

9.     Undisputed that Buyers and Buyers Broker can enter into any written

agreement between themselves.

10.     Undisputed.

3

11.    Disputed as misleading. Humbert inserted the phrase: "Commission 3% to be paid to W.C. & A.N. Miller at settlement." It does not say <u>who</u> will pay the commission, and for all the reasons that Seller Forti discusses in great detail in her Rebuttal of Points and Authorities], Forti reasonably believed that this phrase referred to an agreement between Buyers and Buyer's Broker that Buyers had agreed to pay Humbert a 3 percent commission, because Forti had not signed any agreement with Humbert to pay her a commission..

12.    Disputed. Chong and Zanforlin refused to abide by the terms of their Offer and subsequent contract with Seller Forti which promised Seller Forti Net Proceeds of $950,000.

13.    First, the HUD settlement statement included as Exhibit B is not signed and it is <u>not</u> the revised HUD settlement sheet that Forti signed. The HUD settlement sheet that Forti signed reflected that the commission was disputed and had been put in escrow. Please see Forti's exhibits for the final HUD Settlement Sheet agreed to by Seller and Buyers. Second, Forti did not enter into any agreement with W.C. & A.N. Miller to pay a 3 percent commission. Therefore, Chong and Zanforlin could not bind Forti to pay Miller a 3 percent commission.

14.    Undisputed.

15.    However, Forti submits the following exlanation with respect to this letter. Forti was out of town on April 26, 27, and 28, the three days before the scheduled settlement on April 29, so she wrote this letter on the morning of settlement. She was rushed in writing the letter and not as precise as she should have been. She neglected to

4

inform Humbert that advertisements are merely solicitations to make an offer—not offers themselves in case was Humbert was under that misimpression. Forti had a discussion with an individual in the Antitrust Division and another individual in a government investigative agency. Forti considered participating in an investigation they were interested in conducting but then decided that she did not have the time. Forti is ready and willing to provide more information to Judge Wright in chambers, if he so desires, , but she will not provide any further nformation to W.C. & A.N. Miller or discuss these matters in open court in order not to compromise any government investigation.

16.    At settlement, Humbert informed Forti for the first time that she believed that she was entitled to a commission from Forti.

17.    When Forti told all parties at settlement that she did not owe Humbert any commission, settlement attorney Finklestein suggested escrowing the disputed commission. Forti agreed to escrow the disputed commission so that settlement could proceed, but Humbert refused to escrow the disputed commission, and she encouraged Buyers to refuse as well, which they did.  Footnote 2 is inaccurate. Eight days later, counsel for Forti at Paley Rothman told Agulia that Forti was ready and willing to go to settlement provided the disputed commission was escrowed. Agulia told Forti's counsel that W.C. & A.N. Miller and Chong and Zanforlin had changed their minds and were then willing to escrow the disputed commission.

18.    Undisputed.

19.    Forti has no personal knowledge regarding Chong and Zanforlin's actions on May 8. After the escrow agreement was signed on May 8, 2002, Forti then signed

5

settlement papers on her property. Third Party Defendants' paragraph 19 is inaccurately attributed to Forti's deposition.

20.     Forti has no personal knowledge of Chong or Zanforlin's whereabout on May 8, 2002.

**D.     An escrow agreement containing the disputed commission was signed by Chong, Zanforlin, Donald Hadley, outside counsel for W.C. & A.N. Miller and Seller Forti. Forti signed a revised HUD Settlement Sheet and other settlement papers in her counsel, Dan Hodin's office. Forti strongly disputes that Chong and Zanforlin's "obligations were fulfilled."**

21.     Objected to as misleading.. Richard Agulia drafted the Escrow Agreement, and Dan Hodin reviewed and edited it under rushed circumstances. Forti too was extremely rushed, because Agulia insisted on getting the Escrow Agreement signed before the end of the day on May 8. If Forti had noticed the language quoted here, she would have insisted that $950,000 refer to Net Proceeds. Forti disputes that the reference for this paragraph is her deposition.

22.     Agulia basically drafted the Escrow Agreement and aggressively promoted his clients' interests even though his clients Chong and Zanforlin were responsible for the eight day delay in escrowing the disputed funds and in settling on Forti's property. Forti's counsel had little time to make changes to protect Seller Forti. Forti disputes the reference to Forti's deposition.

23.     Forti lacks personal knowledge as to how or when Chong and Zanforlin made payment. Forti disputes that the source is Forti's deposition.

6

24. Disputed that anything stated in this paragraph comes from Forti's deposition.

25. Disputed. Forti relinquished title to her property after the disputed commission was escrowed and the HUD settlement sheet was revised to reflect that the disputed commission was escrowed.

26. Undisputed except Forti disputes that the source is Forti's deposition.

27. Undisputed except Forti disputes that the source is Forti's deposition.

28. Undisputed except Forti disputes that the source is Forti's deposition.

Respectfully submitted,

Carol A. Forti
Defendant, Counterclaimant, and
Third Party Plaintiff Pro Se
14 West Chapman Street
Alexandria, Virginia 22301
(703) 535-5449

7

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

W.C. & A.N. Miller Development Company
      Plaintiff

         v.                             Case No. 02ca0004745
                                      Calendar 13, Judge Wright

Carol A. Forti
      Defendant/Counterclaimant/Third Party Plaintiff

         v.

June Humbert
4901 Scarsdale Road
Bethesda, Maryland 20816
      Third Party Defendant

         v.

Luisa Zanforlin
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
      Third Party Defendant

         v.

Alberto Chong
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
      Third Party Defendant

REBUTTAL BY DEFENDANT/COUNTERCLAIMANT/THIRD PARTY
PLAINTIFF FORTI OF POINTS AND AUTHORITIES FILED BY THIRD
PARTY DEFENDANTS CHONG AND ZANFORLIN WITH THEIR MOTION
FOR SUMMARY JUDGMENT

## I. <u>Response to Preliminary Statement</u>

Third Party Plaintiff Forti entered into a contract with Buyers Chong and

Zanforlin to sell her house at 2936 Garfield Terrace, N.W. for $950,000 in <u>Net Proceeds.</u>

After Forti selected the Chong/Zanforlin contract over another bona fide offer for

$945,000 in Net Proceeds, Chong, Zanforlin, and their Buyer Broker Humbert tried to force Forti at settlement to pay Humbert a 3 percent commission, although Forti had not entered into any agreement with Humbert to pay her a commission. Forti's Washington Post ad for the sale of her home stated "co-op 3 %," but, according to well settled principles of contract law, that ad was a solicitation or invitation to make offers—not an offer itself. June Humbert recognized the ad as a solicitation to make an Offer. She prepared an Offer on behalf of her clients, Chong and Zanforlin and presented it to Seller Forti. That Offer included a written acknowledgement by Humbert that she was representing the Buyers' interests exclusively. The first page of the Offer contained an Escalator Clause Addendum, in which Chong and Zanforlin made an initial offer of $915,000, which automatically escalated, in accordance with an Escalation Clause Addendum, to provide Seller with $5,000 in Net Proceeds above the Net Proceeds over the next highest offer. Since Forti has received a prior offer for $945,000 in Net Proceeds, that Offer triggered the Escalator Clause Addendum in the Chong/Zanfolin Offer to pay Forti $950,000 in Net Proceeds.

Humbert wrote into the Offer the phrase: "3 % commission to be paid to W.C. & A.N. Miller at settlement," but the phrase does not say who is to pay a 3 percent commission. Since Hambert told Forti verbally and wrote into the contract that she was representing the interests of the Buyers exclusively and the terms of the Escalator Clause Addendum precluded any deductions from Net Proceeds of $950,000 due Seller Forti, Forti reasonably assumed that Buyers had previously agreed to pay Humbert a 3 percent commission. Forti knew that she had not agreed to pay Humbert a 3 percent commission.

