# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CAROL A. FORTI,**
14 West Chapman Street
Alexandria, VA 22301
703.535.5449
        Plaintiff

     **v.**

**GEORGE MASSON, JR. (COUNSEL TO**
   **W.C. & A.N. MILLER)**
Hamilton and Hamilton LLP
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
        Defendant


**HAMILTON AND HAMILTON LLP (COUNSEL TO**
   **W.C. & A.N. MILLER)**
1900 M Street, N.W.—Suite 410
Washington, D.C. 20036-3532
        Defendant,

**RICHARD AGULIA**
**(COUNSEL TO CHONG AND ZANFORLIN)**
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006
        Defendant,

**JEFFREY HARDIE**
**(COUNSEL TO CHONG AND ZANFORLIN)**
Hunton & Williams, LLP
1900 K Street, N.W.
Washington, D.C. 20006
        Defendant,

**NATHAN FINKELSTEIN**
**(SETTLEMENT ATTORNEY)**
Finkelstein & Horvitz, P.C.
7315 Wisconsin Avenue
Suite 400 East
Bethesda, MD 20814
        Defendant,

Civil Action No. 1:06CV00613
JR

**FINKELSTEIN & HORVITZ, P.C.**
**(SETTLEMENT ATTORNEYS)**
7315 Wisconsin Ave., N.W.
Suite 400 East
Bethesda, MD 20814
        Defendant.

## SECOND AMENDED COMPLAINT

### JURISDICTION

This case is properly before this court based on complete diversity among the

litigants. The amount in controversy also exceeds the statutory minimum.

### SECOND AMENDED COMPLAINT

1.      Forti is suing George Masson, Jr. and the law firm of Hamilton and Hamilton

LLP, who represented W.C. & A.N. Miller and Humbert. She is suing Richard Agulia and

Jeffrey Hardie, who represented Chong and Zanforlin. She is suing Nathan Finkelstein

and the law firm of Finkelstein & Horvitz P.C., who were supposed to act as her

settlement attorneys but instead acted illegally to benefit Miller. Instead of serving as

Forti's settlement attorneys, Finkelstein and Finkelstein & Horvitz actually served as the

settlement attorneys for Chong and Zanforlin

2.      Forti is suing all defendant attorneys for furthering and participating in civil fraud,

conspiracy to commit civil fraud, and intentional infliction of severe emotional distress.

She is suing George Masson Jr., Hamilton and Hamilton LLP, Richard Agulia, and

Jeffrey Hardie for the intentional tort of abuse of process. All of these tortious acts were

committed with fraud, ill will, recklessness, and willful disregard of Forti's rights.

3.      The causes of action in Forti's Second Amended Complaint are raised for the first

2

time in United States District Court. The defendant attorneys were not parties to the

action in Superior Court. Thus, Forti's causes of action are not barred by res judicata.

Neither are her causes of action barred by the principle of collateral estoppel. The issues

to be decided by Judge Robertson are not the same as those decided in Superior Court and

the defendant attorneys are not in privity with parties to the action in Superior Court.

Neither is the three-year Statute of Limitations a bar to Forti's claims against the

defendant attorneys. On 07/25/05, George Masson demanded attorney's fees in the

amount of $84,340.71 for his legal work in Superior Court and in the Court of Appeals.

On the same date, Richard Agulia demanded attorney's fees in the amount of $73,773.93

for the legal services of Agulia and Hardie in Superior Court and the Court of Appeals.

Forti paid those attorney's fees on 07/25/05 to remove a lien placed on her retirement

property in Maryland by Masson and Agulia and to prevent the property from being sold

at auction. Forti's Complaint was filed on 04/03/06.  Thus, Forti's Complaint against the

defendant attorneys is well within the three-year Statute of Limitations.

4.    The Chong/Zanforlin Purchase Offer/Contract included an Escalator Clause

Addendum. The Escalator Clause Addendum promised to pay Forti $5,000 in net

proceeds above the net proceeds of the next highest Purchase Offer. Since the next

highest Purchase Offer from Mr. J.W. Silas was for $945,000 in NET PROCEEDS, the

Chong/Zanforlin offer automatically escalated from $915,000 to $950,000 in NET

PROCEEDS. Since the Escalator Clause Addendum promised Forti $950,000 in Net

Proceeds, the Escalator Clause Addendum precluded any deduction from $950,000 in Net

Proceeds of a commission for Miller.

3

5.     Forti had hired Finkelstein to serve as her settlement attorney. Approximately two weeks before settlement on April 29, 2002, Forti advised Finkelstein that she did not owe Miller a commission and directed him to make sure that the HUD Settlement Sheet reflected that fact. Forti also left a message for Finkelstein directing him to fax the HUD Settlement Sheet to her at least five days in advance of the settlement date. As her settlement attorney, Finkelstein had a fiduciary obligation to Forti. Finkelstein, however, ignored both of these instructions. He made no effort to return either of Forti's calls.

6     Finkelstein did not fax the HUD Settlement Sheet to Forti in advance of settlement as Forti had directed, because Finkelstein and Humbert did not want Forti to see that the HUD Settlement Sheet deducted a commission for Miller. Consequently, Forti did not see the HUD Settlement Sheet until the day of settlement on April 29, 2002.

7.     Finkelstein informed Humbert that there was an Assignment of Proceeds on the sale of Forti's property in which part of Forti's proceeds from the sale of her property would go directly to the settlement company to pay the balance that Forti owed on the townhouse that she was buying. Finkelstein and Humbert obviously believed that the Assignment of Proceeds would provide excellent leverage to force Forti to pay a commission to Miller that she did not owe, and they used the Assignment of Proceeds in an attempt to force Forti to pay a commission to Miller or risk losing the townhouse.