2

In addition, the Escalator Clause Addendum states that "both parties agree that this Escalator Clause Addendum takes precedence over any conflicting terms in the contract." For all of these reasons, Forti's assumption that Buyers were paying Humbert a 3 percent commission was entirely reasonable. Finally, this contract for the purchase of Forti's home was between Seller Forti and Buyers Chong and Zanforlin. Forti did not sign any separate agreement with Humbert to pay her a 3 percent commission, which, by law, according to contract law, is they only way Humbert would be owed a commission from Forti.

Seller Forti told Buyers and Buyers Broker **BEFORE** selecting their Offer that the Seller of the townhouse insisted on going to settlement on his townhouse on April 29, 2002 and that there was an Assignment of Proceeds regarding proceeds from the sale of her property to pay the balance owed on settlement of the townhouse, so that she needed to do "back to back settlements" on April 29, 2002: settlement on her property at 9:00 a.m. and a noon settlement on the townhouse. Forti asked prospective Buyers Chong and Zanforlin if they could and would go to settlement on April 29, and Buyers ssured Seller that they could and would go to settlement on April 29.

Although Forti had requested that the HUD Settlement Sheet be faxed to her 5 days in advance of settlement, neither the settlement attorney Finklestein nor his wife, Esther Finklestein, who prepares the papers, faxed them in advance of settlement—as Forti had requested. Forti does not believe that this failure was inadvertent error but rather a deliberate decision.

Consequently, Forti learned for the first time at settlement itself that Humbert had

3

connived with settlement attorney and/or his wife to draw up the HUD Settlement Sheet

to deduct a 3 percent commission for Humbert from Net Proceeds due Forti of $950,000.

Forti refused to sign the HUD settlement sheet as it read, because it did not reflect her

understanding of an essential term of the Offer and subsequent contract, i.e. that the

Chong/Zanforlin contract promised her Net Proceeds of $950,000.

In order for settlement to proceed on April 29, 2002—as scheduled, the settlement

attorney suggested escrowing the disputed funds. Forti agreed to escrow the disputed

commission so that settlement could proceed, but Humbert adamantly refused, and

Buyers Chong and Zanforlin, following her cue, also refused to escrow the disputed

commission. Seller Forti told the parties that she would not sign settlement papers until

the HUD Settlement Sheet reflected the contract's terms to pay her $950,000 in Net

Proceeds or the disputed funds were escrowed. She reminded all parties that she had not

entered into any agreement with Humbert to pay her a 3 percent commission and that she

would not pay Humbert a 3 percent commission. Seller Forti then left for a walk-through

and noon settlement on the townhouse.

On or about May 6, Buyers Chong and Zanforlin hired Richard Agulia of Hunton

and Williams. Agulia sent Seller Forti a letter threatening to sue her for specific

performance even though his clients (and Humbert) had prevented settlement.

Forti hired Paley Rothman to represent her interests since settlement attorney Finklestein

had failed to protect her interests.  On or about May 7, 2002, Forti's counsel, Dan Hodin,

told Agulia that Seller Forti was ready and willing to go to settlement provided the

disputed commission was escrowed. Agulia informed Hodin that Chong and Zanforlin

4

and W.C. & A.N. Miller had changed their minds and were then willing to escrow the

disputed commission. Agulia and Hodin prepared an escrow agreement, which was

finally signed on May 8, 2002. The four signatories to the escrow agreement are Chong,

Zanforlin, Don Hadley, outside counsel for W.C. & A.N. Miller signing for W.C. & A.N.

Miller, and Seller Forti. Disbursement of funds in the Escrow Agreement must be made

by written agreement of the signatories or by Court Order.

## II. Rebuttal by Forti of the Arguments Advanced by Richard Agulia on Behalf of Chong and Zanforlin

Chong and Zanforlin breached the contract by refusing to pay Seller Forti

$950,000 in Net Proceeds on April 29, 2002. They knew that "time was of the essence"

for Forti. They breached the contract by refusing to escrow the disputed funds, so that

settlement could proceed on April 29, 2002, .They breached the contact under the

contract principle of delay and detrimental reliance. Since there was an Assignment of

Proceeds to pay the balance Forti owed on the townhouse from funds received at

settlement on her property, the refusal of Chong and Zanforlin to go to settlement on

April 29 put Forti at risk of losing the townhouse. The refusal of Chong/Zanforlin to go

to settlement on April 29 forced her to spend the entire week following this debacle

scrambling to arrange alternative financing on the townhouse.

Chong and Zanforlin are liable to Forti for all damages proximately caused by

their breach. They are liable to Forti for interest on $950,000 from April 29 through May

8. They are liable to Seller Forti for the escrowed funds and for interest on the escrowed

funds from May 8, 2002 until they and Miller agree to release these funds to Forti or are

5

ordered to release them by this Court. They are liable to Forti for the interest that Forti had to pay the seller of the townhouse, because he did not receive the balance of his sales price on April 29. Chong and Zanforlin are liable to Forti, as a proximate cause of their breach, for the legal fees Forti incurred in having to hire Paley Rothman to work with Richard Agulia to draft an escrow agreement and represent her interests at settlement.

For Agulia to assert that Forti's dispute lies exclusively with Miller is flatly wrong. Richard Agulia has grossly distorted the principles of contract law. Agulia engages in self-serving revisionism regarding the contract doctrine of accord and satisfaction and misrepresents the facts in the instant case Agulia's assertions that (1) Forti's claims against Chong and Zanforlin for breach of contract and damages are barred by accord and satisfaction and (2) that summary judgment is appropriate on this ground are preposterous. His purported authority for his reliance on accord and satisfaction is Pierola v. Moschonas, 687 A.2d 942 ( D.C. App. 1997) although the facts of Pieroli could not be more different from the facts of the instant case. In Pieroli, a bridge painter sued a general contractor for breach of contract. The Court of Appeals held that the contractor's defense of accord and satisfaction had been satisfied when the contractor submitted a check to painter marked "payment in full," and painter negotiated the check. In Pieroli, the Court is careful to state the following. "Accord and satisfaction is a valid affirmative defense to breach of contract claim when there is proof of: (1) legitimately disputed or unliquidated claim; (2) mutual agreement [emphasis added] that debtor will pay and creditor will accept something other than original amount due in satisfaction of disputed claim; and (3) actual giving and taking of agreed upon

6

substitution. Prong 2 has not been satisfied, because Forti did not [emphasis added] agree to take something other than the original amount due in satisfaction of the disputed claim. Forti has never agreed to take less than $950,000 in Net Proceeds. She insisted that the HUD Settlement Sheet reflect her understanding of the contract, i.e. that she would receive $950,000 in Net Proceeds or that the disputed funds be put in escrow to be subsequently dispersed by agreement of the four signatories or by order of this court. In addition, prong 3 has not been satisfied. There has been no substitution for Forti's original demand for $950,000 in Net Proceeds and no actual giving and taking of any agreed upon substitution [emphasis added]. Forti only agreed to put the disputed funds into escrow in order for settlement on her property to proceed.

Forti has never accepted what she received as proceeds at settlement on May 8, 2002 as accord and satisfaction on the Chong/Zanforlin contract promise to pay $950,000 in Net Proceeds over the Net Proceeds of the next highest offer ($945,000). Finklestein eventually wired to MBH Settlement Co. the balance Forti owed on the townhouse, and Forti used the rest of the proceeds for other purposes. Agulia grossly distorted case law (Pieroli) and well settled principles of contract law in a vain attempt to make his case.