(Gant Redmon, attorney for the seller of the townhouse that Forti was buying insisted that there be an Assignment of Proceeds on the settlement transaction on Forti's property. Since Forti did not tell Humbert that there was an Assignment of Proceeds on Forti's property, Humbert could have only learned this from Finkelstein.)

4

8. Finkelstein played a key role in injuring Forti by drawing up a HUD Settlement Sheet that provided a commission to Miller out of what should have been $950,000 in Net Proceeds to Forti since Forti did not owe Miller a commission and Miller was barred by D.C. Code and District of Columbia case law from receiving a commission.

9. When Forti saw the HUD Settlement Sheet and she saw that Finkelstein had deducted a 3 percent commission for Miller from what was supposed to be 950,000 in Net Proceeds to Forti, she was furious. She told Finkelstein, Humbert, Chong, and Zanforlin that she would not sign a HUD Settlement Sheet that did not accurately reflect the Contract that she had signed with Chong and Zanforlin to pay her $950,000 in Net Proceeds for title to her property.

10. As a fallback position when Forti refused to sign the HUD Settlement Sheet giving a commission to Miller, Finkelstein proposed putting the disputed commission in escrow. Forti reluctantly agreed to that proposal, because she had not anticipated fraud and, consequently, had not arranged alternative funding for the townhouse on which she was going to settlement that same day. Humbert, however, adamantly refused to escrow the disputed commission and go to settlement, and she persuaded Chong and Zanforlin not to escrow the disputed commission. Humbert engaged in tortious interference with contract, and Chong and Zanforlin breached their contract with Forti by refusing to pay her $950,000 in Net Proceeds on April 29, 2002 as the Contract required.

11. After telling Finkelstein, Humbert, Chong, and Zanforlin that she would not sign any HUD Settlement Sheet that did not accurately reflect the terms of her Contract with Chong and Zanforlin, Forti left Finkelstein's offices for a walk-through of the townhouse

5

in Alexandria followed by settlement on her townhouse at noon on April 29, 2002.

12.    In the days that followed this abortive settlement on Forti's property, Finkelstein

kept the pressure on Forti on behalf of Miller and Humbert. Finkelstein phoned Forti and

warned her that she "had better sign the HUD Settlement Sheet," because "she did not

want to lose the townhouse."

13.    Forti spent eight frantic days trying to obtain alternative funding for the

townhouse, but no mortgage company could provide funding in such a short period of

time.

14.    During the week following the abortive settlement on Forti's property on April

29, 2002, Richard Agulia sent Forti a letter threatening to sue her for specific

performance even though his clients, Chong and Zanforlin were the parties who had

breached the contract and prevented settlement on Forti's property on April 29, 2002 by

refusing to pay Forti $950,000 in Net Proceeds and by refusing to escrow the disputed

commission.

15.    On or about May 8, 2002, Miller, Humbert, Chong, and Zanforlin changed their

minds. They decided that they would agree to escrow the disputed commission, and on

May 8, 2002, Chong, Zanforlin, and Forti signed the settlement papers on Forti's

property.

16.    Richard Agulia prepared the escrow account with some input from Dan Hodin,

who represented Forti at settlement and with respect to the escrow agreement. Agulia put

into escrow the disputed commission for $28,500 (3 percent of $950,000) plus alleged

costs of Chong and Zanforlin (property taxes and interest on their loan), so that the

6

escrow account totaled $29,850.70, but Agulia refused to make the escrow account equally beneficial to Forti.

17.    Finkelstein conspired with Masson, Agulia, and Hardie to commit civil fraud against Forti by giving Agulia an affidavit from his wife, Esther Finkelstein, the settlement coordinator in Finkelstein's office, which contained many false statements. Esther Finkelstein's affidavit was written with the intention of supporting the conspiracy among Masson, Agulia, and Hardie to defraud Forti of the money in the escrow account, including the $28,500 disputed commission. Contrary to the false statements in Esther Finkelstein's affidavit, Forti told Esther Finkelstein that she did not owe Miller any commission and to make sure that the HUD Settlement Sheet reflected that fact.

18.    After being sued by Miller for a commission, Forti impleaded Humbert, Chong, and Zanforlin as third party defendants in order to be made whole. Her causes of action against Chong and Zanforlin were for breach of contract and for compensatory and consequential damages.

19.    Forti did not owe a commission to Miller. Forti ran an advertisement in the Washington Post listing her house for sale. The ad included the phrase "co-op 3 %." The Supreme Court and the Court of Appeals for the District of Columbia Circuit have stated unequivocally that advertisements are solicitations to make offers or invitations to bid and that they are not offers. According to the Supreme Court, "advertisements are uniformly regarded as mere preliminary invitations to bid which create no power of acceptance in the recipient." Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 539 (9th Cir. 1983), cert denied, 104 S.Ct 1315, 465 U.S. 1038, 79 L.Ed 2d 712 (1984). According

to the Court of Appeals for the District of Columbia Circuit, the "great weight of authority" is that "advertisements" are "mere solicitations for offers which create no power of acceptance in the offeree." Mesaros v. United States, 845 F.2d 1576, 1580 (D.C. Cir. 1988). The general rule is that advertisements are not offers. A Treatise on the Law of Contracts by Samuel Williston, 4th Edition by Richard A. Lord, West Group, section 4:7. In virtually all of these cases, a "promissory undertaking is absent and in all of these cases, a reasonable person receiving the communication has reason to know, from the circumstances under which the manifestation is made, that no offer exists." Id. Thus, the Supreme Court and the Court of Appeals for the D.C. Circuit support the conclusion that Forti's advertisement in the Washington Post for sale of her home, including the phrase "co-op 3 %," was a solicitation to make an offer—not an offer creating the power of acceptance in the recipient.