In Karrick v. McEachern, 2 F.2d 126 (D.C. App. 1924), the Court of Appeals discussed extensively the contract principle of accord and satisfaction: "To constitute a valid accord and satisfaction, it is essential that what is given or agreed to be performed shall be offered as a satisfaction and extinction of the original demand, that the debtor shall intend it as a **satisfaction** for such obligations, and that such intention shall be made known to the creditor in some unmistakable manner. It is equally essential that the

7

creditor shall have accepted it with the intention that it should operate as a **satisfaction**. Both the giving and acceptance in **satisfaction** are essential elements, and if they be lacking, there can be no **accord** and **satisfaction.** The intention of the parties, which is of course controlling, must be determined from all the circumstances attending the transaction." In <u>Stinson v. Mueller,</u> 449 A.2d 329, the District of Columbia Court of Appeals agreed with the analysis in <u>Karrick v. McEachern</u>. " An **accord** and **satisfaction** is a valid defense to a breach of contract claim where there is proof of (a) a legitimately disputed or unliquidated claim; (b) a <u>mutual agreement</u> [emphasis added] that the debtor will pay and the creditor will accept something other than **the** original amount due in satisfaction of the disputed claim; and (c) the actual giving and taking of the <u>agreed upon substitution</u>. [emphasis added]. In the instant case, there was no mutual agreement and there was no agreed upon substitution.

In <u>Laganas v. Installation Specialties,</u> Inc., 291 A. 2d (D.C. App. 1972), the Court of Appeals acknowledged that where a claim is unliquidated or under bona fide dispute, the payment of a lesser sum than claimed operates as an accord and satisfaction, the compromise being good consideration for the concession made. "It is essential [however] that there be a <u>mutual agreement</u> to accept a sum less than that demanded." In the instant case, there was no mutual agreement to accept a sum less than that demanded.

In <u>Resolution Trust Corporation v. Bildman et al.</u>, 768 F. Supp. 3, the United States District Court for the District of Columbia, interpreting D.C. law, shed further light on the doctrine of accord and satisfaction. "In order to effect an accord and satisfaction, the parties must intend that the payments constitute an **accord** and **satisfaction.** The

District Court looked to the Fifth Circuit for guidance and cited <u>Woods-Tucker Leasing</u>

<u>Corp. of Georgia v. Kellum</u>, 641 F.2d 210, 214 (5th Cir. 1981). In <u>Kellum</u>, the Fifth

Circuit held that a "settlement between the lender and borrower did *not* amount to an

accord and satisfaction discharging the guarantor's obligations where the lender expressly

reserved its rights against the grantor in the settlement agreement. <u>Id</u> . The Court found

that, in reserving its rights against the guarantor, the lender could not have intended its

settlement with the borrower as an **accord** and **satisfaction** of the loan." Agulia has

distorted the contract principle of accord and satisfaction to a point where it is almost

beyond recognition.

Agulia cites <u>Perper v. Danford</u>, 63 A.2d 773 (D.C. App.1949) in footnote 3, but

the decision provides no support for the defense of accord and satisfaction to Forti's

claim for breach of contract and damages against Chong and Zanforlin. The facts in

<u>Perper</u> bear no resemblance to the case at bar. In <u>Perper</u>, a landlord and tenant litigated

over rent overcharges on a rent-controlled apartment by the landlord and subletting by the

tenant. The parties entered into a writing to settle their differences. The Court decided

that the most reasonable interpretation of the writing was that both parties intended the

disputed claim to be finally discharged and that in satisfaction of it, the tenant accepted

the promise of the landlord to continue permission to sublet. Having found <u>mutual</u>

<u>agreement</u> [emphasis added] of an intent to settle their differences, the court found

accord and satisfaction. As should be abundantly clear, the facts of this case could not be

more different than the instant case. Mutual agreement is absent from the instant case;

that is why the disputed funds were escrowed. Therefore, <u>Perper</u> lends no weight to

9

Agulia's contention that accord and satisfaction bar Forti's claim to breach of contract and provides no support for the summary judgment motion. The Virginia case has no persuasive authority in this jurisdiction.

For eight days (April 29,2002 through May 7, 2002), Chong, Zanforlin, and W.C. & A.N. Miller and its agent, Humbert, refused to escrow the disputed funds, so that settlement on Seller Forti's property could proceed. On or about May 7, 2002, Chong, Zanforlin, and W.C. & A.N. Miller changed their minds and decided that they would escrow the disputed funds. This change of heart was communicated by Richard Agulia, counsel for Chong and Zanforlin, to Dan Hodin, counsel for Seller Forti. Agulia and Hodin prepared an escrow agreement, which was signed on May 8, 2002. Finklestein wired the balance less the settlement charges customarily charged to Seller to Forti's bank. There was no mutual agreement between Forti and Chong/Zanforlin that the latter would purchase Forti's property for less than $950,000. There was no accord between Chong/Zanforlin and Seller Forti.

"If time is of the essence in the performance of a contract, any delay in its performance beyond the specified period is a material breach." R. Lord, Williston on Contracts, sec. 63:18. "There must also be a causal connection between the delay and the damages suffered by the plaintiff, order to sustain a cause of action for breach on the basis of delay." Id. Since time was of the essence in essence in performance of the contract by the buyers, the delay of 8 days in going in going to settlement was a material breach by the Buyers. There was a causal connection between the delay and going to settlement and the interest Forti had to pay the owner of the townhouse. "It is a material

10

breach of a contract to fail to pay any substantial amount of the consideration owing under the contract." R. Lord, Williston on Contracts, sec. 63:16. Buyers are liable to Forti for interest on $950,000 for eight days. Chong and Zanforlin are also liable to Forti for interest on the escrowed funds from May 8, 2002 until they agree to release these funds to Forti or are ordered to release them to Forti by this Court.

Chong and Zanforlin breached their contract with Seller Forti by not paying Seller Forti on April 29, 2002 the $950,000 in Net Proceeds that their contract promised her. Thirteen months later, Seller Forti still has not been made whole. "The primary remedy for injuries caused by nonperformance of most contracts is an action for damages for the breach." U.S. v Winstar Corp., 518 U.S. 839, 116 S. Ct 2432, 135 L. Ed 2d 964 (1966) (damages are default remedy for breach of contract). According to Williston on Contracts, "contract damages are based on protection of the promisee's expectation interest and are designed to secure for that party the benefit of the bargain that she made by awarding a sum of money that will place the promisee in as good a position as she would have occupied had the contract been performed." R. Lord, Williston on Contracts, 4th Edition, Sec. 64.2. "The theory underlying this [principle] is that a promisee enters into a particular contract because she believes that the best possible outcome will be achieved by contracting with this particular promisor. When the promissor fails to perform as promised, the promisee becomes entitled to damages designed to compensate hin or her for the harm caused by the breach." Id. "The fundamental principle underlying the availability of contract damages is that of compensation. The disappointed promisee is generally entitled to an award of money damages in an amount reasonably calculated to

11

make him or her whole." Truitt v. Evangel Temple, Inc., 486 A.2d 1169 (D.C. App. 1984). "Moreover, this compensation principle generally measures the damages according to the pecuniary loss suffered by the promisee." Hoai v. Sun Refining & Marketing Co., 18 F. 3d 953 (D.C. Cir. 1994).