20.    Even if it is business practice in the real estate industry to use co-op 3 percent to refer to a commission, Supreme Court law always takes precedence over trade practices.

21.    June Humbert, an experienced agent for Miller, recognized that the ad was an invitation to bid or solicitation to make a Purchase Offer and she prepared a Purchase Offer for Chong and Zanforlin and presented it to Forti.

22.    Since the ad was a solicitation to make an offer and not an offer itself, it could not be an offer for a unilateral contract, as Masson contended. Judge Wright's conclusion that Forti's ad was an offer for a unilateral contract that was satisfied by Humbert's procurement of buyers is not only wrong on the law but also applied only to Miller, Humbert, Chong, and Zanforlin. Judge Wright's conclusion has no bearing on Forti's

8

causes of action against the defendant attorneys. The Court of Appeals did not address the

question as whether Forti's ad was an invitation to make offers or an offer for a unilateral

contract. The Court of Appeals merely affirmed Judge Wright's order granting summary

judgment to Miller for a commission and affirmed Judge Wright's dismissal of Forti's

claims against Chong and Zanforlin for breach of contract and compensatory and

consequential damages.

23.     Miller was barred by D.C. Code and District of Columbia case law from receiving

a commission. D.C. Code and District of Columbia case law forbid receipt of a broker's

commission unless there is a written employment agreement between the seller and

broker or a written principal/agent agreement in which the seller agrees to pay the broker

a commission for procuring buyers. According to D.C. Code section 42-1705, "A licensee

(i.e. Miller ) shall not receive payment of a commission in the absence of a written listing

agreement." See p. 1 of 1, Disclosure of Brokerage Relationship in the Purchase

Offer/Contract in which June Humbert identifies Miller as the "licensee." The District of

Columbia Court of Appeals has interpreted this Code provision to require proof of an

employment contract between seller and broker in which the seller agrees to pay the

broker a commission for procuring buyers before a broker may receive a commission.:

"One seeking to obtain compensation as an agent must prove his contract of employment

before he can recover for work done for an alleged principal. The fact that one is the

procuring cause of a sale does not entitle him to a commission unless he had authority to

sell." Eggleton v. Vaughan, 45 A.2d 362, 363 (D.C. App. 1946) [Emphasis added.] There

was no employment contract between Forti and Miller. In Fred Ezra Co. v. Pedas, 682

A.2d 173, 176 (D.C. App. 1996), the Court of Appeals for the District of

Columbia said that "in order for a broker, as agent, to recover against a seller, as

principal, the broker must first establish that they voluntarily entered into a principal-

agent relationship that gives rise to the broker's contractual right to a commission." Forti

did not enter into a principal-agent relationship with Miller or sign an agreement with

Miller promising to pay a commission for procuring buyers. Since Forti did not sign an

employment contract with Miller or sign a principal/agent agreement with Miller agreeing

to pay a commission for procuring buyers, Forti did not owe Miller a commission, and

Miller was barred by D.C. Code and District of Columbia case law from receiving a

commission.

24.    Judge Wright's decision to grant summary judgment to Miller for a commission

and to dismiss Forti's claims against Chong and Zanforlin for breach of contract and

compensatory and consequential damages did not address the applicable case law nor was

the case law addressed by the Court of Appeals.

25.    Even if one assumes that Judge Wright considered the relevant case law but did

not address it in his Order, his Order only applies to Miller, Humbert, Chong, and

Zanforlin—not the defendant attorneys. Judge Wright's Order has no relevance to Forti's

causes of action against the defendant attorneys.

26.    Nathan Finkelstein held himself out as qualified to handle settlements in the

District of Columbia. He knew or had a duty to know D.C. Code and District of Columbia

case law applicable to settlements in the District of Columbia. He knew or had a duty to

10

know that District of Columbia case law barred receipt of a commission without proof of a written employment contract or a principal /agent relationship and written agreement promising to pay a commission for procuring buyers. He knew that Forti had not signed an employment contract with Miller and had not entered into a principal/agent relationship with Miller or signed an agreement promising to pay a commission for procuring buyers. Although he had a fiduciary responsibility to Forti as her settlement attorney, he ignored his fiduciary responsibility and drew up a HUD Settlement Sheet that treated the $950,000 in Net Proceeds as Sales Price and deducted a $28,500 commission for Miller out of Forti's Net Proceeds of $950,000. By drawing up the HUD Settlement Sheet in this manner, Finkelstein conspired with Humbert, Chong, and Zanforlin to deprive Forti of the $950,000 in Net Proceeds that she was owed under the Chong/Zanforlin contract.

27.    Humbert reviewed the next highest Purchase Offer from Mr. J.W. Silas for $945,000 in Net Proceeds in Forti's kitchen and went through the Purchase Offer page by page in Forti's presence. She also reviewed the earnest money check for $45,000 that accompanied the Purchase Offer. Forti offered to have the Purchase Offer and earnest money check xeroxed for Humbert, but Humbert said that was not necessary, because she was satisfied that the other Purchase Offer was bona fide. Only after Forti had refused to pay Miller a 3 percent commission at settlement on April 29, 2002 did Masson, Agulia, and Hardie challenge the bona fide nature of the other Purchase Offer. As the buyer/broker for Chong/Zanforlin, it was Humbert's duty to determine whether or not the other Offer was bona fide at the time the Offer was made, and she determined that it was

bona fide.