Chong and Zanforlin are liable to Seller Forti for eight days of interest on $950,000 between April 29, 2002 and May 8, 2002 when they refused to escrow the disputed funds and go to settlement. Chong and Zanforlin are also liable to Seller Forti for the entire amount withheld from Forti and escrowed. They are liable to Forti for interest on the amount held in escrow from May 8, 2002 until those funds are released to Forti by their signed agreement or by an order of this court. They are liable for the interest that Forti had to pay the owner of the townhouse since he did not receive the balance Forti owed on the townhouse on April 29, 2002 through the Assignment of Proceeds. Chong and Zanforlin are liable to Seller Forti for the legal costs she incurred from Paley Rothman after she was threatened by Richard Agulia, attorney for Chong and Zanforlin with a "suit for specific performance" even though his clients, Chong and Zanforlin were responsible for the eight day delay in going to settlement. Chong and Zanforlin are also liable to Forti for Paley Rothman's legal fees to draft the escrow agreement and represent Forti at settlement. Chong and Zanforlin and W.C. & A.N. Miller are liable for the legal costs Seller Forti incurred by forcing her to have Vernon Johnson of Jackson & Campbell review the pleadings and agree to serve as First Chair after W.C. & A. N. Miller filed suit against Seller Forti for a 3 percent commission that Forti had never agreed to pay. Miller's suit against Seller Forti compelled her to implead

12

Third Party Defendants Chong, Zanforlin, and Humbert as necessary parties to the suit.

### D.    Rebuttal of Third Party Defendants' Section "D."

There was no contract agreement between Forti and Miller or Humbert (Miller's agent) to pay Miller a 3 percent commission. Therefore, Forti does not owe Miller a 3 percent commission.

• Forti's ad in the Washington Post, including the phrase "co-op 3 % was a solicitation to make offers—not an offer itself. The phrase, "commission 3 % to be paid to W.C. & A.N. Miller at settlement" was written into the contract and does not say who is to pay a commission. Humbert acknowledged in writing in an integral part of the contract that she was the Buyers' Broker and represented their interests exclusively. The Escalator Clause Addendum promised Forti $950,000 in Net Proceeds, which precludes any deduction from the amount promised by the Chong/Zanforlin Offer to Forti (and subsequent contract) of a commission for Humbert. For all of these reasons, Seller Forti reasonably assumed that the phrase written into the contract by Humbert referred to a prior agreement between Buyers and Buyers' Broker Humbert for Buyers to pay Humbert a 3 percent commission.

• Only after Buyers Chong and Zanforlin breached their contract with Forti, and Forti was in settlement on the townhouse did Forti learn in a telephone call from settlement attorney Finklestein that Buyers and Broker had entered into a prior agreement to pay $1 for Humbert's services. Deceptively, Humbert never revealed to Seller Forti that she had entered into such a contract with Chong and Zanforlin. Humbert's failure to disclose to Forti the existence of a prior contract between her and the Buyers did not

13

create any obligation for Forti to pay Humbert a commission, but it created ambiguity in the contract between Chong/Zanforlin and Forti. By law, that ambiguity must be construed against the drafter, Humbert, agent for W.C. & A.N. Miller.

- Forti's letter offering to pay Humbert $4,000 is not an admission that Forti owed Humbert a 3 percent commission. Forti never signed an agreement with Humbert to pay her a 3 percent commission. Therefore, Forti did not owe Humbert a 3 percent commission. Forti offered to pay Humbert $4,000 for introducing credit worthy buyers to her home.

- Forti had discussions with the Antitrust Division of Justice and with a government investigative agency regarding price-fixing by real-estate agents. Forti subsequently decided that she not have the time to assist them in their investigations. Forti is ready and willing to discuss these conversations with Judge Wright in chambers, if he wishes, but she will not discuss them with W.C. & A.N. Miller or in open court in order not to compromise any government investigations.

### III. Response to Third Party Defendants' Conclusion

Contrary to the assertions of counsel, Chong and Zanforlin breached their contract with Seller Forti and are liable to Forti for all the damages specifically identified in this pleading. Despite counsel's assertion to the contrary, there was no "accord" between Seller Forti and Chong and Zanforlin as to disposition of the disputed commission. The disputed commission was escrowed precisely because their was no accord between Seller Forti and Chong and Zanforlin.

Chong and Zanforlin are Third Party Defendants, because they are necessary

14

parties to this litigation. They are liable to Seller Forti for all funds held in escrow and all

the other damages Forti incurred that were proximately caused by their breach.  Chong

and Zanforlin retained Richard Agulia of Hunton & Williams, and Agulia and his two

associates, Francine Friedman and Jeffrey Hardie, have aggressively litigated on their

behalf. The collective pleadings of these attorneys are unsupported by any shred of

contract law. Despite that fact,  Forti has had to hundreds of hours responding to their

baseless pleadings. For all of these reasons, the Court should reject the request to dismiss

the complaint as to Third Party Defendants Chong and Zanforlin. Forti asks this Court to

consider her prior Motion for Summary Judgment and this Rebuttal or Opposition as a

Renewed Motion for Summary Judgment against W.C. & A.N. Miller and Chong and

Zanforlin and prays that this Court will grant that Renewed Motion.

> Respectfully submitted,

Carol A. Forti
Defendant, Counterclaimant, and
Third Party Plaintiff Pro Se
14 West Chapman Street
Alexandria, Virginia 22301
(703) 535-5449

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I served copies of Forti's entire response to counsel George Masson, Jr. and counsel Richard Agulia by first-class mail, postage prepaid on June 18, 2003.

_____
Carol A. Forti

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

W.C. & A.N. Miller Development Company
    Plaintiff

     v.
                          Case No. 02ca0004745
                          Calendar 13, Judge Wright

Carol A. Forti
    Defendant/Counterclaimant/Third Party Plaintiff

     v.

June Humbert
4901 Scarsdale Road
Bethesda, Maryland 20816
    Third Party Defendant

     v.

Luisa Zanforlin
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
    Third Party Defendant

     v.

Alberto Chong
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
    Third Party Defendant

RECEIVED
Civil Clerk's Office

JUN 1 9 2003

Superior Court of the
District of Columbia
Washington, D.C.

OPPOSITION OF DEFENDANT, COUNTERCLAIMANT, AND THIRD PARTY
PLAINTIFF FORTI TO MOTION FOR SUMMARY JUDGMENT BY
PLAINTIFF W.C. & A.N. MILLER AND THIRD PARTY DEFENDANT
HUMBERT

AND

RENEWED MOTION FOR SUMMARY JUDGMENT BY DEFENDANT,
COUNTERCLAIMANT, AND THIRD PARTY PLAINTIFF FORTI

Defendant, Counterclaimant, Third Party Plaintiff Forti strongly opposes the

Addendum contains extremely important and controlling terms of the Offer and
subsequent contract. When George Masson filed this Complaint on behalf of Plaintiff
W.C. & A.N. Miller, he omitted altogether page one of the Offer and subsequent contract,
which contained the Escalator Clause Addendum. These actions speak volumes about
Masson's deceptive litigation tactics.

2.     Forti's Exhibit 1 is the actual Offer by Chong and Zanforlin and subsequent
contract between Buyers and Seller.

3.     Forti's Exhibit 2 is the Escrow Agreement signed by Buyers Chong, Zanforlin,
Don Hadley, outside counsel for W.C. & A.N. Miller, and Seller Forti

4.     Opposing counsel have made an Exhibit a HUD Settlement Sheet that was **NOT**
the final iteration agreed to by Seller Forti. See Forti's Exhibit 3 for the HUD Settlement
Sheet that she agreed to sign and was the final version signed by Buyers and Seller.

5.     Selective use by opposing counsel of some transcript pages and intentional
omission of other transcript pages takes Forti's deposition testimony out of context and
risks distorting her deposition testimony. For these reasons, the entire deposition
transcript should be attached as an exhibit, or Masson should not be allowed to use
selective pages. Forti asks this Court to <u>order</u> George Masson to furnish this Court with
the entire deposition transcript.