28.     In violation of the contract principle of mutual mistake, the defendant attorneys

took advantage of a mistake (known to both parties) when seller Forti wrote in $950,000

next to NEW SALES PRICE on the printed form of the Escalator Clause Addendum of

the Purchase Offer/Contract but did not cross out NEW SALES PRICE  and write in

NET PROCEEDS in its place. Since Forti had received another Purchase Offer from Mr.

J.W. Silas for $945,000 in NET PROCEEDS, the Escalator Clause Addendum

automatically raised the Chong/Zanforlin Purchase Offer from $915,000 to $950,000 in

NET PROCEEDS." Adding $5,000 in Net Proceeds to $945,000 in Net Proceeds was the

basis for Forti writing in $950,000 on the page of the Purchase Offer containing the

Escalator Clause Addendum, referring obviously to Net Proceeds. The failure by

Finkelstein, Humbert, Chong, and Zanforlin to acknowledge Forti's simple mistake was

intentional misrepresentation to Forti. The insistence by Masson, Agulia, and Hardie that

the $950,000 represented Sales Price from which a commission could be deducted was

intentional misrepresentation to Superior Court and the Court of Appeals. In pleadings

filed with the District Court, all the defendant attorneys have repeated the

misrepresentation that the contract price was $950,000 from which a commission could

be deducted instead of acknowledging that the contract price was $950,000 in Net

Proceeds. Judge Wright did not deal with the issue of mistake and neither did the Court

of Appeals.

29.     Forti did not raise the issue of conspiracy in Superior Court, and Judge Wright's

order did not deal with conspiracy. All Judge Wright's Order did was grant summary

judgment to Miller on the commission and dismiss Forti's claims against Chong and Zanforlin for breach of contract and compensatory and consequential damages.

30.     According to the terms of the Escalator Clause Addendum, Chong and Zanforlin offered to pay Forti $5,000 in Net Proceeds above the Net Proceeds of the next highest offer for title to her property.   Webster's New Collegiate Dictionary defines "net" as "free from all charges and deductions." Since the next highest offer was for 945,000 in NET PROCEEDS, Chong and Zanforlin promised to pay Forti $950,000 in NET PROCEEDS. Agulia and Hardie admitted in their Answer, p.3, line 15 that $950,000 in Net Proceeds was the Contract Price.

31.     According to first sentence of the text of the Escalator Clause Addendum, "the parties agree that the following provisions are incorporated into the referenced Contract and shall supercede any provisions to the contrary in said Contract." Thus, the provisions of the Escalator Clause Addendum take precedence over any conflicting provisions in the Contract, including the phrase that June Humbert inserted: "3 % commission to Miller at settlement."

32.     The phrase, "commission 3 % to be paid to W.C. & A.N. Miller at settlement" does not say who is to pay a commission. "Any writing that does not specify who is to pay the commission is void for vagueness, because that is an essential term." American Jurisprudence, Second Edition, section 43.

33.     Humbert identified herself to Forti at their first meeting as the buyer's broker and stated that she represented their interests exclusively, an identification that she memorialized on page 1 of 1 of the Disclosure of Brokerage Relationship of the Purchase

Offer. For all of these reasons, Seller Forti reasonably assumed, when she selected the

Chong/Zanforlin Purchase Offer over the next highest Purchase Offer that the phrase

written into the contract by Humbert referred to some prior agreement between buyers

Chong and Zanforlin and broker Humbert for the buyers to pay Miller a 3 percent

commission.

34.     Forti was also damaged substantially by Finkelstein's provision to escrow the

disputed funds. Forti was forced to accede to an escrow arrangement, because she had not

anticipated fraud and had not arranged alternative funding for the townhouse that she was

buying in a settlement scheduled for April 29, 2002—the same day as settlement on her

property at 2936 Garfield Terrace N.W.

35.     Finkelstein drew up the HUD Settlement Sheet and provided for a commission for

Miller with the clear intent of forcing Forti to pay a commission that she did not owe.

Apparently, Finkelstein was willing to defraud Forti for the opportunity to obtain further

settlement business from Miller. It seems likely that Humbert offered Finkelstein further

settlement business if he would draw up the HUD Settlement Sheet to provide Miller with

a commission and followed through on that quid pro quo. During the action in Superior

Court, Forti served Masson with subpoenas addressed to Miller and Humbert to turn over

information regarding any settlement business between Miller and Finkelstein following

Finkelstein's action on behalf of Miller in the settlement proceeding between Forti and

Chong/Zanforlin. Masson adamantly refused all requests for the subpoened information in

gross violation of court rules. Masson's refusal to comply with these subpoenas permits

the inference that Finkelstein was willing to defraud Forti in order to obtain additional

14

settlement business from Miller.

36.     George Masson, Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie,

Nathan Finkelstein, and Finkelstein & Horvitz are all liable to Forti for furthering and

participating in civil fraud and for conspiracy to commit civil fraud. The District of

Columbia recognizes civil fraud and conspiracy to commit civil fraud. The elements of

common law fraud are (1) false representation (2) of a material fact (3) which is made

with knowledge of its falsity (4) with intent to deceive (5) on which the victim took

justified reliance upon the misrepresentation. Bennet v. Kiggins, 377 A. 2d 57, 59 (D.C.

App.1977) cert denied 434 U.S. 1034, 98 S.Ct 768, 54 L Ed 2d 782 (1978) Humbert,

Chong, and Zanforlin made false representation of a material fact that Chong and

Zanforlin would pay $950,000 in Net Proceeds for title to Forti's property with

knowledge of its falsity and with intent to deceive. Although the Purchase Offer/Contract

was signed on April 15, 2002, Humbert, Chong, and Zanforlin did not disclose to Forti

that they were treating the $950,000 as Sales Price from which a commission could be

deducted until April 29, 2002, the date of settlement. Forti took justifiable reliance upon

the misrepresentation, which resulted in substantial financial injury to Forti. "Non-

disclosure or silence as well as active misrepresentation may constitute fraud." Bennett v.