6.     Opposing counsel include as Exhibits "Affidavits" by Humbert, Chong, Zanforlin,
settlement attorney Finklestein, and Esther Finklestein. All of these individuals
committed perjury in swearing to these false statements. In addition, Esther Finklestein
was <u>not</u> at the settlement table during the settlement proceeding on Forti's property on

2

April 29, 2002 and has no first-hand knowledge of what was said there or by whom. <u>See</u>

Gant Redmon's Affidavit in Forti's Exhibits for an accurate account—direct from

Finklestein—that Chong, Zanforlin, and Humbert prevented settlement on April 29, 2002

by refusing to escrow the disputed commission.

Respectfully submitted,

Carol A. Forti
Defendant, Counterclaimant, and
Third Party Plaintiff <u>Pro Se</u>
14 West Chapman Street
Alexandria, Virginia 22301

3

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

W.C. & A.N. Miller Development Company
  Plaintiff

   v.

Carol A. Forti
  Defendant/Counterclaimant/Third Party Plaintiff

   v.

June Humbert
4901 Scarsdale Road
Bethesda, Maryland 20816
  Third Party Defendant

   v.

Luisa Zanforlin
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
  Third Party Defendant

   v.

Alberto Chong
2936 Garfield Terrace, N.W.
Washington, D.C. 20008
  Third Party Defendant

Case No. 02ca0004745
Calendar 13, Judge Wright

## RESPONSE BY DEFENDANT/COUNTERCLAIMANT/THIRD PARTY PLAINTIFF FORTI TO MILLER'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE AND REBUTTAL OF MILLER'S POINTS AND AUTHORITIES

### I. INTRODUCTION

By and through counsel Masson, Plaintiff and Third Party Defendant Humbert

have filed a motion for summary judgment that is extraordinary for its deceipt, use of

excerpts from treatises entirely out of context, and wholesale revisionism of well settled

principles of contract law. Plaintiff has consistently used deception as a tool in this litigation. Plaintiff's initial filing of this contract claim intentionally omitted the first page of the contract, which contains the highly important Escalator Clause Addendum. In this motion, Plaintiff makes the page containing the Escalator Clause Addendum a separate exhibit to make it appear that it is not an integral part of the contract. Miller and counsel Masson have tried every means to make the Escalator Clause Addendum "disappear,," because it is so harmful to their claims. However, the Escalator Clause Addendum is an integral part of the Offer and subsequent contract, contains terms that are critical to contract interpretation and legal construction of the contract, and by its stated terms, takes precedence over any conflicting provisions in the contract.

## II.   FORTI'S RESPONSE TO W.C. & A.N. MILLER'S DISTORTED AND MISLEADING  PRESENTATION OF MATERIAL FACTS THAT PLAINTIFF MILLER  CONTENDS ARE NOT IN DISPUTE

This action arises out of a breach of contract by Third Party Defendants Chong and Zanforlin that was encouraged by June Humbert, the Buyers' Broker and an agent of W.C. & A.N. Miller. W.C. & A.N. Miller's support for the Chong/Zanforlin breach of contract is evidenced by the company's filing of this suit for a commission that Seller Forti did not agree to pay Miller or Humbert.

Forti placed an advertisement in the <u>Washington Post</u> in early April 2002 for the sale of her house; the ad included the phrase "co-op 3%." According to well-settled and long-standing principles of contract law, advertisements are <u>not</u> offers; they are solicitations or invitations to make offers. Seller Forti intended the ad to be considered by

2

potential buyers acting as principals on their own behalf as well as potential buyers using

a broker. She set the floor price at $895,000, knowing that in a very "hot" market, which

April 2002 was, with a small inventory of quality homes for sale and high demand,

Buyers would make substantially higher offers than the floor price listed in the paper, and

vie to be selected as the "Best Offer."

  June Humbert saw the ad and made an appointment for Alberto Chong and Luisa

Zanforlin to see Seller Forti's home. (Buyers are referred to hereafter as "Chong" and

"Zanforlin" or "Chong/Zanforlin.") Humbert told Forti that she was the Buyers' Broker

and that she was representing exclusively the interests of Chong and Zanforlin. On behalf

of Chong and Zanforlin, she submitted an Offer to Seller Forti. An integral part of the

Offer was a standard form filled out by Humbert stating that she was the Buyers' Broker

and was representing the Buyers' interests exclusively. Humbert wrote into the Offer that

she was preparing for Chong/Zanforlin: "Commission 3% to be paid to W.C. & A.N.

Miller at settlement." Humbert's phrase does not say who will pay such a commission.

Since Humbert had told Forti that she was the Buyers' Broker and was representing their

interests exclusively and made that disclosure in writing in the Offer, Seller Forti

reasonably believed that the Buyers had agreed to pay their exclusive Broker a

commission. Since the Offer that Humbert prepared was between Buyers Chong/

Zanforlin and Forti, and Buyers were in a Buyer/Broker relationship with Humbert, it

was reasonable for Seller Forti to assume that the phrase referred to an agreement

between Buyers and Broker and that Buyers had agreed to pay Humbert a 3 percent

commission at settlement.

3

The Offer [Exhibit 1] submitted by Humbert to Seller Forti on behalf of Chong/Zanforlin initially offered a purchase price of $915,000, but the first page of the contract contained an Escalator Clause Addendum. The Escalator Clause Addendum automatically increased the Chong/Zanforlin Offer to $5,000 in Net Proceeds over the Net Proceeds of the next highest Offer up to $975,000. Prior to receipt of the Chong/Zanforlin Offer, Seller had received another Offer for Net Proceeds of $945,000 submitted by a principal not using a broker. Seller informed Humbert that the other Offer for Net Proceeds of $945,000 triggered the Escalator Clause Addendum in the Chong/Zanforlin Offer, increasing their Offer to $950,000 in Net Proceeds. Seller Forti also told Humbert that she was accepting the Chong/Zanforlin contract Offer for $950,000 in Net Proceeds. Humbert told Seller that Buyers would be delighted with that good news. After calling the Buyers, Humbert came by Forti's house. She asked to see the other Offer. Forti handed her the other Offer and that potential Buyer's earnest money check for $45,000. Humbert reviewed the other Offer in Forti's kitchen in Forti's presence. She carefully examined the other Offer page by page, and she also examined the earnest money check. Since Forti's fax/copier was not working, Forti offered to take the other Offer and check to a nearby business establishment to get xerox copies made for Humbert. Humbert, however, told Forti that it was not necessary for Forti to get the Offer and check xeroxed, because she was satisfied that the other Offer was a bona fide Offer.

On the page of the Chong/Zanforlin Offer containing the Escalator Clause Addendum, Forti wrote in the figure $950,000, intending it to represent Net Proceeds but neglected to cross out the words "Sales Price," which were printed on the form.

4

By its own terms, the Escalator Clause Addendum in the Chong/Zanforlin Offer assured Forti of Net Proceeds of $950,000 ($5,000 above the Net Proceeds of the next highest Offer). Since the Escalator Clause Addendum assured Forti of Net Proceeds of $950,000, it precluded deduction from Net Proceeds of $950,000 any charges other than the recordation and document preparation fees normally paid by Sellers. In addition, the Escalator Clause Addendum stated very clearly that both "parties agree that the provisions [of the Escalator Clause Addendum] shall supercede any provisions to the contrary in said Contract." For all of these reasons, it was entirely reasonable for Seller Forti to conclude that the Chong/Zanforlin Offer represented Net Proceeds to her of $950,000. No reasonable Seller would select an Offer for $921,500 (950,000 minus a 3 percent commission of $28,500 for "Net Proceeds" of $921,500) when the other Offer assured her of Net Proceeds of $945,000.