Kiggins, supra at 60. "A false representation may be either an affirmative

misrepresentation or a failure to disclose a material fact when a duty to disclose that fact

has arisen." Rothenberg v. Aero Mayflower Transit Co., 495 F. Supp 399, 406 (D.D.C.

1980). These facts contain all the elements of civil fraud. Richard Agulia, Jeffrey Hardie,

George Masson, Jr., and Nathan Finkelstein all knew that civil fraud had been

perpetrated against Forti by their clients. They all knew that Forti had selected the

ChongZanforlin Offer over the next highest Offer for $945,000 in net proceeds only

because it offered $950,000 in net proceeds. They ignored the unambiguous terms of the

Escalator Clause Addendum of the Chong/Zanforlin Purchase Offer/Contract, which can

only be interpreted as offering Forti $950,000 in Net Proceeds. They furthered that fraud

by treating the $950,000 as "Sales Price" from which a commission could be deducted.

They furthered that fraud by ignoring all the facts and the case law which prove that Forti

did not owe Miller a commission. "Civil conspiracy requires an (1) agreement between

two or more persons (2) to participate in an unlawful act (3) an injury caused by an

unlawful act performed by one of the parties to the agreement (4) which overt act was

done pursuant to and in furtherance of the common scheme." Halbertstam v. Welch, 705

F. 2d 472, 479 (D.C. Cir 1983). "Once a conspiracy has been formed, all of its members

are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy."

Halbertstam v. Welch, supra at 481. The defendant attorneys did not merely advise. They

knew of their clients' wrongful conduct and they actively participated in that wrongful

conduct. Finkelstein conspired with Humbert, Chong, and Zanforlin to deprive Forti of

the $950,000 in Net Proceeds that she was owed at settlement on April 29, 2002 under the

Chong/Zanforlin contract. He ignored Forti's call advising him that she did not owe a

commission to Miller and her instruction to make sure that the HUD Settlement Sheet

reflected that fact. Finkelstein drew up a HUD Settlement Sheet that provided a

commission for Miller of $28,500. Finkelstein and Humbert used the Assignment of

Proceeds on the sale of Forti's property as leverage in an attempt to force Forti to pay a

16

commission to Miller that she did not owe. Since Forti refused to pay a commission to

Miller that she did not owe, she was deprived of the proceeds by which she planned to

pay the balance that she owed on the townhouse on which she was going to settlement

that same day. Forti spent eight frantic days trying to obtain alternative funding for the

townhouse but no mortgage company could provide funding in such a short period of

time. She almost lost the townhouse. Forti was forced to agree to escrow the disputed

funds, because she had not anticipated fraud and had not arranged alternative funding for

the townhouse. Finkelstein conspired with Humbert, Chong, and Zanforlin to benefit

Miller and injure Forti. Finkelstein also conspired with Masson, Agulia, and Hardie to

commit civil fraud against Forti by giving Agulia an affidavit from his wife, Esther

Finkelstein, the settlement coordinator in Finkelstein's office, which contained many

false statements. Esther Finkelstein's affidavit was written with the intention of

supporting the conspiracy among Masson, Agulia, and Hardie to defraud Forti of the

money in the escrow account, including the $28,500 disputed commission. Contrary to

the false statements in Esther Finkelstein's affidavit, Forti told Esther Finkelstein that she

did not owe Miller any commission and directed her and Nathan Finkelstein to make sure

that the HUD Settlement Sheet reflected that fact. For all of the foregoing conduct, Forti

sues Finkelstein for furthering civil fraud, conspiracy to commit civil fraud, and

intentional infliction of severe emotional distress. Richard Agulia, Jeffrey Hardie, George

Masson Jr., and Hamilton and Hanilton conspired with each other against Forti and

furthered that civil fraud by litigating a colorless, wanton suit against Forti to defraud her

of $29, 850.70 in the escrow account.  They litigated wantonly and maliciously against

17

Forti for three years in order to defraud her of the $29, 850.70 in the escrow account, and they succeeded in defrauding her of that amount. They forced Forti to pay a commission to Miller that she did not owe. Their common actions in conspiring against Forti and in litigating wantonly and maliciously against Forti for three years to defraud her of the amount in escrow showed that there was an agreement among these defendants to act unlawfully and their overt tortious acts caused severe financial injury to Forti. These facts satisfy all the elements of conspiracy to commit civil fraud.

37.    Forti sues George Masson, Jr., Hamilton and Hamilton, Richard Agulia, and Jeffrey Hardie for intentional infliction of severe emotional distress.

38.    Forti sues George Masson, Jr., Hamilton and Hamilton, Richard Agulia, and Jeffrey Hardie for the intentional tort of abuse of process. According to Brown v. Hamilton, 601 A. 2d 1074, 1079 (D.C. App 1992), the tort of abuse of process lies when the legal system "has been used to accomplish some end which is without the regular purview of the process or which compels the party against whom it is used to do some collateral thing which he could not legally be required to do." By means of this litigation, Forti was forced to pay Miller a commission even though Miller was barred from receiving a commission by D.C. Code and case law by the District of Columbia Court of Appeals. The language of Williams v. City Stores Co., 192 A.2d 534, 537 is virtually identical. "To charge an abuse of process, there must be a perversion of court processes to accomplish some end which the process was not intended by law to achieve, or which compels the party against whom it has been used to do some collateral thing which he could not legally be compelled to do." Forti did not legally owe Miller a commission, but

court process was used to force Forti to pay Miller a commission."