Although Seller Forti asked Esther Finklestein, who prepares settlement papers for her husband, settlement attorney Nathan Finklestein, to fax her the HUD settlement sheet 5 days in advance of settlement, Esther Finklestein failed to fax the HUD Settlement Sheet to Forti in advance—as requested. Forti does not believe that this was inadventent error but rather a deliberate decision. Consequently, Forti did not discover until the day of settlement that Humbert had connived with the settlement attorney or his wife to deduct a 3 percent commission for W.C. & A.N. Miller from Forti's Net Proceeds of $950,000, although Seller Forti had not signed any agreement with Miller or Humbert to pay Miller to pay a 3 percent commission. According to contract law, the only way that Seller Forti would be liable for a 3 percent commission to Miller would be if she had

5

entered into a written contract with Miller agreeing to pay a 3 percent commission. Forti never entered into an agreement with Miller or with Humbert to pay a commission. Thus, she does not owe Miller or Humbert any commission.

When Forti saw the deduction of $28,500 from her Net Proceeds of $950,000, she told the settlement attorney, Humbert, and Buyers that she had never agreed to pay Miller or Humbert a 3 percent commission, and she would not send any HUD Settlement Sheet that did not reflect her understanding of the terms of the contract. Settlement attorney Finklestein recommended putting the disputed funds in escrow, so that settlement could proceed. Forti agreed to escrow the disputed funds, so that settlement could proceed, but Humbert adamantly refused and encouraged the Buyers to refuse to escrow the disputed funds, which they did. [See Forti Exhibit 6, Gant Redmon's Affidavit.] Buyers thereby breached the contract by refusing to pay Forti the Net Proceeds of $950,000 promised by their contract. They also breached by refusing to escrow the disputed commission and proceeding to settlement. While Chong and Zanforlin were influenced by Humbert, they were not dupes of Humbert. They have PhD's in economics and work for the World Bank and International Monetary Fund.

On or about May 7, 2002, Richard Agulia, an attorney hired by Chong and Zanforlin, sent Forti a letter threatening to sue for specific performance even though his clients (Chong and Zanforlin), with Humbert's strong encouragement, had prevented settlement. Forti retained Dan Hodin of Paley Rothman to represent her interests since Nathan Finklestein had failed to protect her interests. Hodin told Agulia that Forti was ready and willing to go to settlement as soon as Chong/Zanforlin and W.C. & A.N. Miller

6

agreed to escrow the disputed commission. Agulia informed Hodin that Buyers Chong and Zanforlin and W.C. & A.N. Miller had changed their minds and were then willing to escrow the disputed funds. Agulia and Hodin prepared an escrow agreement [Exhibit 2], and settlement on Forti's property finally took place on May 8, 2002. [Exhibit 3 is the final version of the HUD Settlement Sheet signed by Seller and Buyers.] Signatories to the escrow agreement are Buyers Chong and Zanforlin, Don Hadley, outside counsel for W.C. & A.N. Miller, and Seller Forti. The escrow agreement provides for distribution of these funds through written release of the signatories or in accordance with an order of this Court. George Masson filed this suit on behalf of W.C. & A.N. Miller to demand a 3 percent commission for W.C. & A.N. Miller despite that fact that no contract law or case law supports Miller's claim to a commission.

### III. POINTS AND AUTHORITIES WHICH REFUTE MILLER'S CLAIM FOR A COMMISSION AND SUPPORT FORTI'S POSITION THAT NO COMMISSION IS OWED TO MILLLER OR MILLER'S AGENT, HUMBERT

Forti's rebuttal of W.C. & A.N. Miller's purported legal analysis begins on page 8 of Miller and Humbert's Points and Authorities. Contrary to Plaintiff's contention, Forti's ad in the <u>Washington Post</u> is <u>not</u> an offer, and it is <u>not</u> an offer for a unilateral contract. It is well-settled that advertisements are solicitations to make an offer—not offers themselves. "Advertisements are uniformly regarded as mere preliminary invitations which create no power of acceptance in the recipient." <u>Foremost Pro Color, Inc. v. Eastman Kodak Co.</u>, 703 F.2d 534, 539 (9th Cir. 1983), <u>cert denied</u>, 104 S.Ct 1315, 465 U.S. 1038, 79 L.Ed 2d 712 (1984). The Court of Appeals for the District of Columbia Circuit elaborated on this principle in <u>Mesaros v. United States</u>. In that case,

7

the court stated that advertisements by the United States Mint which solicited orders for

commemorative coins were "no more than invitations to deal." According to the court,

the "great weight of authority" is that "advertisements" are "mere notices and

solicitations for offers which create no power of acceptance in the offeree." <u>Mesaros v.</u>

<u>United States,</u> 845 F.2d 1576, 1580 (D.C. Cir. 1988). "We hold that the Mint

advertisement was not an offer of sale that could be accepted by the plaintiff to create a

contract, and that no contract was made between the plaintiff and the government with

reference to the coins." <u>Mesaros v. United States, supra</u> at 1582. The general rule is that

advertisements are not offers. <u>A Treatise on the Law of Contracts</u> by Samuel Williston,

4th Edition by Richard A. Lord, section 4:7. This rule is grounded on various bases,

including the potential unlimited liability of the offeror is an offer is held to exist,

because Forti had only one house to sell. In virtually all of these cases, a promissory

undertaking is absent and in all of these cases, a reasonable person receiving the

communication has reason to know, from the circumstances under which the

manifestation is made, that no offer exists. The great weight of authority supports the

view that the <u>advertisement for sale of Forti's home</u> in the <u>Washington Post, including</u>

<u>the phrase "co-op 3 %</u> ," [emphasis added] was a solicitation to make an offer—<u>not</u> an

offer creating the power of acceptance. "Courts routinely hold that such advertisements

are solicitations of offers or invitations to enter into a bargain rather than offers

themselves." R. Lord, <u>Williston on Contracts, Id</u>.

    The ad that appeared in the <u>Washington Post</u> was <u>not</u> an offer. Neither was it an

an offer for a unilateral contract, as Plaintiff asserts, which, in Plaintiff's words, "is

8

capable of being accepted by one rendering performance in the manner indicated." A "unilateral contract" is one in which one party makes a promise to a specific individual, and the other party renders an act or forbearance." R. Lord, <u>Williston on Contracts</u>, sec. 4.5. The <u>Washington Post</u> ad was an invitation to all prospective buyers, those acting as principals on their own behalf, and those represented by brokers, to enter into a bargain— <u>not</u> an offer. Plaintiff's string cites on page 9 do not change this fundamental principle of contract law. "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." R. Lord, <u>Williston on Contracts</u>, sec. 26. It is incontrovertible that Forti's <u>Washington Post</u> ad was merely an invitation or solicitation to potential Buyers or Brokers representing Buyers to make an offer. Furthermore, June Humbert, an experienced real estate agent, recognized that the <u>Washington Post</u> ad was not an offer but rather an invitation or solicitation to make an offer. After showing Forti's home to Buyers Chong and Zanforlin, Humbert prepared an Offer for Buyers Chong/ Zanforlin and presented it to Seller Forti, who had the right to accept it or refuse it.

Plaintiff, through counsel, acts deceptively by claiming that the District of Columbia recognizes that a broker is entitled to receive a commission when the broker procures a buyer ready and willing to buy, because that is only true when the Seller agrees in writing, prior to settlement, to pay the broker a commission. Seller Forti never any agreement to pay W.C. & A.N. Miller or Humbert a commission. Given the facts of the instant case, the cases cited by Plaintiff are not on point.