39.     Attorneys are liable for the intentional tort of abuse of process. The privilege an attorney has for his actions in representing a client is a qualified one that does not extend to the intentional tort of abuse of process. McElhanon v. Hing, 728 P.2d 256, 264 (Ariz. App 1985) cert denied 481 U.S. 1030, 107 S.Ct. 1956, 95 L. Ed 2d 529 (1987). Masson, Agulia, and Hardie are liable to Forti for the intentional tort of abuse of process.

40.     All the defendant attorneys submitted sworn affidavits to Superior Court that contained many false statements. See Exhibit C to Forti's Motion for Summary Judgment. Agulia and Hardie conspired with Masson against Forti, most conspicuously in their Motions for Summary Judgment. In support of Miller's motion for summary judgment, Masson filed a perjured affidavit by Humbert, who claimed that Forti had refused to escrow the disputed commission when, in fact, it was Chong and Zanforlin who prevented settlement by refusing to pay Forti the $950,000 in Net Proceeds that they promised her in their Purchase Offer/Contract and by refusing to escrow the disputed funds. Humbert also lied in saying that she did not persuade Chong and Zanforlin to breach their contract a second time on April 29, 2002 by refusing to escrow the disputed funds so that settlement could proceed, although that is precisely what she did. Agulia and Hardie filed perjured affidavits signed by Chong and Zanforlin with Superior Court in support of their motion for summary judgment. The affidavit by Zanforlin claimed that Forti had refused to put the disputed commission into an escrow account, which was utterly false. Zanforlin also misrepresented the contract price as $950,000 when it was actually $950,000 in Net Proceeds. She also lied in claiming that she did not conspire with attorney Finkelstein and

19

Humbert to extort a commission for Miller, when that is exactly what she did. The affidavit by Chong also misrepresented that the contract price was $950,000 when, in fact, it was $950,000 in Net Proceeds. Agulia and Hardie also filed with Superior Court an affidavit by Esther Finkelstein that was prepared by Nathan Finkelstein. Contrary to the false statements in Esther Finkelstein's affidavit, Forti told Esther Finkelstein that she did not owe Miller any commission and to make sure that the HUD Settlement Sheet reflected that fact. Esther Finkelstein, who was not even present at the settlement proceedings itself and had no personal knowledge of what took place at settlement, also swore, "At no time do I recall Ms. Forti suggesting that the disputed commission be placed in escrow to facilitate the closing." The fact is that after the buyers refused to tender Forti the $950,000 in Net Proceeds that they owed her under the contract, Forti reluctantly agreed to escrow the disputed amount so that settlement could proceed. There is no question that the affidavits by Humbert, Zanforlin, and Esther Finkelstein contained false statements, because Chong and Zanforlin, who had filed affidavits containing false statements with the trial court, subsequently admitted in another pleading that it was "Humbert who disagreed with placing the disputed commission into an escrow account and that Chong and Zanforlin also disagreed with placing the disputed commission into an escrow account."

41.    At the time that this case was being heard in Superior Court, there was no security for pleadings filed with Superior Court. Illegally removed from the File Room in the Civil Action Branch of Superior Court were Forti's most significant pleadings. They included Forti's Opposition to Miller's Motion for Summary Judgment; Forti's

Opposition to Chong and Zanforlin's Motion for Summary Judgment; Forti's Rebuttal of

Miller's Points and Authorities; Forti's Rebuttal of Chong and Zanforlin's Points and

Authorities; Forti's Renewed Motion for Summary Judgment, and subpoenas duces tecum

addressed to Miller and Humbert, which called for information on any settlement business

that Miller provided to Finkelstein following the settlement transaction between Forti and

Chong/Zanforlin.  The pleadings filed in Superior Court are the pleadings used to prepare

the Record on Appeal. See Exhibit D to Forti's Motion for Summary Judgment. The

docket sheet prepared by the Civil Action Branch of Superior Court records the filing of

each of the specified pleadings by Forti and the date on which she filed the pleading. Forti

asks Judge Robertson to compare the docket sheet with the INDEX/CLERK'S

CERTIFICATION prepared by the Appeal Coordinator's Office as part of the Record on

Appeal. Each of the specified pleadings is conspicuously missing from the

INDEX/CLERK'S CERTIFICATION. These pleadings were obviously removed from the

File Room of the Civil Action Branch sometime after they were filed by Forti and before

the Appeal Coordinator's Office prepared the INDEX/CERTIFICATION for the Court of

Appeals. Since no one but Masson, Agulia, and Hardie had a motive to remove these

pleadings and there is no other reasonable explanation for their disappearance, these facts

lead to the inevitable conclusion that these pleadings were removed by the named

attorneys.  Theft by these attorneys of Forti's most important pleadings caused the Court

of Appeals to reach an erroneous decision. The decision in the Court of Appeals was

procured by fraud upon the court. Although Forti attempted to bring to the attention of the

Court of Appeals the fact that her most important pleadings had been removed illegally

21

from the File Room of the Civil Action Branch before the record on appeal was sent to
the Court of Appeals, the Court of Appeals never dealt with the theft issue and affirmed
the lower court decision based on a grossly incomplete record.

42.    Although the Escalator Clause Addendum promised Forti $950,000 in Net
Proceeds, Masson, Agulia, and Hardie conspired against Forti and litigated wantonly and
maliciously through affidavits that were perjured and pleadings that grossly
misrepresented the facts to defraud Forti of $29,850.70 in the escrow account.