9

"The general principles of law governing the interpretation or construction or contracts generally are applicable to a real estate broker's contract of employment." R. Lord, Williston on Contracts, sec. 62.18. "As with any other contract, the primary object in interpreting a real estate broker's contract is to give effect to the intention of the parties." Id. "A real estate brokerage contract generally arises by virtue of a pre-arranged agreement between the parties." Seller Forti did not enter into a listing agreement with W.C. & A.N. Miller or Humbert to sell her home, and she did not enter into any agreement with either the company or Humbert to pay a 3 percent commission. Only "under a contract" which provides that the "broker is employed [by the Seller]" to find a buyer ready and willing to purchase and provides for a commission for the broker's services in procuring a purchaser," is the broker "entitled to a commission." R. Lord, Williston on Contracts, sec. 6219. Seller Forti did not retain W.C. & A.N. Miller or Humbert to act as Seller's Broker. For Forti to be liable for a 3 percent commission to Miller, Forti would have had to enter into a written agreement with Miller agreeing to pay a 3 percent commission. Forti never signed such an agreement with Miller.

The Escalator Clause Addendum, which is Page 1 of the Contract promised Seller Forti $5,000 in Net Proceeds above the Net Proceeds of the next highest offer, which was for Net Proceeds of $945,000. Thus, the Chong/Zanforlin Offer to Forti was for $950,000 in Net Proceeds. The Escalator Clause Addendum precluded deducting a commission from Forti's Net Proceeds of $950,000. In addition, no reasonable Seller would select the Chong/Zanforlin offer over the next highest offer if a 3 percent commission was to be deducted from $950,000, leaving Seller with Net Proceeds of $921,500 when she would

10

have received $945,000 in Net Proceeds by selecting the next highest Offer.  The

Regional Sales Contract and Addendums were filled in by June Humbert, and the

Escalator Clause Addendum was prepared by an attorney for W.C. & A.N. Miller. "Any

ambiguity [in a contract] with respect to broker's right to a commission will generally be

resolved against the broker." R. Lord, Williston on Contracts, sec. 62.18.   It is well

settled that "ambiguities in a contract are more strictly construed against the drafter. This

rule is especially true when the drafter has greater professional or business knowledge,

such as a real estate broker." R. Lord, Williston on Contracts, sec. 62.18. If Humbert

thought that she was entitled to a 3 percent commission, she should have asked Seller

Forti to sign a contract to that effect. W.C. & A.N. Miller has a standard contract it uses

to bind Sellers to pay a 6 percent listing commission or a 3 percent co-op commission.

[See Forti's Exhibit 4.] All Humbert needed to do was draw a line through the top half of

Page 1 and fill in Broker's Fee. That Humbert she did not ask Forti to sign this contract

strongly suggests that she realized that Forti did not owe any commission or she thought

it was in her interest to leave the matter of a commission ambiguous. In any event,

Humbert created the ambiguity in the contract, and since Humbert is Miller's agent, that

ambiguity, by law, should be construed against Miller.  Again, Plaintiff's string cites do

not change the well-established principle of contract law that Seller must agree in writing,

before or at the time that the Offer to purchase is presented to the Seller, to pay Broker a

commission in order for Seller to be liable for a commission. In the instant case, there

was no such agreement between Seller and W.C. & A.N. Miller or agent Humbert.

The quote attributed to Corbin on Contracts, on Plaintiff's page 10, is

11

inapplicable to the facts of the instant case. Only if Seller Forti had entered into a contract

with Humbert to pay her a 3 percent commission would Forti be liable to pay Humbert a

3 percent commission. Seller Forti did not enter into any agreement with Humbert to pay

a 3 percent commission. The Washington Post ad, including the phrase "co-op 3%" was a

solicitation to make an Offer. As Buyer/Broker for Chong/Zanforlin, Humbert prepared

their contract Offer and presented that Offer to Seller.

At settlement, when it became clear to Forti for the time that there was no meeting

of the minds on an essential term, i.e., that $950,000 represented Net Proceeds to Forti,

Forti, legally, could have voided the Chong/Zanforlin contract and terminated all

negotiations with Buyers. Forti did not void the contract, because, she believes, with the

courts, that reformation of the contract is preferable to voiding the contract. The

quotation attributed to R. Lord , Williston on Contracts, sec. 4.7 is also inapplicable,

because it does not address the facts of the instant case. Although the Washington Post

ad describes the property and states a "floor" for offers, the Post ad was not directed "to

one person individually." Rather, the ad was directed to all interested buyers, whether

acting as principals on their own behalf, or buyers working with a broker.

As proven by the terms of the Escalator Clause Addendum, Buyers believed that

Seller's home was worth $975,000 and expressed a willingness to pay up to that price in

order to have their Offer selected as the winning bid.

After Seller accepted the Chong/Zanforlin Offer for $950,000 in Net Proceeds

over the next highest offer of $945,000 in Net Proceeds, which made it a binding

contract, Humbert and the Buyers, without consulting Seller Forti, connived with the

12

settlement attorney or his wife to draft the HUD Settlement Sheet to deduct a 3 percent commission for Miller from Forti's Net Proceeds. Naturally, Forti refused to sign a settlement sheet that left her with Net Proceeds of $921,500 as opposed to the $950,000 in Net Proceeds promised by the Chong/Zanforlin contract.

Humbert, Chong, and Zanforlin tried to deprive Seller of the benefit of the bargain by attempting to extort a 3 percent commission for Miller although Forti had not agreed to pay Miller a commission. It appears that Humbert, Chong, and Zanforlin, with the connivance of the settlement attorney, thought that they could force Seller Forti to pay a 3 percent commission to Humbert, because there was an Assignment of Proceeds on the sale of Forti's property. [ See Forti's Exhibit 5.] The attorney for the seller of the townhouse that Forti planned to buy had entered into an Assignment of Proceeds with settlement attorney Finklestein, for direct transfer of the balance that Forti owed on the townhouse from proceeds due Forti at settlement on her home. Under the Assignment of Proceeds, Finklestein was to wire the funds directly to the settlement company that Forti was using to buy the townhouse. Humbert, Chong, Zanforlin, and the settlement attorney apparently thought that Forti would be forced to sign a HUD Settlement Sheet that deducted a 3 percent commission for Miller, because Forti would not risk losing the townhouse. Thus, Humbert, Chong and Zanforlin, with the aid of Finklestein, tried to extort a $29,500 commission for Miller from Forti.

Plaintiff, through counsel, beginning on page 13, wastes two and one-half pages on a useless discussion of unilateral offers since unilateral offers, as Forti explained earlier, are not relevant to the instant case. Plaintiff and Plaintiff's counsel refuse to

13

accept the well-settled principle that advertisements are solicitations to make an offer—
not offers themselves, and advertisements create no power of acceptance in the offeree.
Therefore, Seller notes again that this principle of contract law has been upheld by the
Supreme Court and the Court of Appeals for the District of Columbia Circuit.
"Advertisements are uniformly regarded as mere preliminary invitations which create no
power of acceptance in the recipient." Foremost Pro Color, Inc. v. Eastman Kodak Co.,
703 F.2d 534, 539 (9th Cir. 1983), cert denied, 104 S.Ct 1315, 465 U.S. 1038, 79 L.Ed 2d
712 (1984); Mesaros v. United States , supra , in which the Court of Appeals for the
District of Columbia Circuit stated that advertisements by the United States Mint which
solicited orders for commemorative coins are "no more than invitations to deal."