43.    The defendant attorneys badly injured Forti economically, and they did so
deliberately with evil motive, with malice, and with willful disregard for Forti's rights. As
a result of the litigation, Forti was left with NET PROCEEDS of $921,500. No reasonable
seller would select an offer worth $921,500 in NET PROCEEDS when she had an offer
for $945,000 in NET PROCEEDS, and Forti is a reasonable seller.

44.    Forti knew that she did not owe Miller a commission, and she told Humbert so in
a letter. She offered to pay Humbert $4,000 for introducing credit-worthy buyers to her
home and for arranging the Purchase Offer.

45.    By making an initial offer of $915,000 and having it escalate automatically to
provide $5,000 in net proceeds above the net proceeds of the next highest offer up to
$975,000, the clear intention of the buyers and broker in using the Escalator Clause
Addendum was to have this offer selected over all other offers in a very "hot" market
with a small inventory of homes for sale.

46.    The Escalator Clause Addendum offered net proceeds of $5,000 above the net
proceeds of the next highest offer. Since the next highest offer was for net proceeds of

$945,000, the Chong/Zanforlin contract promised net proceeds of $950,000. The intention of seller Forti was to accept the Chong/Zanforlin offer for $950,000 in net proceeds.

47.     A reasonable person in the situation of the promisee (seller Forti) would interpret the Chong/Zanforlin contract as offering $950,000 in net proceeds. Otherwise, she would have no reason to select the Chong/Zanforlin contract over the next highest offer, which promised $945,000 in net proceeds.

48.     June Humbert, the buyers' broker, told seller Forti that the Escalator Clause Addendum was prepared by an attorney for W.C. & A.N. Miller. Humbert, an agent of W.C. & A.N. Miller, wrote the Purchase Offer that she submitted to seller Forti on behalf of Chong and Zanforlin.

49.     Since Masson and Hamilton and Hamilton had no legal basis for filing a suit against Forti for a commission on behalf of Miller, they had no legal basis for suing Forti for attorney's fees.

50.     Chong and Zanforlin's duty under the Contract was to pay Forti $950,000 in NET PROCEEDS. Instead, they breached their contract and refused to pay Forti $950,000 in Net Proceeds on April 29, 2002. Since Chong and Zanforlin had no legal basis to litigate against Forti, Agulia and Hardie had no legal basis for claiming attorney's fees for their representation.

51.     Since Masson, Agulia and Hardie no legal basis for claiming attorney's fees, Masson, Agulia, and Hardie's action in placing a lien on Forti's retirement property in Maryland was a further demonstration of malice toward Forti.

52.     Although the courts in this jurisdiction normally follow the American Rule with

23

each party responsible for its attorney's fees, there is one notable exception. That is the

bad faith exception, which permits an award of attorneys' fees against a party who has

acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." <u>Synanon</u>

<u>Foundation , Inc. v Bernstein</u>, 517 A. 2d  28, 36 (D.C. App. 1986). "Filing of a frivolous

claim or the manner in which the claim is subsequently litigated would justify an award of

bad faith attorney's fees." <u>Synanon</u>, <u>supra</u> at 39. <u>See also</u> <u>Jemison v. National Baptist</u>

<u>Convention et al.</u>, 720 A.2d 275, 285.  "An action is brought in bad faith when the claim

is entirely without color and has been asserted wantonly, for purposes of harassment or

delay, or for other improper reasons." <u>Synanon</u>, <u>supra</u> at 40.

53.     George Masson, Jr. and Hamilton and Hamilton LLP filed suit against Forti in

bad faith since they had no basis in fact or law to claim a commission for Miller. George

Masson Jr's complaint against Forti was entirely without color and was asserted

wantonly, to harass Forti, and for the improper purpose of defrauding her of the amount in

escrow.

54.     Agulia and Hardie's litigation against Forti was also wanton and oppressive. It

was designed to harass Forti and had the improper motive of defrauding Forti of the

amount in escrow so that Chong and Zanforlin would not have to pay a commission to

Miller.

55.     The Supreme Court has stated that "if in the informed discretion of the court,

neither the statute or the rules are up to the task, the court may safely rely on its inherent

power" to sanction those who engage in bad faith conduct in the course of the litigation.

<u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 50, 11 S.Ct. 2123, 115 L.Ed. 27 (1991).

56.    Masson, Hamilton and Hamilton LLP, Agulia and Hardie should be required to pay Forti her "opportunity costs" of having to defend against this wanton and malicious lawsuit. Since Forti's hourly rate is $275 per hour, Masson, Hamilton and Hamilton, Agulia, and Hardie are jointly liable to Forti for $180,557 in opportunity costs. If Forti was not forced to spend her time responding to this lawsuit, she could have earned this amount by performing legal services for clients in Pennsylvania, where she is licensed.

57.    Forti sues Finkelstein for the $330 that he fraudulently charged her in settlement fees, because he proved so untrustworthy that Forti had to hire Dan Hodin of Paley Rothman to represent her at the actual settlement on May 8, 2002 and with respect to the escrow agreement.

58.    Finkelstein, and Finkelstein & Horvitz are jointly liable to Forti for the $1,412.50 that she had to pay Dan Hodin of Paley Rothman to draw up an escrow agreement and to represent her at settlement on her property on May 8, 2002. Finkelstein and Finkestein & Horvitz are also jointly liable to Forti for the $616.46 that she had to pay in interest to the seller of the townhouse, because there was no settlement on her property on April 29, 2002. Settlement did not take place until May 8, 2002.

59.    Masson and Hamilton and Hamilton are jointly liable to Forti for the $1,875 in legal fees she had to pay Vernon Johnson of Jackson & Campbell whom she retained as First Chair in case this baseless litigation went to trial.