It is correct that Seller Forti wrote in $950,000 intending it to represent Net
Proceeds. She neglected to cross out Sales Price and insert Net Proceeds, but the rules of
contract interpretation and legal construction of contracts requires the trial judge to
consider the contract in its entirety. The "elementary canon of interpretation is that
particular words may not be considered in isolation but that the whole contract must be
brought into view and interpreted with reference to the nature of the obligations between
the parties and the intention which they have manifested in forming them." O'Brien v.
Miller, 18 S.Ct 140, 144, 168 U.S. 287, 297, 42 L.Ed 469, 473 "The law prefers an
interpretation which gives effect to all parts of the contract, rather than one which leaves
a portion of the contract ineffective or meaningless. But where this is not possible, the
court will seek to interpret the contact in a way that will at least effectuate the principal or
main apparent purpose of the parties." R. Lord, Williston on Contracts, sec. 32:9. "In

14

order to carry out the contracting parties' intention, the contract's words may be interpolated, transposed, or even rejected." Id . "Interpolating, omitting, or disregarding certain words can be justified where the remainder of the agreement demonstrates as intention which makes such an interpretation appropriate." Id. See also American Aviation & Gen. Ins. Co. v. Georgia Telco Co. U., 223 F.2d 206, 51 A.L.R. 2d 316 (5th Cir. 1955)(quoting text). The Restatement (Second) of Contracts (current through March 2003), published by the American Law Institute, Section 153 is entitled: "When Mistake of One Party Makes a Contract Voidable." According to the Restatement, "where a mistake of one party was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performance that is adverse to him, the contract is voidable by him if (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake." Forti could have legally voided the contract; however, Forti believed that reformation of the contract rather than avoidance of the contract was more reasonable for both parties. To deny Forti the additional $28,500 that the Chong/Zanforlin contract promised her would be unconscionable. The other party had reason to know of the mistake, because Ms. Forti attempted to reason with Mr. Chong, in order to avoid the time and expense of litigation. However, Mr. Chong refused to listen to reason and referred Ms. Forti to his attorney, Richard Agulia. If the trial judge views the contract in its entirety, including the Escalator Clause Addendum, which "both parties agree takes precedence over any conflicting terms in the contract," the $950,000 figure that Ms. Forti inserted clearly refers to Net Proceeds.

15

The Court of Appeals for the District of Columbia takes the same approach as Williston and the Restatement on interpretation and construction of contracts. "Whether or not a contract is ambiguous is a question of law for the court." Gryce v. Lavine, 675 A.2d 67 (D.C. App. 1996). "If the meaning of the contract is so clear that reasonable men could reach but one conclusion or no extrinsic evidence is necessary to determine the contract's meaning, the contract's interpretation is a matter for the court." Howard University v. Best, 484 A.2d 958 (D.C. App. 1984). "A contract is not rendered 'ambiguous' merely because the parties disagree over its proper interpretation; instead, a contract is ambiguous when, and only when, it is, or provisions in controversy are reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings." Gryce v. Lavine, supra . "Contract language is ambiguous if it is susceptible of more than one reasonable interpretation." American Bldg Maintenance Co. v. L'Enfant Plaza, 655 A.2d 858 (D.C.App. 1995). "If the contract is ambiguous, its language should be read in light of all surrounding facts and circumstances, including the conduct of the parties." Id. "When a court is faced with an integrated agreement which contains ambiguous terms, the standard of interpretation is what a reasonable person in the position of the parties would have thought it meant." Howard University v. Best, supra at 484 A.2d 958 (D.C. App. 1984). Interpreting the $950,000 as net proceeds is consistent with the promises made by Buyers to Seller in the Escalator Clause Addendum of the sales contract. Interpreting $950,000 as Sales Price with no deduction for a commission is also consistent with the expectations of a reasonable person in the position of the Seller. Interpreting $950,000 as Sales Price and deducting a $28,500 commission

16

for Miller, which Seller did <u>not</u> agree to pay, is unconscionable. Humbert had reason to know that Forti had simply made a mistake by not crossing out the words "Sales Price," which was already on the printed form and writing in the words, "Net Proceeds." Nevertheless, Miller has unreasonably and without any legal authority to support their position, persisted in trying to cheat Ms. Forti out of the $28,500 held in escrow plus interest on the funds in escrow. Miller is also liable to Forti for the legal fees she incurred from Vernon Johnson at Jackson & Campbell when Miller filed this baseless claim and had Masson litigate it aggressively.

With respect to Plaintiff's footnote 12, Defendant/Counterclaimant has no obligation, based on contract law or common law, to pay Miller a 3 percent commission for all of factual and legal reasons explained earlier. Any neutral person reading the entire contract presented to Seller would reach the same conclusion that Seller reached regarding the disputed commission.

Seller's offer to pay Humbert $4,000 is NOT an admission that she owed a 3 percent commission. Seller knew that she did not owe Humbert a 3 percent commission. She had no legal obligation to pay Humbert anything. She offered to pay Humbert $4,000 for introducing two credit worthy buyers to her, while the quality of her home sold itself. Humbert did not ask Forti to sign the standard contract that W.C. & A.N. Miller provides to its agents in dealing with Sellers, which, if the Seller was willing, would obligate the Seller to pay a commission. That proves that she knew that she was not owed a commission, or, if she believed that she was entitled to a commission but failed to ask Forti to sign a contract to pay her 3 percent, she created the ambiguity that, by law, must

17

be construed against Miller. Seller had no contract with Miller to pay Miller a 3 percent commission, and Seller owes no commission.

Restatement (Second) of Contracts provides guidance to the trial court. The basic rule for mistake of both parties as to is expression is stated in section 155. "It allows reformation where the parties are mistaken in thinking that a writing correctly expresses an agreement that they have previously reached." Id. " Under the rule stated in section 156, the Statute of Frauds does not prevent reformation as an equitable remedy." Id. "Section 156 states a rule that is substantially more liberal than that of former section 509 in allowing reformation in spite of the Statute of Frauds." Id. "If there is a mistake of only one party as to expression"...[and] "his mistake is in believing that a writing correctly expresses that agreement, the problem is one of the effect of the [other party's] failure to disclose this fact. This is dealt with in sections 160-61, in which non-disclosure [by the other party] may be tantamount to misrepresentation." Id.

According to the Restatement Second of Contracts, the "law of mistake was shaped largely by courts of equity which had broad discretionary powers." Id. "Flexibility marks the rules [of mistake] as evidenced by such necessarily imprecise language as 'materially' (section 152) and 'unconscionable'." (section 153). Id. "Section 158 makes clear that if these rules will not suffice to do substantial justice, it is within the discretion of the court to grant relief on such terms as justice requires." Id.

## IV. CONCLUSION

W.C. & A.N. Miller's purported "Points and Authorities" have no legal merit.

18

There is no support whatsoever in contract law for Miller's claim to a commission. In an attempt to support its groundless claim, Miller, through its counsel, has stooped to taking quotes from legal treatises totally out of context, citing case law that does not apply to the facts of the instant case, and engaging in revisionism of well settled contract law. The legal positions that it advances in support of its Motion for Summary Judgment have been rejected by the Supreme Court, the Court of Appeals for the District of Columbia Circuit, and the Court of Appeals for the District of Columbia. Plaintiff has taken Williston on Contracts (4th Edition by R. Lord) out of context repeatedly. Williston on Contracts and the Restatement (Second) of Contracts provide no support for the vacuous legal arguments concocted by Plaintiff. On the other hand, Williston on Contracts and the Restatement (Second) of Contracts strongly support the legal principles advanced by Defendant/ Counterclaimant/Third Party Plaintiff Forti. For all of the legal reasons advanced in Forti's prior Motion for Summary Judgment and for all of the legal arguments presented here in rebuttal and in Opposition to W.C. & A.N. Miller's motion, Defendant and Counterclaimant Forti asks this Court to treat her prior Motion for Summary Judgment and this Opposition/Rebuttal as a Renewed Motion for Summary Judgment and prays that this Court will grant her Renewed Motion for Summary Judgment.

Respectfully submitted,

Carol A. Forti
Defendant, Counterclaimant, and
Third Party Plaintiff Pro Se

19