60.    Masson, Hamilton and Hamilton, Agulia, and Hardie are jointly liable to Forti for the $29,850.70 in the escrow account from which they defrauded Forti plus interest on that amount from May 8, 2002 to the present.

25

61.    Masson, Agulia, and Hardie compounded their malice against Forti by suing for attorney's fees. Masson claimed that he had to sue to obtain a commission from which Miller was actually barred by D.C. Code and District of Columbia case law.  George Masson, Jr. and Hamilton and Hamilton LLP are jointly liable to Forti for the $84,340.71 that she had to pay in attorney's fees.

62    Richard Agulia and Jeffrey Hardie are jointly liable to Forti for the $73,773.93 that she had to pay in attorney's fees.

63.    In <u>Jemison v. National Baptist Convention, Inc. et al</u>, 720 A.2d 275, 284 (D.C. App 1998), the District of Columbia Court of Appeals decided that repayment of attorney's fees in defending against bad faith litigation is properly treated as compensatory damages for purpose of computing punitive damages.

64.    Masson, Agulia, and Hardie further compounded their malice against Forti by placing a lien on Forti's retirement property in Maryland and threatened to have the sheriff's office sell it at auction to pay off the lien.

65.    Masson, Hamilton and Hamilton, Agulia and Hardie are jointly liable to Forti for the $10,629 that she had to pay McNamee Hosea to represent her, work out a settlement agreement, and remove the lien.

66.    While compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct, punitive damages are aimed at deterrence and retribution. Punitive damages may be imposed to further a state's legitimate intent in punishing unlawful conduct and deterring its repetition." <u>Id.</u>  In <u>Marshall v. Marshall</u>, 126 S. Ct. 1735, 164 L.Ed 2d 480, 2006 Lexis 3456, the Supreme

26

Court affirmed a District Court's decision in awarding $44.3 million in compensatory damages and, based on overwhelming evidence of "willfulness, maliciousness, and fraud," awarded an equal amount in punitive damages.

67.    In determining the amount of punitive damages, the Supreme Court has instructed courts to consider, among other factors, "whether the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, or deceit." State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 1516, 155 L.Ed 2d 585 (2003). In the instant case, Forti was certainly financially vulnerable. Not having anticipated fraud, she had not arranged alternative financing for the townhouse. She almost lost the townhouse. The Assignment of Proceeds was used as leverage in an attempt to force her to pay Miller a commission that she did not owe. The malicious, wanton conduct of Masson, Hamilton and Hamilton, Agulia and Hardie in litigating against Forti to defraud her of the amount in escrow lasted three years, including the appeal process.

68.    The harm to Forti was the result of intentional malice, trickery, and deceit.

69.    Punitive damages are clearly available under District of Columbia law for the torts of furthering and participating in civil fraud, conspiracy to commit civil fraud, abuse of process, and intentional infliction of severe emotional distress. In Robinson v. Sarisky, 535 A.2d 901, 906 (D.C. App. 1988), the District of Columbia Court of Appeals stated: "Punitive damages may be awarded for tortious acts aggravated by evil motive, actual malice, or for outrageous conduct in willful disregard of another's rights."

27

70.    "The requisite state of mind need not (and usually cannot) be proven by direct evidence but may be inferred from all the facts and circumstances of the case." Id.

71.    In Jemison v. National Baptist Convention, 720 A.2d 275 (D.C. App 1998), the District of Columbia Court of Appeals reaffirmed that "punitive damages are warranted" when defendants "commit a tortious act 'accompanied by fraud, ill will, recklessness or in willful disregard of the plaintiff's rights'." Jemison, supra at 276, f.n. 10 citing to Washington Medical Center v. Holle, 573 A.2d 1269, 1284 (D.C.App 1990).

72.    "Whether punitive damages will lie depends on the intent with which the wrong was done and not on the extent of the actual damages" Jemison, supra at 285. The Court can "infer the requisite state of mind from the surrounding circumstances." Jemison, supra at 285-286. There is abundant evidence of recklessness, bad faith, and improper motive by the defendant attorneys.

73.    George Masson, Jr., Hamilton and Hamilton LLP, Richard Agulia, Jeffrey Hardie, Nathan Finkelstein, and Finkelstein & Horvitz are all liable to Forti for furthering and participating in civil fraud and conspiracy to commit civil fraud. All of the defendant attorneys are also liable to Forti for intentional infliction of severe emotional distress.

74.    George Masson, Jr., Hamilton and Hamilton, Agulia and Hardie are also liable to Forti for the intentional tort of abuse of process.

75.    All the defendant attorneys committed these tortious acts with fraud, ill will, recklessly, maliciously, and in willful disregard of Forti's rights

76.    All the defendant attorneys are liable to Forti for punitive damages. Plaintiff Forti seeks punitive damages against George Masson Jr. and Hamilton and Hamilton LLP in

28

the amount of 6 million dollars each. She seeks punitive damages against Richard Agulia

and Jeffrey Hardie in the amount of $6 million each, and she seeks punitive damages

against Nathan Finkelstein and Finkelstein and Horvitz P.C. in the amount of $6 million

dollars each.

Exhibits to the Second Amended Complaint are the same exhibits that were filed

with the Amended Complaint.

Respectfully submitted,

Carol A. Forti
Plaintiff pro se
14 West Chapman Street
Alexandria, VA 22301
703.535.5449

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have served George Masson, Jr., Richard Agulia,
Jeffrey Hardie, and Nathan Finkelstein with a copy of this Second Amended Complaint
by first-class mail, postage prepaid on September 20, 2006.

Carol A. Forti